IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION D/B/A ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION OF PHILADELPHIA | : : : : : | CIVIL ACTION |
| | : | Case No. 2:24-cv-06348 |
| YO DELI, INC. | : : | |
| BEST BEER, INC. | : : | ***Jury Trial Demanded*** |
| SKY BEER DELI, INC. | : : | |
| MAYA INVESTMENT GROUP, LLC | : : | |
| 7701 OGONTZ, INC. | : : | |
| CDD 725, INC. | : : | |
| and | : : | |
| ARAB AMERICAN BUSINESS ASSOCIATION AND PROFESSIONAL ASSOCIATION OF THE DELAWARE VALLEY | : : : : : | |
| Plaintiff, | : : | |
| v. | : : | |
| CITY OF PHILADELPHIA | : : | |
| COMMONWEALTH OF PENNSYLVANIA | : : | |
| PENNSYLVANIA STATE POLICE BUREAU OF LIQUOR CONTROL ENFORCEMENT | : : : | |
| and | : : | |
| PENNSYLVANIA LIQUOR CONTROL BOARD | : : : | |
| Defendants. | : : : | |

## ORDER

AND NOW, this _____ day of _____, 2024, upon consideration of Plaintiffs'
Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery, and
the Court having found as follows:

1.      Plaintiffs have shown a likelihood of success on the merits of their claims.

2.      That substantial, immediate and irreparable harm to Plaintiffs, in the form of,
among other things, adverse action from the Pennsylvania Liquor Control Board or the
Philadelphia Police Department that threatens to permanently close Plaintiffs' established
businesses arbitrarily and without adequate due process, is likely to occur unless the injunctive
relief requested is granted.

3.      That the grant of the injunctive relief requested will not result in greater harm to
Defendants than to Plaintiffs if injunctive relief is not granted.

4.      That granting the requested injunctive relief is in the public interest.

**THEREFORE**, it is **ORDERED** as follows:

1.      Plaintiffs' Motion for Temporary Restraining Order, Preliminary Injunction, and
Expedited Discovery is GRANTED.

2.      Defendants shall preserve all documents and information in whatever form it exists
relevant to the claims in the Verified Complaint, including, without limitation, all correspondence,
emails, and text messages related to enactment and enforcement of the state and local laws
identified in Plaintiffs' Verified Complaint, all records of inspections or citations issued under
those laws, and all internal correspondence relating to the process for ;

3.      Defendants are ENJOINED from continuing their unlawful and discriminatory
treatment of Plaintiffs, including the selective enforcement of state and local laws, specifically the

Curfew and Nuisance Ordinances, and prohibiting any further harassment, intimidation, or retaliation related to Plaintiffs' business operations, until further order of the Court.

4.    Defendants are ENJOINED from denying or obstructing the renewal of Plaintiffs' liquor licenses or business permits based on discriminatory, unconstitutional, or unlawful criteria, including the improper application of the Curfew and Nuisance Ordinances;

5.    Stay all proceedings related to the renewal of Plaintiffs' liquor licenses and/or the "temporary licenses" issued to Plaintiffs pending resolution of this matter;

6.    Within ten (10) days of the date of this order, Defendants shall produce to Plaintiffs all documents and correspondence related to the allegations in the Verified Complaint, including but not limited to correspondence, emails, and text messages from January 1, 2018, to present related to the enactment and enforcement of the state and local laws identified;

7.    Defendants shall make themselves available for depositions at the office of Plaintiffs' counsel at a mutually convenient date within ten (10) days of compliance with paragraph 5 above;

8.    A preliminary injunction hearing shall be scheduled for a date and time mutually convenient to the parties and this Court, no earlier than January 25, 2024.

9.    Plaintiffs shall post a bond in the amount of $5,000 as security pursuant to Fed. R. Civ. P. 65(c).

10.    This ORDER shall remain in effect until further ORDER of this Court.

IT IS SO ORDERED.

BY THE COURT:


_____
, U.S. District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION D/B/A ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION OF PHILADELPHIA | : : : : : | CIVIL ACTION |
| | : | Case No. 2:24-cv-06348 |
| YO DELI, INC. | : : | |
| BEST BEER, INC. | : : | ***Jury Trial Demanded*** |
| SKY BEER DELI, INC. | : : | |
| MAYA INVESTMENT GROUP, LLC | : : | |
| 7701 OGONTZ, INC. | : : | |
| CDD 725, INC. | : : | |
| and | : : | |
| ARAB AMERICAN BUSINESS ASSOCIATION AND PROFESSIONAL ASSOCIATION OF THE DELAWARE VALLEY | : : : : : | |
| Plaintiff, | : : | |
| v. | : : | |
| CITY OF PHILADELPHIA | : : | |
| COMMONWEALTH OF PENNSYLVANIA | : : | |
| PENNSYLVANIA STATE POLICE BUREAU OF LIQUOR CONTROL ENFORCEMENT | : : : | |
| and | : : | |
| PENNSYLVANIA LIQUOR CONTROL BOARD | : : : | |
| Defendants. | : : | |

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY**

Plaintiffs, Asian-American Licensed Beverage Association D/B/A Asian-American Licensed Beverage Association Of Philadelphia ("AALBA"), Yo Deli, Inc., Best Beer, Inc., Sky Beer Deli, Inc., Maya Investment Group, LLC, 7701 Ogontz, Inc., CDD 725, Inc. and Arab American Business And Professional Association Of The Delaware Valley ("AAB"), by and through their undersigned counsel, hereby move this Court for a Temporary Restraining Order, Preliminary Injunction, and  Expedited Discovery against Defendants, City of Philadelphia, Commonwealth of Pennsylvania, Pennsylvania State Police Bureau of Liquor Control Enforcement and Pennsylvania Liquor Control Board, enjoining Defendants from continuing their unlawful and discriminatory treatment of Plaintiffs, including the selective enforcement of state and local laws, and prohibiting any further harassment, intimidation, or retaliation related to Plaintiffs' business operations and from denying or obstructing the renewal of Plaintiffs' liquor licenses or business permits based on discriminatory, unconstitutional, or unlawful criteria, including the improper application of Philadelphia's Curfew and Nuisance Ordinances. In support of the motion, Plaintiffs rely on the accompanying memorandum of law.

WHEREFORE, for the reasons stated in the accompanying memorandum of law, incorporated herein by reference, Plaintiffs request that the Court issue a Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery against Defendants in the form attached to this motion.

**KANG HAGGERTY LLC**

*/s/ Kyle Garabedian*
Edward T. Kang
Kyle Garabedian
Kelly Lavelle
Kang Haggerty LLC
123 South Broad Street, Suite 1950
Philadelphia, Pennsylvania 19109
(215) 525-5850 (tel)
(215) 525-5860 (fax)
ekang@kanghaggerty.com
kgarabedian@kanghaggerty.com
klavelle@kanghaggerty.com
*Counsel for Plaintiffs*

Dated: November 26, 2024

3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION D/B/A ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION OF PHILADELPHIA | : : : CIVIL ACTION : : |
| YO DELI, INC. | : Case No. 2:24-cv-06348 : |
| BEST BEER, INC. | : *Jury Trial Demanded* : |
| SKY BEER DELI, INC. | : : |
| MAYA INVESTMENT GROUP, LLC | : : |
| 7701 OGONTZ, INC. | : : |
| CDD 725, INC. | : : |
| and | : : |
| ARAB AMERICAN BUSINESS ASSOCIATION AND PROFESSIONAL ASSOCIATION OF THE DELAWARE VALLEY | : : : : : |
| Plaintiff, | : : |
| v. | : : |
| CITY OF PHILADELPHIA | : : |
| COMMONWEALTH OF PENNSYLVANIA | : : |
| PENNSYLVANIA STATE POLICE BUREAU OF LIQUOR CONTROL ENFORCEMENT | : : : |
| and | : : |
| PENNSYLVANIA LIQUOR CONTROL BOARD | : : : |
| Defendants. | : : |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY**

Plaintiffs, Asian-American Licensed Beverage Association D/B/A Asian-American Licensed Beverage Association Of Philadelphia ("AALBA"), Yo Deli, Inc.,  Best Beer, Inc., Sky Beer Deli, Inc., Maya Investment Group, LLC, 7701 Ogontz, Inc., CDD 725, Inc. and Arab American Business And Professional Association Of The Delaware Valley ("AAB"), submit this Memorandum of Law in support of their Motion for a Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery against Defendants, City of Philadelphia, Commonwealth of Pennsylvania, Pennsylvania State Police Bureau of Liquor Control Enforcement and Pennsylvania Liquor Control Board.

## I.    INTRODUCTION

This matter stems from the unlawful deprivation of Plaintiffs' constitutionally protected rights under the First, Fifth and Fourteenth Amendments to the United States Constitution and the equivalent sections of the Pennsylvania Constitution by intentionally and purposefully enforcing laws in a discriminatory manner against Plaintiffs and others. With state and local authorities acting in concert, Defendants seek to shut down businesses that are overwhelmingly owned by Asian Americans and Arab Americans through the passage of vague ordinances that carry draconian punishments. At the same time, state actors seek to strip these same businesses of their liquor licenses by any means necessary, which will effectively shutter the targeted businesses. The ordinances and regulations are then enforced in a discriminatory manner, often arbitrarily finding violations based on absurd applications of the law, or suddenly finding violations for conditions that had been approved in the past. Those violations are then used as a basis to threaten the businesses with closure or the loss of the licenses that they depend on to survive.

Defendants, including the City of Philadelphia, have a deeply rooted history of discriminating against Asian Americans and Arab Americans, which is unfortunate given the City's claimed protection for immigrants and other racially or ethnically oppressed people. Indeed, behind its façade, the City has long been discriminating against Asian Americans and Arab Americans, who are law-abiding citizens trying to make an honest living. Defendants have engaged in selective and invidious discrimination against certain groups and their businesses in Philadelphia, including Plaintiffs, through the adoption, administration, and enforcement of certain state and local laws, described more fully herein, resulting in Plaintiffs being unconstitutionally deprived of due process and equal protection of the laws in violation of 42 U.S.C. §1983 and of Article 1, §§ 1, 20, 26 and 29 of the Pennsylvania Constitution. The state and local laws were enacted to target and discriminate against certain groups and their businesses in Philadelphia. The state and local laws are so vague and overbroad that persons of ordinary intelligence must necessarily guess as to their meaning and differ as to their application.

The vague and unequal application of these laws makes it so that even being the *victim* of a crime can subject these businesses to punishment, up to and including the immediate closure of the business. Further, the state and local laws have been selectively enforced against minority groups and their businesses. As a result of the unconstitutionally vague and overbroad state and local laws and selective enforcement of such, certain groups and their businesses have been required to pay fines and are at risk of losing their liquor licenses and have otherwise been damaged and will continue to suffer injury.

For these reasons, in this lawsuit, Plaintiffs seek injunctive relief barring the City of Philadelphia and the Commonwealth of Pennsylvania from enforcing the state and local laws against Plaintiffs in a manner that deprives them of due process and equal protection.

