IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION D/B/A ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION OF PHILADELPHIA | CIVIL ACTION |
| YO DELI, INC. | Case No. 2:24-cv-06348 |
| BEST BEER, INC. | *Jury Trial Demanded* |
| SKY BEER DELI, INC. | |
| MAYA INVESTMENT GROUP, LLC | |
| 7701 OGONTZ, INC. | |
| CDD 725, INC. | |
| and | |
| ARAB AMERICAN BUSINESS ASSOCIATION AND PROFESSIONAL ASSOCIATION OF THE DELAWARE VALLEY | |
| Plaintiffs, | |
| v. | |
| CHERELLE PARKER, IN HER OFFICIAL CAPACITY AS MAYOR OF THE CITY OF PHILADELPHIA | |
| CITY OF PHILADELPHIA | |
| DAVID W. SUNDAY, JR., IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE COMMONWEALTH OF PENNSYLVANIA | |
| PENNSYLVANIA STATE POLICE BUREAU OF LIQUOR CONTROL ENFORCEMENT | |

| | |
|---|---|
| and | : |
| | : |
| PENNSYLVANIA LIQUOR CONTROL BOARD | : |
| | : |
| | : |
| Defendants. | : |
| | : |

## AMENDED VERIFIED COMPLAINT

1.      This matter stems from the unlawful deprivation of Plaintiffs' constitutionally protected rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution and the Pennsylvania Constitution by intentionally and purposefully enforcing laws in a discriminatory manner against Plaintiffs and others.

2.      With state and local authorities acting in concert, Defendants seek to shut down businesses that are overwhelmingly owned by Asian Americans and Arab Americans through the passage of vague and overbroad ordinances that carry draconian punishments.

3.      At the same time, state actors seek to strip these same businesses of their liquor licenses by any means necessary, which will effectively shutter the targeted businesses.

4.      The ordinances and regulations are then enforced discriminatorily, often arbitrarily finding violations based on absurd applications of the law or suddenly finding violations for conditions that had been approved in the past.

5.      Those violations are then used as a basis to threaten the businesses with closure or the loss of the licenses that they depend on to survive.

6.      Defendants, including the City of Philadelphia, have a deeply rooted history of discriminating against Asian Americans and Arab Americans, which is unfortunate given the City's claimed protection for immigrants and other racially or ethnically oppressed people. Indeed, behind its façade, the City has long been discriminating against Asian Americans and Arab Americans, who are law-abiding citizens trying to make an honest living.

2

7.      Defendants have engaged in selective and invidious discrimination against certain groups and their businesses in Philadelphia, including Plaintiffs, through the adoption, administration, and enforcement of certain state and local laws, described more fully herein. These actions have unconstitutionally deprived Plaintiffs of their rights under the First Amendment of the United States Constitution and the Pennsylvania Constitution equivalent, as well as their rights to due process and equal protection of the laws in violation of 42 U.S.C. §1983 and of Article 1, §§ 1, 20, 26 and 29 of the Pennsylvania Constitution.The state and local laws were deliberately enacted to target and discriminate against certain groups and their businesses in Philadelphia. The state and local laws are so vague and overbroad that persons of ordinary intelligence must necessarily guess as to their meaning and differ as to their application.

10.      The vague and unequal application of these laws means that even being the *victim* of a crime can subject these businesses to punishment, up to and including the immediate closure of the business.

11.      Further, the state and local laws have been selectively enforced against certain groups and their businesses.

12.      As a result of the unconstitutional state and local laws and selective enforcement of such, certain groups and their businesses have been subjected to fines, forced to cease operations, and deprived of their livelihoods. Many are also at risk of losing their liquor licenses, and, consequently, their ability to sustain their businesses and have otherwise been damaged and will continue to suffer injury.

## PARTIES

13.      Plaintiff Asian-American Licensed Beverage Association D/B/A Asian-American Licensed Beverage Association of Philadelphia ("AALBA") is a domestic non-profit corporation

existing under Pennsylvania law, with its principal place of business located at 711 Sansom Street, Philadelphia, Pennsylvania.

14.    AALBA represents approximately 110 Asian-owned businesses with liquor licenses in Philadelphia. Many AALBA members have been targeted by the unlawful conduct described here.

15.    Plaintiff Yo Deli, Inc. is a business entity organized and existing under Pennsylvania law, with its principal place of business located at 900 W. Huntingdon Street, Philadelphia, PA. Yo Deli Inc. is a member of AALBA.

16.    Plaintiff Best Beer, Inc. is a business entity organized and existing under Pennsylvania law, with its principal place of business located at 6603 Chew Avenue, Philadelphia, PA. Best Beer, Inc. is a member of AALBA.

17.    Plaintiff Sky Beer Deli, Inc. is a business entity organized and existing under Pennsylvania law, with its principal place of business located at 3403 Germantown Avenue, Philadelphia, PA. Sky Beer Deli, Inc. is a member of AALBA.

18.    Plaintiff Maya Investment Group, LLC is a business entity organized and existing under Pennsylvania law, with its principal place of business located at 2901 North 27th Street, Philadelphia, PA. Maya Investment Group, LLC is a member of AALBA.

19.    Plaintiff 7701 Ogontz, Inc. is a business entity organized and existing under Pennsylvania law, with its principal place of business located at 7701 Ogontz Avenue, Philadelphia, PA. 7701 Ogontz, Inc. is a member of AALBA.

20.    Plaintiff CDD 725, Inc. is a business entity organized and existing under Pennsylvania law, with its principal place of business located at 725 North 10th Street, Philadelphia, PA. CDD 725, Inc. is also a member of AALBA.

21.     Plaintiff Arab American Business and Professional Association of The Delaware Valley ("AAB") is a business entity organized and existing under Pennsylvania law, with its principal place of business located at 522 E. Church Road, Elkins Park, Pennsylvania. Many AAB members have been targeted by the unlawful conduct described here.

22.     In particular, many AAB members have been impacted by targeted curfew laws which limit the hours of operation for AAB-related businesses.

23.     Defendant Cherelle Parker is the Mayor of the City of Philadelphia, a City of the First Class, formed under the laws of the Commonwealth of Pennsylvania, with a business address of City Hall, Office 215, Philadelphia, Pennsylvania 19102.

24.     Defendant, City of Philadelphia is a municipal corporation, defined as a City of the First Class, formed under the laws of the Commonwealth of Pennsylvania, with a business address of One Parkway Building, 17th Floor, 1515 Arch Street, Philadelphia, Pennsylvania 19102-1595.

25.     Defendant David W. Sunday, Jr. is the Attorney General of the Commonwealth of Pennsylvania.

26.     Defendant Pennsylvania Liquor Control Board ("PLCB") is an independent commonwealth agency created under Section 201 of the Pennsylvania Liquor Code, the Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. § 1-101 to 8-803 ("Liquor Code") with a business address of 401 Northwest Office Building, Harrisburg, Pennsylvania 17124-001.

27.     Defendant Pennsylvania State Police Bureau of Liquor Board Enforcement ("BLCE") is a subdivision of the Pennsylvania State Police authorized to enforce the Liquor Code and its attendant regulations; specifically, the BLCE is authorized to investigate and issue citations for any violations of the Liquor Code or any laws of the Commonwealth of Pennsylvania relating

to liquor, alcohol or malt or brewed beverages, or any regulations of the board adopted pursuant to such laws or any violation of any laws of the Commonwealth. 47 P.S. § 2-211(a)(4).

28.    Defendants John Does 1 – 10 are potential defendants who participated in Defendants' unlawful scheme to deprive Plaintiffs of their constitutional rights under the United States and Pennsylvania Constitutions. These defendants include other members of the City of Philadelphia, the Commonwealth of Pennsylvania, and/or the Pennsylvania Liquor Control Board.

## JURISDICTION AND VENUE

29.    This Court has original jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

30.    Venue is proper pursuant to U.S.C. §1391 because Defendants reside in this District and the events giving rise to these claims occurred within the District.

## STATEMENT OF FACTS

31.    AALBA is an association of businesspeople, all of whom have been granted a license from Defendant, PLCB, licensing them to sell and dispense alcoholic beverages, including malt and brewed beverages, under the provisions of the Pennsylvania Liquor Code.

32.    The members of the AALBA hold their licenses either in their individual names or in the form of a business corporation they own and control.

33.    Further, the members of the AALBA are largely of Asian-American heritage and are licensed to sell and dispense alcoholic beverages, including brewed beverages, in the City of Philadelphia.

34.    AALBA members hold their licenses through their individual names or the names of a business entity.

35.     There are approximately 110 members of the AALBA representing a similar number of liquor licenses.

36.     Plaintiff AAB is an association of businesspeople, many of whom have been granted a license from the PLCB, licensing them to sell and dispense alcoholic beverages, including malt and brewed beverages, under the provisions of the Pennsylvania Liquor Code.