## II.    <u>FACTUAL BACKGROUND</u>

Plaintiff Asian-American Licensed Beverage Association D/B/A Asian-American Licensed Beverage Association Of Philadelphia ("AALBA") is an association of businesspeople, all of whom have been granted a license from Defendant, PLCB, licensing them to sell and dispense alcoholic beverages, including malt and brewed beverages, under the provisions of the Pennsylvania Liquor Code. Compl. ¶ 28. The members of the AALBA, including Plaintiffs, Yo Deli, Inc., Best Beer, Inc., Sky Beer Deli, Inc., Maya Investment Group, LLC, 7701 Ogontz, Inc. and CDD 725, Inc., hold their licenses either in their individual names or in the form of a business corporation they own and control. Compl. ¶¶ 14-19, 29. Further, the members of the AALBA are largely of Asian-American heritage and are licensed to sell and dispense alcoholic beverages, including brewed beverages, in the City of Philadelphia. Compl. ¶ 30. AALBA members hold their licenses through their individual names or the names of a business entity. Compl. ¶ 31. There are approximately 110 members of the AALBA representing a similar number of liquor licenses. Compl. ¶ 32.

Plaintiff AAB is an association of business people, many of whom have been granted a license from the PLCB, licensing them to sell and dispense alcoholic beverages, including malt and brewed beverages, under the provisions of the Pennsylvania Liquor Code. Compl. ¶ 33. Additionally, members of AAB operate various convenience stores and similar businesses throughout Philadelphia. Their operations depend on maintaining flexible business hours, serving the community at times when traditional grocery stores have closed. Compl. ¶ 34. The members of the AAB hold their licenses either in their individual names or in the form of a business entity they own and control. Compl. ¶ 35.

Many members of the Plaintiff organizations run establishments that have completed the Liquor Control Board application and secured licenses to operate as either a retail dispenser (R-Licenses (also known as a "Restaurant License")) or an eating place retail dispenser (E license). Compl. ¶ 36. Plaintiffs operate from licensed premises approved by the PLCB and the City of Philadelphia acting through the City of Philadelphia's Department of Licenses and Inspections. 47 P.S. §§ 4-407, 4-442. Compl. ¶ 37. At all times, Plaintiffs' members were operating in a legal manner. Compl. ¶ 38.

Upon information and belief, all actions taken by the Defendants against the Plaintiffs were due to a purposeful campaign between and among the Defendants herein with a specific goal of preventing Plaintiffs from operating. Compl. ¶ 39. Defendants have tirelessly made efforts to inhibit Plaintiffs' business operations, selectively enforcing laws and ordinances for the express purpose of driving Plaintiffs out of business. Compl. ¶ 40. The overwhelming majority of the impacted businesses are owned by racial minorities, specifically Asian and Arab Americans. Compl. ¶ 41. Actions taken by and on behalf of the Defendants, individually and collectively, against Plaintiffs' lawful business operations, include but are not limited to:

a. Selective enforcement of laws and ordinances targeted at Plaintiffs;
b. Facially unfair and biased administration of those laws and ordinances intended to prevent Plaintiffs from complying in good faith as a pretext to impose penalties (up through and including the loss of a license or the closure of the business);
c. Repeated Police Department and BLCE visits to the Plaintiffs' establishments for unannounced inspections;
d. Discriminatory and harassing conduct by the Police Department and BLCE.

Compl. ¶ 42. Upon information and belief, the Police Department and the BLCE had no registered complaints involving the Plaintiffs' establishments. Compl. ¶ 43. Despite the absence of registered complaints, the Police Department and the BLCE continually targeted Plaintiffs' establishments. Compl. ¶ 44.

Due to the concerted and purposeful efforts of the Defendants, Plaintiffs have struggled to stay open for business and are at risk of losing the liquor licenses. Compl. ¶ 45. Plaintiffs have been unable to operate in a manner originally conceived and approved by the City of Philadelphia and the Liquor Control Board. Compl. ¶ 46. Accordingly, Plaintiffs have sustained and will continue to sustain a substantial loss of business due to the adverse effect of the unlawful conduct of Defendants. Compl. ¶ 47. Defendants' arbitrary and capricious conduct unjustly deprives Plaintiffs of their fundamental and constitutionally protected rights under the Constitution of the United States and the Constitution of the Commonwealth of Pennsylvania, violating due process and equal protection guarantees. Compl. ¶ 48.

### History of Regulations of "Stop-and-Go" Establishments

The City of Philadelphia has a longstanding history of scrutinizing and regulating minority-owned (namely, Asian or Arab Americans) businesses, including so-called "stop-and-go" establishments. Compl. ¶ 49. In 1987, enforcement of alcohol sales at these establishments shifted from the Pennsylvania Liquor Control Board to the Pennsylvania State Police, creating the Pennsylvania State Police Bureau of Liquor Control Enforcement. Sections 211 and 472 of the Act of April 12, 1951 (P.L. 90, No. 21), known as the Liquor Code, re-enacted and amended June 29, 1987 (P.L. 32, No. 14). Compl. ¶ 50. In 1990, the PLCB introduced the Nuisance Bar Program, which allows the PLCB to deny license renewals in an effort to remove "problem bars" from communities. Pennsylvania Liquor Control Board, Nuisance Bar Program, https://www.lcb.pa.gov/Licensing/Topics-of-Interest/Pages/Nuisance-Bar-Program.aspx. Compl. ¶ 51. Then, in 2005, Governor Ed Rendell signed into law Act 39 of 2005, amending the  Liquor Code to require all licensed establishments in the City of Philadelphia that sell malt or brewed alcoholic beverages for consumption off-premises to first obtain approval from the Philadelphia

City Council. Compl. ¶ 52. Only with the approval of City Council by way of a special permit may licensees apply to the PLCB for permission to continue such sales. Compl. ¶ 53. The pertinent provisions of Act 39 of 2005 are outlined in Sections 407 and 442 of the Liquor Code, 47 P.S. §§ 4-407 and 4-442, which include requirements for licensing. Compl. ¶ 54.

That same year, Philadelphia's former Mayor John A. Street enacted an ordinance mandating an 11 p.m. curfew for businesses on residential streets. Phila. Code § 9-627. Compl. ¶ 55. Section 9-627, enacted to address "nuisance retail shops, such as take-out and convenience stores, was amended by the Philadelphia City Council in 2007 to specifically target "take-out restaurants" situated on corner lots at street intersections. *Id.* Compl. ¶ 56. In 2018, a lawsuit was filed by twenty-three local Chinese take-out restaurant owners against the City of Philadelphia, challenging the 11 p.m. curfew ordinance under  Philadelphia Code section 9-627 as unconstitutional for its alleged discriminatory intent and enforcement against Asian Americans. *See Liu v. City of Philadelphia*, 2:18-cv-04900-MMB (E.D. Pa. November 13, 2018). Compl. ¶ 57. The former curfew ordinance was overwhelmingly and selectively enforced against Chinese-owned businesses. Compl. ¶ 58. Upon information and belief, 80%-90% of the citations issued under the former curfew ordinance in 2015-2016 were issued against Asian or minority-owned businesses, while similar businesses were allowed to operate without issue. Compl. ¶ 59. The case settled, with the City agreeing to suspend curfew enforcement and provide police training on implicit bias and effective communication with limited English-proficient community members. Compl. ¶ 60.

Unfortunately, the passage of time has done little to quell the anti-Asian and other minority sentiments that motivated the passage and selective enforcement of the earlier ordinance. Compl. ¶ 61. In the wake of the pandemic and ever-increasing geopolitical tensions in Asia and the Middle

East, time has only increased anti-Asian and anti-Arab sentiment. Compl. ¶ 62. Further evidence

of this is reflected in the proposed plans to develop a new 76ers arena in Chinatown, which poses

a serious threat to the survival of this historic Asian-American neighborhood. Compl. ¶ 63. As set

forth in greater detail below, the City of Philadelphia has renewed its discriminatory conduct by

passing a new suite of curfew laws and an overbroad nuisance ordinance that discriminates against

minority-owned businesses. Compl. ¶ 64.

In 2023, the Pennsylvania Stop-and-Go Legislative Task Force ("Task Force") was

established to review and recommend solutions regarding these establishments. 47 P.S. § 218.

Compl. ¶ 65. On information and belief, no members of the Asian or Arab communities were

members of the Task Force or had a substantial voice in the process that followed. Compl. ¶ 66.

In response to ongoing concerns over "stop-and-go" establishments, the Pennsylvania General

Assembly passed Act 44 of 2017 (Act 44), expanding PLCB oversight through the Licensee

Compliance Program ("Compliance Program") and the creation of the PLCB Bureau of Licensing.

Compl. ¶ 67. The Compliance Program introduced the Investigation & Suspension Process, which

mandates seating and food service compliance in such establishments and permits the PLCB and

law enforcement to perform unannounced inspections, with the authority to suspend or revoke

licenses for noncompliance.[1] Compl. ¶ 68. The Task Force defines "stop-and-go establishment"

as establishments that are: (i) legal holders of restaurant or R-licenses; and (ii) a convenience store

or deli that sells beer and liquor, sometimes in quantities as low as a single shot, that may be

consumed on premises or immediately outside the establishment. 47 P.S. § 218(h)(1). Compl. ¶

69.

---

[1] *See* Pennsylvania Liquor Control Board, Licensee Compliance Program, https://www.lcb.pa.gov/Licensing/Documents/Complete%20Licensee%20Compliance%20Program%20Guide%20for%20Licensees.pdf.

In October 2024, the Task Force issued its Report and Recommendations, advising the General Assembly of guidelines for legislative remedies to regulate "stop-and-gos," including streamlining the citation processes, strengthening the Compliance Program, increasing penalties and fines, and recruiting more BLCE agents. *See* Exhibit A. Compl. ¶ 70. Notably, the Report and Recommendations provide an alternative definition for stop-and-go establishments as "a Commonwealth licensee which holds either a restaurant liquor (R) license or an eating place retail dispenser (E) license and receives at least two violations for failing to act as a bona fide restaurant or eating place within a 12-month period." *See* Exhibit A, Report and Recommendations, pg. 9 (citing *770 Ameribeer, Inc. v. Pennsylvania Liquor Control Bd.*, 318 A.3d 998 (Pa.Cmwlth. 2024)). Compl. ¶ 71. As of 2024, the Pennsylvania General Assembly continues to review these regulations, with some legislators advocating for fairer enforcement practices to avoid discrimination. Compl. ¶ 72.

Many of the targeted establishments are owned and operated by immigrants and minority entrepreneurs. The heightened regulations place an undue burden on small business operators, leading to the closure of businesses that cannot meet the stricter standards. This, in turn, has led to claims of economic discrimination and disparate impact. Compl. ¶ 73. Moreover, the Task Force has acknowledged that the supposed problems with "stop-and-go" businesses that it seeks to address are limited to Philadelphia, where such establishments are overwhelmingly minority-owned. Compl. ¶ 74. On information and belief, license holders in other parts of Pennsylvania are not subject to the same repeated scrutiny as minority-owned businesses located in Philadelphia. Compl. ¶ 75.