37.     Additionally, members of AAB operate various convenience stores and similar businesses throughout Philadelphia. Their operations depend on maintaining flexible business hours, serving the community at times when traditional grocery stores have closed.

38.     The members of the AAB hold their licenses either in their individual names or in the form of a business entity they own and control.

39.     Many members of the Plaintiff organizations run establishments that have completed the Liquor Control Board application and secured licenses to operate as either a retail dispenser (R- Licenses (also known as a "Restaurant License")) or an eating place retail dispenser (E license).

40.     Plaintiffs operate from licensed premises approved by the PLCB and by the City of Philadelphia acting through the City of Philadelphia's Department of Licenses and Inspections. (Phila. Code § 6-503)(47 P.S. §§ 4-407, 4-442).

41.     At all times, Plaintiffs' members were operating in a legal manner.

42.     Upon information and belief, all actions taken by the Defendants against the Plaintiffs were due to a purposeful campaign between and among the Defendants described herein with a specific goal of preventing Plaintiffs from operating.

43.     Defendants have tirelessly made efforts to inhibit Plaintiffs' business operations, selectively enforcing laws and ordinances for the express purpose of driving Plaintiffs out of business.

44.     The overwhelming majority of the impacted businesses are owned by racial minorities, specifically Asian and Arab Americans.

45.     Actions taken by and on behalf of the Defendants, individually and collectively, against Plaintiffs' lawful business operations, include but are not limited to:

    a.  Selective enforcement of laws and ordinances targeted at Plaintiffs;

    b.  Facially unfair and biased administration of those laws and ordinances intended to prevent Plaintiffs from complying in good faith as a pretext to impose penalties (up through and including the loss of a license or the closure of the business);

    c.  Repeated Police Department and BLCE visits to the Plaintiffs' establishments for unannounced inspections;

    d.  Discriminatory and harassing conduct by the Police Department and BLCE.

46.     Upon information and belief, the Police Department and the BLCE had no registered complaints involving the Plaintiffs' establishments.

47.     Despite the absence of registered complaints, the Police Department and the BLCE continually targeted Plaintiffs' establishments.

48.     Due to the concerted and purposeful efforts of the Defendants, Plaintiffs have, at times, been forced to cease operations, have otherwise struggled to stay open for business and are at risk of losing the liquor licenses and, consequently, their livelihood.

49.     Plaintiffs have been unable to operate in a manner originally conceived and approved by the City of Philadelphia and the Liquor Control Board.

50.     Accordingly, Plaintiffs have sustained and will continue to sustain a substantial loss of business due to the adverse effect of the unlawful conduct of Defendants.

51.     Defendants' arbitrary and capricious conduct unjustly deprives Plaintiffs of their fundamental and constitutionally protected rights under the Constitution of the United States and the Constitution of the Commonwealth of Pennsylvania, violating due process and equal protection guarantees and infringing on protected expressive activity.

## History of Regulations of "Stop-and-Go" Establishments

52.     The City of Philadelphia has a longstanding history of scrutinizing and regulating minority-owned (namely, Asian or Arab Americans) businesses, including so-called "stop-and-go" establishments.

53.     In 1987, enforcement of alcohol sales at these establishments shifted from the Pennsylvania Liquor Control Board to the Pennsylvania State Police, creating the Pennsylvania State Police Bureau of Liquor Control Enforcement. Sections 211 and 472 of the Act of April 12, 1951 (P.L. 90, No. 21), known as the Liquor Code, re-enacted and amended June 29, 1987 (P.L. 32, No. 14).

54.     In 1990, the PLCB introduced the Nuisance Bar Program, which allows the PLCB to deny license renewals in an effort to remove "problem bars" from communities. Pennsylvania Liquor Control Board, Nuisance Bar Program, https://www.lcb.pa.gov/Licensing/Topics-of-Interest/Pages/Nuisance-Bar-Program.aspx.

55.     Then, in 2005, Governor Ed Rendell signed into law Act 39 of 2005, amending the Liquor Code to require all licensed establishments in the City of Philadelphia that sell malt or brewed alcoholic beverages for consumption off-premises to first obtain approval from the Philadelphia City Council.

56.     Only with the approval of City Council by way of a special permit may licensees apply to the PLCB for permission to continue such sales.

57.     The pertinent provisions of Act 39 of 2005 are outlined in Sections 407 and 442 of the Liquor Code, 47 P.S. §§ 4-407 and 4-442, which include requirements for licensing.

58.     That same year, Philadelphia's former Mayor John A. Street enacted an ordinance mandating an 11 p.m. curfew for businesses on residential streets. Phila. Code § 9-627.

59.     Section 9-627, enacted to address "nuisance retail shops, such as take-out and convenience stores, was amended by the Philadelphia City Council in 2007 to specifically target "take-out restaurants" situated on corner lots at street intersections. *Id.*

60.     In 2018, a lawsuit was filed by twenty-three local Chinese take-out restaurant owners against the City of Philadelphia, challenging the 11 p.m. curfew ordinance under Philadelphia Code section 9-627 as unconstitutional for its alleged discriminatory intent and enforcement against Asian Americans. *See Liu v. City of Philadelphia*, 2:18-cv-04900-MMB (E.D. Pa. November 13, 2018).

61.     The former curfew ordinance was overwhelmingly and selectively enforced against Chinese-owned businesses.

62.     Upon information and belief, 80%-90% of the citations issued under the former curfew ordinance in 2015-2016 were issued against Asian or minority-owned businesses, while similar businesses were allowed to operate without issue.

63.     The case settled, with the City agreeing to suspend curfew enforcement and provide police training on implicit bias and effective communication with limited English-proficient community members.

64.     Unfortunately, the passage of time has done little to quell the anti-Asian and other minority sentiments that motivated the passage and selective enforcement of the earlier ordinance.

65.     In the wake of the pandemic and ever-increasing geopolitical tensions in Asia and the Middle East, time has only increased anti-Asian and anti-Arab sentiment.

66.     Further evidence of this is reflected in the proposed plans to develop a new 76ers arena in Chinatown, which poses a serious threat to the survival of this historic Asian-American neighborhood.

67.     As set forth in greater detail below, the City of Philadelphia has renewed its discriminatory conduct by passing a new suite of curfew laws and an overbroad nuisance ordinance that discriminates against minority-owned businesses.

68.     In response to ongoing concerns over "stop-and-go" establishments, the Pennsylvania General Assembly passed Act 44 of 2017 (Act 44), amending the Fiscal Code at 72 P.S. § 1799.6-E, and expanding PLCB oversight through the Licensee Compliance Program ("Compliance Program") and the creation of the PLCB Bureau of Licensing. 72 P.S. § 1799.6-E.

69.     The Compliance Program introduced the Investigation & Suspension Process, which mandates seating and food service compliance in such establishments and permits the PLCB and law enforcement to perform unannounced inspections, with the authority to immediately impose an unappealable administrative suspension of the operating privileges or revoke licenses for noncompliance.[1] 72 P.S. § 1799.6-E(a)(1) and (b).

70.     In 2023, the Pennsylvania Stop-and-Go Legislative Task Force ("Task Force") was established to review and recommend solutions regarding these establishments. 47 P.S. § 218.

---

[1] *See* Pennsylvania Liquor Control Board, Licensee Compliance Program, https://www.lcb.pa.gov/Licensing/Documents/Complete%20Licensee%20Compliance%20Program%20Guide%20for%20Licensees.pdf.

71.     On information and belief, no members of the Asian or Arab communities were members of the Task Force or had a substantial voice in the process that followed.

72.     The Task Force defines "stop-and-go establishment" as establishments that are: (i) legal holders of restaurant or R-licenses; and (ii) a convenience store or deli that sells beer and liquor, sometimes in quantities as low as a single shot, that may be consumed on premises or immediately outside the establishment. 47 P.S. § 218(h)(1).

73.     In October 2024, the Task Force issued its Report and Recommendations, advising the General Assembly of guidelines for legislative remedies to regulate "stop-and-gos," including streamlining the citation processes, strengthening the Compliance Program, increasing penalties and fines, and recruiting more BLCE agents. A true and correct copy of the Commonwealth of Pennsylvania Stop-And-Go Legislative Task Force Report and Recommendations (October 2, 2024) is attached as Exhibit A.

74.     Notably, the Report and Recommendations provide an alternative definition for stop-and-go establishments as "a Commonwealth licensee which holds either a restaurant liquor (R) license or an eating place retail dispenser (E) license and receives at least two violations for failing to act as a bona fide restaurant or eating place within a 12-month period." *See* Exhibit A, Report and Recommendations, pg. 9 (citing *770 Ameribeer, Inc. v. Pennsylvania Liquor Control Bd.*, 318 A.3d 998 (Pa.Cmwlth. 2024)).