## Statutory and Regulatory Requirements
### The Liquor Code

Most businesses selling alcohol are licensed under the Liquor Code as either retail dispensers (R licenses or Restaurant License) or eating place retail dispensers (E license). See 47 P.S. §§ 4-406, 4-407, 4-442, respectively. Compl. ¶ 76. Retail dispenser liquor licenses (R license) allow licensees to sell distilled spirits, wine and malt or brewed beverages for consumption on the premises, and malt or brewed beverages may be sold to-go. 47 P.S. §§ 4-406, 4-407. Compl. ¶ 77. R licensees are also eligible to obtain expanded permits to sell limited quantities of wine to-go as well as ready-to-drink cocktail permits to sell ready-to-drink cocktails on a to-go basis. 47 P.S. § 4-415. Compl. ¶ 78. Eating place retail dispenser liquor licenses (E license) allow licensees to sell only malt or brewed beverages for consumption on the premises or on a to-go basis; holders of these licenses may not sell other types of alcoholic beverages. 47 P.S. § 4-442. Compl. ¶ 79. Both R license and E licensees are required to offer food to the public and must have seating to accommodate thirty persons. R licensees must measure at least 400 square feet, while E licensees require a minimum of 300 square feet. 47 P.S. § 1-102. Compl. ¶ 80. Additionally, all licensees must provide: (i) no less than thirty seats immediately available and accessible to the public (seats may not be stacked); (ii) sufficient food for at least thirty patrons; (iii) dishes and utensils for at least thirty persons; (iv) a current and valid health license; (v) a functioning kitchen or food preparation area. *See* PLCB Compliance Program. Compl. ¶ 81.

### The Philadelphia Code

Plaintiffs' businesses are also subject to local laws and ordinances under The Philadelphia Code. Compl. ¶ 82. Recently enacted sections 9-630, 9-641, 9-642, and 9-643 (collectively, the "Curfew Ordinances") of the Philadelphia Code restrict the hours of operation for business in certain designated areas of Philadelphia. Phila. Code §§ 9-630, 9-641, 9-642 and 9-643. Compl. ¶

83. Sections 9-630, 9-641, and 9-642 define "Commercial Establishment" as "[a]n establishment involved in the buying and selling of goods where consumers primarily purchase goods intended for consumption or use off premises, including a Food Establishment as defined in Code Section 6-102." This definition excludes "Food Establishments" with a Restaurant Liquor License, as well as those serving exclusively as drive-throughs or operating as gas stations. Section 9-643 defines "Commercial Establishment" without these specific exclusions.   Phila. Code §§ 9-630, 9-641, 9-642 and 9-643. Compl. ¶ 84. Under section 6-102 "Food Establishment" is defined broadly as "[a]ny establishment or portion thereof where food is handled or sold" including various types of stands,  vehicles, or vending machines but excluding facilities such as railroad dining cars in transit and financial investment and brokerage transactions where no food handling takes place with the City. Phila. Code § 6-102. Compl. ¶ 85.

On or about August 12, 2024, City Council enacted Ordinance (Bill No. 240498), amending Chapter 9-600 of The Philadelphia Code, adding various locations to the section regulating the hours of operations of certain establishments and including the modification of the definition of "Commercial Establishment" to exclude Food Establishments that serve customers exclusively from a drive-through window or fueling station. Phila. Code § 9-630 (Seventh District Commercial Business Hour Restriction). Compl. ¶ 86. Specifically, section 9-630 prohibits any "Commercial Establishment" from operating between the hours of 11 p.m. and 6 a.m. within the following areas:

(a) The area bounded by East Lehigh Ave., Kensington Ave., D St., East Tioga St. and Frankford Ave.

(b) The area bounded by North 5th St., Erie Ave., North 9th St. and Roosevelt Blvd.

(c) The area bounded by East Hunting Park Ave., North 5th St., Roosevelt Blvd. and Castor Ave.

     (d) The area bounded by East Lehigh Ave., North 2nd St., East Hunting Park Ave., Whitaker Ave., and B St.

Phila. Code § 9-630 (2). Compl. ¶ 87.

     Also, on August 12, 2024, City Council enacted Ordinance (Bill No. 240474), further amending Chapter 9-600 by adding Section 9-641, which imposes restrictions on operating between the hours of 11 p.m. and 6 a.m. on "Commercial Establishments" within the area bounded by East Allegheny Avenue, Kensington Avenue, Torresdale Avenue, and Frankford Avenue. Phila. Code § 9-641 (Sixth District Commercial Business Hour Restriction). Compl. ¶ 88. On the same date, City Council enacted Ordinances (Bill Nos. 240414 and 240468), adding Section 9-642 restricting "Commercial Establishments" in the areas of (a) Ogontz Avenue, between Haines Street and Cheltenham Avenue, on both sides and (b) the area bounded by Ogontz Avenue, between Haines Street and 66th Avenue on both sides from operating during the hours of 12 midnight and 6 a.m. Phila. Code § 9-642 (Ninth District Commercial Business Hour Restriction). Compl. ¶ 89.

     Also enacted on August 12, 2024, Ordinance (Bill No. 240476) added Section 9-643, which restricts any "Commercial Establishment" from operating between 11 p.m. and 6 a.m. along the following streets:

     (a) North Broad [S]treet between West Chew Avenue and West Tabor Road.

     (b) Old York Road between West Olney Avenue and West Tabor Road

     (c) West Olney Avenue between North Broad Street and North Park Avenue.

     (d) Wagner Avenue between North Broad Street and Old York Road.

Phila. Code § 9-643 (Commercial Business Hour Restrictions Near the Boundary of the Eighth and Ninth Districts). Compl. ¶ 90. The Curfew Ordinances primarily affect specific areas within Philadelphia where Plaintiffs operate their establishments. Compl. ¶ 91. These restrictions thus disproportionately impact these minority groups and their businesses operating in these specific

areas within the City. Compl. ¶ 92. More affluent, whiter, neighborhoods within Philadelphia are
not subject to the same restrictions and oversite as Plaintiffs' businesses. Compl. ¶ 93.

### Enforcement of Ordinances and Statutes

#### PLCB Bureau of Licensing and BLCE

The PLCB Bureau of Licensing and the BLCE play significant roles in enforcing the
Liquor Code. Compl. ¶ 94. The BLCE prioritizes the enforcement of violations commonly
associated with these establishments, allocating considerable resources to monitor compliance
within the City of Philadelphia and throughout the Commonwealth. *See* Exhibit A, pg. 5. Compl.
¶ 95. When public complaints are filed, they are investigated, and the BLCE must notify the
licensee of any alleged violation within 30 days of the investigation. 47 P.S. § 4-471(b). Compl. ¶
96. If violations of the Liquor Code are found, the BLCE may issue a citation, which is then
adjudicated by an Administrative Law Judge (ALJ). 47 P.S. § 4-471(a). Compl. ¶ 97.

#### PLCB Licensing Compliance Program

As mandated by Act 44 of 2017, the PLCB's Bureau of Licensing and the License
Compliance Program oversee establishments' adherence to requirements regarding seating,  food,
square footage, and other criteria. Compl. ¶ 98. Upon receiving a complaint, a licensing analyst
and law enforcement officer conduct an unannounced on-site inspection for compliance. *Id.*
Compl. ¶ 99.

If violations are found, they document the deficiencies with photographs, issue a
suspension notice effective immediately, and notify the BLCE of the suspension. *Id.* Compl. ¶ 100.
A follow-up inspection occurs within five to ten business days to verify compliance, and operating
privileges remain suspended if deficiencies remain. Repeated violations within a 12-month period

escalate penalties, including a minimum license suspension of twenty days for a second offense and thirty days for a third. *Id.* Compl. ¶ 101.

The PLCB's Bureau of Licensing has the authority to object to or deny license renewal based on a licensee's operational history, such as prior citations (by reaching out to police for public records and police incident reports), the reputations of owners and officers, compliance with statutory requirements, and incidents occurring o or near the premises that may affect public safety or welfare. 47 P.S. § 4-470. Compl. ¶ 102. Once an establishment is identified through the citation process or through the PLCB Compliance Program, the PLCB can further evaluate these businesses during license renewal and deny the renewal, which occurs every two years. *Id*. Compl. ¶ 103. If a license is revoked, the affected business is ineligible to have a license until the expiration of three years from the date the license is revoked. 47 P.S. § 4-471(b). Compl. ¶ 104.

Philadelphia County currently has more retail liquor licenses than the Pennsylvania Liquor Code allows; therefore, if a plaintiff's liquor license is revoked or not renewed, the license ceases to exist. Compl. ¶ 105. The only ways to obtain a liquor license are by transferring a license from an existing owner or by purchasing one from a current licensee or at auction. Compl. ¶ 106. R-licenses can sell for up to $300,000, while E-licenses go for around $150,000. Compl. ¶ 107. Given the high demand, the prices are likely to be even higher by the time they are eligible to obtain a new license (three years from the date it is revoked). Compl. ¶ 108.

<u>The Philadelphia Police Department</u>

Philadelphia has also passed new ordinances targeting Plaintiffs' businesses. Compl. ¶ 109. Chapter 9-4400 of the Philadelphia Code, titled "Responsible Business Operations," establishes regulations to identify and address "nuisance businesses." Phila. Code §§ 9-4401-9-4406 (the "Nuisance Ordinances"). Compl. ¶ 110. While the supposed purpose is to deter criminal activity,

it takes no action against the actual lawbreakers; instead, it punishes law-abiding business owners by punishing them for even alleged criminal activities *around* their businesses. Compl. ¶ 111. In a shocking overreach of police power, the Nuisance Ordinance purports to give officers the ability to shutter businesses if violent activity happens nearby, or if they can string together seemingly trivial offenses. Compl. ¶ 112. Section 1-112 of the Philadelphia Code provides the Police Department with the authority to issue code violation notices ("CVNs") to enforce any provision of the Philadelphia Code or any regulation adopted under the Code. Phila. Code § 1-112(a). Compl. ¶ 113. The Police Department also has authority under section 9-4403 of the Philadelphia Code to deem businesses as "chronic nuisance business" or "critical nuisance business" and to issue a Notice of Intent to Cease Operations against them. Phila. Code § 9-4403. Compl. ¶ 114.

According to the Philadelphia Code a "chronic nuisance business" is one that has received notices for "nuisance behavior" on three (3) or more separate days within a twelve (12) month period." Phila. Code § 9-4401(1). Compl. ¶ 115. "Nuisance behavior" includes activities that disrupt the community's health, safety, or welfare and consists of eighteen possible offenses. Compl. ¶ 116. These range from obviously illegal conduct, such as drug dealing and prostitution, to trivial offenses completely outside the owners' control, such as littering, or a patron parking on the sidewalk. Compl. ¶ 117. It also includes vague "catchall provisions" that incorporate unspecified other potential offenses, including, but not limited to:

* * * * *

(o) Conduct that violates the provisions of the Pennsylvania Liquor Code. . .pertaining to unlawful acts relative to liquor and licenses (47 P.S. § 4-493);

* * * * *

(q)  Repeated or continuing violations of any other City ordinance and/or regulations;

(r)   Any other activity that constitutes a public nuisance under The Philadelphia Code. Phila. Code § 9-4401(3). Compl. ¶ 118. Moreover, the Philadelphia Code defines a "critical nuisance business" as one that has been issued a notice concerning serious violent behavior such as homicide, aggravated assault, or obstruction of an investigation related to such offenses. Phila. Code § 9-4401(5) and (6). Compl. ¶ 119. The Police Department may issue a violation notice to a business owner when nuisance behavior or serious violent behavior has taken place inside the business or ***on the sidewalk or street, abutting the business*** during business hours. Phila. Code § 9-4402(1)(emphasis added). Compl. ¶ 120. The Nuisance Ordinance offers no guidance on how nearby the alleged nuisance behavior must be to trigger its requirements. Compl. ¶ 121. Indeed, read literally, the business itself could be the *victim* of a crime and then be subject to further punishment City. Compl. ¶ 122. Such a system is wildly unfair on its face, enacting punitive measures against law-abiding citizens instead of actual criminals. Compl. ¶ 123. This inconsistency indicates that the true purpose of the Nuisance Ordinance is to target and shut down minority-owned businesses rather than deter supposed criminal conduct. Compl. ¶ 124.