75.     As of 2024, the Pennsylvania General Assembly continues to review these regulations, with some legislators advocatingfor fairer enforcement practices to avoid discrimination.

76.     Many of the targeted establishments are owned and operated by immigrants and minority entrepreneurs. The heightened regulations place an undue burden on small business

operators, leading to the closure of businesses that cannot meet the stricter standards. This, in turn, has led to claims of economic discrimination and disparate impact.

77.     Moreover, the Task Force has acknowledged that the supposed problems with the "stop-and-go" businesses it seeks to address are limited to Philadelphia, where such establishments are overwhelmingly minority-owned.

78.     The General Assembly intends to use the Task Force's Report and Recommendations to enact additional legislation regulating stop-and-go establishments. 47 P.S. § 218.

79.     On information and belief, license holders in other parts of Pennsylvania are not subject to the same repeated scrutiny as minority-owned businesses located in Philadelphia.

### Statutory and Regulatory Requirements

### The Liquor Code

80.     Most businesses selling alcohol are licensed under the Liquor Code as either retail dispensers (R licenses or Restaurant License) or eating place retail dispensers (E license). See 47 P.S. §§ 4-406, 4-407, 4-442, respectively.

81.     Retail dispenser liquor licenses (R license) allow licensees to sell distilled spirits, wine and malt or brewed beverages for consumption on the premises, and malt or brewed beverages may be sold to-go. 47 P.S. §§ 4-406, 4-407.

82.     R licensees are also eligible to obtain expanded permits to sell limited quantities of wine to-go as well as ready-to-drink cocktail permits to sell ready-to-drink cocktails on a to-go basis. 47 P.S. § 4-415.

83. Eating place retail dispenser liquor licenses (E license) allow licensees to sell only malt or brewed beverages for consumption on the premises or on a to-go basis; holders of these licenses may not sell other types of alcoholic beverages. 47 P.S. § 4-442.

84. Both R licensees and E licensees are required to offer food to the public and must have seating to accommodate thirty persons. R licensees must measure at least 400 square feet, while E licensees require a minimum of 300 square feet. 47 P.S. § 1-102.

85. Additionally, all licensees must provide: (i) no less than thirty seats immediately available and accessible to the public (seats may not be stacked); (ii) sufficient food for at least thirty patrons; (iii) dishes and utensils for at least thirty persons; (iv) a current and valid health license; (v) a functioning kitchen or food preparation area. *See* PLCB Compliance Program.

86. Licensees must also maintain and display a valid health license. 47 P.S. § 4-437; 40 Pa. Code § 5.41 (R-licensees).

<u>The Philadelphia Code</u>

87. Plaintiffs' businesses are also subject to local laws and ordinances under The Philadelphia Code, including the Curfew and Nuisance Ordinances discussed in detail herein.

88. At least fifteen of Plaintiff AALBA's members are subject to the Curfew Ordinances.

<u>The Curfew Ordinances</u>

89. Recently enacted sections 9-630, 9-641, 9-642, and 9-643 (collectively, the "Curfew Ordinances") of the Philadelphia Code restrict the hours of operation for business in certain designated areas of Philadelphia. Phila. Code §§ 9-630, 9-641, 9-642 and 9-643.

90. Sections 9-630, 9-641, and 9-642 define "Commercial Establishment" as "[a]n establishment involved in the buying and selling of goods where consumers primarily purchase

goods intended for consumption or use off premises, including a Food Establishment as defined in Code Section 6-102." This definition excludes "Food Establishments" with a Restaurant Liquor License, as well as those serving exclusively as drive-throughs or operating as gas stations. Section 9-643 defines "Commercial Establishment" without these specific exclusions.   Phila. Code §§ 9-630, 9-641, 9-642 and 9-643.

91.     Under section 6-102 "Food Establishment" is defined broadly as "[a]ny establishment or portion thereof where food is handled or sold" including various types of stands, vehicles, or vending machines but excluding facilities such as railroad dining cars in transit and financial investment and brokerage transactions where no food handling takes place with the City. Phila. Code § 6-102.

92.     On or about August 12, 2024, City Council enacted Ordinance (Bill No. 240498), amending Chapter 9-600 of The Philadelphia Code, adding various locations to the section regulating the hours of operations of certain establishments and including the modification of the definition of "Commercial Establishment" to exclude Food Establishments that serve customers exclusively from a drive-through window or fueling station. Phila. Code § 9-630 (Seventh District Commercial Business Hour Restriction).

93.     Specifically, section 9-630 prohibits any "Commercial Establishment" from operating between the hours of 11 p.m. and 6 a.m. within the following areas:

    (a) The area bounded by East Lehigh Ave., Kensington Ave., D St., East Tioga St. and Frankford Ave.

    (b) The area bounded by North 5th St., Erie Ave., North 9th St. and Roosevelt Blvd.

    (c) The area bounded by East Hunting Park Ave., North 5th St., Roosevelt Blvd. and Castor Ave.

    (d) The area bounded by East Lehigh Ave., North 2nd St., East Hunting Park Ave., Whitaker Ave., and B St.

Phila. Code § 9-630 (2).

94.    Also, on August 12, 2024, City Council enacted Ordinance (Bill No. 240474), further amending Chapter 9-600 by adding Section 9-641, which imposes restrictions on operating between the hours of 11 p.m. and 6 a.m. on "Commercial Establishments" within the area bounded by East Allegheny Avenue, Kensington Avenue, Torresdale Avenue, and Frankford Avenue. Phila. Code § 9-641 (Sixth District Commercial Business Hour Restriction).

95.    On the same date, City Council enacted Ordinances (Bill Nos. 240414 and 240468), adding Section 9-642 restricting "Commercial Establishments" in the areas of (a) Ogontz Avenue, between Haines Street and Cheltenham Avenue, on both sides and (b) the area bounded by Ogontz Avenue, between Haines Street and 66th Avenue on both sides from operating during the hours of 12 midnight and 6 a.m. Phila. Code § 9-642 (Ninth District Commercial Business Hour Restriction).

96.    Also enacted on August 12, 2024, Ordinance (Bill No. 240476) added Section 9-643, which restricts any "Commercial Establishment" from operating between 11 p.m. and 6 a.m. along the following streets:

    (a) North Broad [S]treet between West Chew Avenue and West Tabor Road.

    (b) Old York Road between West Olney Avenue and West Tabor Road

    (c) West Olney Avenue between North Broad Street and North Park Avenue.

    (d) Wagner Avenue between North Broad Street and Old York Road.

Phila. Code § 9-643 (Commercial Business Hour Restrictions Near the Boundary of the Eighth and Ninth Districts).

97.    Pursuant to the Philadelphia Police Department Memorandum (24-06) regarding Enforcement of Business Curfews, officers are required to track violations of the Curfew

Ordinances and notify the Neighborhood Nuisance Enforcement Unit of all violations, and for repeated violations "consider Nuisance Business Action, consistent with Directive 4.25, 'Nuisance Abatement Tool for Commanders'" (related to identifying Chronic and Critical Nuisance Businesses and enforcing the Nuisance Ordinance).

98.     The Curfew Ordinances primarily affect specific areas within Philadelphia where Plaintiffs operate their establishments.

99.     These restrictions thus disproportionately impact these minority groups and their businesses operating in these specific areas within the City.

100.    More affluent, whiter neighborhoods within Philadelphia are not subject to the same restrictions and oversite as Plaintiffs' businesses.

The Nuisance Ordinance

101.    Chapter 9-4400 of the Philadelphia Code, titled "Responsible Business Operations," establishes regulations to identify and address "nuisance businesses." Phila. Code §§ 9-4401-9-4406 (the "Nuisance Ordinances").

102.    While the supposed purpose is to deter criminal activity, it takes no action against the actual lawbreakers; instead, it punishes law-abiding business owners by punishing them for even alleged criminal activities *around* their businesses.

103.    In a shocking overreach of police power, the Nuisance Ordinance purports to give officers the ability to shutter businesses if violent activity happens nearby, or if they can string together seemingly trivial offenses.

104.    Section 1-112 of the Philadelphia Code provides the Police Department with the authority to issue code violation notices ("CVNs") to enforce any provision of the Philadelphia Code or any regulation adopted under the Code. Phila. Code § 1-112(a).

105.    The Police Department also has authority under section 9-4403 of the Philadelphia Code to deem businesses as "chronic nuisance business" or "critical nuisance business" and to issue a Notice of Intent to Cease Operations against them. Phila. Code § 9-4403.