**The Ordinances of The Philadelphia Code are Unconstitutionally Vague and Overbroad**

For the reasons set forth herein, among others, the Curfew and Nuisance Ordinances are unconstitutionally vague and overbroad. Compl. ¶ 125. As set forth above, the Curfew Ordinances regulate the operations of "Commercial Establishments." Compl. ¶ 126. The Curfew Ordinances of the Philadelphia Code define "Commercial Establishment" as "[a]n establishment involved in the buying and selling of goods where consumers primarily purchase goods intended for consumption or use off premises, including a Food Establishment as defined in Code Section 6-102 . . . ." Phila Code §§ 9-630(1), 9-641(1), 9-642(1), 9-643(1). Compl. ¶ 127. However, the Curfew Ordinances do not define critical terms such as "primarily" or "goods," which are essential

for the application and enforcement of the regulations. Compl. ¶ 128. This lack of clarity leaves the ordinances susceptible to arbitrary and discriminatory enforcement. Compl. ¶ 129. The Curfew Ordinances do not provide any mechanism or clear standard for the Philadelphia Police to determine whether a business qualifies as a "Commercial Establishment" under the ordinances. Compl. ¶ 130. The Curfew Ordinances' definition of "Commercial Establishment" is so vague that persons of ordinary intelligence must guess its meaning and application, leading to inconsistent enforcement. Compl. ¶ 131. This vagueness allows for selective enforcement. Compl. ¶ 132.

Upon information and belief, as with efforts to enforce the prior curfew ordinance, enforcement of the new Curfew Ordinance is once again selective and targeted toward minority-owned businesses. Compl. ¶ 133. Section 9-4402(1) of the Nuisance Ordinances, which allows establishments to be issued notices of violation based on nuisance behavior or serious violent behavior that has taken place inside the business or on the sidewalk or street, abutting the business is unconstitutionally overbroad and vague. Phila. Code § 9-4402(1). Compl. ¶ 134. The broad scope of this provision invites arbitrary and discriminatory enforcement as it encompasses a wide range of behaviors, including activities not related to the operation of the business itself. Compl. ¶ 135. The Nuisance Ordinance also includes the extreme punitive measure of shutting down a business, even if the business played no part in the offending behavior. Compl. ¶ 136.

Defendants intentionally discriminated against members of a minority group and their businesses based on race and/or national origin by deliberately crafting the Curfew and Nuisance Ordinances to produce discriminatory effects. Compl. ¶ 137. The Curfew and Nuisance Ordinances were designed and have been enforced to disproportionately target specific groups and their businesses, resulting in discriminatory effects that violate both the United States Constitution and the Pennsylvania Constitution. Compl. ¶ 138. The vagueness and overbreadth of the Curfew and

Nuisance Ordinances are further demonstrated by the record of enforcement actions taken by the Philadelphia Police Department, as detailed below. Compl ¶ 139. The inconsistent and arbitrary nature of these actions illustrates how the ordinances are being applied in a manner that fails to provide adequate notice and results in unequal treatment. Compl ¶ 140.

### The Philadelphia Code and Liquor Code Have Been Selectively Enforced to Discriminate Against Certain Groups and Their Businesses in Violation of the Equal Protection Clause of the United States and Pennsylvania Constitutions

The Philadelphia Code and Liquor Code have been selectively enforced against certain minority groups, including Plaintiffs and their businesses, resulting in discriminatory treatment. Compl ¶ 141. As detailed herein, the Curfew and Nuisance Ordinances are impermissibly vague and overbroad in both their language and their application, enabling selective enforcement against Plaintiffs in violation of constitutional protections. Compl ¶ 142. Specifically, in addition to being unconstitutionally vague and overbroad, the Curfew Ordinances target specific geographic areas within the City of Philadelphia, leading to disparate treatment for Plaintiffs who are licensed to sell certain alcoholic beverages for consumption off-premises compared to other licensees across the City of Philadelphia and the Commonwealth of Pennsylvania who are not subject to the same restrictions. Compl ¶ 143. The restrictions based on geography are arbitrary and bear no rational relationship to any legitimate state interest. Compl ¶ 144. Additionally, the establishment of the Task Force and the implementation of its Report and Recommendations will likely lead to further targeted enforcement efforts that violate Plaintiffs' equal protection rights of the United States and Pennsylvania Constitutions. Compl ¶ 145. There is a clear path set for the laws to be applied in a discriminatory manner, disproportionately impacting Plaintiffs and other minority-owned businesses. Compl ¶ 146. The harm from this is compounded because the PLCB then uses these

alleged violations as a pretext to avoid renewal of the liquor licenses for the impacted businesses. Compl ¶ 147.

In previous years, the PLCB would simply issue a renewal—or in exceedingly rare cases, a denial—of the license in question during each renewal period. Compl ¶ 148. In a complete change from the past practice, the PCLB has now issued dozens of "temporary renewal" letters refusing to renew many liquor licenses pending the results of a hearing. Compl ¶ 149. The enforcement practices of the Defendants reveal a consistent and discriminatory pattern of targeting Plaintiffs as detailed below. Compl ¶ 150.

<u>Yo Deli Inc.</u>

In some instances, the PLCB now purports to take action against Plaintiff and their members based on alleged violations in the distant past. For instance, AALBA member Yo Deli Inc. recently received a temporary license renewal from PLCB, claiming it may have abused its license based on two provided citation numbers: 15-174 and 13-1726. A true and correct copy of the citations and the PLCB letter regarding temporary renewal are attached as Exhibit B. Compl ¶ 151. However, as the first two digits in the citation numbers indicate the year the citations were issued, it is evident that the most recent of those citations occurred nearly *ten years* ago, with the other occurring over *eleven years ago.* Compl ¶ 152.

Yo Deli Inc. has renewed its license multiple times in the interim without issue, investing considerable time, effort, and money into the business year after year. Compl ¶ 153. PLCB now arbitrarily threatens the existence of the business nearly a decade later, illustrating its clear bias and efforts to shut down minority-owned businesses like Yo Deli Inc. at any cost. Compl ¶ 154. In effect, the PLCB appears to be taking the unfair position that any citation, no matter how remote

in time, could resurface at any time and for any reason to shut down a law-abiding business in the future. Compl ¶ 155.

Yo Deli Inc. has also been the target of unfair efforts to drum up new citations. Compl. ¶ 156. In June 2024, immediately upon opening the store, white inspectors for the PLCB came in to inspect and measure the premises. Compl ¶ 157. While the staff prepared to open the store and was sweeping, the inspectors began yelling and accusing them of adding additional seating. Compl ¶ 158. This would have been impossible for additional seating to be added in that matter. Compl ¶ 159. After this hostile exchange, the inspector left. Compl ¶ 160. The inspector returned later purporting to shut down Yo Deli Inc, not because there was insufficient seating, but because they felt there should have been a sign advising patrons that additional seating was available on the second floor. Compl ¶ 161. Setting aside that the additional seating should be obvious to customers, there is no express requirement in the law to post such a sign. Compl ¶ 162. Even if there was, remediating the issue would be trivial and could be accomplished immediately for virtually zero expense. Compl ¶ 163. Despite this, the inspector required Yo Deli Inc. to shut down for two weeks, causing significant financial harm, disruption of regular business, and a further threat to renewal of its license. Compl ¶ 164. Based on the old violation and the trivial claim that it was missing a sign, PLCB now arbitrarily threatens the existence of the business by issuing only a temporary license based on this conduct, illustrating its clear bias and efforts to shut down minority-owned businesses like Yo Deli Inc. at any cost. Compl ¶ 165.

<u>7701 Ogontz Inc.</u>

The City of Philadelphia, using the Nuisance Business Ordinance, also actively seeks to disrupt and shut down members of Plaintiff's organization. Compl ¶ 166. For instance, 7701 Ogontz Inc. operates Riley Deli in Philadelphia. Compl ¶ 167. On or about February 28, 2024,

they received a warning from the City accusing them of being a nuisance business. A true and correct copy of the police incident report and the warning letter are attached as Exhibit C. Compl ¶ 168. This allegation was based on the fact that members of the Police Department arrested two individuals in Riley Deli for allegedly selling drugs somewhere nearby the restaurant. Compl ¶ 169. During the arrest that followed, one of the individuals appeared to break several fingers. That individual was ultimately released at the scene. Compl ¶ 170. On information and belief, the allegations against both these individuals were later dismissed. Compl ¶ 171. However, the City of Philadelphia has not withdrawn its citations against Riley Deli, warning that with further violations the City could "begin legal action to close your establishment." Compl ¶ 172. This has the perverse effect that Riley Deli is subject to punishment, even where, apparently, no underlying crime was committed. Compl ¶ 173. Officers at the scene asserted to the manager of Riley Deli that if there was another incident or if they received another ticket, the business would be shut down. Compl ¶ 174. As a result, Riley Deli's owners, managers, and employees are afraid to even contact the police or report potential criminal activity in the neighborhood out of concern that they will receive another nuisance violation, which could result in the closing of the establishment. Compl ¶ 175.

Best Beer, Inc.

On or about February 22, 2022, the BLCE issued a citation (Citation No. 22-0189) to Best Beer, Inc., alleging that it did not meet the 300 square-foot public space requirement for an eating place license. Compl ¶ 176. As a result, Best Beer was shut down for two weeks, and a liquor license suspension placard was displayed on the storefront. On June 6, 2022, an administrative hearing was held, and the citation was dismissed, finding that BLCE had failed to establish that Best Beer had inadequate square footage. Compl ¶ 177. Despite the citation being dismissed, Best

Beer received a letter on October 17, 2024 from the PLCB in response to its application for renewal. This letter indicated that the PLCB was considering the previously dismissed citation as part of its determination on the renewal application. A true and correct copy of the October 17, 2024 letter and Adjudication is attached as Exhibit D. Compl ¶ 178. Best Beer incurred $1,750 in legal fees related to the citation and the administrative hearing. Compl ¶ 179.

To make matters worse, Best Beer shares common ownership with a similar establishment called Sky Beer Deli, Inc. ("Sky Beer"). Compl ¶ 180. Sky Beer has *never* been shut down due to an inspection by the BLCE or Police Department. Compl ¶ 181. Despite this, Sky Beer received only a temporary license renewal. On information and belief, Defendants are attempting to use the same *dismissed* allegations against Best Beer to shut down the business of a separate business. A true and correct copy of the October 18, 2024 letter is attached as Exhibit D. Compl ¶ 182.

<u>Bu-Bu Deli</u>

Maya 2008 Investment Group LLC operates Bu-Bu Deli at 3153 N. 22nd Street in Philadelphia. Compl ¶ 183. On or about September 12, 2024, Bu-Bu Deli received two CVNs from the Philadelphia Police Department for patrons drinking on the sidewalk in front of the establishment and creating a nuisance. A true and correct copy of the CVNs and City of Philadelphia warning letter are attached as Exhibit F. Compl ¶ 184. These individuals were not encouraged to loiter anywhere near the business, nor could Bu-Bu Deli force them to leave a public sidewalk where they otherwise had a right to be. Compl ¶ 185. The business is also located near a bus stop, where residents *need* to gather in order to ride public transportation. Compl ¶ 186. The owners and managers of Bu-Bu Deli have no means to determine who is unlawfully loitering nearby, as opposed to waiting for a bus. Compl ¶ 187.