106.    According to the Philadelphia Code a "chronic nuisance business" is one that has received notices for "nuisance behavior" on three (3) or more separate days within a twelve (12) month period." Phila. Code § 9-4401(1).

107.    "Nuisance behavior" includes activities that disrupt the community's health, safety, or welfare and consists of eighteen possible offenses.

108.    These range from obviously illegal conduct, such as drug dealing and prostitution, to trivial offenses completely outside the owners' control, such as littering, or a patron parking on the sidewalk.

109.    It also includes vague "catchall provisions" that incorporate unspecified other potential offenses, including, but not limited to:

* * * * *

(o) Conduct that violates the provisions of the Pennsylvania Liquor Code. . .pertaining to unlawful acts relative to liquor and licenses (47 P.S. § 4-493);

* * * * *

(q)  Repeated or continuing violations of any other City ordinance and/or regulations;

(r)  Any other activity that constitutes a public nuisance under The Philadelphia Code. Phila. Code § 9-4401(3).

110.    Moreover, the Philadelphia Code defines a "critical nuisance business" as one that has been issued a notice concerning serious violent behavior such as homicide, aggravated assault, or obstruction of an investigation related to such offenses. Phila. Code § 9-4401(5) and (6).

111.    The Police Department may issue a violation notice to a business owner when nuisance behavior or serious violent behavior has taken place inside the business or **on the sidewalk or street, abutting the business** during business hours. Phila. Code § 9-4402(1)(emphasis added); Philadelphia Police Department Directive 4.25.

112.    The Nuisance Ordinances offers no guidance on how nearby the alleged nuisance behavior must be to trigger its requirements.

113.    Indeed, read literally, the business itself could be the *victim* of a crime and then be subject to further punishment City.

114.    Such a system is wildly unfair on its face, enacting punitive measures against law-abiding citizens instead of actual criminals.

115.    This inconsistency indicates that the true purpose of the Nuisance Ordinance is to target and shut down minority-owned businesses rather than deter supposed criminal conduct.

### Enforcement of Ordinances and Statutes

#### PLCB Bureau of Licensing and BLCE

116.    The PLCB Bureau of Licensing and the BLCE play significant roles in enforcing the Liquor Code.

117.    The BLCE prioritizes the enforcement of violations commonly associated with these establishments, allocating considerable resources to monitor compliance within the City of Philadelphia and throughout the Commonwealth. *See* Exhibit A, Report and Recommendations, pg. 5.

118.    When public complaints are filed, they are investigated, and the BLCE must notify the licensee of any alleged violation within 30 days of the investigation. 47 P.S. § 4-471(b).

119.    If violations of the Liquor Code are found, the BLCE may issue a citation, which is then adjudicated by an Administrative Law Judge (ALJ). 47 P.S. § 4-471(a).

PLCB Licensee Compliance Program

120.    As mandated by Act 44 of 2017, which amended the Fiscal Code, the PLCB's Bureau of Licensing and the Licensee Compliance Program oversee establishments' adherence to requirements regarding seating, food, square footage, and other criteria. 72 P.S. § 1799.6-E; s*ee also* PLCB Compliance Program.

121.    Upon receiving a complaint, a licensing analyst and law enforcement officer conduct an unannounced on-site inspection for compliance. PLCB Compliance Program.

122.    If violations are found, they document the deficiencies with photographs and impose an unappealable administrative suspension of the operating privileges. *Id.*; 72 P.S. § 1799.6-E(a)(1) and (b).

123.    A follow-up inspection occurs within five to ten business days to verify compliance, and operating privileges remain suspended if deficiencies remain. PLCB Compliance Program.

124.    Repeated violations within a 12-month period escalate penalties, including a minimum license suspension of twenty days for a second offense and thirty days for a third. *Id.*

125.    The PLCB's Bureau of Licensing has the authority to object to or deny license renewal based on a licensee's operational history, such as prior citations (by reaching out to police for public records and police incident reports), the reputations of owners and officers, compliance with statutory requirements, and incidents occurring on or near the premises that may affect public safety or welfare. 47 P.S. § 4-470.

126.    Once an establishment is identified through the citation process or through the PLCB Compliance Program, the PLCB can further evaluate these businesses during license renewal and deny the renewal, which occurs every two years. *Id.*

127.    If a license is revoked, the affected business is ineligible to have a license until the expiration of three years from the date the license is revoked. 47 P.S. § 4-471(b).

128.    Philadelphia County currently has more retail liquor licenses than the Pennsylvania Liquor Code allows; therefore, if a plaintiff's liquor license is revoked or not renewed, the license ceases to exist.

129.    The only ways to obtain a liquor license are by transferring a license from an existing owner or by purchasing one from a current licensee or at auction.

130.    R-licenses can sell for up to $300,000, while E-licenses go for around $150,000.

131.    Given the high demand, the prices are likely to be even higher by the time they are eligible to obtain a new license (three years from the date it is revoked)

132.    The PLCB may refuse to renew a license:

(1) if the licensee, its shareholders, directors, officers, association members, servants, agents or employees have violated any of the laws of the Commonwealth or any regulations of the board;

(2) if the licensee, its shareholders, directors, officers, association members, servants, agents or employees have one or more adjudicated citations under the license seeking to be renewed or any other license issued by the board or were involved in a license whose renewal was objected to by the Bureau of Licensing;

(3) if the licensed premises no longer meets the requirements of this act or the board's regulations; or

(4) due to the manner in which this or another licensed premises was operated while the licensee, its shareholders, directors, officers, association members, servants, agents or employes were involved with that license. When considering the manner in which this or another licensed premises was being operated, the board may consider activity that occurred on or about the licensed premises or in areas under the licensee's control if the activity occurred when the premises was open for operation and if there was a

relationship between the activity outside the premises and the manner in which the licensed premises was operated. The board may take into consideration whether any substantial steps were taken to address the activity occurring on or about the premises.

47 P.S. § 4-470(a.1).

133.    The ambiguous and overly broad interpretation of the term "activity" considered during the renewal process could unjustly punish businesses through the non-renewal of liquor licenses in circumstances where they were actually the *victims* of a crime.

134.    This, combined with the fact that the PLCB may also consider police incident reports or citations in its decision-making process, discourages businesses from calling the police for assistance or reporting crimes occurring on or near their premises.

**The Ordinances of The Philadelphia Code are Unconstitutionally Vague and Overbroad**

135.    For the reasons set forth herein, among others, the Curfew and Nuisance Ordinances are unconstitutionally vague and overbroad.

136.    As set forth above, the Curfew Ordinances regulate the operations of "Commercial Establishments."

137.    The Curfew Ordinances of the Philadelphia Code define "Commercial Establishment" as "[a]n establishment involved in the buying and selling of goods where consumers primarily purchase goods intended for consumption or use off premises, including a Food Establishment as defined in Code Section 6-102 . . . ." Phila Code §§ 9-630(1), 9-641(1), 9-642(1), 9-643(1).

138.    However, the Curfew Ordinances do not define critical terms such as "primarily" or "goods," which are essential for the application and enforcement of the regulations.

139.    This lack of clarity leaves the ordinances susceptible to arbitrary and discriminatory enforcement.

140.    The Curfew Ordinances do not provide any mechanism or clear standard for the Philadelphia Police to determine whether a business qualifies as a "Commercial Establishment" under the ordinances.

141.    The Curfew Ordinances' definition of "Commercial Establishment" is so vague that persons of ordinary intelligence must guess its meaning and application, leading to inconsistent enforcement.

142.    This vagueness allows for selective enforcement.

143.    Upon information and belief, as with efforts to enforce the prior curfew ordinance, enforcement of the new Curfew Ordinance is once again selective and targeted toward minority-owned businesses.

144.    Section 9-4402(1) of the Nuisance Ordinances, which allows establishments to be issued notices of violation based on nuisance behavior or serious violent behavior that has taken place inside the business or on the sidewalk or street, abutting the business is unconstitutionally overbroad and vague. Phila. Code § 9-4402(1)(emphasis added)

145.    The broad scope of this provision invites arbitrary and discriminatory enforcement as it encompasses a wide range of behaviors, including activities not related to the operation of the business itself.

146.    The Nuisance Ordinance also includes the extreme punitive measure of shutting down a business, even if the business did not contribute to the offending behavior.

147.    The overly broad scope of the Nuisance Ordinance unlawfully infringes upon the Plaintiffs' protected right to petition law enforcement for protection or to report criminal activity on or near their property without fear of reprisal or punishment.

148.    As a result, several Plaintiffs have expressed reluctance to contact law enforcement out of fear that doing so will generate police reports, which could later be used as grounds for denying their liquor licenses.

149.    This chilling effect on the fundamental right to petition the police underscores the unconstitutional nature of the Nuisance Code's vague and overly broad provisions.