On or about September 14, 2024, Bu-Bu Deli received CVN 6456364-5 also for creating a nuisance and a separate Complaint or Incident Report was issued describing the incident as follows "Upon arrival at the business at the above location Police observed multiple individuals creating a nuisance by blocking the active pedestrian sidewalk and, when politely asked, failed to disperse from outside the store." *See* Exhibit F. Compl ¶ 188. To the extent these individuals did anything unlawful in the first instance, they received no punishment. Instead, only Bu-Bu Deli received a citation. Compl ¶ 189. These citations were accompanied by threats that further citations could result in the closure of this business. Compl ¶ 190.

<u>700 SE Inc.</u>

700 SE Inc. operates a takeout business on 700 Snyder. Compl ¶ 191. Like many members of the AALBA and AAB, the owners of 700 SE Inc. have limited English proficiency, but have nevertheless been able to establish a successful business that serves the community in South Philadelphia. Compl ¶ 192. 700 SE Inc. has nevertheless received two citations from the Police Department, based on conduct over which it has no control. Compl ¶ 193. For the first citation, the officer cited Section 10-604(2)(a), which prohibits the consumption of alcohol in public parks and similar spaces. Compl ¶ 194. To extent anyone has loitered in front of the business, the owners or managers of 700 SE Inc., generally asked them to leave. Compl ¶ 195. However, much like the owners of 700 SE Inc., the patrons often have limited English skills as well, making any communication (much less a directive to leave) difficult. Compl ¶ 196. Regardless, the cited ordinance was inapplicable and, further, it was the individuals and not the business who committed the alleged violation. Compl ¶ 197. On information and belief, those accused of loitering received no punishment. Compl ¶ 198.

On a second instance, the officer allegedly observed empty beer containers in bushes nearby, citing the Nuisance Ordinance restriction on illegal consumption of alcohol. Compl ¶ 199. In fact, the Nuisance Ordinance also expressly identifies littering as a form of nuisance behavior. Compl ¶ 200. In effect, other people's attempts to litter is now a potential basis to shut down 700 SE Inc. business. Compl ¶ 201. Given the general condition of streets, and the common sight of empty alcohol containers, virtually any business in Philadelphia could be subject to citation for violating the Nuisance Ordinance. Compl ¶ 202. However, the selective enforcement has targeted minority-owned businesses instead. Compl ¶ 203. 700 SE Inc. is left in a precarious position, as even a trivial offense by one of its customers, or even a random person passing by the store, could not serve as a basis for a third citation that can shut down the business. Compl ¶ 204.

<u>CDD 725, Inc.</u>

Upon information and belief, CDD 725, Inc. has been subjected to numerous unfounded and unnecessary inspections, which were allegedly conducted with the intent and effect of intimidating, harassing, and threatening Plaintiffs. A true and correct copy of the Philadelphia Police Department Complaint or Incident Reports from April 23, 2024, September 18, 2024 and October 21, 2024 are attached as Exhibit G. Compl ¶ 205. Despite each unannounced inspection's Complaint or Incident Report stating that "no issues were noted," the assigned police officer continued to conduct repeated inspections without any new basis or violations observed. *Id.* Compl ¶ 206. On or about October 21, 2024, an officer from the Philadelphia Police Department arrived at CDD 725 for an unannounced inspection. During the issuance of the incident report, the officer requested that the manager on duty sign the notice, which once again confirmed that there were no violations. Compl ¶ 207. There is no printed space on the incident report form which requires, or even requests, that an owner or manager sign. Compl ¶ 208. That line was added by hand by the

officer. Compl ¶ 209. When the manager on duty asked why he needed to sign, the officer immediately became hostile, raised his voice, and issued threats. Compl ¶ 210. The officer accused the manager of "giving him a hard time" and "breaking his stones." Compl ¶ 211. The officer then threatened to return every day for further inspections. Compl ¶ 212. The officer made good on this threat, having returned for further inspections on at least two separate occassion since then. Compl ¶ 213. Illustrating the concerted action between the City and the PLCB, the officer further threatened that he would "come back with the LCB and we'll see how that works out." Compl ¶ 214.

On a separate occasion, the officer advised the owner that stores like his are liable for crimes in the area. Compl ¶ 215. The owner of CDD 725 Inc. went to the local precinct to try and find more information about this conduct and why he was the subject of repeated inspections or requests that he sign these incident reports. Compl ¶ 216. Instead of answers, the owner received conflicting explanations about the number of inspections and the reasons he was presented with the citation. Compl ¶ 217.

<u>Other Impacted Businesses</u>

Even businesses that do not serve alcohol, but serve the community by offering flexible hours are suffering as a result of these practices. Compl ¶ 218. For instance, several member organizations of AAB do not sell alcohol, but still suffer considerable harm from the curfew ordinances. Compl ¶ 219. Once such member operates a grocery store, known as the Quick Stop, on Kensington Avenue. Compl ¶ 220. Their business relies on having flexible hours to serve the community, which suffers from a lack of quality options for fresh food. Compl ¶ 221. In particular, shift workers and other working class people depend on businesses that are open after 11 p.m. Compl ¶ 222. The Quick Stop is one of the only businesses that can cater to these needs, providing

fresh meat, produce, and dairy products to this underserved community, even at odd hours. Compl ¶ 223. Reducing the time members of AAB can operate has a significant impact on their revenue, which relies in their flexible hours. Compl ¶ 224.

Upon information and belief, other businesses not owned by minorities are not subject to the same level of enforcement. Compl ¶ 225. These are but a few examples of the discriminatory conduct faced by members of the Asian and Arab business owners in Philadelphia. Compl ¶ 226. Of AALBA's approximately 110 members, nearly 60 have already received an adverse action from the PLCB in the form of temporary renewals to their liquor licenses based on the selective and discriminatory enforcement of the law. Compl ¶ 227. For context, in prior renewal periods, on average *one* member of AALBA would receive an adverse action, in the form of an outright rejection of their renewal application. Compl ¶ 228.

Defendants' actions threaten to permanently close established businesses arbitrarily and without adequate due process and/or result in non-renewal of their liquor licenses. Compl ¶ 229. Defendants' conduct is part of a concerted pattern targeted at these minority-owned businesses, with the express purpose of shutting them down. Compl ¶ 230. On information and belief, even if a single citation or enforcement action is defeated by Plaintiffs or its members, Defendants will simply keep harassing them until they drum up a basis for further enforcement action, or the stress, expense, and uncertainty of operating under these conditions push the owners to abandon the business. Compl ¶ 231. Several members of AALBA and ABA have already expressed that they are considering closing or selling their businesses to escape the harassment and avoid the uncertainty that they will be shut down arbitrarily. Compl ¶ 232.

These instances collectively demonstrate a sustained pattern of enforcement actions, unannounced inspections, and citation issuances disproportionately directed at Plaintiffs'

businesses. Compl ¶ 233. On information and belief, other businesses, owned by non-minorities or controlled by larger corporate interests, are treated differently and are not subject to the same frequency of inspection or the repeated bad-faith interpretations of the applicable requirements. Compl ¶ 234. On information and belief, alcohol sellers in other parts of the state, where the racial makeup of the owners is not overwhelmingly Asian or Arab as it is in Philadelphia, are not subject to the same requirements or level of enforcement. Compl ¶ 235. On information and belief, white-owned businesses, take-outs, grocery stores, or restaurants are not similarly designated as potential nuisances. Compl ¶ 236.

To make matters worse, this conduct makes the impacted businesses *less safe* by creating a barrier to contacting the police to report any crimes in the area. Compl ¶ 237. By reporting a crime, business owners risk receiving a citation, even if they are the victim of criminal activity. Compl ¶ 238. This same catch-22 can similarly impact their liquor licenses, given the coordination between the City of Philadelphia and the PLCB on this issue. Compl ¶ 239. As Plaintiffs and their members stand to lose their livelihoods from this pattern of unlawful conduct, they now seek recourse from this Court to enjoin the discriminatory enforcement and application of the overbroad, vague, and inconsistently enforced laws and ordinance threatening to close businesses throughout the City. Compl ¶ 240. The Plaintiffs, and the members of AALBA and ABA will face significant, irreparable damages if the discriminatory enforcement practices continue.

## III.   <u>ARGUMENT</u>

The conduct of Defendants violates the Plaintiffs' rights under the United States Constitution and similar provisions of the Pennsylvania Constitution, exposing Plaintiffs to irreparable harm that cannot be corrected through monetary damages. Accordingly, Plaintiffs

request this Court enter an Order restraining enforcement of the state and local laws at issue and schedule a hearing for a preliminary injunction.

### A.  Legal Standard

Under Federal Rule of Civil Procedure 65, the court should grant an application for a temporary restraining order where the party seeking the injunction has satisfied four factors: (1) a likelihood of success on the merits; (2) it will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the non-moving party; and (4) the public interest favors such relief. *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010) (citing *Child Evangelism Fellowship of New Jersey Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 524 (3d Cir. 2004)). The court must also balance these four factors. *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999). "A temporary restraining order is a 'stay put,' equitable remedy that has its essential purpose the preservation of the status quo while the merits of the cause are explored through litigation." *J.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 273 (3d Cir. 2002) (citations omitted).

The standard for granting an application for a temporary restraining order under Federal Rule of Civil Procedure 65 is the same as that for granting a preliminary injunction.  *Pileggi v. Aichele*, 843 F. Supp. 2d 584, 592 (E.D. Pa. 2012). A temporary restraining order generally may not exceed 14 days, although the court may extend it "for a like period" for good cause. Fed. R. Civ. P. 65(b)(2). Where, as here, all four elements necessary for injunctive relief are easily met by Plaintiffs, injunctive relief is appropriate.

### B.  Analysis

Analysis of each of the four factors favors issuing a temporary restraining order, expedited discovery, and preliminary injunction in favor of Plaintiffs and against the Defendants.

1.  **Plainitffs are Likely to Succeed on their Claims Against the Defendants**

For the court to issue an injunction, the movant need not prove their entire case to show a likelihood of success on the merits. Rather, the movant for a preliminary injunction "need only prove *a prima facie case, not a certainty* that he or she will win." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001) (citation omitted) (emphasis added). The Third Circuit requires only a "reasonable likelihood" of success on the merits. *Saudi Basic Indus. Corp. v. Exxon Corp.*, 364 F.3d 106, 112 (3d Cir. 2004) (citing *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.2d 153, 158 (3d Cir. 1999)).