150.    Defendants intentionally discriminated against members of a minority group and their businesses based on race and/or national origin by deliberately crafting the Curfew and Nuisance Ordinances to produce discriminatory effects.

151.    The Curfew and Nuisance Ordinances were designed and have been enforced to disproportionately target specific groups and their businesses, resulting in discriminatory effects that violate both the United States Constitution and the Pennsylvania Constitution.

152.    The vagueness and overbreadth of the Curfew and Nuisance Ordinances are further demonstrated by the record of enforcement actions taken by the Philadelphia Police Department, as detailed below.

153.    The inconsistent and arbitrary nature of these actions illustrates how the ordinances are being applied in a manner that fails to provide adequate notice and results in unequal treatment.

**Provisions of the Liquor Code Governing Renewal of Liquor Licenses are Unconstitutionally Vague and Overbroad**

154.    For the reasons set forth herein, among others, the provisions of the Liquor Code governing the renewal of liquor licenses are unconstitutionally vague and overbroad.

155.    As set forth above, Section 4-470 of the Liquor Code governs the renewal of liquor licenses and establishes the criteria that the Director of the Bureau Licensing and the PLCB may

consider when grating or denting an application for the renewal of a liquor license. 47 P.S. § 4-470.

156.    The grounds for objecting to and refusing the renewal of a liquor license include violations of any laws of the Commonwealth or any regulations promulgated by the PLCB, as well as the existence of one or more adjudicated citations associated with the license sought to be renewed or any other license issued by the PLCB. 47 P.S. § 4-470(a.1).

157.    Additionally, the renewal process permits consideration of the vague and overly broad term "activity" occurring on or near the licensed premises or in areas under the licensee's control.[2] 47 P.S. § 4-470(a.1)(4).

158.    The provisions of Section 4-470 of the Liquor Code fail to provide clear standards or adequate notice to licensees regarding the criteria for renewal decisions.

159.    Allowing consideration of vague and overly broad terms such as "activity" and basing decisions regarding renewals on the undefined "activity" invites arbitrary and discriminatory decision-making.

160.    The broad and undefined scope of "activity" also infringes on licensees' fundamental right to petition law enforcement for assistance or to report a crime.

161.    Several Plaintiffs have expressed reluctance to contact law enforcement out of fear that doing so will generate police reports of "activity," which may later be cited as grounds for denying their liquor licenses.

162.    This chilling effect on the fundamental right to petition the police underscores the unconstitutional nature of the Liquor Code's vague and overly broad provisions.

---

[2] The Liquor Code does limit this to "activity" that took place while the premises were open for operation and bore a relationship to the manner in which the licensed premises was operated. *See* 47 P.S. ¶ 4-470(a.1).

163.    Furthermore, Defendants' actions have resulted in the suspension of operating privileges (effective immediately) resulting in significant financial harm, disruption of regular business, and a further threat to the renewal of their licenses.

164.    Defendants' actions have further threatened to permanently close established businesses arbitrarily and without adequate due process and/or result in non-renewal of their liquor licenses

### The Philadelphia Code and Liquor Code Have Been Selectively Enforced to Discriminate Against Certain Groups and Their Businesses in Violation of the Equal Protection Clause of the United States and Pennsylvania Constitutions

165.    The Philadelphia Code and Liquor Code have been selectively enforced against certain minority groups, including Plaintiffs and their businesses, resulting in discriminatory treatment.

166.    As detailed herein, the Curfew and Nuisance Ordinances are impermissibly vague and overbroad in both their language and their application, enabling selective enforcement against Plaintiffs in violation of constitutional protections.

167.    Specifically, in addition to being unconstitutionally vague and overbroad, the Curfew Ordinances target specific geographic areas within the City of Philadelphia, leading to disparate treatment for Plaintiffs who are licensed to sell certain alcoholic beverages for consumption off-premises compared to other licensees across the City of Philadelphia and the Commonwealth of Pennsylvania who are not subject to the same restrictions.

168.    The restrictions based on geography are arbitrary and bear no rational relationship to any legitimate state interest.

169.    Additionally, the establishment of the Task Force and the implementation of its Report and Recommendations will likely lead to further targeted enforcement efforts that violate Plaintiffs' equal protection rights of the United States and Pennsylvania Constitutions.

170.    There is a clear path set for the laws to be applied in a discriminatory manner, disproportionately impacting Plaintiffs and other minority-owned businesses.

171.    The harm from this is compounded because the PLCB then uses these alleged violations as a pretext to avoid renewal of the liquor licenses for the impacted businesses.

172.    In previous years, the PLCB would simply issue a renewal—or in exceedingly rare cases, a denial—of the license in question during each renewal period.

173.    In a complete change from the past practice, the PCLB has now issued dozens of "temporary renewal" letters refusing to renew many liquor licenses pending the results of a hearing.

174.    The enforcement practices of the Defendants reveal a consistent and discriminatory pattern of targeting Plaintiffs as detailed below.

<u>Yo Deli Inc.</u>

175.    In some instances, the PLCB now purports to take action against Plaintiff and their members based on alleged violations in the distant past. For instance, AALBA member Yo Deli Inc. recently received a temporary license renewal from PLCB, claiming it may have abused its license based on two provided citation numbers: 15-174 and 13-1726. A true and correct copy of the citations and the PLCB letter regarding temporary renewal are attached as Exhibit B.

176.    However, as the first two digits in the citation numbers indicate the year the citations were issued, it is evident that the most recent of those citations occurred nearly *ten years* ago, with the other occurring over *eleven years ago.*

177.    Yo Deli Inc. has renewed its license multiple times in the interim without issue, investing considerable time, effort, and money into the business year after year.

178.    PLCB now arbitrarily threatens the existence of the business nearly a decade later, illustrating its clear bias and efforts to shut down minority-owned businesses like Yo Deli Inc. at any cost.

179.    In effect, the PLCB appears to be taking the unfair position that any citation, no matter how remote in time, could resurface at any time and for any reason to shut down a law-abiding business in the future.

180.    Yo Deli Inc. has also been the target of unfair efforts to drum up new citations.

181.    In June 2024, immediately upon opening the store, white inspectors for the PLCB came in to inspect and measure the premises.

182.    While the staff prepared to open the store and was sweeping, the inspectors began yelling and accusing them of adding additional seating.

183.    This would have been impossible for additional seating to be added in that matter.

184.    After this hostile exchange, the inspector left.

185.    The inspector returned later purporting to shut down Yo Deli Inc, not because there was insufficient seating, but because they felt there should have been a sign advising patrons that additional seating was available on the second floor.

186.    Setting aside that the additional seating should be obvious to customers, there is no express requirement in the law to post such a sign.

187.    Even if there was, remediating the issue would be trivial and could be accomplished immediately for virtually zero expense.

188.    Despite this, the inspector required Yo Deli Inc. to shut down for two weeks, causing significant financial harm, disruption of regular business, and a further threat to renewal of its license.

189.    Based on the old violation and the trivial claim that it was missing a sign, PLCB now arbitrarily threatens the existence of the business by issuing only a temporary license based on this conduct, illustrating its clear bias and efforts to shut down minority-owned businesses like Yo Deli Inc. at any cost.

7701 Ogontz Inc.

190.    The City of Philadelphia, using the Nuisance Business Ordinance, also actively seeks to disrupt and shut down members of Plaintiff's organization.

191.    For instance, 7701 Ogontz Inc. operates Riley Deli in Philadelphia.

192.    On or about February 28, 2024, they received a warning from the City accusing them of being a nuisance business. A true and correct copy of the police incident report and the warning letter are attached as Exhibit C.

193.    This allegation was based on the fact that members of the Police Department arrested two individuals in Riley Deli for allegedly selling drugs somewhere nearby the restaurant.

194.    During the arrest that followed, one of the individuals appeared to break several fingers. That individual was ultimately released at the scene.

195.    On information and belief, the allegations against both these individuals were later dismissed.

196.    However, the City of Philadelphia has not withdrawn its citations against Riley Deli, warning that with further violations the City could "begin legal action to close your establishment."

29

197.    This has the perverse effect that Riley Deli is subject to punishment, even where, apparently, no underlying crime was committed.

198.    Officers at the scene asserted to the manager of Riley Deli that if there was another incident or if they received another ticket, the business would be shut down.

199.    As a result, Riley Deli's owners, managers, and employees are afraid to even contact the police or report potential criminal activity in the neighborhood out of concern that they will receive another nuisance violation, which could result in the closing of the establishment.

<u>Best Beer, Inc.</u>

200.    On or about February 22, 2022, the BLCE issued a citation (Citation No. 22-0189) to Best Beer, Inc., alleging that it did not meet the 300 square-foot public space requirement for an eating place license.