The Verified Complaint alleges seven counts: (i) deprivation of due process under 42 U.S.C. § 1983, (ii) deprivation of due process under Article I, Section 1 of the Pennsylvania Constitution, (iii) violation of the right to petition under the First Amendment, (iv) violation of the right to petition under Article I, Section 20 of the Pennsylvania Constitution, (v) violation of equal protection under 42 U.S.C. § 1983, (vi) violation of equal protection under Article I, Section 26 of the Pennsylvania Constitution and (vii) civil conspiracy under 42 U.S.C. § 1983. Plaintiffs have a reasonable probability of succeeding on each of these claims. Plaintiffs can readily make out a *prima facie* case for all these claims, although they only need make such a case for one of the claims for this motion to succeed. *Thomas v. Little*, 2024 WL 3295584, at *4 (E.D. Pa. July 3, 2024) (citing *Johnson v. Wetzel*,  209 F.Supp.3d 766 (M.D. Pa. 2016)).

a.  **Plaintiffs are Likely to Succeed on their Deprivation of Due Process Claims under the United States and Pennsylvania Constitutions.**

Plaintiffs have a reasonable probability of prevailing on their due process claim under 42 U.S.C. § 1983 and Article I, Section 1 of the Pennsylvania Constitution.[2] Imprecise laws are

_____

[2] A due process claim brought under the Pennsylvania Constitution is indistinguishable from a due process claim brought under the Fourteenth Amendment of the United States Constitution; the same analysis applies to both. *Magoni-Detwiler v. Pennsylvania*, 502 F.Supp.2d 468, 475 (E.D. Pa. 2007), *aff'd sub nom. Magoni-Detwiler v.*

vulnerable to facial challenges on two grounds. First, the overbreadth doctrine permits the invalidation of laws that substantially inhibit the exercise of constitutionally protected rights if the impermissible applications of the law are substantial relative to their legitimate scope. *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). Second, even if a law does not substantially impact a constitutionally protected right, it may be impermissibly vague if it lacks clear standards to establish clear standards to prevent the arbitrary deprivation of liberty interests. *Id.*

i.    The Ordinances are Unconstitutionally Overbroad

A statute is "overbroad" if by its reach if it punishes constitutionally protected activity as well as illegal activity. *Grayned v. City of Rockford,* 408 U.S. 104, 114 (1972). Such a statute violates substantive due process by denying individuals constitutionally protected interests through measures that are not rationally related to a legitimate state objective, thereby "sweep[ing] unnecessarily broadly." *Adler v. Montefiore Hospital Association of Western Pennsylvania,* 311 A.2d 634, 640 (Pa. 1973), *cert. denied,* 414 U.S. 1131 (1974); *Grayned,* 408 U.S. 104. While overbreadth arguments are typically invoked in First Amendment contexts, a statute may still be deemed overbroad if it regulates too broadly, exceeding legitimate state police powers or acting arbitrarily by punishing entities with little relation to the public harm targeted. *Troxel v. Granville*, 530 U.S. 57 (2000).

Section 9-4402(1) of the Nuisance Ordinance allows the issuance of violation notices to establishments based on nuisance behavior or serious violent behavior that has taken place *inside the business or on the sidewalk or street, abutting the business*. Phila. Code § 9-4402(1)(emphasis added). This provision is overbroad for multiple reasons. First, it unconstitutionally infringes on Plaintiffs' First Amendment right to petition, as detailed below. Second, it invites arbitrary and

*Bloomingdale*, 293 Fed.Appx. 928 (3d Cir. 2008); *see also Kaehley v. City of Pittsburgh*, 988 F.Supp. 888 (W.D. Pa. 1997).

discriminatory enforcement because it applies to a broad range of behaviors, including activities unrelated to the businesses' operations. *See Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)(holding that a city ordinance was unconstitutionally broad where the City could have achieved the same end through penalties "directed with reasonable specificity toward the conduct to be prohibited"). Moreover, the ordinance permits extreme punitive measures, such as shutting down a business, even when the business was uninvolved in the offending behavior. Under the guise of protecting the public interest, the legislature cannot unduly interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. *Adler v. Montefiore Hosp. Ass'n of W. Pennsylvania*, 311 A.2d 634, 640–41 (Pa. 1973)(quoting *Gambone v. Commonwealth*, 101 A.2d 634, 637 (Pa. 1954)). Here, the ordinance exceeds those bounds by unduly burdening establishments based on the location of a bad act rather than targeting those responsible for the bad acts in question.

In perhaps the most extreme example, 7701 Ogontz Inc, which operates Riley Deli, received multiple citations and threats that the business would be shut down. These citations were based on patrons *allegedly* being involved in selling drugs (with no apparent connection to the business). However, after a violent arrest inside the store, all charges against these individuals were dropped. However, 7701 Ogontz Inc. still faces punishment even though there was no evidence of wrongdoing.

Similarly, Maya 2008 Investment Group, LLC, which operates Bu-Bu Deli, is effectively being punished for its proximity to a bus stop. Bu-Bu Deli has received CVNs based on individuals allegedly loitering near the business. Even if the staff could tell adults who have *left* their establishment what to do, Bu-Bu Deli has no way to determine whether a person outside their business is "loitering" or just waiting for public transportation.

ii.    The Ordinances are Unconstitutionally Vague

The basic principle of due process holds that a statute is void for vagueness if its prohibitions are not clearly defined. *Dailey v. City of Philadelphia*, 417 F.Supp.3d 597, 616 (E.D. Pa. 2019), *aff'd*, 819 Fed.Appx. 71 (3d Cir. 2020)(citing *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972)). Although the vagueness doctrine is rooted in criminal law, it has also been held to apply in civil contexts. *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1135 (3d Cir. 1992).

A law is unconstitutionally vague if it (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" *__or__* (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Adams Outdoor Advert. Ltd. P'ship by Adams Outdoor GP, LLC v. Pennsylvania Dep't of Transp.*, 930 F.3d 199, 205 (3d Cir. 2019)(citing *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000))(emphasis added). A vagueness challenge requires a case-by-case inquiry to determine whether the statute at issue is vague as applied to the affected party. *San Filippo*, 961 F.2d at 1136.

<u>The ordinances fail to provide fair notice of prohibited conduct.</u>

The fundamental rationale behind the vagueness doctrine is that due process requires a statute to provide sufficient notice of its scope. *Grayned,* 408 U.S. at 108. Laws must provide people of ordinary intelligence a reasonable opportunity to understand what conduct is prohibited. *Id.* Terms dependent on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" are particularly problematic. *Holder v. Humanitarian L. Project,* 561 U.S. 1, 20, (2010). Without transparent meanings, citizens may "steer far wider of the unlawful zone . . .than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (quoting *Bagget v. Bullitt*, 377 U.S. 360, 372 (1964)). When a statute includes an undefined term and "the statutes and case law fail to provide any standards of what is meant by the term," such circumstances "compel[ ] the conclusion that use of the term in the challenged

scheme is unconstitutionally vague." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 274 (4th Cir. 2019).

Here, the Curfew Ordinances are unconstitutionally vague because they fail to define critical terms, depriving individuals of clear notice of prohibited conduct. For example, the term "Commercial Establishment" is defined as "[a]n establishment involved in the buying and selling of goods where consumers primarily purchase goods intended for consumption or use off premises, including a Food Establishment as defined in Code Section 6-102 . . . ." Phila Code §§ 9-630(1), 9-641(1), 9-642(1), 9-643(1). However, the ordinances do not define key terms such as "primarily" or "goods" which are essential for the proper application and enforcement of the ordinances.

The term "primarily," as a "term of degree," is especially problematic. The Supreme Court has recognized that such terms are inherently challenging to enforce because they fail to provide adequate notice. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1047 (1991). Without clear standards, individuals cannot determine whether their businesses qualify as "Commercial Establishments" under the ordinances. This lack of clarity denies individuals and businesses fair notice and invites arbitrary enforcement. Further, the ordinances lack a clear standard to guide the Police Department's determination of whether a business qualifies as a "Commercial Establishment" under the provisions. Consequently, City officials have broad discretion to interpret which establishments must comply, resulting in inconsistent application.

<u>The ordinances permit arbitrary and discriminatory enforcement.</u>

The vagueness doctrine's most critical function is requiring legislatures to establish minimal guidelines to govern law enforcement. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). Vague laws impermissibly delegate basic policy decisions to law enforcement, judges and juries, allowing for *ad hoc* and subjective resolutions. *Bykofsky v. Borough of Middletown*, 401 F.Supp.

1242, 1248–49 (M.D. Pa. 1975), *aff'd*, 535 F.2d 1245 (3d Cir. 1976)(citations omitted) This delegation leads to erratic and arbitrary enforcement based on individual impressions and personal biases. *Id.* Legislation must not be so vague, the language so loose, as to leave to those who apply it too wide a discretion. *Id.* Laws that are ambiguous, imprecise, and vague do not provide "for government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman on his beat.' *Id.* (citing *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90 (1969); *see also*, *Morales*, 527 U.S. 41 (invalidating ordinance solely on its failure to limit discretionary enforcement by police)

The ambiguous definition of "Commercial Establishment" under the Curfew Ordinances forces individuals of ordinary intelligence to guess its meaning and scope. This ambiguity allows City officials to enforce the ordinances selectively and inconsistently.   This unchecked discretion violates due process by enabling discriminatory application.

### iii.    The Ordinances Deprive Plaintiffs of Due Process.

As detailed above and in Plaintiffs' Verified Complaint, the ordinances violate fundamental due process protections under both federal and Pennsylvania law. The Nuisance Ordinance is unconstitutionally broad, punishing businesses solely for incidents occurring within or near their premises, regardless of the business' actual involvement or culpability.   By targeting businesses merely for their proximity to certain behaviors, the ordinance unjustly burdens establishments with little or no connection to the public harm at issue, exceeding legitimate state police powers and enabling arbitrary enforcement by the police department. This danger is put into sharp focus when considering the sheer breadth of the covered conduct, which includes *eighteen* different categories of offenses, many of which are exceeding broad in themselves. The full *non-exhaustive* list includes:

(3) *Nuisance Behavior.* Behavior that interferes with the health, safety or welfare of the community, including, but not limited to, the following:

(a) legal consumption or sale of alcoholic beverages;
(b) Illegal drug activity;
(c) Unlawful street or sidewalk obstruction;
(d) Gambling and illegal gaming activities;
(e) Public urination or defecation;
(f) Litter in the right-of-way, including the sidewalk or street;
(g) Prostitution;
(h) Owning, operating or conducting a vehicle chop shop in any building or structure, including a lot or curtilage, for the purpose of dealing in stolen vehicles or stolen vehicle parts or illegally obtaining and altering vehicles or vehicle identification numbers of vehicle parts;
(i) Vehicles parked on the sidewalk;
(j) Use of street parking spaces or sidewalk for open storage, sale, or rental of goods, or storage or repair of inoperable vehicles;
(k) Unlicensed or unlawful firearms possession by a patron;
(*l*) Short dumping;
(m) Unlawful junk dealer operations;
(n) Disorderly conduct and related behavior;
(o) Conduct that violates the provisions of the Pennsylvania Liquor Code (47 P.S. §§ 1101 et seq.) pertaining to unlawful acts relative to liquor and licensees (47 P.S. § 4-493);
(p) Obstruction of an investigation of nuisance behavior;
(q) Repeated or continuing violations of any other City ordinance and/or regulations;
(r) Any other activity that constitutes a public nuisance under The Philadelphia Code.

§ 9-4401(3).

On its face, the Nuisance Ordinance allows Philadelphia Police to shut down a business for littering, for cars outside that are bad at parallel parking, or for blocking the sidewalk. Beyond the trivial, the Nuisance Ordinance purports to punish businesses for violating any unspecified provision of the Philadelphia Code, ordinances, or regulations, with no guidance as to what additional information might be covered.

Even the more serious violations included in the list, such as allegations of drug activity, provide business owners with no guidance as to comply with the ordinance, or even a basis to know that such illegal activity is happening at some unspecified distance *near* their business. There is not even a basis for Plaintiffs to determine how nearby their business the alleged activity needs

to be in order to be subject to punishment, as it punishes activity "on the sidewalk or street abutting the business." § 9-4402(1).