201.    As a result, Best Beer was shut down for two weeks, and a liquor license suspension placard was displayed on the storefront. On June 6, 2022, an administrative hearing was held, and the citation was dismissed, finding that BLCE had failed to establish that Best Beer had inadequate square footage.

202.    Despite the citation being dismissed, Best Beer received a letter on October 17, 2024 from the PLCB in response to its application for renewal. This letter indicated that the PLCB was considering the previously dismissed citation as part of its determination on the renewal application. A true and correct copy of the October 17, 2024 letter and Adjudication is attached as Exhibit D.

203.    Best Beer incurred $1,750 in legal fees related to the citation and the administrative hearing.

204.    To make matters worse, Best Beer shares common ownership with a similar establishment called Sky Beer Deli, Inc. ("Sky Beer").

205.    Sky Beer has *never* been shut down due to an inspection by the BLCE or Police Department.

206.    Despite this, Sky Beer received only a temporary license renewal. On information and belief, Defendants are attempting to use the same *dismissed* allegations against Best Beer to shut down the business of a separate business. A true and correct copy of the October 18, 2024 letter is attached as Exhibit D.

<u>Bu-Bu Deli</u>

207.    Maya 2008 Investment Group LLC operates Bu-Bu Deli at 3153 N. 22nd Street in Philadelphia.

208.    On or about September 12, 2024, Bu-Bu Deli received two CVNs from the Philadelphia Police Department for patrons drinking on the sidewalk in front of the establishment and creating a nuisance. A true and correct copy of the CVNs and City of Philadelphia warning letter are attached as Exhibit F.

209.    These individuals were not encouraged to loiter anywhere near the business, nor could Bu-Bu Deli force them to leave a public sidewalk where they otherwise had a right to be.

210.    The business is also located near a bus stop, where residents *need* to gather in order to ride public transportation.

211.    The owners and managers of Bu-Bu Deli have no means to determine who is unlawfully loitering nearby, as opposed to waiting for a bus.

212.    On or about September 14, 2024, Bu-Bu Deli received CVN 6456364-5 also for creating a nuisance and a separate Complaint or Incident Report was issued describing the incident

as follows "Upon arrival at the business at the above location Police observed multiple individuals creating a nuisance by blocking the active pedestrian sidewalk and, when politely asked, failed to disperse from outside the store." *See* Exhibit F.

213.    To the extent these individuals did anything unlawful in the first instance, they received no punishment. Instead, only Bu-Bu Deli received a citation.

214.    These citations were accompanied by threats that further citations could result in the closure of this business.

<u>700 SE Inc.</u>

215.    700 SE Inc. operates a takeout business at 700 Snyder.

216.    Like many members of the AALBA and AAB, the owners of 700 SE Inc. have limited English proficiency, but have nevertheless been able to establish a successful business that serves the community in South Philadelphia.

217.    700 SE Inc. has nevertheless received two citations from the Police Department, based on conduct over which it has no control.

218.    For the first citation, the officer cited Section 10-604(2)(a), which prohibits the consumption of alcohol in public parks and similar spaces.

219.    To extent anyone has loitered in front of the business, the owners or managers of 700 SE Inc., generally asked them to leave.

220.    However, much like the owners of 700 SE Inc., the patrons often have limited English skills as well, making any communication (much less a directive to leave) difficult.

221.    Regardless, the cited ordinance was inapplicable and, further, it was the individuals and not the business who committed the alleged violation.

222.    On information and belief, those accused of loitering received no punishment.

223.    On a second instance, the officer allegedly observed empty beer containers in bushes nearby, citing the Nuisance Ordinance restriction on illegal consumption of alcohol.

224.    In fact, the Nuisance Ordinance also expressly identifies littering as a form of nuisance behavior.

225.    In effect, other people's attempts to litter are now a potential basis to shut down 700 SE Inc. business.

226.    Given the general condition of streets, and the common sight of empty alcohol containers, virtually any business in Philadelphia could be subject to citation for violating the Nuisance Ordinance

227.    However, the selective enforcement has targeted minority-owned businesses instead.

228.    700 SE Inc. is left in a precarious position, as even a trivial offense by one of its customers, or even a random person passing by the store, could not serve as a basis for a third citation that could shut down the business.

<u>CDD 725, Inc.</u>

229.    Upon information and belief, CDD 725, Inc. has been subjected to numerous unfounded and unnecessary inspections, which were allegedly conducted with the intent and effect of intimidating, harassing, and threatening Plaintiffs. A true and correct copy of the Philadelphia Police Department Complaint or Incident Reports from April 23, 2024, September 18, 2024 and October 21, 2024 are attached as Exhibit G.

230.    Despite each unannounced inspection's Complaint or Incident Report stating that "no issues were noted," the assigned police officer continued to conduct repeated inspections without any new basis or violations observed. *Id.*

231.    On or about October 21, 2024, an officer from the Philadelphia Police Department arrived at CDD 725 for an unannounced inspection. During the issuance of the incident report, the officer requested that the manager on duty sign the notice, which once again confirmed that there were no violations.

232.    There is no printed space on the incident report form which requires, or even requests, that an owner or manager sign.

233.    That line was added by hand by the officer.

234.    When the manager on duty asked why he needed to sign, the officer immediately became hostile, raised his voice, and issued threats.

235.    The officer accused the manager of "giving him a hard time" and "breaking his stones."

236.    The officer then threatened to return every day for further inspections.

237.    The officer made good on this threat, having returned for further inspections on at least two separate occasions since then.

238.    Illustrating the concerted action between the City and the PLCB, the officer further threatened that he would "come back with the LCB and we'll see how that works out."

239.    On a separate occasion, the officer advised the owner that stores like his are liable for crimes in the area.

240.    The owner of CDD 725 Inc. went to the local precinct to try and find more information about this conduct and why he was the subject of repeated inspections or requests that he sign these incident reports.

241.    Instead of answers, the owner received conflicting explanations about the number of inspections and the reasons he was presented with the citation.

Other Impacted Businesses

242.    Even businesses that do not serve alcohol, but serve the community by offering flexible hours, are suffering as a result of these practices.

243.    For instance, several member organizations of AAB do not sell alcohol, but still suffer considerable harm from the curfew ordinances.

244.    Once such member operates a grocery store, known as the Quick Stop, on Kensington Avenue.

245.    Their business relies on having flexible hours to serve the community, which suffers from a lack of quality options for fresh food.

246.    In particular, shift workers and other working-class people depend on businesses that are open after 11 p.m.

247.    The Quick Stop is one of the only businesses that can cater to these needs, providing fresh meat, produce, and dairy products to this underserved community, even at odd hours.

248.    Reducing the time members of AAB can operate has a significant impact on their revenue, which relies on their flexible hours.

249.    On information and belief, other businesses not owned by minorities are not subject to the same level of enforcement.

250.    These are but a few examples of the discriminatory conduct faced by members of the Asian and Arab business owners in Philadelphia.

251.    Of AALBA's approximately 110 members, nearly 60 have already received an adverse action from the PLCB in the form of temporary renewals to their liquor licenses based on the selective and discriminatory enforcement of the law.

252.    For context, in prior renewal periods, on average *one* member of AALBA would receive an adverse action, in the form of an outright rejection of their renewal application.

253.    Defendants' actions threaten to permanently close established businesses arbitrarily and without adequate due process and/or result in non-renewal of their liquor licenses.

254.    Defendants' conduct is part of a concerted pattern targeted at these minority-owned businesses, with the express purpose of shutting them down.

255.    On information and belief, even if a single citation or enforcement action is defeated by Plaintiffs or its members, Defendants will simply keep harassing them until they drum up a basis for further enforcement action, or the stress, expense, and uncertainty of operating under these conditions push the owners to abandon the business.

256.    Several members of AALBA and ABA have already expressed that they are considering closing or selling their businesses to escape the harassment and avoid the uncertainty that they will be shut down arbitrarily.

257.    These instances collectively demonstrate a sustained pattern of enforcement actions, unannounced inspections, and citation issuances disproportionately directed at Plaintiffs' businesses.

258.    On information and belief, other similarly situated businesses possessing liquor licenses in Philadelphia, owned by non-minorities or controlled by larger corporate interests, are treated differently and are not subject to the same frequency of inspection or the repeated bad-faith interpretations of the applicable requirements.

259.    On information and belief, similarly situated businesses possessing liquor licenses and operating in neighborhoods in Philadelphia where the racial makeup of the owners is not

overwhelmingly Asian or Arab, are not subject to the same stringent requirements or level of enforcement.

260.    On information and belief, similarly situated businesses possessing liquor licenses operating in neighborhoods in Philadelphia where the clientele is predominantly white are not subject to the same stringent requirements or level of enforcement.