    Similarly, the Curfew Ordinances are unconstitutionally vague, as they fail to provide clear definitions or standards for enforcement. The ordinances' ambiguous language allows unchecked discretion, leading to inconsistent and subjective application. This similarly allows for broad discretion and seemingly arbitrary enforcement. Police are left to determine what businesses are subject to the ordinance, including determining what "good" consumers "primarily" purchase. Coupled with the appearance of unequal enforcement, this makes it difficult for businesses to operate during the hours they have traditionally maintained. As such, Plaintiffs have a likelihood of success as to the curfew ordinance as well.

      **b.  Plaintiffs are Likely to Prevail on their Claims for Violation of Their Right to Petition Under the United States and Pennsylvania Constitutions**.

    Defendants' repeated threats to close Plaintiffs' establishments under the Nuisance Ordinance have effectively forced Plaintiffs to choose between seeking police protection and maintaining their businesses. Plaintiffs have consequently refrained from calling the police, even in situations requiring law enforcement intervention, placing Plaintiffs and the community at large in unnecessary danger.

    The First Amendment, applicable to the states and municipalities through the Fourteenth Amendment, safeguards the right to petition the government for redress of grievances. *See BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 524–25 (2002)(recognizing the right to petition as one of the "most precious of the liberties safeguarded by the Bill of Rights"). The same rights are protected by Article I, Section 20 of the Pennsylvania Constitution.

    Calls to the police to report crimes or request assistance constitute legitimate exercises of the First Amendment right to petition. *See Branning v. Wayne Cnty.*, 3:15-CV-1936, 2017 WL

3946262, at *4 (M.D. Pa. May 11, 2017), *report and recommendation adopted in part, rejected in part*, 3:15-CV-1936, 2017 WL 3927611 (M.D. Pa. Sept. 7, 2017)(citing *Meyer v. Bd. of Cnty. Comm'rs of Harper Cnty.*, 482 F.3d 1232, 1243 (10th Cir. 2007) (reporting a crime to police officers "constitutes an exercise of the First Amendment right to petition the government for the redress of grievances."); *Ibarra v. City of Chicago*, 816 F. Supp. 2d 541, 550 (S.D. Ind. 2011) ("When a crime victim reports that crime to a police officer ... he is engaging in constitutionally protected activity"). Such calls to the police also constitute a form of speech protected against government penalties or restrictions based on their content or effect. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) (stating that this requirement "appl[ies] the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content"). This protection applies regardless of whether the restriction explicitly targets specific content on its face or, in its operation or effect, disproportionately impacts or penalizes constitutionally protected speech. *Thornhill v. State of Alabama*, 310 U.S. 88, 97-98 (1940) (holding that a penal statute "which does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech . . . .").

Thus, Plaintiffs have a First Amendment right to engage in communications with law enforcement free from express or effective limitations on the subject matter or impact of that speech, including communications to report a crime at a property, request police services, or relay other information the effect of which would foreseeably lead to a police response. *See Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)(holding that a city ordinance was unconstitutionally broad where the City could have achieved the same end through penalties "directed with reasonable specificity toward the conduct to be prohibited"). The Nuisance Ordinance imposes a

direct penalty on Plaintiffs for exercising their First Amendment rights by deterring them from reporting crimes or seeking assistance from the police. Its enforcement threatens business closure based on crime reports, regardless of whether Plaintiffs were victims, thereby unduly chilling protected speech, the right to petition. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) (holding that Plaintiffs may challenge the impact of a policy on others because "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."); *see also United States v. Stevens*, 559 U.S. 460, 473 (2010) (holding that "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.") (internal quotation marks omitted). Plaintiffs' legitimate fear of their businesses being shut down inhibits their ability to engage in constitutionally protected communications with law enforcement.

Restrictions on free speech and the right to petition are subject to strict scrutiny. To justify infringement of either, Defendants must demonstrate that the Nuisance Ordinance serves a compelling governmental interest and that it is the least restrictive means to further such an interest. *See Wayte v. U.S.*, 470 U.S. 598, 611(1985) ("Although the right to petition and the right to free speech are separate guarantees, they are related and generally subject to the same constitutional analysis"). Defendants cannot demonstrate any legitimate interest in justifying punishing Plaintiffs for crimes committed against them or restricting their rights to request police aid in an emergency. The ordinance neither serves a compelling interest nor employs narrowly tailored means. As set forth in the Complaint, businesses such as 7701 Ogontz Inc., have been threatened with threatened with the closure of their business if the police allege further nuisance activity. As a result, they are afraid to even contact the police for fear that that it will lead to additional citations. In effect, the continued enforcement of the Nuisance Ordinance places Plaintiffs and other members of the community in jeopardy by restricting their access to police protection and other emergency services. Its enforcement is overbroad and fails to meet the

strict scrutiny standard, and Plaintiffs will face immediate and irreparable harm if Defendants continue

to enforce this unconstitutional ordinance. Accordingly, Plaintiffs are likely to prevail on their

claim against Defendants for deprivation of free speech and the right to petition.

      **c.   Plaintiffs are Likely to Prevail on their Violation of Equal Protection Claims under the United States and Pennsylvania Constitutions.**

Plaintiffs have a reasonable likelihood of success on their claim for violation of equal

protection under 42 U.S.C. § 1983 and Article I, Sections 26 and 29 of the Pennsylvania

Constitution[3]. The Fourteenth Amendment of the United States Constitution prohibits states from

denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend.

XIV, § 1. Similarly, Article I, Sections 26 and 29 of the Pennsylvania Constitution provide for

similar protections. Selective discriminatory enforcement of a facially valid law is unconstitutional

under the Equal Protection Clause of the Fourteenth Amendment. *Jewish Home of E. PA v. Centers

for Medicare & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012)(citing *See Yick Wo v. Hopkins,*

118 U.S. 356, 373 (1886); *Holder v. City of Allentown,* 987 F.2d 188, 197 (3d Cir.1993). To

establish selective enforcement, a plaintiff must show that: "(1) the plaintiff, compared with others

similarly situated, was selectively treated; and (2) the selective treatment was motivated by an

intent to discriminate on the basis of impermissible considerations, such as race or religion, to

punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure

a person." *Homan v. City of Reading,* 15 F.Supp.2d 696, 702 (E.D.Pa.1998)). Therefore, to

maintain an equal protection claim of this sort, Plaintiffs must provide evidence of discriminatory

purpose, not mere unequal treatment or adverse effect. *Snowden v. Hughes,* 321 U.S. 1, 8 (1944).

---

[3] Article I, §§ 26, 29 of the Pennsylvania Constitution is analyzed under the same standards that the Supreme Court uses in reviewing federal equal protection claims. *Sargent v. Sch. Dist. of Philadelphia*, CV 22-1509, 2024 WL 4476555, at *8 (E.D. Pa. Oct. 11, 2024)(citing G*rutter v. Bollinger*, 539 U.S. 306, 343 (2003) and *Commonwealth v. Albert*, 758 A.2d 1149, 1151 (Pa. 2000)).

Plaintiffs must show that the "decisionmaker ... selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects." *Wayte v. United States,* 470 U.S. 598, 610, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (quotation marks omitted).

   i. <u>Plaintiffs are Treated Differently from Similarly Situated Individuals</u>

The Equal Protection Clause requires that "all persons similarly situated should be treated alike." *Shuman v. Penn Manor School District,* 422 F.3d 141, 151 (3d Cir.2005) (citation omitted). Persons are considered similarly situated when they are "alike in all relevant aspects." *Suber v. Guinta*, 927 F.Supp.2d 184, 202 (E.D.Pa. 2013) (quoting *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008)). However, "similarly situated" does not mean "identically situated." *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020)(citations omitted).

Here, the state and local laws have not been applied consistently, as similarly situated businesses have not faced enforcement under comparable circumstances. For example, in addition to being unconstitutionally vague and overbroad, the Curfew Ordinances target specific geographic areas within the City of Philadelphia, resulting in disparate treatment for businesses in different parts of the City that are not subject to the same restrictions. The geographically based restrictions are arbitrary and bear no rational relationship to any legitimate state interest, particularly as the restrictions appear targeted in poorer parts of the City with a larger minority population. As with the prior curfew ordinance, the enforcement appears focused on minority-owned businesses, while non-minority owned businesses and are not subject to the same level of scrutiny.

The selective enforcement is particularly evident when it comes to the enforcement by the PLCB. As explained in greater detail in the Verified Complaint, the PLCB has specifically targeted licensed businesses in Philadelphia, where the businesses are largely minority-owned, with the

apparent intent to shut them down and strip them of their liquor licenses by any means necessary. Alcohol sellers in other parts of the Commonwealth, where the racial makeup of the owners is not overwhelmingly Asian or Arab as it is in Philadelphia, do not experience the same level of enforcement. White-owned businesses are not subject to the same frequency or level of as Plaintiffs.

The numbers further support the improper racial targeting. In prior years, of approximately 110 AALBA members, *only one* would typically receive a non-renewal notice from the PLCB. This year, *nearly 60* have received "temporary licenses" instead of a traditional renewal or denial. Those businesses are now being threatened with having their licenses stripped, often based on unclear or even absurd interpretations of the requirements for their businesses.

Plaintiff Yo Deli Inc. provides an instructive example. Yo Deli is at risk of losing its liquor license based on three citations identified by the PLCB. Two of those citations are nearly a decade old, and Yo Deli has received renewals multiple times since those citations were issued. The only other alleged wrongdoing is that Yo Deli failed to maintain a sign informing patrons that there was additional seating upstairs. There appears to be no clear requirement to business owners that such a sign is necessary in the first place. Yo Deli had never received such a citation in the past, even though the basic layout of the business had not changed. Regardless, this alleged violation could be fixed in a matter of minutes for virtually no cost. Despite this, based on a supposedly missing sign, Defendants shut the business down for two weeks and are now threatening to take its liquor license.

Best Beer and Sky Beer are similarly instructive. Best Beer received a citation because, supposedly, it did not maintain enough square footage to meet the license requirements. This claim was ultimately dismissed because the PLCB could not prove that the square footage was

insufficient. Even though Best Beer defeated that citation, it is still being used as a basis not to renew its liquor license. To make matters worse, Best Beer is under common management with Sky Beer. Defendants similarly refused to renew Sky Beer's liquor license on the basis of the (now dismissed) citation against Best Beer.

The Philadelphia Police appear to be aware of and assisting in this targeted behavior. When one police officer perceived Plaintiff CDD 75, Inc.'s management as being insufficiently cooperative with an inspection he was conducting, he expressly threatened to come back for further investigation every day and to bring investigators from the PLCB with him. Other non-minority business owners do not appear to be subject to the same hostile treatment.

These issues are compounded by the language barrier that often prevents minority owners from explaining themselves adequately to investigators. Indeed, this issue should have been remedied, as training on implicit bias and dealing with communities with limited English proficiency was supposed to be part of the settlement of the prior discrimination lawsuit. Unfortunately, such conduct has continued and remains targeted at minority-owned businesses.

ii.   <u>Selective Treatment is Motivated by an Intent to Discriminate</u>

Defendants are selectively targeting minority-owned businesses, including Plaintiffs, resulting in discriminatory treatment. As noted above, Defendants, namely, the City of Philadelphia, has a well-documented history of discriminating against Asian American and Arab American communities. The selective application and enforcement of state and local laws represent yet another avenue to target these groups. Moreover, the establishment of the Task Force and the implementation of its Report and Recommendations are likely to exacerbate targeted enforcement actions, further infringing on Plaintiffs' equal protection rights under the United States and Pennsylvania Constitutions. The continued selective application and enforcement

practices of the Defendants reveal a persistent pattern of discrimination against Plaintiffs, as outlined in the Verified Complaint.