261.    On information and belief, similarly situated white-owned businesses, takeouts, grocery stores, or restaurants possessing liquor licenses are not similarly designated as potential nuisances.

262.    To make matters worse, this conduct makes the impacted businesses *less safe* by creating a barrier to contacting the police to report any crimes in the area.

263.    By reporting a crime, business owners risk receiving a citation, even if they are the victim of criminal activity.

264.    This same catch-22 can similarly impact their liquor licenses, given the coordination between the City of Philadelphia and the PLCB on this issue.

265.    As Plaintiffs and their members stand to lose their businesses and livelihoods from this pattern of unlawful conduct, they now seek recourse from this Court to enjoin the discriminatory enforcement and application of the overbroad, vague, and inconsistently enforced laws and ordinance, threatening to close businesses throughout the City.

266.    The Plaintiffs, and the members of AALBA and ABA will face significant, irreparable damages if the discriminatory enforcement practices continue.

### COUNT I
### 42 U.S.C. § 1983
### Plaintiffs v. All Defendants
### Violation of Due Process – Ordinances are Unconstitutionally Vague and Overbroad

267.    Plaintiffs incorporate the preceding paragraphs as though set forth in their entirety.

268.    The due process clauses of the Fifth and Fourteenth Amendments to the Constitution prohibit the enforcement of legislation that is unconstitutionally vague and overbroad.

269.    The state and local laws are unduly vague and overbroad because the prohibitions are not sufficiently defined and do not provide a person of ordinary intelligence fair notice of what conduct is prohibited.

270.    As a result, Plaintiffs, similarly situated business owners, and law enforcement charged with enforcing the state and local laws are left without adequate guidance on the correct interpretation.

271.    The impermissibly vague and overbroad terms of the state and local laws invite selective discriminatory enforcement, which has resulted in harm to the Plaintiffs, as described in detail herein.

272.    Defendants acted under color of state law in adopting, administering, and enforcing the actions and laws described herein.

273.    Accordingly, the state and local laws are void under the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

274.    As a direct and proximate result of the Defendants' intentional and discriminatory conduct, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm, including but not limited to financial loss, loss of business opportunities, and emotional distress, as set forth in greater detail above

**COUNT II**
**Pennsylvania Constitution, Article I, Section 1**
**Plaintiffs v. All Defendants**
**Violation of Due Process – Ordinances are Unconstitutionally Vague and Overbroad**

275.    Plaintiffs incorporate the preceding paragraphs as though set forth in their entirety.

276.    Article I, Section 1 of the Pennsylvania Constitution provides: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa.Const. art. I, § 1.

277.    A due process claim brought under the Pennsylvania Constitution is indistinguishable from a due process claim brought under the Fourteenth Amendment of the United States Constitution; the same analysis applies to both.

278.    Accordingly, the state and local laws are void under the due process clause of the Pennsylvania Constitution.

279.    As a direct and proximate result of the Defendants' intentional and discriminatory conduct, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm, including but not limited to financial loss, loss of business opportunities, and emotional distress, as set forth in greater detail above.

**<u>COUNT III</u>**
**Plaintiffs v. All Defendants**
**Violation of First Amendment – Right to Petition**

280.    Plaintiffs incorporate the preceding paragraphs as though set forth in their entirety.

281.    The First Amendment to the United States Constitution guarantees the right to petition the government to redress grievances.

282.    Under the First Amendment's "right to petition" clause, communications to law enforcement—including reporting criminal activity—are constitutionally protected activities.

283.    Defendants' enforcement of the state and local laws against Plaintiffs directly violates their rights to petition the government to redress grievances.

284.    Plaintiffs are reluctant to report any criminal activity in or around their establishments to law enforcement for fear of receiving a violation notice and triggering the shutdown of their establishments and/or non-renewal of their liquor licenses.

285.    Thus, the state and local laws have create an undue chilling effect on Plaintiffs' fundamental right to petition the police for protection.

286.    The state and local laws do not advance any compelling government interest and are not narrowly tailored to justify the infringement on Plaintiffs to call the police.

287.    Defendants acted under color of state law in adopting, administering, and enforcing the actions and laws described herein.

288.    Accordingly, the state and local laws violate the First Amendment and its Pennsylvania equivalent.

289.    As a direct and proximate result of the Defendants' intentional and discriminatory conduct, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm, including but not limited to financial loss, loss of business opportunities, and emotional distress, as set forth in greater detail above.

**<u>COUNT IV</u>**
**Pennsylvania Constitution – Article I, Section 20**
**(Plaintiffs v. All Defendants)**
**Violation of First Amendment - Right to Petition**

290.    Plaintiffs incorporate the preceding paragraphs as though set forth in their entirety.

291.    Article I, Section 20 of the Pennsylvania Constitution provides: "Citizens have the right to . . .petition the government for redress of grievances." Pa.Const. art. I, § 20.

292.    Claims under Article I, Section 20 are analyzed in the same way as claims made for a right to petition under the First Amendment of the United States Constitution.

293.    All of the aforementioned acts deprived Plaintiffs and their members of the rights guaranteed to citizens of Pennsylvania by Article I, Section 20 of the Pennsylvania Constitution.

294.    As a direct and proximate result of the Defendants' intentional and discriminatory conduct, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm, including but not limited to financial loss, loss of business opportunities, and emotional distress, as set forth in greater detail above.

### COUNT V
### Plaintiffs v. All Defendants
### Violation of First Amendment – Ordinances are Unconstitutionally Overbroad

295.    Plaintiffs incorporate the preceding paragraphs as though set forth in their entirety.

296.    The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits the enactment of laws that restrict the freedom of speech.

297.    The state and local laws are unconstitutionally overbroad because the prohibitions are not sufficiently defined and do not provide a person of ordinary intelligence fair notice of what conduct is prohibited.

298.    The overbroad state and local laws extend far beyond any legitimate government interest and significantly restrict protected conduct, including the right to petition law enforcement.

299.    The impermissibly overbroad state and local laws invite selective discriminatory enforcement, which has resulted in harm to the Plaintiffs, as described in detail herein.

300.    Defendants acted under color of state law in adopting, administering, and enforcing the actions and laws described herein.

301.    Accordingly, the state and local laws are void under the First Amendment to the United States Constitution.

### COUNT VI
### Pennsylvania Constitution, Article I, Section 20

**Plaintiffs v. All Defendants**
**Violation of First Amendment – Ordinances are Unconstitutionally Overbroad**

302.    Plaintiffs incorporate the preceding paragraphs as though set forth in their entirety.

303.    Article I, Section 20 of the Pennsylvania Constitution provides: "Citizens have the right to . . .petition the government for redress of grievances." Pa.Const. art. I, § 20.

304.    Claims under Article I, Section 20 are analyzed in the same way as claims made for a right to petition under the First Amendment of the United States Constitution.

305.    All the aforementioned acts deprived Plaintiffs and their members of the rights guaranteed to citizens of Pennsylvania by Article I, Section 20 of the Pennsylvania Constitution.

306.    Accordingly, the state and local laws are void under Article I, Section 20 of the Pennsylvania Constitution.

307.    As a direct and proximate result of the Defendants' intentional and discriminatory conduct, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm, including but not limited to financial loss, loss of business opportunities, and emotional distress, as set forth in greater detail above.

## COUNT VII
### 42 U.S.C. § 1983, Procedural Due Process
### (Plaintiffs v. Commonwealth Defendants)

308.    Plaintiffs incorporate the preceding paragraphs as though set forth in their entirety.

309.    Plaintiffs have a protected interest in maintaining their liquor licenses, which are essential to the operation of their businesses, as well as in the continued operation of the business itself to sustain their livelihood

310.    Defendants have acted intentionally and unlawfully to strip Plaintiffs of their protected interests by enjoining them from operating their businesses without prior notice or

warning, often for weeks at a time, and without providing any procedures to challenge or contest these actions.

311.    As a result of Defendants' actions, Plaintiffs have been unjustly deprived of their livelihood without the due process of law.

312.    As set forth in greater detail above, Plaintiffs will suffer immediate and irreparable harm if Defendants are not enjoined from continuing their unlawful conduct, including the arbitrary and improper closure of Plaintiffs' businesses without due process.

313.    Defendants acted under color of state law in adopting, administering, and enforcing the actions and laws described herein.

314.    Defendants' conduct was for an unlawful purpose: to target and discriminate against Plaintiffs, depriving them of their constitutional rights and protected interests.

315.    As a direct and proximate result of the Defendants' intentional and discriminatory conduct, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm, including but not limited to financial loss, loss of business opportunities, and emotional distress, as set forth in greater detail above.