 Accordingly, Plaintiffs are likely to prevail on their claims against Defendants for violations of equal protection rights.

### d.  Plaintiffs are Likely to Prevail on their Civil Conspiracy Claims.

Plaintiffs have a reasonable probability of success on their claim for civil conspiracy. To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law reached an understanding to deprive the plaintiff of constitutional rights. *Harvard*, 973 F.3d at 207 (citing *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 293-94 (3d Cir. 2018)). This requires that the state actors took "concerted action" based on an "agreement" to deprive the plaintiff of his constitutional rights, and that an actual constitutional violation occurred. *Id*.

Here, Defendants participated in a conspiracy to cover up unlawful conduct against Plaintiffs. The actions were carried out by the Defendants under the color of state law in their capacities as policymakers, city and state officials and/or police officers, in accordance with the customs, practices, procedures, and laws of the City of Philadelphia, the Philadelphia Police Department, the Commonwealth of Pennsylvania and the Pennsylvania Liquor Control Board. This conspiracy is evidenced by threats from the Philadelphia Police Department, who have expressly threatened business owners with a joint inspection by the police and the PLCB.

As a direct and proximate result of the Defendants' participation in the conspiracy, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm,  including but not limited to financial loss, loss of business opportunities, and emotional distress, as detailed above.

.Accordingly, Plaintiffs have shown a likelihood of success on Plaintiffs' conspiracy claim.

### 2.  Plaintiffs have Established Irreparable Harm

To prove irreparable harm, the moving party "must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994) (*quoting Instant Air Freight Co., v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir. 1989)). The word "irreparable connotes that which cannot be repaired, retrieved, put down again, atoned for." *Id.* (citations omitted). In addition, the claimed injury cannot merely be possible, speculative or remote. More than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief is a "clear showing of immediate irreparable injury, or a presently existing actual threat; an injunction may not be used simply to eliminate a possibility of a remote future injury." *Id.* at 655 (internal citations and quotations omitted).

In *Bimbo Bakeries*, the court explained that "[h]arm is irreparable when it cannot be adequately compensated in damages, either because of the nature of the right that is injured, or because there exist no certain pecuniary standards for the measurement of damages. *Bimbo Bakeries USA,* 2010 WL 571774, at *15 (citation omitted). The "impending loss of a business opportunity or market advantage may aptly be characterized as an 'irreparable injury' for … the purpose of a preliminary injunction." *Kessler v. Broder*, 851 A.2d 944, 951 (Pa. Super. 2004). Similarly, "damage to interests in real estate are generally viewed as unique." *J.C. Penney Co. v. Giant Eagle, Inc.*, 813 F. Supp. 360, 369 (W.D. Pa. 1992), *aff'd,* 995 F.2d 217 (3d Cir. 1993) (citing *K–Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 915–16 (3d Cir. 1989))

Here, irreparable harm has already occurred and will continue if not stopped promptly by the Court. Many members of AALBA and ABA have already received some form of adverse action from the PLCB based on the selective and discriminatory enforcement of the law. Those who have not received an adverse action or notice of only a temporary renewal of their license, expect to receive them imminently based on Defendants' conduct to date. If allowed to carry out this

discriminatory scheme, Plaintiffs and other licensees in Philadelphia risk permanent closure as they cannot operate without a liquor license.

Similarly, the curfew ordinance risks making it economically untenable for certain businesses to operate in the impacted areas. In particular, many of ABA's members rely upon maintaining flexible hours to cater to underserved members of the community, including shift workers and others who depend on businesses staying open past 11 p.m. Without those flexible hours, many ABA members lose significant revenue which threatens the viability of their business. Defendants' actions threaten to permanently close established businesses arbitrarily and without adequate due process. Defendants' conduct is part of a concerted pattern targeted at these minority-owned businesses, with the express purpose of shutting them down. On information and belief, even if a single citation or enforcement action is defeated by Plaintiffs or its members, Defendants will simply keep harassing them until they drum up a basis for further enforcement action or the stress, expense, and uncertainty of operating under these conditions push the owners to abandon the business. Several members of AALBA and ABA have already expressed that they are considering closing or selling their businesses to escape the harassment and avoid the uncertainty that they will be shut down. These instances collectively demonstrate a sustained pattern of enforcement actions, unannounced inspections, and citation issuances disproportionately directed at Plaintiffs' businesses.

As set forth above, other businesses, owned by non-minorities or controlled by larger corporate interests, are treated differently and are not subject to the same frequency of inspection or the repeated bad-faith interpretations of the applicable requirements. And, in other parts of the state, where the racial makeup of the owners is not overwhelmingly Asian or Arab as it is in Philadelphia, subject to the same requirements or level of enforcement.

As Plaintiffs and their members stand to lose their livelihoods from this pattern of unlawful conduct, they now seek recourse from this Court to enjoin the discriminatory enforcement and application of the overbroad, vague, and inconsistently enforced laws and ordinance threatening to close businesses throughout the City. The Plaintiffs and the members of AALBA and ABA will face significant, irreparable damages if the discriminatory enforcement practices continue. Thus, the harm Defendants' conduct has caused, and is causing, is imminent and irreparable and can only be remedied through the issuance of an injunction.

### 3.  The Balance of Harms Favors Issuing an Injunction

In deciding whether injunctive relief is appropriate, the court must balance the hardships to the respective parties. *MarbleLife, Inc. v. Stone Res., Inc.*, 759 F. Supp. 2d 552, 563 (E.D. Pa. 2010). The balancing test is intended to ensure that the issuance of an injunction would not harm the defendants more than a denial would harm the party seeking an injunction. *Id.* (citation omitted).

Defendants will not be harmed in any way if their discriminatory enforcement practices are enjoined. By contrast, if an injunction is not granted, Plaintiffs will suffer irreparable harm, including the irretrievable loss of their businesses and liquor licenses.

### 4.  The Public Interest Favors Injunctive Relief

There is a clear public interest in assuring compliance with federal and state statutes protecting the right to due process, free speech-right to petition and equal protection. No legitimate public interest is served through this discriminatory conduct. Accordingly, this factor also weighs in favor of injunctive relief.

IV.    **THE COURT SHOULD ORDER EXPEDITED DISCOVERY TO PREVENT FURTHER HARM**

For the above reasons, the consideration and balancing of the four factors favors the granting of a temporary restraining order and preliminary injunction. Plaintiffs also request that the Court direct Defendants to maintain and preserve, without change or alteration, all documents and electronic evidence relevant to the Complaint pending the completion of this matter and further order of the Court.

It is well-settled that parties in a lawsuit may not destroy evidence. *See Convolve, Inc. v. M.I.T.*, 223 F.R.D. 162 (S.D.N.Y. 2004) ("Once a party reasonably anticipates litigation it must suspend routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents") (quoting *Zubulake v. USB Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003)). Further, there is a special duty to preserve electronic evidence. The duty to preserve electronic evidence is triggered when the party knows or should know that the evidence is relevant to litigation. *See, e.g., Silvestri v. General Motors Corp.*, 271 F. 3d 583, 591 (4th Cir. 2001); *Winters v. Textron, Inc.*, 187 F.R.D. 518, 520 (M.D. Pa. 1999).

Here, an order directing Defendants to preserve all documents and electronic information relevant to the factual allegations and claims contained in the Complaint is appropriate. Much of this information exists in digital form and may still reside on smart phones, thumb drives, personal computers and other computing devices. Accordingly, the Court should direct the Defendants to preserve and account for all materials in whatever form and format that are relevant to Plaintiffs' claims.

For Plaintiffs to present the facts of its case to the Court as completely as possible in a Preliminary Injunction proceeding and to disclose the full extent of Defendants' unlawful activities

and the corresponding damage being done or already done to Plaintiffs and threatened to be done, Plaintiffs must conduct certain expedited discovery.

Rule 26(d) of the Federal Rules of Civil Procedure authorizes this Court to enter an Order permitting expedited discovery, and expedited discovery is appropriate in connection with preliminary injunction motions. *Wiluna Holdings, Inc. v. Does*, 2013 WL 1336792 at *1-2 (E.D. Pa. Apr. 3, 2013). The standard of "reasonableness" has generally been utilized when expedited discovery is sought in furtherance of a preliminary injunction hearing. *Bae Sys. Aircraft Controls, Inc. v. Eclipse Aviation Corp.,* 224 F.R.D. 581, 587 (D. Del. 2004) (citing *Entertainment Tech. Corp. v. Walt Disney Imagineering, et al*., 2003 WL 22519440 (E.D. Pa. Oct. 02, 2003). The *Wiluna* Court explained that when applying the reasonableness standard courts may consider: "(i) the timing and context of discovery request; (ii) the scope and purpose of the request; and (iii) the nature of the burden to the responding party." *Id.* at 2. This standard requires the court to consider whether "the Plaintiffs' need for expedited discovery, in consideration of the administration of justice, outweighs the possible prejudice or hardship to the Defendants." *Fonovisa, Inc. v. Does 1-9,* No. 07-1515, 2008 WL 919701, at *10 n.22 (W.D. Pa. Apr. 3, 2008). Good cause is usually found "when a party seeks a preliminary injunction, and when physical evidence may be consumed or destroyed with the passage of time, thus causing one or more parties to be disadvantaged." *Id.* at 2.

Here, an order for expedited discovery is appropriate. As such, the burden on Defendants is low and strongly outweighed by the need to obtain such discovery prior to a preliminary injunction hearing.

## V.     CONCLUSION

For all these reasons, Plaintiffs respectfully request this Court to grant its Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery.

**KANG HAGGERTY LLC**

<u>*/s/ Kyle Garabedian*</u>
Edward T. Kang
Kyle Garabedian
Kelly Lavelle
Kang Haggerty LLC
123 South Broad Street, Suite 1950
Philadelphia, Pennsylvania 19109
(215) 525-5850 (tel)
(215) 525-5860 (fax)
ekang@kanghaggerty.com
kgarabedian@kanghaggerty.com
klavelle@kanghaggerty.com
*Counsel for Plaintiffs*

Dated: November 26, 2024

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION D/B/A ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION OF PHILADELPHIA | : : : CIVIL ACTION : : |
| YO DELI, INC. | : Case No. 2:24-cv-06348 : |
| BEST BEER, INC. | : *Jury Trial Demanded* : |
| SKY BEER DELI, INC. | : : |
| MAYA INVESTMENT GROUP, LLC | : : |
| 7701 OGONTZ, INC. | : : |
| CDD 725, INC. | : : |
| and | : : |
| ARAB AMERICAN BUSINESS ASSOCIATION AND PROFESSIONAL ASSOCIATION OF THE DELAWARE VALLEY | : : : : : |
| Plaintiff, | : : |
| v. | : : |
| CITY OF PHILADELPHIA | : : |
| COMMONWEALTH OF PENNSYLVANIA | : : |
| PENNSYLVANIA STATE POLICE BUREAU OF LIQUOR CONTROL ENFORCEMENT | : : : |
| and | : : |
| PENNSYLVANIA LIQUOR CONTROL BOARD | : : : |
| Defendants. | : : |

## <u>CERTIFICATE OF SERVICE</u>

I, Kyle Garabedian, counsel for the Plaintiffs, hereby certify that a true and correct copy of the foregoing was served on the Defendants via overnight mail on November 27, 2024. The forgoing will also be served via process server in the issuance of summons.

*/s/ Kyle Garabedian*
Kyle Garabedian

Dated: November 26, 2024