### COUNT VIII
**Pennsylvania Constitution, Article I, Section 1, Procedural Due Process**
**Plaintiffs v. Commonwealth Defendants**

316.    Plaintiffs incorporate the preceding paragraphs as though set forth in their entirety.

317.    Article I, Section 1 of the Pennsylvania Constitution provides: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa.Const. art. I, § 1.

318.    A due process claim brought under the Pennsylvania Constitution is indistinguishable from a due process claim brought under the Fourteenth Amendment of the United States Constitution; the same analysis applies to both.

319.    All of the aforementioned acts deprived Plaintiffs and their members of the rights guaranteed to citizens of Pennsylvania by Article I, Section 1 of the Pennsylvania Constitution.

320.    As a direct and proximate result of the Defendants' intentional and discriminatory conduct, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm, including but not limited to financial loss, loss of business opportunities, and emotional distress, as set forth in greater detail above.

**COUNT IX**
**42 U.S.C. § 1983**
**(Plaintiffs v. All Defendants)**
**Violation of Equal Protection - Selective Enforcement**

321.    Plaintiffs incorporate the preceding paragraphs as though set forth in their entirety.

322.    Plaintiffs, as members of a minority group, are a protected class under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

323.    Defendants deprived Plaintiffs of equal protection under the law by "selective enforcement" of state and local laws in a purposeful and discriminatory manner against Plaintiffs.

324.    Similarly situated, non-minority group business owners possessing liquor licenses in the City of Philadelphia and the Commonwealth of Pennsylvania are treated differently than Plaintiffs.

325.    Defendants have selectively and discriminatorily enforced the state and local laws against Plaintiffs based on race, in contrast to non-minority group business owners possessing liquor licenses in other parts of the City of Philadelphia and the Commonwealth.

326. The acts complained of were carried out by the Defendants under the color of state law in their capacities as policymakers, city and state officials and/or police officers, pursuant to the customs, usages, practices, procedures, and laws of the City of Philadelphia, the Philadelphia Police Department, the Commonwealth of Pennsylvania and the Pennsylvania Liquor Control Board.

327. Said acts of defendants served no legitimate or reasonable law enforcement purpose and were objectively unreasonable, disproportionate when compared to other similarly licensed establishments in the same community and calculated to harass and intimidate Plaintiffs motivated by racial animus.

328. These acts of intimidation were performed regularly, purposefully, maliciously, selectively, and without proper cause.

329. All of the aforementioned acts deprived Plaintiffs and their members of the rights, equal protections, and privileges guaranteed to citizens of the United States by the Fourteenth Amendment to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983

330. As a direct and proximate result of the Defendants' intentional and discriminatory conduct, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm, including but not limited to financial loss, loss of business opportunities, and emotional distress, as set forth in greater detail above.

**COUNT X**
**Pennsylvania Constitution, Article I, Sections 26, 29**
**Plaintiffs v. All Defendants**
**Violation of Equal Protection - Selective Enforcement**

331. Plaintiffs incorporate the preceding paragraphs as though set forth in their entirety.

332.    Article I, Section 26 of the Pennsylvania Constitution provides: "[n]either the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right." Pa.Const. art. I, § 26.

333.    Article I, Section 29 of the Pennsylvania Constitution provides: [e]quality of rights under the law should not be denied or abridged in the Commonwealth of Pennsylvania because of the race or ethnicity of the individual." Pa.Const. art. I, § 29.

334.    Equal protection claims under Article I, Sections 26 and 29 of the Pennsylvania Constitution are analyzed in the same way as claims made pursuant to the Fourteenth Amendment of the United States Constitution.

335.    All of the aforementioned acts deprived Plaintiffs and their members of the rights, equal protections, and privileges guaranteed to citizens of Pennsylvania by Article I, Section 26 of the Pennsylvania Constitution.

336.    As a direct and proximate result of the Defendants' intentional and discriminatory conduct, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm, including but not limited to financial loss, loss of business opportunities, and emotional distress, as set forth in greater detail above.

**COUNT XI**
**42 U.S.C. § 1983**
**Plaintiffs v. Defendants**
**Civil Conspiracy**

337.    Plaintiffs incorporate the preceding paragraphs as though set forth in their entirety.

338.    One or more of the Defendants participated in a conspiracy to cover up unlawful conduct against Plaintiffs.

339.    The conspiracy, as it applied to Plaintiffs, was an expressed or implied agreement between the Defendants and others, whose exact identity is unknown to Plaintiffs, to deprive Plaintiffs of their constitutional rights by selective enforcement of local and state laws.

340.    The acts complained of were carried out by the Defendants under the color of state law in their capacities as policymakers, city and state officials and/or police officers, pursuant to the customs, usages, practices, procedures, and laws of the City of Philadelphia, the Philadelphia Police Department, the Commonwealth of Pennsylvania and the Pennsylvania Liquor Control Board.

341.    As a direct and proximate result of the Defendants' participation in the conspiracy, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm, including but not limited to financial loss, loss of business opportunities, and emotional distress, as set forth in greater detail above.

## COUNT XII
### 28 U.S.C. § 2201, et seq. - Declaratory Judgment
### Plaintiffs v. Defendants

342.    Plaintiffs incorporate the preceding paragraphs as though set forth in their entirety.

343.    This action for declaratory relief is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq.

344.    The purpose of a declaratory judgment is to afford relief from uncertainty with respect to rights, status, and other legal relations and is to be liberally construed and administered.

345.    To sustain an action under the Declaratory Judgment Act, a plaintiff must demonstrate an "actual controversy" indicating imminent and inevitable litigation and direct, substantial, and present interest.

346.    Defendants have acted intentionally and unlawfully to strip Plaintiffs of their protected interests by enjoining them from operating their businesses without prior notice or warning, often for weeks at a time, and without providing any procedures to challenge or contest these actions.

347.    Defendants' actions have resulted in the suspension of operating privileges (effective immediately), which has caused significant financial harm, disruption of regular business, and an immediate threat to the renewal of their licenses.

348.    Plaintiffs have suffered and will continue to suffer immediate and irreparable harm, including but not limited to financial loss, loss of business opportunities, and emotional distress if the state and local law at issue are not declared unconstitutional and void as set forth in detail above.

WHEREFORE, Plaintiffs respectfully request that this Court issue the following relief:

1.    A preliminary and permanent injunction enjoining Defendants from continuing their unlawful and discriminatory treatment of Plaintiffs, including the selective enforcement of state and local laws, specifically the Curfew and Nuisance Ordinances and Section 4-470 of the Liquor Code governing renewal of licenses, and prohibiting any further harassment, intimidation, or retaliation related to Plaintiffs' business operations;

2.    A preliminary and permanent injunction restraining Defendants from denying or obstructing the renewal of Plaintiffs' liquor licenses or business permits based on discriminatory, unconstitutional, or unlawful criteria, including the improper application of the Curfew and Nuisance Ordinances and Section 4-470 of the Liquor Code;

3.     A preliminary and permanent injunction restraining Defendants from suspending Plaintiffs' liquor licenses under the PLCB Compliance Program and 72 P.S. § 1799.6-E(a)(1) and (b) of the Fiscal Code;

4.     Stay all proceedings related to the renewal of Plaintiffs' liquor licenses and/or the "temporary licenses" issued to Plaintiffs pending resolution of this matter;

5.     Declare and enter judgment against Defendants declaring the local and state laws unconstitutional and void;

6.     Damages in an amount to be determined at trial;

7.     Attorney's fees; and

8.     Monitoring of any further efforts to enforce these ordinances and laws to prevent future discrimination;

9.     Award such other relief as the Court deems appropriate.

**KANG HAGGERTY LLC**

*/s/ Kyle Garabedian*
Edward T. Kang
Kyle Garabedian
Kelly Lavelle
Kang Haggerty LLC
123 South Broad Street, Suite 1950
Philadelphia, Pennsylvania 19109
(215) 525-5850 (tel)
(215) 525-5860 (fax)
ekang@kanghaggerty.com
kgarabedian@kanghaggerty.com
klavelle@kanghaggerty.com
*Counsel for Plaintiffs*

Dated: January 27, 2025

## <u>VERIFICATION</u>

I, William Chow, hereby certify as follows:

       1.      I am the President of the Asian-American Licensed Beverage Association. As such, I am authorized to make this Verification on its behalf.

       2.      I have read the attached Amended Complaint and based on my personal knowledge and the information reported to me by members of the Asian-American Licensed Beverage Association and others, the factual allegations contained in the Amended Complaint are true to the best of my knowledge, information, and belief.

       3.      I understand that the foregoing statements are subject to penalties for unsworn falsification to authorities.

                                      ASIAN-AMERICAN LICENSED
                                      BEVERAGE ASSOCIATION

Dated: January  27  , 2025           By:  /s/ *William Chow*
                                        William Chow, President