IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION D/B/A ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION OF PHILADELPHIA | : <br> : <br> : CIVIL ACTION <br> : <br> : <br> : Case No. 2:24-cv-06348 |
| YO DELI, INC. | : <br> : |
| BEST BEER, INC. | : ***Jury Trial Demanded*** <br> : |
| SKY BEER DELI, INC. | : <br> : |
| MAYA INVESTMENT GROUP, LLC | : <br> : |
| 7701 OGONTZ, INC. | : <br> : |
| CDD 725, INC. | : <br> : |
| and | : <br> : |
| ARAB AMERICAN BUSINESS ASSOCIATION AND PROFESSIONAL ASSOCIATION OF THE DELAWARE VALLEY | : <br> : <br> : <br> : <br> : |
| Plaintiff, | : <br> : |
| v. | : <br> : |
| CHERELLE PARKER, IN HER OFFICIAL CAPACITY AS MAYOR OF THE CITY OF PHILADELPHIA | : <br> : <br> : |
| CITY OF PHILADELPHIA | : <br> : |
| DAVID W. SUNDAY, JR., IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE COMMONWEALTH OF PENNSYLVANIA | : <br> : <br> : <br> : |
| PENNSYLVANIA STATE POLICE BUREAU OF LIQUOR CONTROL ENFORCEMENT | : <br> : <br> : |

| | |
|---|---|
| and | : |
| | : |
| PENNSYLVANIA LIQUOR CONTROL | : |
| BOARD | : |
| | : |
| Defendants. | : |

## **ORDER**

AND NOW, this ____ day of _____, 2025, upon consideration of Plaintiffs'

Motion for Preliminary Injunction and the Court having found as follows:

1.      Plaintiffs have shown a likelihood of success on the merits of their claims.

2.      That substantial, immediate and irreparable harm to Plaintiffs, in the form of,

among other things, adverse action from the Pennsylvania Liquor Control Board or the

Philadelphia Police Department that threatens to permanently close Plaintiffs' established

businesses arbitrarily and without adequate due process, is likely to occur unless the injunctive

relief requested is granted.

3.      That the grant of the injunctive relief requested will not result in greater harm to

Defendants than to Plaintiffs if injunctive relief is not granted.

4.      That granting the requested injunctive relief is in the public interest.

**THEREFORE**, it is **ORDERED** as follows:

1.      Plaintiffs' Motion for Preliminary Injunction is GRANTED.

2.      Defendants are ENJOINED from continuing their unlawful and discriminatory

treatment of Plaintiffs, including the selective enforcement of state and local laws, specifically the

Curfew and Nuisance Ordinances and Section 4-470 of the Liquor Code governing renewal of

licenses, and prohibiting any further harassment, intimidation, or retaliation related to Plaintiffs'

business operations, until further order of the Court.

2

3.      Defendants are ENJOINED from denying or obstructing the renewal of Plaintiffs' liquor licenses or business permits based on discriminatory, unconstitutional, or unlawful criteria, including the improper application of the Curfew and Nuisance Ordinances and Section 4-470 of the Liquor Code governing renewal of licenses;

4.      Defendants are ENJOINED from suspending Plaintiffs' liquor licenses under the PLCB Compliance Program and 72 P.S. § 1799.6-E(a)(1) and (b) of the Fiscal Code;

5.      Stay all proceedings related to the renewal of Plaintiffs' liquor licenses and/or the "temporary licenses" issued to Plaintiffs pending resolution of this matter;

6.      Declare and enter judgment against Defendants declaring the local and state laws unconstitutional and void;

7.      This ORDER shall remain in effect until further ORDER of this Court.

IT IS SO ORDERED.

BY THE COURT:

_____
, U.S. District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION D/B/A ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION OF PHILADELPHIA | : : : : : | CIVIL ACTION |
| | : | Case No. 2:24-cv-06348 |
| YO DELI, INC. | : : | |
| BEST BEER, INC. | : : | ***Jury Trial Demanded*** |
| SKY BEER DELI, INC. | : : | |
| MAYA INVESTMENT GROUP, LLC | : : | |
| 7701 OGONTZ, INC. | : : | |
| CDD 725, INC. | : : | |
|  and | : : | |
| ARAB AMERICAN BUSINESS ASSOCIATION AND PROFESSIONAL ASSOCIATION OF THE DELAWARE VALLEY | : : : : : | |
| Plaintiff, | : : | |
| v. | : : | |
| CHERELLE PARKER, IN HER OFFICIAL CAPACITY AS MAYOR OF THE CITY OF PHILADELPHIA | : : : : | |
| CITY OF PHILADELPHIA | : : | |
| DAVID W. SUNDAY, JR., IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE COMMONWEALTH OF PENNSYLVANIA | : : : : : | |
| PENNSYLVANIA STATE POLICE BUREAU OF LIQUOR CONTROL ENFORCEMENT | : : | |

| | |
|---|---|
| and | : |
| | : |
| PENNSYLVANIA LIQUOR CONTROL BOARD | : |
| | : |
| | : |
| Defendants. | : |

## **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs, Asian-American Licensed Beverage Association D/B/A Asian-American Licensed Beverage Association Of Philadelphia ("AALBA"), Yo Deli, Inc., Best Beer, Inc., Sky Beer Deli, Inc., Maya Investment Group, LLC, 7701 Ogontz, Inc., CDD 725, Inc. and Arab American Business And Professional Association Of The Delaware Valley ("AAB"), by and through their undersigned counsel, hereby move this Court for a Preliminary against Defendants, Cherelle Parker, In Her Official Capacity as Mayor of the City of Philadelphia, City of Philadelphia, David W. Sunday, Jr., In His Official Capacity as Attorney General of the Commonwealth of Pennsylvania, Pennsylvania State Police Bureau of Liquor Control Enforcement and Pennsylvania Liquor Control Board, enjoining Defendants from continuing their unlawful and discriminatory treatment of Plaintiffs, including the selective enforcement of state and local laws, and prohibiting any further harassment, intimidation, or retaliation related to Plaintiffs' business operations and from denying or obstructing the renewal of Plaintiffs' liquor licenses or business permits based on discriminatory, unconstitutional, or unlawful criteria, including the improper application of Philadelphia's Curfew and Nuisance Ordinances, Section 4-470 of the Liquor Code, the PLCB Compliance Program and 72 P.S. § 1799.6-E(a)(1) and (b) of the Fiscal Code. In support of the motion, Plaintiffs rely on the accompanying memorandum of law.

WHEREFORE, for the reasons stated in the accompanying memorandum of law, incorporated herein by reference, Plaintiffs request that the Court issue a Preliminary Injunction against Defendants in the form attached to this motion.

KANG HAGGERTY LLC

*/s/ Kyle Garabedian*
Edward T. Kang
Kyle Garabedian
Kelly Lavelle
Kang Haggerty LLC
123 South Broad Street, Suite 1950
Philadelphia, Pennsylvania 19109
(215) 525-5850 (tel)
(215) 525-5860 (fax)
ekang@kanghaggerty.com
kgarabedian@kanghaggerty.com
klavelle@kanghaggerty.com
*Counsel for Plaintiffs*

Dated: January 27, 2025

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION D/B/A ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION OF PHILADELPHIA | : : CIVIL ACTION : : |
| YO DELI, INC. | : Case No. 2:24-cv-06348 : |
| BEST BEER, INC. | : *Jury Trial Demanded* : |
| SKY BEER DELI, INC. | : : |
| MAYA INVESTMENT GROUP, LLC | : : |
| 7701 OGONTZ, INC. | : : |
| CDD 725, INC. | : : |
| and | : : |
| ARAB AMERICAN BUSINESS ASSOCIATION AND PROFESSIONAL ASSOCIATION OF THE DELAWARE VALLEY | : : : : : |
| Plaintiff, | : : |
| v. | : : |
| CHERELLE PARKER, IN HER OFFICIAL CAPACITY AS MAYOR OF THE CITY OF PHILADELPHIA | : : : : |
| CITY OF PHILADELPHIA | : : |
| DAVID W. SUNDAY, JR., IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE COMMONWEALTH OF PENNSYLVANIA | : : : : |
| PENNSYLVANIA STATE POLICE BUREAU OF LIQUOR CONTROL ENFORCEMENT | : : : |

and                                                    :
                                                       :
PENNSYLVANIA LIQUOR CONTROL                            :
BOARD                                                  :
                                                       :
            Defendants.                                :

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs, Asian-American Licensed Beverage Association D/B/A Asian-American Licensed Beverage Association Of Philadelphia ("AALBA"), Yo Deli, Inc., Best Beer, Inc., Sky Beer Deli, Inc., Maya Investment Group, LLC, 7701 Ogontz, Inc., CDD 725, Inc. and Arab American Business And Professional Association Of The Delaware Valley ("AAB"), submit this Memorandum of Law in support of their Motion for a Preliminary Injunction against Defendants, Cherelle Parker, In Her Official Capacity as Mayor of the City of Philadelphia, City of Philadelphia, David W. Sunday, Jr., In His Official Capacity as Attorney General of the Commonwealth of Pennsylvania, Pennsylvania State Police Bureau of Liquor Control Enforcement and Pennsylvania Liquor Control Board.

## I.    INTRODUCTION

This matter stems from the unlawful deprivation of Plaintiffs' constitutionally protected rights under the First, Fifth and Fourteenth Amendments to the United States Constitution and the equivalent sections of the Pennsylvania Constitution by intentionally and purposefully enforcing laws in a discriminatory manner against Plaintiffs and others. With state and local authorities acting in concert, Defendants seek to shut down businesses that are overwhelmingly owned by Asian Americans and Arab Americans through the passage of vague and overbroad ordinances that carry draconian punishments. At the same time, state actors seek to strip these same businesses of their liquor licenses by any means necessary, which will effectively shutter the targeted

2

businesses. The ordinances and regulations are then enforced in a discriminatory manner, often arbitrarily finding violations based on absurd applications of the law or suddenly finding violations for conditions that had been approved in the past. Those violations are then used as a basis to threaten the businesses with closure or the loss of the licenses that they depend on to survive.

Defendants, including the City of Philadelphia, have a deeply rooted history of discriminating against Asian Americans and Arab Americans, which is unfortunate given the City's claimed protection for immigrants and other racially or ethnically oppressed people. Indeed, behind its façade, the City has long been discriminating against Asian Americans and Arab Americans, who are law-abiding citizens trying to make an honest living. Defendants have engaged in selective and invidious discrimination against certain groups and their businesses in Philadelphia, including Plaintiffs, through the adoption, administration, and enforcement of certain state and local laws, described more fully herein. These actions have unconstitutionally deprived Plaintiffs of their rights under the First Amendment of the United States Constitution and the Pennsylvania Constitution equivalent, as well as their rights to due process and equal protection of the laws in violation of 42 U.S.C. §1983 and of Article 1, §§ 1, 20, 26 and 29 of the Pennsylvania Constitution.

The state and local laws were deliberately enacted to target and discriminate against certain groups and their businesses in Philadelphia. The state and local laws are so vague and overbroad that persons of ordinary intelligence must necessarily guess as to their meaning and differ as to their application. The vague and unequal application of these laws means that even being the *victim* of a crime can subject these businesses to punishment, up to and including the immediate closure of the business. Further, the state and local laws have been selectively enforced against certain groups and their businesses. As a result of the unconstitutional state and local laws and selective

enforcement of such, certain groups and their businesses have been subjected to fines, forced to cease operations, and deprived of their livelihoods. Many are also at risk of losing their liquor licenses, and, consequently, their ability to sustain their businesses and have otherwise been damaged and will continue to suffer injury.

For these reasons, in this lawsuit, Plaintiffs seek injunctive relief barring Cherelle Parker, City of Philadelphia, and David W. Sunday, Jr., of the Commonwealth of Pennsylvania from enforcing the state and local laws against Plaintiffs in a manner that deprives them of due process, equal protection, and their rights under the First Amendment of the United States and Pennsylvania Constitutions.

## II.    FACTUAL BACKGROUND

Plaintiff Asian-American Licensed Beverage Association D/B/A Asian-American Licensed Beverage Association Of Philadelphia ("AALBA") is an association of businesspeople, all of whom have been granted a license from Defendant, PLCB, licensing them to sell and dispense alcoholic beverages, including malt and brewed beverages, under the provisions of the Pennsylvania Liquor Code. Amend. Compl. ¶ 31. The members of the AALBA, including Plaintiffs, Yo Deli, Inc., Best Beer, Inc., Sky Beer Deli, Inc., Maya Investment Group, LLC, 7701 Ogontz, Inc. and CDD 725, Inc., hold their licenses either in their individual names or in the form of a business corporation they own and control. Amend Compl. ¶¶ 14-19, 32. Further, the members of the AALBA are largely of Asian-American heritage and are licensed to sell and dispense alcoholic beverages, including brewed beverages, in the City of Philadelphia. Amend. Compl. ¶ 33. AALBA members hold their licenses through their individual names or the names of a business entity. Amend. Compl. ¶ 32. There are approximately 110 members of the AALBA representing a similar number of liquor licenses. Amend. Compl. ¶ 35.

Plaintiff AAB is an association of businesspeople, many of whom have been granted a license from the PLCB, licensing them to sell and dispense alcoholic beverages, including malt and brewed beverages, under the provisions of the Pennsylvania Liquor Code. Amend. Compl. ¶ 36. Additionally, members of AAB operate various convenience stores and similar businesses throughout Philadelphia. Their operations depend on maintaining flexible business hours, serving the community at times when traditional grocery stores have closed. Amend. Compl. ¶ 37. The members of the AAB hold their licenses either in their individual names or in the form of a business entity they own and control. Amend. Compl. ¶ 38.

Many members of the Plaintiff organizations run establishments that have completed the Liquor Control Board application and secured licenses to operate as either a retail dispenser (R-Licenses (also known as a "Restaurant License")) or an eating place retail dispenser (E license). Amend. Compl. ¶ 39. Plaintiffs operate from licensed premises approved by the PLCB and the City of Philadelphia acting through the City of Philadelphia's Department of Licenses and Inspections. 47 P.S. §§ 4-407, 4-442. Amend. Compl. ¶ 40. At all times, Plaintiffs' members were operating in a legal manner. Amend. Compl. ¶ 41.

Upon information and belief, all actions taken by the Defendants against the Plaintiffs were due to a purposeful campaign between and among the Defendants herein with a specific goal of preventing Plaintiffs from operating. Amend. Compl. ¶ 42. Defendants have tirelessly made efforts to inhibit Plaintiffs' business operations, selectively enforcing laws and ordinances for the express purpose of driving Plaintiffs out of business. Amend. Compl. ¶ 43. The overwhelming majority of the impacted businesses are owned by racial minorities, specifically Asian and Arab Americans. Amend. Compl. ¶ 44. Actions taken by and on behalf of the Defendants, individually and collectively, against Plaintiffs' lawful business operations, include but are not limited to:

     a.   Selective enforcement of laws and ordinances targeted at Plaintiffs;

     b.   Facially unfair and biased administration of those laws and ordinances intended to prevent Plaintiffs from complying in good faith as a pretext to impose penalties (up through and including the loss of a license or the closure of the business);

     c.   Repeated Police Department and BLCE visits to the Plaintiffs' establishments for unannounced inspections;

     d.   Discriminatory and harassing conduct by the Police Department and BLCE.

Amend. Compl. ¶ 45. Upon information and belief, the Police Department and the BLCE had no registered complaints involving the Plaintiffs' establishments. Amend. Compl. ¶ 46. Despite the absence of registered complaints, the Police Department and the BLCE continually targeted Plaintiffs' establishments. Amend. Compl. ¶ 47.

Due to the concerted and purposeful efforts of the Defendants, Plaintiffs have, at times, been forced to cease operations, have otherwise struggled to stay open for business and are at risk of losing the liquor licenses and, consequently, their livelihood. Amend. Compl. ¶ 48. Plaintiffs have been unable to operate in a manner originally conceived and approved by the City of Philadelphia and the Liquor Control Board. Amend. Compl. ¶ 49. Accordingly, Plaintiffs have sustained and will continue to sustain a substantial loss of business due to the adverse effect of the unlawful conduct of Defendants. Amend. Compl. ¶ 50. Defendants' arbitrary and capricious conduct unjustly deprives Plaintiffs of their fundamental and constitutionally protected rights under the Constitution of the United States and the Constitution of the Commonwealth of Pennsylvania, violating due process and equal protection guarantees and infringing on protected expressive activity. Amend. Compl. ¶ 51.

### History of Regulations of "Stop-and-Go" Establishments

The City of Philadelphia has a longstanding history of scrutinizing and regulating minority-owned (namely, Asian or Arab Americans) businesses, including so-called "stop-and-go"

establishments. Amend. Compl. ¶ 52. In 1987, enforcement of alcohol sales at these establishments shifted from the Pennsylvania Liquor Control Board to the Pennsylvania State Police, creating the Pennsylvania State Police Bureau of Liquor Control Enforcement. Sections 211 and 472 of the Act of April 12, 1951 (P.L. 90, No. 21), known as the Liquor Code, re-enacted and amended June 29, 1987 (P.L. 32, No. 14). Amend Compl. ¶ 53. In 1990, the PLCB introduced the Nuisance Bar Program, which allows the PLCB to deny license renewals in an effort to remove "problem bars" from communities. Pennsylvania Liquor Control Board, Nuisance Bar Program, https://www.lcb.pa.gov/Licensing/Topics-of-Interest/Pages/Nuisance-Bar-Program.aspx. Amend. Compl. ¶ 54. Then, in 2005, Governor Ed Rendell signed into law Act 39 of 2005, amending the Liquor Code to require all licensed establishments in the City of Philadelphia that sell malt or brewed alcoholic beverages for consumption off-premises to first obtain approval from the Philadelphia City Council. Amend. Compl. ¶ 55. Only with the approval of City Council by way of a special permit may licensees apply to the PLCB for permission to continue such sales. Amend. Compl. ¶ 56. The pertinent provisions of Act 39 of 2005 are outlined in Sections 407 and 442 of the Liquor Code, 47 P.S. §§ 4-407 and 4-442, which include requirements for licensing. Amend. Compl. ¶ 57.

That same year, Philadelphia's former Mayor John A. Street enacted an ordinance mandating an 11 p.m. curfew for businesses on residential streets. Phila. Code § 9-627. Amend. Compl. ¶ 58. Section 9-627, enacted to address "nuisance retail shops, such as take-out and convenience stores, was amended by the Philadelphia City Council in 2007 to specifically target "take-out restaurants" situated on corner lots at street intersections. *Id.* Amend. Compl. ¶ 59. In 2018, a lawsuit was filed by twenty-three local Chinese take-out restaurant owners against the City of Philadelphia, challenging the 11 p.m. curfew ordinance under Philadelphia Code section 9-627

as unconstitutional for its alleged discriminatory intent and enforcement against Asian Americans. *See Liu v. City of Philadelphia*, 2:18-cv-04900-MMB (E.D. Pa. November 13, 2018). Amend. Compl. ¶ 60. The former curfew ordinance was overwhelmingly and selectively enforced against Chinese-owned businesses. Amend. Compl. ¶ 61. Upon information and belief, 80%-90% of the citations issued under the former curfew ordinance in 2015-2016 were issued against Asian or minority-owned businesses, while similar businesses were allowed to operate without issue. Amend. Compl. ¶ 62. The case settled, with the City agreeing to suspend curfew enforcement and provide police training on implicit bias and effective communication with limited English-proficient community members. Amend Compl. ¶ 63.

Unfortunately, the passage of time has done little to quell the anti-Asian and other minority sentiments that motivated the passage and selective enforcement of the earlier ordinance. Amend. Compl. ¶ 64. In the wake of the pandemic and ever-increasing geopolitical tensions in Asia and the Middle East, time has only increased anti-Asian and anti-Arab sentiment. Amend. Compl. ¶ 65. Further evidence of this is reflected in the proposed plans to develop a new 76ers arena in Chinatown, which poses a serious threat to the survival of this historic Asian-American neighborhood. Amend. Compl. ¶ 66. As set forth in greater detail below, the City of Philadelphia has renewed its discriminatory conduct by passing a new suite of curfew laws and an overbroad nuisance ordinance that discriminates against minority-owned businesses. Amend. Compl. ¶ 67.

In response to ongoing concerns over "stop-and-go" establishments, the Pennsylvania General Assembly passed Act 44 of 2017 (Act 44), amending the Fiscal Code at 72 P.S. § 1799.6-E,  and expanding PLCB oversight through the Licensee Compliance Program ("Compliance Program") and the creation of the PLCB Bureau of Licensing. 72 P.S. § 1799.6-E. Amend. Compl. ¶ 68. The Compliance Program introduced the Investigation & Suspension Process, which

mandates seating and food service compliance in such establishments and permits the PLCB and law enforcement to perform unannounced inspections, with the authority to immediately impose an unappealable administrative suspension of the operating privileges or revoke licenses for noncompliance.[1] 72 P.S. § 1799.6-E(a)(1) and (b). Amend. Compl. ¶ 69.

In 2023, the Pennsylvania Stop-and-Go Legislative Task Force ("Task Force") was established to review and recommend solutions regarding these establishments. 47 P.S. § 218. Amend. Compl. ¶ 70.

On information and belief, no members of the Asian or Arab communities were members of the Task Force or had a substantial voice in the process that followed. Amend. Compl. ¶ 71. The Task Force defines "stop-and-go establishment" as establishments that are: (i) legal holders of restaurant or R-licenses; and (ii) a convenience store or deli that sells beer and liquor, sometimes in quantities as low as a single shot, that may be consumed on premises or immediately outside the establishment. 47 P.S. § 218(h)(1). Amend. Compl. ¶ 72.

In October 2024, the Task Force issued its Report and Recommendations, advising the General Assembly of guidelines for legislative remedies to regulate "stop-and-gos," including streamlining the citation processes, strengthening the Compliance Program, increasing penalties and fines, and recruiting more BLCE agents. A true and correct copy of the Commonwealth of Pennsylvania Stop-And-Go Legislative Task Force Report and Recommendations (October 2, 2024) is attached as Exhibit A. Amend. Compl. ¶ 73.

Notably, the Report and Recommendations provide an alternative definition for stop-and-go establishments as "a Commonwealth licensee which holds either a restaurant liquor (R) license

---

[1] *See* Pennsylvania Liquor Control Board, Licensee Compliance Program, https://www.lcb.pa.gov/Licensing/Documents/Complete%20Licensee%20Compliance%20Program%20Guide%20for%20Licensees.pdf.

or an eating place retail dispenser (E) license and receives at least two violations for failing to act as a bona fide restaurant or eating place within a 12-month period." *See* Exhibit A, Report and Recommendations, pg. 9 (citing *770 Ameribeer, Inc. v. Pennsylvania Liquor Control Bd.*, 318 A.3d 998 (Pa.Cmwlth. 2024)). As of 2024, the Pennsylvania General Assembly continues to review these regulations, with some legislators advocating for fairer enforcement practices to avoid discrimination. Amend. Compl. ¶ 75.

Many of the targeted establishments are owned and operated by immigrants and minority entrepreneurs. The heightened regulations place an undue burden on small business operators, leading to the closure of businesses that cannot meet the stricter standards. This, in turn, has led to claims of economic discrimination and disparate impact. Amend. Compl. ¶ 76. Moreover, the Task Force has acknowledged that the supposed problems with the "stop-and-go" businesses it seeks to address are limited to Philadelphia, where such establishments are overwhelmingly minority-owned. Amend. Compl. ¶ 77. The General Assembly intends to use the Task Force's Report and Recommendations to enact additional legislation regulating stop-and-go establishments. 47 P.S. § 218. Amend. Compl. ¶ 78. On information and belief, license holders in other parts of Pennsylvania are not subject to the same repeated scrutiny as minority-owned businesses located in Philadelphia. Amend. Compl. ¶ 79.

## **Statutory and Regulatory Requirements**

### The Liquor Code

Most businesses selling alcohol are licensed under the Liquor Code as either retail dispensers (R licenses or Restaurant License) or eating place retail dispensers (E license). See 47 P.S. §§ 4-406, 4-407, 4-442, respectively. Amend. Compl. ¶ 80. Retail dispenser liquor licenses (R license) allow licensees to sell distilled spirits, wine and malt or brewed beverages for consumption

on the premises, and malt or brewed beverages may be sold to-go. 47 P.S. §§ 4-406, 4-407. Amend. Compl. ¶ 81. R licensees are also eligible to obtain expanded permits to sell limited quantities of wine to-go as well as ready-to-drink cocktail permits to sell ready-to-drink cocktails on a to-go basis. 47 P.S. § 4-415. Amend. Compl. ¶ 82. Eating place retail dispenser liquor licenses (E license) allow licensees to sell only malt or brewed beverages for consumption on the premises or on a to-go basis; holders of these licenses may not sell other types of alcoholic beverages. 47 P.S. § 4-442. Amend. Compl. ¶ 83. Both R licensees and E licensees are required to offer food to the public and must have seating to accommodate thirty persons. R licensees must measure at least 400 square feet, while E licensees require a minimum of 300 square feet. 47 P.S. § 1-102. Amend. Compl. ¶ 84. Additionally, all licensees must provide: (i) no less than thirty seats immediately available and accessible to the public (seats may not be stacked); (ii) sufficient food for at least thirty patrons; (iii) dishes and utensils for at least thirty persons; (iv) a current and valid health license; (v) a functioning kitchen or food preparation area. *See* PLCB Compliance Program. Amend. Compl. ¶ 85. Licensees must also maintain and display a valid health license. 47 P.S. § 4-437; 40 Pa. Code § 5.41 (R-licensees). Amend. Compl. ¶ 86.

The Philadelphia Code

Plaintiffs' businesses are also subject to local laws and ordinances under The Philadelphia Code, including the Curfew and Nuisance Ordinances discussed in detail herein. Amend. Compl. ¶ 87. At least fifteen of Plaintiff AALBA's members are subject to the Curfew Ordinances. Amend. Compl. ¶ 88.

The Curfew Ordinances

Recently enacted sections 9-630, 9-641, 9-642, and 9-643 (collectively, the "Curfew Ordinances") of the Philadelphia Code restrict the hours of operation for business in certain

designated areas of Philadelphia. Phila. Code §§ 9-630, 9-641, 9-642 and 9-643. Amend. Compl. ¶ 89. Sections 9-630, 9-641, and 9-642 define "Commercial Establishment" as "[a]n establishment involved in the buying and selling of goods where consumers primarily purchase goods intended for consumption or use off premises, including a Food Establishment as defined in Code Section 6-102." This definition excludes "Food Establishments" with a Restaurant Liquor License, as well as those serving exclusively as drive-throughs or operating as gas stations. Section 9-643 defines "Commercial Establishment" without these specific exclusions.   Phila. Code §§ 9-630, 9-641, 9-642 and 9-643. Amend. Compl. ¶ 90. Under section 6-102 "Food Establishment" is defined broadly as "[a]ny establishment or portion thereof where food is handled or sold" including various types of stands, vehicles, or vending machines but excluding facilities such as railroad dining cars in transit and financial investment and brokerage transactions where no food handling takes place with the City. Phila. Code § 6-102. Amend. Compl. ¶ 91.

On or about August 12, 2024, City Council enacted Ordinance (Bill No. 240498), amending Chapter 9-600 of The Philadelphia Code, adding various locations to the section regulating the hours of operations of certain establishments and including the modification of the definition of "Commercial Establishment" to exclude Food Establishments that serve customers exclusively from a drive-through window or fueling station. Phila. Code § 9-630 (Seventh District Commercial Business Hour Restriction). Amend. Compl. ¶ 92. Specifically, section 9-630 prohibits any "Commercial Establishment" from operating between the hours of 11 p.m. and 6 a.m. within the following areas:

> (a) The area bounded by East Lehigh Ave., Kensington Ave., D St., East Tioga St. and Frankford Ave.

> (b) The area bounded by North 5th St., Erie Ave., North 9th St. and Roosevelt Blvd.

(c) The area bounded by East Hunting Park Ave., North 5th St., Roosevelt Blvd. and Castor Ave.

(d) The area bounded by East Lehigh Ave., North 2nd St., East Hunting Park Ave., Whitaker Ave., and B St.

Phila. Code § 9-630 (2). Amend. Compl. ¶ 93.

Also, on August 12, 2024, City Council enacted Ordinance (Bill No. 240474), further amending Chapter 9-600 by adding Section 9-641, which imposes restrictions on operating between the hours of 11 p.m. and 6 a.m. on "Commercial Establishments" within the area bounded by East Allegheny Avenue, Kensington Avenue, Torresdale Avenue, and Frankford Avenue. Phila. Code § 9-641 (Sixth District Commercial Business Hour Restriction). Amend. Compl. ¶ 94. On the same date, City Council enacted Ordinances (Bill Nos. 240414 and 240468), adding Section 9-642 restricting "Commercial Establishments" in the areas of (a) Ogontz Avenue, between Haines Street and Cheltenham Avenue, on both sides and (b) the area bounded by Ogontz Avenue, between Haines Street and 66th Avenue on both sides from operating during the hours of 12 midnight and 6 a.m. Phila. Code § 9-642 (Ninth District Commercial Business Hour Restriction). Amend. Compl. ¶ 95.

Also enacted on August 12, 2024, Ordinance (Bill No. 240476) added Section 9-643, which restricts any "Commercial Establishment" from operating between 11 p.m. and 6 a.m. along the following streets:

(a) North Broad [S]treet between West Chew Avenue and West Tabor Road.

(b) Old York Road between West Olney Avenue and West Tabor Road

(c) West Olney Avenue between North Broad Street and North Park Avenue.

(d) Wagner Avenue between North Broad Street and Old York Road.

13

Phila. Code § 9-643 (Commercial Business Hour Restrictions Near the Boundary of the Eighth and Ninth Districts). Amend. Compl. ¶ 96.

Pursuant to the Philadelphia Police Department Memorandum (24-06) regarding Enforcement of Business Curfews, officers are required to track violations of the Curfew Ordinances and notify the Neighborhood Nuisance Enforcement Unit of all violations, and for repeated violations "consider Nuisance Business Action, consistent with Directive 4.25, 'Nuisance Abatement Tool for Commanders'" (related to identifying Chronic and Critical Nuisance Businesses and enforcing the Nuisance Ordinance). Amend. Compl. ¶ 97.

The Curfew Ordinances primarily affect specific areas within Philadelphia where Plaintiffs operate their establishments. Amend. Compl. ¶ 98. These restrictions thus disproportionately impact these minority groups and their businesses operating in these specific areas within the City. Amend. Compl. ¶ 99. More affluent, whiter neighborhoods within Philadelphia are not subject to the same restrictions and oversite as Plaintiffs' businesses. Amend. Compl. ¶ 100.

<u>The Nuisance Ordinance</u>

Chapter 9-4400 of the Philadelphia Code, titled "Responsible Business Operations," establishes regulations to identify and address "nuisance businesses." Phila. Code §§ 9-4401-9-4406 (the "Nuisance Ordinances"). Amend. Compl. ¶ 101. While the supposed purpose is to deter criminal activity, it takes no action against the actual lawbreakers; instead, it punishes law-abiding business owners by punishing them for even alleged criminal activities *around* their businesses. Amend. Compl. ¶ 102. In a shocking overreach of police power, the Nuisance Ordinance purports to give officers the ability to shutter businesses if violent activity happens nearby, or if they can string together seemingly trivial offenses. Amend. Compl. ¶ 103. Section 1-112 of the Philadelphia Code provides the Police Department with the authority to issue code violation notices ("CVNs")

to enforce any provision of the Philadelphia Code or any regulation adopted under the Code. Phila. Code § 1-112(a). Amend. Compl. ¶ 104. The Police Department also has authority under section 9-4403 of the Philadelphia Code to deem businesses as "chronic nuisance business" or "critical nuisance business" and to issue a Notice of Intent to Cease Operations against them. Phila. Code § 9-4403. Amend. Compl. ¶ 105.

According to the Philadelphia Code a "chronic nuisance business" is one that has received notices for "nuisance behavior" on three (3) or more separate days within a twelve (12) month period." Phila. Code § 9-4401(1). Amend. Compl. ¶ 106. "Nuisance behavior" includes activities that disrupt the community's health, safety, or welfare and consists of eighteen possible offenses. Amend. Compl. ¶ 107. These range from obviously illegal conduct, such as drug dealing and prostitution, to trivial offenses completely outside the owners' control, such as littering, or a patron parking on the sidewalk.  Amend. Compl. ¶ 108. It also includes vague "catchall provisions" that incorporate unspecified other potential offenses, including, but not limited to:

* * * * *

(o) Conduct that violates the provisions of the Pennsylvania Liquor Code. . .pertaining to unlawful acts relative to liquor and licenses (47 P.S. § 4-493);

* * * * *

(q)   Repeated or continuing violations of any other City ordinance and/or regulations;

(r)   Any other activity that constitutes a public nuisance under The Philadelphia Code. Phila. Code § 9-4401(3). Amend. Compl. ¶ 109.

Moreover, the Philadelphia Code defines a "critical nuisance business" as one that has been issued a notice concerning serious violent behavior such as homicide, aggravated assault, or obstruction of an investigation related to such offenses. Phila. Code § 9-4401(5) and (6). Amend.

Compl. ¶ 110. The Police Department may issue a violation notice to a business owner when nuisance behavior or serious violent behavior has taken place inside the business or ***on the sidewalk or street, abutting the business*** during business hours. Phila. Code § 9-4402(1)(emphasis added); Philadelphia Police Department Directive 4.25. Amend. Compl. ¶ 111. The Nuisance Ordinances offers no guidance on how nearby the alleged nuisance behavior must be to trigger its requirements. Amend. Compl. ¶ 112. Indeed, read literally, the business itself could be the *victim* of a crime and then be subject to further punishment City. Amend. Compl. ¶ 113. Such a system is wildly unfair on its face, enacting punitive measures against law-abiding citizens instead of actual criminals. Amend. Compl. ¶ 114. This inconsistency indicates that the true purpose of the Nuisance Ordinance is to target and shut down minority-owned businesses rather than deter supposed criminal conduct. Amend. Compl. ¶ 115.

### Enforcement of Ordinances and Statutes

### PLCB Bureau of Licensing and BLCE

The PLCB Bureau of Licensing and the BLCE play significant roles in enforcing the Liquor Code. Amend. Compl. ¶ 116. The BLCE prioritizes the enforcement of violations commonly associated with these establishments, allocating considerable resources to monitor compliance within the City of Philadelphia and throughout the Commonwealth. *See* Exhibit A, Report and Recommendations, pg. 5. Amend. Compl. ¶ 117. When public complaints are filed, they are investigated, and the BLCE must notify the licensee of any alleged violation within 30 days of the investigation. 47 P.S. § 4-471(b). Amend. Compl. ¶ 118. If violations of the Liquor Code are found, the BLCE may issue a citation, which is then adjudicated by an Administrative Law Judge (ALJ). 47 P.S. § 4-471(a). Amend. Compl. ¶ 119.

### PLCB Licensee Compliance Program

As mandated by Act 44 of 2017, which amended the Fiscal Code, the PLCB's Bureau of Licensing and the Licensee Compliance Program oversee establishments' adherence to requirements regarding seating, food, square footage, and other criteria. 72 P.S. § 1799.6-E; s*ee also* PLCB Compliance Program. Amend. Compl. ¶ 120. Upon receiving a complaint, a licensing analyst and law enforcement officer conduct an unannounced on-site inspection for compliance. PLCB Compliance Program. Amend. Compl. ¶ 121.

If violations are found, they document the deficiencies with photographs and impose an unappealable administrative suspension of the operating privileges. *Id.*; 72 P.S. § 1799.6-E(a)(1) and (b).  Amend. Compl. ¶ 122. A follow-up inspection occurs within five to ten business days to verify compliance, and operating privileges remain suspended if deficiencies remain. PLCB Compliance Program. Amend. Compl. ¶ 123. Repeated violations within a 12-month period escalate penalties, including a minimum license suspension of twenty days for a second offense and thirty days for a third. *Id.* Amend. Compl. ¶ 124.

The PLCB's Bureau of Licensing has the authority to object to or deny license renewal based on a licensee's operational history, such as prior citations (by reaching out to police for public records and police incident reports), the reputations of owners and officers, compliance with statutory requirements, and incidents occurring on or near the premises that may affect public safety or welfare. 47 P.S. § 4-470. Amend. Compl. ¶ 125. Once an establishment is identified through the citation process or through the PLCB Compliance Program, the PLCB can further evaluate these businesses during license renewal and deny the renewal, which occurs every two years. *Id.* Amend. Compl. ¶ 126. If a license is revoked, the affected business is ineligible to have a license until the expiration of three years from the date the license is revoked. 47 P.S. § 4-471(b). Amend. Compl. ¶ 127.

Philadelphia County currently has more retail liquor licenses than the Pennsylvania Liquor Code allows; therefore, if a plaintiff's liquor license is revoked or not renewed, the license ceases to exist. Amend. Compl. ¶ 128. The only way to obtain a liquor license is by transferring a license from an existing owner or by purchasing one from a current licensee or at auction. Amend. Compl. ¶ 129. R-licenses can sell for up to $300,000, while E-licenses go for around $150,000. Amend. Compl. ¶ 120. Given the high demand, the prices are likely to be even higher by the time they are eligible to obtain a new license (three years from the date it is revoked). Amend. Compl. ¶ 131.

The PLCB may refuse to renew a license:

(1) if the licensee, its shareholders, directors, officers, association members, servants, agents or employees have violated any of the laws of the Commonwealth or any regulations of the board;

(2) if the licensee, its shareholders, directors, officers, association members, servants, agents or employees have one or more adjudicated citations under the license seeking to be renewed or any other license issued by the board or were involved in a license whose renewal was objected to by the Bureau of Licensing;

(3) if the licensed premises no longer meets the requirements of this act or the board's regulations; or

(4) due to the manner in which this or another licensed premises was operated while the licensee, its shareholders, directors, officers, association members, servants, agents or employes were involved with that license. When considering the manner in which this or another licensed premises was being operated, the board may consider activity that occurred on or about the licensed premises or in areas under the licensee's control if the activity occurred when the premises was open for operation and if there was a relationship between the activity outside the premises and the manner in which the licensed premises was operated. The board may take into consideration whether any substantial steps were taken to address the activity occurring on or about the premises.

47 P.S. § 4-470(a.1). Amend. Compl. ¶ 132.

The ambiguous and overly broad interpretation of the term "activity" considered during the renewal process could unjustly punish businesses through the non-renewal of liquor licenses

in circumstances where they were actually the *victims* of a crime. Amend. Compl. ¶ 133. This, combined with the fact that the PLCB may also consider police incident reports or citations in its decision-making process, discourages businesses from calling the police for assistance or reporting crimes occurring on or near their premises. Amend. Compl. ¶ 134.

### The Ordinances of The Philadelphia Code are Unconstitutionally Vague and Overbroad

For the reasons set forth herein, among others, the Curfew and Nuisance Ordinances are unconstitutionally vague and overbroad. Amend. Compl. ¶ 135. As set forth above, the Curfew Ordinances regulate the operations of "Commercial Establishments." Amend. Compl. ¶ 136. The Curfew Ordinances of the Philadelphia Code define "Commercial Establishment" as "[a]n establishment involved in the buying and selling of goods where consumers primarily purchase goods intended for consumption or use off premises, including a Food Establishment as defined in Code Section 6-102 . . . ." Phila Code §§ 9-630(1), 9-641(1), 9-642(1), 9-643(1). Amend. Compl. ¶ 137. However, the Curfew Ordinances do not define critical terms such as "primarily" or "goods," which are essential for the application and enforcement of the regulations. Amend. Compl. ¶ 138. This lack of clarity leaves the ordinances susceptible to arbitrary and discriminatory enforcement. Amend. Compl. ¶ 139. The Curfew Ordinances do not provide any mechanism or clear standard for the Philadelphia Police to determine whether a business qualifies as a "Commercial Establishment" under the ordinances. Amend. Compl. ¶ 140. The Curfew Ordinances' definition of "Commercial Establishment" is so vague that persons of ordinary intelligence must guess its meaning and application, leading to inconsistent enforcement. Amend. Compl. ¶ 141. This vagueness allows for selective enforcement. Amend. Compl. ¶ 142.

Upon information and belief, as with efforts to enforce the prior curfew ordinance, enforcement of the new Curfew Ordinance is once again selective and targeted toward minority-

owned businesses. Amend. Compl. ¶ 143. Section 9-4402(1) of the Nuisance Ordinances, which allows establishments to be issued notices of violation based on nuisance behavior or serious violent behavior that has taken place inside the business or on the sidewalk or street, abutting the business is unconstitutionally overbroad and vague. Phila. Code § 9-4402(1)(emphasis added). Amend. Compl. ¶ 144. The broad scope of this provision invites arbitrary and discriminatory enforcement as it encompasses a wide range of behaviors, including activities not related to the operation of the business itself. Amend. Compl. ¶ 145. The Nuisance Ordinance also includes the extreme punitive measure of shutting down a business, even if the business did not contribute to the offending behavior. Amend. Compl. ¶ 146.

The overly broad scope of the Nuisance Ordinance unlawfully infringes upon the Plaintiffs' protected right to petition law enforcement for protection or to report criminal activity on or near their property without fear of reprisal or punishment. Amend. Compl. ¶ 147.  As a result, several Plaintiffs have expressed reluctance to contact law enforcement out of fear that doing so will generate police reports, which could later be used as grounds for denying their liquor licenses. Amend. Compl. ¶ 148. This chilling effect on the fundamental right to petition the police underscores the unconstitutional nature of the Nuisance Code's vague and overly broad provisions. Amend. Compl. ¶ 149.

Defendants intentionally discriminated against members of a minority group and their businesses based on race and/or national origin by deliberately crafting the Curfew and Nuisance Ordinances to produce discriminatory effects. Amend. Compl. ¶ 150. The Curfew and Nuisance Ordinances were designed and have been enforced to disproportionately target specific groups and their businesses, resulting in discriminatory effects that violate both the United States Constitution and the Pennsylvania Constitution. Amend. Compl. ¶ 151. The vagueness and overbreadth of the

Curfew and Nuisance Ordinances are further demonstrated by the record of enforcement actions taken by the Philadelphia Police Department, as detailed below. Amend. Compl. ¶ 152. The inconsistent and arbitrary nature of these actions illustrates how the ordinances are being applied in a manner that fails to provide adequate notice and results in unequal treatment. Amend. Compl. ¶ 153.

### Provisions of the Liquor Code Governing Renewal of Liquor Licenses are Unconstitutionally Vague and Overbroad

For the reasons set forth herein, among others, the provisions of the Liquor Code governing the renewal of liquor licenses are unconstitutionally vague and overbroad. Amend. Compl. ¶ 154. As set forth above, Section 4-470 of the Liquor Code governs the renewal of liquor licenses and establishes the criteria that the Director of the Bureau Licensing and the PLCB may consider when grating or denting an application for the renewal of a liquor license. 47 P.S. § 4-470. Amend. Compl. ¶ 155.

The grounds for objecting to and refusing the renewal of a liquor license include violations of any laws of the Commonwealth or any regulations promulgated by the PLCB, as well as the existence of one or more adjudicated citations associated with the license sought to be renewed or any other license issued by the PLCB. 47 P.S. § 4-470(a.1). Amend. Compl. ¶ 156. Additionally, the renewal process permits consideration of the vague and overly broad term "activity" occurring on or near the licensed premises or in areas under the licensee's control.[2] 47 P.S. § 4-470(a.1)(4). Amend. Compl. ¶ 157. The provisions of Section 4-470 of the Liquor Code fail to provide clear standards or adequate notice to licensees regarding the criteria for renewal decisions. Amend. Compl. ¶ 158.

---

[2] The Liquor Code does limit this to "activity" that took place while the premises were open for operation and bore a relationship to the manner in which the licensed premises was operated. *See* 47 P.S. ¶ 4-470(a.1).

Allowing consideration of vague and overly broad terms such as "activity" and basing decisions regarding renewals on the undefined "activity" invites arbitrary and discriminatory decision-making. Amend. Compl. ¶ 159. The broad and undefined scope of "activity" also infringes on licensees' fundamental right to petition law enforcement for assistance or to report a crime. Amend. Compl. ¶ 160.

Several Plaintiffs have expressed reluctance to contact law enforcement out of fear that doing so will generate police reports of "activity," which may later be cited as grounds for denying their liquor licenses. Amend. Compl. ¶ 161. This chilling effect on the fundamental right to petition the police underscores the unconstitutional nature of the Liquor Code's vague and overly broad provisions. Amend. Compl. ¶ 162.

Furthermore, Defendants' actions have resulted in the suspension of operating privileges (effective immediately) resulting in significant financial harm, disruption of regular business, and a further threat to the renewal of their licenses. Amend. Compl. ¶ 163. Defendants' actions have further threatened to permanently close established businesses arbitrarily and without adequate due process and/or result in non-renewal of their liquor licenses. Amend. Compl. ¶ 164.

**The Philadelphia Code and Liquor Code Have Been Selectively Enforced to Discriminate Against Certain Groups and Their Businesses in Violation of the Equal Protection Clause of the United States and Pennsylvania Constitutions**

The Philadelphia Code and Liquor Code have been selectively enforced against certain minority groups, including Plaintiffs and their businesses, resulting in discriminatory treatment. Amend. Compl. ¶ 165. As detailed herein, the Curfew and Nuisance Ordinances are impermissibly vague and overbroad in both their language and their application, enabling selective enforcement against Plaintiffs in violation of constitutional protections. Amend. Compl. ¶ 166. Specifically, in addition to being unconstitutionally vague and overbroad, the Curfew Ordinances target specific

geographic areas within the City of Philadelphia, leading to disparate treatment for Plaintiffs who are licensed to sell certain alcoholic beverages for consumption off-premises compared to other licensees across the City of Philadelphia and the Commonwealth of Pennsylvania who are not subject to the same restrictions. Amend. Compl. ¶ 167. The restrictions based on geography are arbitrary and bear no rational relationship to any legitimate state interest. Amend. Compl. ¶ 168. Additionally, the establishment of the Task Force and the implementation of its Report and Recommendations will likely lead to further targeted enforcement efforts that violate Plaintiffs' equal protection rights of the United States and Pennsylvania Constitutions. Amend. Compl. ¶ 169. There is a clear path set for the laws to be applied in a discriminatory manner, disproportionately impacting Plaintiffs and other minority-owned businesses. Amend. Compl. ¶ 170. The harm from this is compounded because the PLCB then uses these alleged violations as a pretext to avoid renewal of the liquor licenses for the impacted businesses. Amend. Compl. ¶ 171.

In previous years, the PLCB would simply issue a renewal—or in exceedingly rare cases, a denial—of the license in question during each renewal period. Amend. Compl. ¶ 172. In a complete change from the past practice, the PCLB has now issued dozens of "temporary renewal" letters refusing to renew many liquor licenses pending the results of a hearing. Amend. Compl. ¶ 173. The enforcement practices of the Defendants reveal a consistent and discriminatory pattern of targeting Plaintiffs as detailed below. Amend. Compl. ¶ 174.

<u>Yo Deli Inc.</u>

In some instances, the PLCB now purports to take action against Plaintiff and their members based on alleged violations in the distant past. Amend. Compl. ¶ 175. For instance, AALBA member Yo Deli Inc. recently received a temporary license renewal from PLCB, claiming it may have abused its license based on two provided citation numbers: 15-174 and 13-1726. A

true and correct copy of the citations and the PLCB letter regarding temporary renewal are attached as Exhibit B. Amend. Compl. ¶ 175. However, as the first two digits in the citation numbers indicate the year the citations were issued, it is evident that the most recent of those citations occurred nearly *ten years* ago, with the other occurring over *eleven years ago.* Amend. Compl. ¶ 176.

Yo Deli Inc. has renewed its license multiple times in the interim without issue, investing considerable time, effort, and money into the business year after year. Amend. Compl. ¶ 177. PLCB now arbitrarily threatens the existence of the business nearly a decade later, illustrating its clear bias and efforts to shut down minority-owned businesses like Yo Deli Inc. at any cost. Amend. Compl. ¶ 178. In effect, the PLCB appears to be taking the unfair position that any citation, no matter how remote in time, could resurface at any time and for any reason to shut down a law-abiding business in the future. Amend. Compl. ¶ 179.

Yo Deli Inc. has also been the target of unfair efforts to drum up new citations. Amend. Compl. ¶ 180. In June 2024, immediately upon opening the store, white inspectors for the PLCB came in to inspect and measure the premises. Amend. Compl. ¶ 181. While the staff prepared to open the store and was sweeping, the inspectors began yelling and accusing them of adding additional seating. Amend. Compl. ¶ 182. This would have been impossible for additional seating to be added in that matter. Amend. Compl. ¶ 183. After this hostile exchange, the inspector left. Amend. Compl. ¶ 184. The inspector returned later purporting to shut down Yo Deli Inc, not because there was insufficient seating, but because they felt there should have been a sign advising patrons that additional seating was available on the second floor. Amend. Compl. ¶ 185. Setting aside that the additional seating should be obvious to customers, there is no express requirement in the law to post such a sign. Amend. Compl. ¶ 186. Even if there was, remediating the issue

would be trivial and could be accomplished immediately for virtually zero expense. Amend. Compl. ¶ 187. Despite this, the inspector required Yo Deli Inc. to shut down for two weeks, causing significant financial harm, disruption of regular business, and a further threat to renewal of its license. Amend. Compl. ¶ 188. Based on the old violation and the trivial claim that it was missing a sign, PLCB now arbitrarily threatens the existence of the business by issuing only a temporary license based on this conduct, illustrating its clear bias and efforts to shut down minority-owned businesses like Yo Deli Inc. at any cost. Amend. Compl. ¶ 189.

<u>7701 Ogontz Inc.</u>

The City of Philadelphia, using the Nuisance Business Ordinance, also actively seeks to disrupt and shut down members of Plaintiff's organization. Amend. Compl. ¶ 190. For instance, 7701 Ogontz Inc. operates Riley Deli in Philadelphia. Amend. Compl. ¶ 191. On or about February 28, 2024, they received a warning from the City accusing them of being a nuisance business. A true and correct copy of the police incident report and the warning letter are attached as Exhibit C. Amend. Compl. ¶ 193. This allegation was based on the fact that members of the Police Department arrested two individuals in Riley Deli for allegedly selling drugs somewhere nearby the restaurant. Amend. Compl. ¶ 193. During the arrest that followed, one of the individuals appeared to break several fingers. That individual was ultimately released on the scene. Amend. Compl. ¶ 194. On information and belief, the allegations against both these individuals were later dismissed. Amend. Compl. ¶ 195. However, the City of Philadelphia has not withdrawn its citations against Riley Deli, warning that with further violations the City could "begin legal action to close your establishment." Amend. Compl. ¶ 196. This has the perverse effect that Riley Deli is subject to punishment, even where, apparently, no underlying crime was committed. Amend. Compl. ¶ 197.

Officers at the scene asserted to the manager of Riley Deli that if there was another incident or if they received another ticket, the business would be shut down. Amend. Compl. ¶ 198. As a result, Riley Deli's owners, managers, and employees are afraid to even contact the police or report potential criminal activity in the neighborhood out of concern that they will receive another nuisance violation, which could result in the closing of the establishment. Amend. Compl. ¶ 199.

<u>Best Beer, Inc.</u>

On or about February 22, 2022, the BLCE issued a citation (Citation No. 22-0189) to Best Beer, Inc., alleging that it did not meet the 300 square-foot public space requirement for an eating place license. Amend. Compl. ¶ 200. As a result, Best Beer was shut down for two weeks, and a liquor license suspension placard was displayed on the storefront. On June 6, 2022, an administrative hearing was held, and the citation was dismissed, finding that BLCE had failed to establish that Best Beer had inadequate square footage. Amend. Compl. ¶ 201. Despite the citation being dismissed, Best Beer received a letter on October 17, 2024 from the PLCB in response to its application for renewal. This letter indicated that the PLCB was considering the previously dismissed citation as part of its determination on the renewal application. A true and correct copy of the October 17, 2024 letter and Adjudication is attached as Exhibit D. Amend. Compl. ¶ 202. Best Beer incurred $1,750 in legal fees related to the citation and the administrative hearing. Amend. Compl. ¶ 203.

To make matters worse, Best Beer shares common ownership with a similar establishment called Sky Beer Deli, Inc. ("Sky Beer"). Amend. Compl. ¶ 204. Sky Beer has *never* been shut down due to an inspection by the BLCE or Police Department. Amend. Compl. ¶ 205. Despite this, Sky Beer received only a temporary license renewal. On information and belief, Defendants are attempting to use the same *dismissed* allegations against Best Beer to shut down the business of a

separate business. A true and correct copy of the October 18, 2024 letter is attached as Exhibit D. Amend. Compl. ¶ 206.

### Bu-Bu Deli

Maya 2008 Investment Group LLC operates Bu-Bu Deli at 3153 N. 22nd Street in Philadelphia. Amend. Compl. ¶ 207. On or about September 12, 2024, Bu-Bu Deli received two CVNs from the Philadelphia Police Department for patrons drinking on the sidewalk in front of the establishment and creating a nuisance. A true and correct copy of the CVNs and City of Philadelphia warning letter are attached as Exhibit F. Amend. Compl. ¶ 208. These individuals were not encouraged to loiter anywhere near the business, nor could Bu-Bu Deli force them to leave a public sidewalk where they otherwise had a right to be. Amend. Compl. ¶ 209. The business is also located near a bus stop, where residents *need* to gather in order to ride public transportation. Amend. Compl. ¶ 210. The owners and managers of Bu-Bu Deli have no means to determine who is unlawfully loitering nearby, as opposed to waiting for a bus. Amend. Compl. ¶ 211.

On or about September 14, 2024, Bu-Bu Deli received CVN 6456364-5 also for creating a nuisance and a separate Complaint or Incident Report was issued describing the incident as follows "Upon arrival at the business at the above location Police observed multiple individuals creating a nuisance by blocking the active pedestrian sidewalk and, when politely asked, failed to disperse from outside the store." *See* Exhibit F. Amend. Compl. ¶ 212. To the extent these individuals did anything unlawful in the first instance, they received no punishment. Instead, only Bu-Bu Deli received a citation. Amend. Compl. ¶ 213. These citations were accompanied by threats that further citations could result in the closure of this business. Amend. Compl. ¶ 214.

### 700 SE Inc.

700 SE Inc. operates a takeout business at 700 Snyder. Amend. Compl. ¶ 215. Like many members of the AALBA and AAB, the owners of 700 SE Inc. have limited English proficiency, but have nevertheless been able to establish a successful business that serves the community in South Philadelphia. Amend. Compl. ¶ 216. 700 SE Inc. has nevertheless received two citations from the Police Department, based on conduct over which it has no control. Amend. Compl. ¶ 217. For the first citation, the officer cited Section 10-604(2)(a), which prohibits the consumption of alcohol in public parks and similar spaces. Amend. Compl. ¶ 218. To extent anyone has loitered in front of the business, the owners or managers of 700 SE Inc., generally asked them to leave. Amend. Compl. ¶ 219. However, much like the owners of 700 SE Inc., the patrons often have limited English skills as well, making any communication (much less a directive to leave) difficult. Amend. Compl. ¶ 220. Regardless, the cited ordinance was inapplicable and, further, it was the individuals and not the business who committed the alleged violation. Amend. Compl. ¶ 221. On information and belief, those accused of loitering received no punishment. Amend. Compl. ¶ 222.

On a second instance, the officer allegedly observed empty beer containers in bushes nearby, citing the Nuisance Ordinance restriction on illegal consumption of alcohol. Amend. Compl. ¶ 223. In fact, the Nuisance Ordinance also expressly identifies littering as a form of nuisance behavior. Amend. Compl. ¶ 224. In effect, other people's attempts to litter are now a potential basis to shut down 700 SE Inc. business. Amend. Compl. ¶ 225. Given the general condition of streets, and the common sight of empty alcohol containers, virtually any business in Philadelphia could be subject to citation for violating the Nuisance Ordinance. Amend. Compl. ¶ 226. However, the selective enforcement has targeted minority-owned businesses instead. Amend. Compl. ¶ 227. 700 SE Inc. is left in a precarious position, as even a trivial offense by one of its

customers, or even a random person passing by the store, could not serve as a basis for a third citation that could shut down the business. Amend. Compl. ¶ 228.

CDD 725, Inc.

Upon information and belief, CDD 725, Inc. has been subjected to numerous unfounded and unnecessary inspections, which were allegedly conducted with the intent and effect of intimidating, harassing, and threatening Plaintiffs. A true and correct copy of the Philadelphia Police Department Complaint or Incident Reports from April 23, 2024, September 18, 2024 and October 21, 2024 are attached as Exhibit G. Amend. Compl. ¶ 229. Despite each unannounced inspection's Complaint or Incident Report stating that "no issues were noted," the assigned police officer continued to conduct repeated inspections without any new basis or violations observed. *Id.* Amend. Compl. ¶ 230. On or about October 21, 2024, an officer from the Philadelphia Police Department arrived at CDD 725 for an unannounced inspection. During the issuance of the incident report, the officer requested that the manager on duty sign the notice, which once again confirmed that there were no violations. Amend. Compl. ¶ 231. There is no printed space on the incident report form which requires, or even requests, that an owner or manager sign. Amend. Compl. ¶ Amend. Compl. ¶ 232. That line was added by hand by the officer. Amend. Compl. ¶ 233. When the manager on duty asked why he needed to sign, the officer immediately became hostile, raised his voice, and issued threats. The officer accused the manager of "giving him a hard time" and "breaking his stones." Amend. Compl. ¶ 235. The officer then threatened to return every day for further inspections. Amend. Compl. ¶ 236. The officer made good on this threat, having returned for further inspections on at least two separate occasions since then. Amend. Compl. ¶ 237. Illustrating the concerted action between the City and the PLCB, the officer further threatened that he would "come back with the LCB and we'll see how that works out." Amend. Compl. ¶ 238.

On a separate occasion, the officer advised the owner that stores like his are liable for crimes in the area. Amend. Compl. ¶ 239. The owner of CDD 725 Inc. went to the local precinct to try and find more information about this conduct and why he was the subject of repeated inspections or requests that he sign these incident reports. Amend. Compl. ¶ 240. Instead of answers, the owner received conflicting explanations about the number of inspections and the reasons he was presented with the citation. Amend. Compl. ¶ 241.

<u>Other Impacted Businesses</u>

Even businesses that do not serve alcohol, but serve the community by offering flexible hours, are suffering as a result of these practices. Amend. Compl. ¶ 242. For instance, several member organizations of AAB do not sell alcohol, but still suffer considerable harm from the curfew ordinances. Amend. Compl. ¶ 243. Once such member operates a grocery store, known as the Quick Stop, on Kensington Avenue. Amend. Compl. ¶ 244. Their business relies on having flexible hours to serve the community, which suffers from a lack of quality options for fresh food. Amend. Compl. ¶ 245. In particular, shift workers and other working-class people depend on businesses that are open after 11 p.m. Amend. Compl. ¶ 246. The Quick Stop is one of the only businesses that can cater to these needs, providing fresh meat, produce, and dairy products to this underserved community, even at odd hours. Amend. Compl. ¶ 247. Reducing the time members of AAB can operate has a significant impact on their revenue, which relies on their flexible hours. Amend. Compl. ¶ 248.

On information and belief, other businesses not owned by minorities are not subject to the same level of enforcement. Amend. Compl. ¶ 249. These are but a few examples of the discriminatory conduct faced by members of the Asian and Arab business owners in Philadelphia. Amend. Compl. ¶ 250. Of AALBA's approximately 110 members, nearly 60 have already received

an adverse action from the PLCB in the form of temporary renewals to their liquor licenses based on the selective and discriminatory enforcement of the law. Amend. Compl. ¶ 251. For context, in prior renewal periods, on average *one* member of AALBA would receive an adverse action, in the form of an outright rejection of their renewal application. Amend. Compl. ¶ 252.

Defendants' actions threaten to permanently close established businesses arbitrarily and without adequate due process and/or result in non-renewal of their liquor licenses. Amend. Compl. ¶ 253. Defendants' conduct is part of a concerted pattern targeted at these minority-owned businesses, with the express purpose of shutting them down. Amend. Compl. ¶ 254. On information and belief, even if a single citation or enforcement action is defeated by Plaintiffs or its members, Defendants will simply keep harassing them until they drum up a basis for further enforcement action, or the stress, expense, and uncertainty of operating under these conditions push the owners to abandon the business. Amend. Compl. ¶ 255. Several members of AALBA and ABA have already expressed that they are considering closing or selling their businesses to escape the harassment and avoid the uncertainty that they will be shut down arbitrarily. Amend. Compl. ¶ 256.

These instances collectively demonstrate a sustained pattern of enforcement actions, unannounced inspections, and citation issuances disproportionately directed at Plaintiffs' businesses. Amend. Compl. ¶ 257. On information and belief, other similarly situated businesses possessing liquor licenses in Philadelphia, owned by non-minorities or controlled by larger corporate interests, are treated differently and are not subject to the same frequency of inspection or the repeated bad-faith interpretations of the applicable requirements. Amend. Compl. ¶ 258. On information and belief, similarly situated businesses possessing liquor licenses and operating in neighborhoods in Philadelphia where the racial makeup of the owners is not overwhelmingly Asian

or Arab, are not subject to the same stringent requirements or level of enforcement. Amend. Compl. ¶ 259. On information and belief, similarly situated businesses possessing liquor licenses operating in neighborhoods in Philadelphia where the clientele is predominantly white are not subject to the same stringent requirements or level of enforcement. Amend. Compl. ¶ 260. On information and belief, similarly situated white-owned businesses, takeouts, grocery stores, or restaurants possessing liquor licenses are not similarly designated as potential nuisances. Amend. Compl. ¶ 261.

To make matters worse, this conduct makes the impacted businesses *less safe* by creating a barrier to contacting the police to report any crimes in the area. Amend. Compl. ¶ 262. By reporting a crime, business owners risk receiving a citation, even if they are the victim of criminal activity. Amend. Compl. ¶ 263. This same catch-22 can similarly impact their liquor licenses, given the coordination between the City of Philadelphia and the PLCB on this issue. Amend. Compl. ¶ 264. As Plaintiffs and their members stand to lose their businesses and livelihoods from this pattern of unlawful conduct, they now seek recourse from this Court to enjoin the discriminatory enforcement and application of the overbroad, vague, and inconsistently enforced laws and ordinance, threatening to close businesses throughout the City. Amend. Compl. ¶ 265. The Plaintiffs, and the members of AALBA and ABA will face significant, irreparable damages if the discriminatory enforcement practices continue. Amend. Compl. ¶ 266.

## III.  <u>ARGUMENT</u>

The conduct of Defendants violates the Plaintiffs' rights under the United States Constitution and similar provisions of the Pennsylvania Constitution, exposing Plaintiffs to irreparable harm that cannot be corrected through monetary damages. Accordingly, Plaintiffs request this Court enter an Order restraining enforcement of the state and local laws at issue.

### A.  Legal Standard

Under Federal Rule of Civil Procedure 65, the court should grant an application for an order where the party seeking a preliminary injunction has satisfied four factors: (1) a likelihood of success on the merits; (2) it will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the non-moving party; and (4) the public interest favors such relief. *Pileggi v. Aichele*, 843 F. Supp. 2d 584, 592 (E.D. Pa. 2012). The court must also balance these four factors. *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999). Where, as here, all four elements necessary for injunctive relief are easily met by Plaintiffs, injunctive relief is appropriate.

### B.  Analysis

Analysis of each of the four factors favors issuing a preliminary injunction in favor of Plaintiffs and against the Defendants.

### 1.  Plaintiffs are Likely to Succeed on their Claims Against the Defendants

For the court to issue an injunction, the movant need not prove their entire case to show a likelihood of success on the merits. Rather, the movant for a preliminary injunction "need only prove *a prima facie case, not a certainty* that he or she will win." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001) (citation omitted) (emphasis added). The Third Circuit requires only a "reasonable likelihood" of success on the merits. *Saudi Basic Indus. Corp. v. Exxon Corp.*, 364 F.3d 106, 112 (3d Cir. 2004) (citing *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.2d 153, 158 (3d Cir. 1999)).

The Verified Amended Complaint alleges twelve counts: (i) deprivation of due process under 42 U.S.C. § 1983, (ii) deprivation of due process under Article I, Section 1 of the Pennsylvania Constitution, (iii) violation of the right to petition under the First Amendment, (iv)

violation of the right to petition under Article I, Section 20 of the Pennsylvania Constitution, (v) violation of First Amendment rights under the United States Constitution, (vi) violation of the Article I, Section 20 of the Pennsylvania Constitution, (vii) violation of procedural due process under 42 U.S.C. § 1983, (viii) violation of procedural due process under Article I, Section 1 of the Pennsylvania Constitution, (ix) violation of equal protection under 42 U.S.C. § 1983, (x) violation of equal protection under Article I, Sections 26 and 29 of the Pennsylvania Constitution (xi) civil conspiracy under 42 U.S.C. § 1983 and (xii) action for declaratory relief under 28 U.S.C.§ 2201, *et seq.*   Plaintiffs have a reasonable probability of succeeding on each of these claims. Plaintiffs can readily make out a *prima facie* case for all these claims, although they only need make such a case for one of the claims for this motion to succeed. *Thomas v. Little*, 2024 WL 3295584, at *4 (E.D. Pa. July 3, 2024) (citing *Johnson v. Wetzel*,  209 F.Supp.3d 766 (M.D. Pa. 2016)).

### a.  Plaintiffs are Likely to Succeed on their Deprivation of Due Process Claims under the United States and Pennsylvania Constitutions.

Plaintiffs have a reasonable probability of prevailing on their due process claim under 42 U.S.C. § 1983 and Article I, Section 1 of the Pennsylvania Constitution.[3] Imprecise laws are vulnerable to facial challenges on two grounds. First, the overbreadth doctrine permits the invalidation of laws that substantially inhibit the exercise of constitutionally protected rights if the impermissible applications of the law are substantial relative to their legitimate scope. *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). Second, even if a law does not substantially impact

---

[3] A due process claim brought under the Pennsylvania Constitution is indistinguishable from a due process claim brought under the Fourteenth Amendment of the United States Constitution; the same analysis applies to both. *Magoni-Detwiler v. Pennsylvania*, 502 F.Supp.2d 468, 475 (E.D. Pa. 2007), *aff'd sub nom. Magoni-Detwiler v. Bloomingdale*, 293 Fed.Appx. 928 (3d Cir. 2008); *see also Kaehley v. City of Pittsburgh*, 988 F.Supp. 888 (W.D. Pa. 1997).

a constitutionally protected right, it may be impermissibly vague if it lacks clear standards to establish clear standards to prevent the arbitrary deprivation of liberty interests. *Id.*

i.   <u>The Ordinances are Unconstitutionally Overbroad</u>

A statute is "overbroad" if by its reach if it punishes constitutionally protected activity as well as illegal activity. *Grayned v. City of Rockford,* 408 U.S. 104, 114 (1972). Such a statute violates substantive due process by denying individuals constitutionally protected interests through measures that are not rationally related to a legitimate state objective, thereby "sweep[ing] unnecessarily broadly." *Adler v. Montefiore Hospital Association of Western Pennsylvania,* 311 A.2d 634, 640 (Pa. 1973), *cert. denied,* 414 U.S. 1131 (1974); *Grayned,* 408 U.S. 104. While overbreadth arguments are typically invoked in First Amendment contexts, a statute may still be deemed overbroad if it regulates too broadly, exceeding legitimate state police powers or acting arbitrarily by punishing entities with little relation to the public harm targeted. *Troxel v. Granville*, 530 U.S. 57 (2000).

Section 9-4402(1) of the Nuisance Ordinance allows the issuance of violation notices to establishments based on nuisance behavior or serious violent behavior that has taken place *inside the business or on the sidewalk or street, abutting the business*. Phila. Code § 9-4402(1)(emphasis added). This provision is overbroad for multiple reasons. First, it unconstitutionally infringes on Plaintiffs' First Amendment right to petition, as detailed below. Second, it invites arbitrary and discriminatory enforcement because it applies to a broad range of behaviors, including activities unrelated to the businesses' operations. *See Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)(holding that a city ordinance was unconstitutionally broad where the City could have achieved the same end through penalties "directed with reasonable specificity toward the conduct to be prohibited"). Moreover, the ordinance permits extreme punitive measures, such as shutting down a business, even when the business is uninvolved in the offending behavior. Under the guise

35

of protecting the public interest, the legislature cannot unduly interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. *Adler v. Montefiore Hosp. Ass'n of W. Pennsylvania*, 311 A.2d 634, 640–41 (Pa. 1973)(quoting *Gambone v. Commonwealth*, 101 A.2d 634, 637 (Pa. 1954)). Here, the ordinance exceeds those bounds by unduly burdening establishments based on the location of a bad act rather than targeting those responsible for the bad acts in question.

In perhaps the most extreme example, 7701 Ogontz Inc, which operates Riley Deli, received multiple citations and threats that the business would be shut down. These citations were based on patrons *allegedly* being involved in selling drugs (with no apparent connection to the business). However, after a violent arrest inside the store, all charges against these individuals were dropped. However, 7701 Ogontz Inc. still faces punishment even though there was no evidence of wrongdoing.

Similarly, Maya 2008 Investment Group, LLC, which operates Bu-Bu Deli, is effectively being punished for its proximity to a bus stop. Bu-Bu Deli has received CVNs based on individuals allegedly loitering near the business. Even if the staff could tell adults who have *left* their establishment what to do, Bu-Bu Deli has no way to determine whether a person outside their business is "loitering" or just waiting for public transportation.

ii.    The Ordinances are Unconstitutionally Vague

The basic principle of due process holds that a statute is void for vagueness if its prohibitions are not clearly defined. *Dailey v. City of Philadelphia*, 417 F.Supp.3d 597, 616 (E.D. Pa. 2019), *aff'd*, 819 Fed.Appx. 71 (3d Cir. 2020)(citing *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972)). Although the vagueness doctrine is rooted in criminal law, it has also been held to apply in civil contexts. *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1135 (3d Cir. 1992).

36

A law is unconstitutionally vague if it (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" **_or_** (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Adams Outdoor Advert. Ltd. P'ship by Adams Outdoor GP, LLC v. Pennsylvania Dep't of Transp.*, 930 F.3d 199, 205 (3d Cir. 2019)(citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000))(emphasis added). A vagueness challenge requires a case-by-case inquiry to determine whether the statute at issue is vague as applied to the affected party. *San Filippo*, 961 F.2d at 1136.

<u>The ordinances fail to provide fair notice of prohibited conduct.</u>

The fundamental rationale behind the vagueness doctrine is that due process requires a statute to provide sufficient notice of its scope. *Grayned,* 408 U.S. at 108. Laws must provide people of ordinary intelligence a reasonable opportunity to understand what conduct is prohibited. *Id.* Terms dependent on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" are particularly problematic. *Holder v. Humanitarian L. Project,* 561 U.S. 1, 20, (2010). Without transparent meanings, citizens may "steer far wider of the unlawful zone . . .than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (quoting *Bagget v. Bullitt*, 377 U.S. 360, 372 (1964)). When a statute includes an undefined term and "the statutes and case law fail to provide any standards of what is meant by the term," such circumstances "compel[ ] the conclusion that use of the term in the challenged scheme is unconstitutionally vague." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 274 (4th Cir. 2019).

Here, the Curfew Ordinances are unconstitutionally vague because they fail to define critical terms, depriving individuals of clear notice of prohibited conduct. For example, the term "Commercial Establishment" is defined as "[a]n establishment involved in the buying and selling

of goods where consumers primarily purchase goods intended for consumption or use off premises, including a Food Establishment as defined in Code Section 6-102 . . . ." Phila Code §§ 9-630(1), 9-641(1), 9-642(1), 9-643(1). However, the ordinances do not define key terms such as "primarily" or "goods" which are essential for the proper application and enforcement of the ordinances.

The term "primarily," as a "term of degree," is especially problematic. The Supreme Court has recognized that such terms are inherently challenging to enforce because they fail to provide adequate notice. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1047 (1991). Without clear standards, individuals cannot determine whether their businesses qualify as "Commercial Establishments" under the ordinances. This lack of clarity denies individuals and businesses fair notice and invites arbitrary enforcement. Further, the ordinances lack a clear standard to guide the Police Department's determination of whether a business qualifies as a "Commercial Establishment" under the provisions. Consequently, City officials have broad discretion to interpret which establishments must comply, resulting in inconsistent application.

Further, Section 4-470(a.1) of the Liquor Code is also unconstitutionally vague because it fails to define critical terms, depriving licensees of clear notice of prohibited conduct. Specifically, the provision states that the PLCB may consider "activity" that occurs on or off a licensee's premises when determining whether to renew a license. However, the term "activity" is not defined, granting the board unrestrained discretion to arbitrarily decide which conduct could lead to the non-renewal of a liquor license. This lack of clarity invites inconsistent decision-making and undermines due process protections guaranteed by the United States and Pennsylvania Constitutions.

<u>The ordinances permit arbitrary and discriminatory enforcement.</u>

The vagueness doctrine's most critical function is requiring legislatures to establish minimal guidelines to govern law enforcement. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). Vague laws impermissibly delegate basic policy decisions to law enforcement, judges and juries, allowing for *ad hoc* and subjective resolutions. *Bykofsky v. Borough of Middletown*, 401 F.Supp. 1242, 1248–49 (M.D. Pa. 1975), *aff'd*, 535 F.2d 1245 (3d Cir. 1976)(citations omitted) This delegation leads to erratic and arbitrary enforcement based on individual impressions and personal biases. *Id.* Legislation must not be so vague, the language so loose, as to leave to those who apply it too wide a discretion. *Id.* Laws that are ambiguous, imprecise, and vague do not provide "for government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman on his beat.' *Id.* (citing *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90 (1969); *see also*, *Morales*, 527 U.S. 41 (invalidating ordinance solely on its failure to limit discretionary enforcement by police)

The ambiguous definitions of "Commercial Establishment" under the Curfew Ordinances and "activity" under Section 4-470(a.1) forces individuals of ordinary intelligence to guess the meaning and scope of these laws. This ambiguity allows City and State officials to enforce the laws selectively and inconsistently.   This unchecked discretion violates due process by enabling discriminatory application.

           iii.    <u>The Ordinances Deprive Plaintiffs of Due Process.</u>

As detailed above and in Plaintiffs' Verified Amended Complaint, the ordinances violate fundamental due process protections under both federal and Pennsylvania law. The Nuisance Ordinance is unconstitutionally broad, punishing businesses solely for incidents occurring within or near their premises, regardless of the business' actual involvement or culpability.   By targeting businesses merely for their proximity to certain behaviors, the ordinance unjustly burdens

establishments with little or no connection to the public harm at issue, exceeding legitimate state

police powers and enabling arbitrary enforcement by the police department. This danger is put into

sharp focus when considering the sheer breadth of the covered conduct, which includes *eighteen*

different categories of offenses, many of which are exceeding broad in themselves. The full *non-*

*exhaustive* list includes:

 (3) *Nuisance Behavior.* Behavior that interferes with the health, safety or welfare of the
community, including, but not limited to, the following:

> (a) legal consumption or sale of alcoholic beverages;
> (b) Illegal drug activity;
> (c) Unlawful street or sidewalk obstruction;
> (d) Gambling and illegal gaming activities;
> (e) Public urination or defecation;
> (f) Litter in the right-of-way, including the sidewalk or street;
> (g) Prostitution;
> (h) Owning, operating or conducting a vehicle chop shop in any building or structure,
> including a lot or curtilage, for the purpose of dealing in stolen vehicles or stolen vehicle
> parts or illegally obtaining and altering vehicles or vehicle identification numbers of
> vehicle parts;
> (i) Vehicles parked on the sidewalk;
> (j) Use of street parking spaces or sidewalk for open storage, sale, or rental of goods, or
> storage or repair of inoperable vehicles;
> (k) Unlicensed or unlawful firearms possession by a patron;
> (*l*) Short dumping;
> (m) Unlawful junk dealer operations;
> (n) Disorderly conduct and related behavior;
> (o) Conduct that violates the provisions of the Pennsylvania Liquor Code (47 P.S. §§
> 1101 et seq.) pertaining to unlawful acts relative to liquor and licensees (47 P.S. § 4-493);
> (p) Obstruction of an investigation of nuisance behavior;
> (q) Repeated or continuing violations of any other City ordinance and/or regulations;
> (r) Any other activity that constitutes a public nuisance under The Philadelphia Code.

§ 9-4401(3).

On its face, the Nuisance Ordinance allows Philadelphia Police to shut down a business for

littering, for cars outside that are bad at parallel parking, or for blocking the sidewalk. Beyond the

trivial, the Nuisance Ordinance purports to punish businesses for violating any unspecified

provision of the Philadelphia Code, ordinances, or regulations, with no guidance as to what additional information might be covered.

Even the more serious violations included in the list, such as allegations of drug activity, provide business owners with no guidance as to comply with the ordinance, or even a basis to know that such illegal activity is happening at some unspecified distance *near* their business. There is not even a basis for Plaintiffs to determine how nearby their business the alleged activity needs to be in order to be subject to punishment, as it punishes activity "on the sidewalk or street abutting the business." § 9-4402(1).

Similarly, the Curfew Ordinances and Section 4-470 of the Liquor Code are unconstitutionally vague, as they fail to provide clear definitions or standards for enforcement. The laws' ambiguous language allows unchecked discretion, leading to inconsistent and subjective application. They allow for broad discretion and seemingly arbitrary enforcement. Police are left to determine what businesses are subject to the ordinance, including determining what "good" consumers "primarily" purchase. Coupled with the appearance of unequal enforcement, this makes it difficult for businesses to operate during the hours they have traditionally maintained. As such, Plaintiffs have a likelihood of success as to the curfew ordinance and Section 4-470 of the Liquor Code as well.

### b. Plaintiffs are Likely to Prevail on their Claims for Violation of Their Right to Petition Under the United States and Pennsylvania Constitutions.

Defendants' repeated threats to close Plaintiffs' establishments under the Nuisance Ordinance have effectively forced Plaintiffs into an untenable decision: choose between seeking police protection or maintaining their businesses. This situation is compounded by the fact that the PLCB may consider police incident reports or citations issued under the Nuisance Ordinance when deciding whether to renew a liquor license. As a result, Plaintiffs have refrained from calling the

police, even in situations requiring law enforcement intervention, placing Plaintiffs and the community at large in unnecessary danger.

The First Amendment, applicable to the states and municipalities through the Fourteenth Amendment, safeguards the right to petition the government for redress of grievances. *See BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 524–25 (2002)(recognizing the right to petition as one of the "most precious of the liberties safeguarded by the Bill of Rights"). The same rights are protected by Article I, Section 20 of the Pennsylvania Constitution.

Calls to the police to report crimes or request assistance constitute legitimate exercises of the First Amendment right to petition. *See Branning v. Wayne Cnty.*, 3:15-CV-1936, 2017 WL 3946262, at *4 (M.D. Pa. May 11, 2017), *report and recommendation adopted in part, rejected in part*, 3:15-CV-1936, 2017 WL 3927611 (M.D. Pa. Sept. 7, 2017)(citing *Meyer v. Bd. of Cnty. Comm'rs of Harper Cnty.*, 482 F.3d 1232, 1243 (10th Cir. 2007) (reporting a crime to police officers "constitutes an exercise of the First Amendment right to petition the government for the redress of grievances."); *Ibarra v. City of Chicago*, 816 F. Supp. 2d 541, 550 (S.D. Ind. 2011) ("When a crime victim reports that crime to a police officer ... he is engaging in constitutionally protected activity"). Such calls to the police also constitute a form of speech protected against government penalties or restrictions based on their content or effect. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) (stating that this requirement "appl[ies] the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content"). This protection applies regardless of whether the restriction explicitly targets specific content on its face or, in its operation or effect, disproportionately impacts or penalizes constitutionally protected speech. *Thornhill v. State of Alabama*, 310 U.S. 88, 97-98 (1940) (holding that a penal statute "which does not aim specifically at evils within the allowable

area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech . . . .").

Thus, Plaintiffs have a First Amendment right to engage in communications with law enforcement free from express or effective limitations on the subject matter or impact of that speech, including communications to report a crime at a property, request police services, or relay other information the effect of which would foreseeably lead to a police response. *See Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)(holding that a city ordinance was unconstitutionally broad where the City could have achieved the same end through penalties "directed with reasonable specificity toward the conduct to be prohibited"). The Nuisance Ordinance and the Liquor Code impose a direct penalty on Plaintiffs for exercising their First Amendment rights by deterring them from reporting crimes or seeking assistance from the police. Their enforcement threatens business closure based on crime reports, regardless of whether Plaintiffs were victims, thereby unduly chilling protected speech, the right to petition. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) (holding that Plaintiffs may challenge the impact of a policy on others because "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."); *see also United States v. Stevens*, 559 U.S. 460, 473 (2010) (holding that "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.") (internal quotation marks omitted). Plaintiffs' legitimate fear of their businesses being shut down or losing their liquor license, and as such their livelihood inhibits their ability to engage in constitutionally protected communications with law enforcement.

Restrictions on free speech and the right to petition are subject to strict scrutiny. To justify infringement of either, Defendants must demonstrate that the Nuisance Ordinance and Section 4-

470 of the Liquor Code serve a compelling governmental interest and that it is the least restrictive means to further such an interest. *See Wayte v. U.S.*, 470 U.S. 598, 611(1985) ("Although the right to petition and the right to free speech are separate guarantees, they are related and generally subject to the same constitutional analysis"). Defendants cannot demonstrate any legitimate interest in justifying punishing Plaintiffs for crimes committed against them or restricting their rights to request police aid in an emergency. The laws neither serve a compelling interest nor employ narrowly tailored means. As set forth in the Amended Complaint, businesses such as 7701 Ogontz Inc., have been threatened with threatened with the closure of their business if the police allege further nuisance activity. As a result, they are afraid to even contact the police for fear that that it will lead to additional citations. In effect, the continued enforcement of the Nuisance Ordinance and Section 4-470(a.1) of the Liquor Code places Plaintiffs and other members of the community in jeopardy by restricting their access to police protection and other emergency services. Their enforcement is overbroad and fails to meet the strict scrutiny standard, and Plaintiffs will face immediate and irreparable harm if Defendants continue to enforce this unconstitutional ordinance. Accordingly, Plaintiffs are likely to prevail on their claim against Defendants for deprivation of free speech and the right to petition.

### c. Plaintiffs are Likely to Prevail on their Claims for Violation of Their First Amendment Rights Under the United States and Pennsylvania Constitutions

As detailed above, the state and local laws at issue, specifically the Nuisance Ordinance and Section 4-470 of the Liquor Code, are facially overbroad. As such, the statutes infringe upon the Plaintiffs' First Amendment right to petition the police for assistance or redress. The overbreadth doctrine prohibits laws that sweep too broadly as is this case with the state and local laws at issue.

It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to

give way to other compelling needs of society. *Herndon v. Lowry*, 301 U.S. 242, 258 (1937). ; As a corollary, the Court has altered its traditional rules of standing to permit—in the First Amendment area—'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965). Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression. *Broadrick v. Oklahoma*, 413 U.S. 601, 611–12 (1973).

Here, not only are Plaintiffs' own First Amendment rights being violated, but the rights of all business owners and liquor license holders who are subject to these laws. The overbreadth of the Nuisance Ordinance and Section 4-470 of the Liquor Code create a chilling effect on constitutionally protected expression, harming not only Plaintiffs but an entire class of individuals subject to the laws.

As a direct and proximate result of the overbroad statutes, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm, including but not limited to financial loss, loss of business opportunities, and emotional distress, as detailed above.

Accordingly, Plaintiffs are likely to prevail on their claim against Defendants for deprivation of free speech and the right to petition.

### d. Plaintiffs are Likely to Prevail on their Violation of Procedural Due Process Claims under the United States and Pennsylvania Constitutions

Plaintiffs have a reasonable probability of prevailing on their due process claim under 42 U.S.C. § 1983 and Article I, Section 1 of the Pennsylvania Constitution. As set forth above, Act 44 of 2017, which amended the Fiscal Code, established the PLCB's Bureau of Licensing and the

Licensee Compliance Program to oversee establishments' adherence to various requirements including seating, food, square footage, and other criteria. 72 P.S. § 1799.6-E; s*ee also* PLCB Compliance Program. Under this program, upon receiving a complaint, a licensing analyst and law enforcement officer conduct unannounced on-site inspections to determine compliance. If violations are found, the officers impose an immediate unappealable administrative suspension of the operating privileges. *Id.*; 72 P.S. § 1799.6-E(a)(1) and (b).

Plaintiffs have a protected interest in maintaining their liquor licenses, which are essential to the operation of their businesses, as well as in the continued operation of the business itself to sustain their livelihood. Liquor licenses are not mere privileges – they constitute valuable rights subject to constitutional protection. *See Bell v. Burson*, 402 U.S. 535, 539 (1971)(holding that once licenses are issued, their continued possession may become essential in the pursuit of a livelihood, and in such cases, the licenses cannot be taken away without procedural due process required, by the Fourteenth Amendment). Defendants' action under the Licensee Compliance Program and Section 1779.6-E of the Fiscal Code strip Plaintiffs of their protected interests by enjoining them from operating their businesses without prior notice or warning, often for weeks at a time, and without providing any procedures to challenge or contest these actions. As a result of Defendants' actions, Plaintiffs have been unjustly deprived of their livelihood without the due process of law.

As a direct and proximate result of the violation of their due process rights, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm, including but not limited to financial loss, loss of business opportunities, and emotional distress, as detailed above. Accordingly, Plaintiffs are likely to prevail on their claim against Defendants for deprivation of due process rights.

### e.  Plaintiffs are Likely to Prevail on their Violation of Equal Protection Claims under the United States and Pennsylvania Constitutions.

Plaintiffs have a reasonable likelihood of success on their claim for violation of equal protection under 42 U.S.C. § 1983 and Article I, Sections 26 and 29 of the Pennsylvania Constitution[4]. The Fourteenth Amendment of the United States Constitution prohibits states from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Similarly, Article I, Sections 26 and 29 of the Pennsylvania Constitution provide for similar protections. Selective discriminatory enforcement of a facially valid law is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. *Jewish Home of E. PA v. Centers for Medicare & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012)(citing *See Yick Wo v. Hopkins,* 118 U.S. 356, 373 (1886); *Holder v. City of Allentown,* 987 F.2d 188, 197 (3d Cir.1993). To establish selective enforcement, a plaintiff must show that: "(1) the plaintiff, compared with others similarly situated, was selectively treated; and (2) the selective treatment was motivated by an intent to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure a person." *Homan v. City of Reading,* 15 F.Supp.2d 696, 702 (E.D.Pa.1998)). Therefore, to maintain an equal protection claim of this sort, Plaintiffs must provide evidence of discriminatory purpose, not mere unequal treatment or adverse effect. *Snowden v. Hughes,* 321 U.S. 1, 8 (1944). Plaintiffs must show that the "decisionmaker ... selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects." *Wayte v. United States,* 470 U.S. 598, 610, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (quotation marks omitted).

---

[4] Article I, §§ 26, 29 of the Pennsylvania Constitution is analyzed under the same standards that the Supreme Court uses in reviewing federal equal protection claims. *Sargent v. Sch. Dist. of Philadelphia*, CV 22-1509, 2024 WL 4476555, at *8 (E.D. Pa. Oct. 11, 2024)(citing G*rutter v. Bollinger*, 539 U.S. 306, 343 (2003) and *Commonwealth v. Albert*, 758 A.2d 1149, 1151 (Pa. 2000)).

i.    <u>Plaintiffs are Treated Differently from Similarly Situated Individuals</u>

The Equal Protection Clause requires that "all persons similarly situated should be treated alike." *Shuman v. Penn Manor School District,* 422 F.3d 141, 151 (3d Cir.2005) (citation omitted). Persons are considered similarly situated when they are "alike in all relevant aspects." *Suber v. Guinta*, 927 F.Supp.2d 184, 202 (E.D.Pa. 2013) (quoting *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008)). However, "similarly situated" does not mean "identically situated." *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020)(citations omitted).

Here, the state and local laws have not been applied consistently, as similarly situated businesses have not faced enforcement under comparable circumstances. For example, in addition to being unconstitutionally vague and overbroad, the Curfew Ordinances target specific geographic areas within the City of Philadelphia, resulting in disparate treatment for businesses in different parts of the City that are not subject to the same restrictions. The geographically based restrictions are arbitrary and bear no rational relationship to any legitimate state interest, particularly as the restrictions appear targeted in poorer parts of the City with a larger minority population. As with the prior curfew ordinance, the enforcement appears focused on minority-owned businesses, while non-minority owned businesses and are not subject to the same level of scrutiny.

The selective enforcement is particularly evident when it comes to the enforcement by the PLCB. As explained in greater detail in the Verified Amended Complaint, the PLCB has specifically targeted licensed businesses in Philadelphia, where the businesses are largely minority-owned, with the apparent intent to shut them down and strip them of their liquor licenses by any means necessary. Alcohol sellers in other parts of the Commonwealth, where the racial makeup of the owners is not overwhelmingly Asian or Arab as it is in Philadelphia, do not

experience the same level of enforcement. White-owned businesses are not subject to the same frequency or level of as Plaintiffs.

The numbers further support the improper racial targeting. In prior years, of approximately 110 AALBA members, *only one* would typically receive a non-renewal notice from the PLCB. This year, *nearly 60* have received "temporary licenses" instead of a traditional renewal or denial. Those businesses are now being threatened with having their licenses stripped, often based on unclear or even absurd interpretations of the requirements for their businesses.

Plaintiff Yo Deli Inc. provides an instructive example. Yo Deli is at risk of losing its liquor license based on three citations identified by the PLCB. Two of those citations are nearly a decade old, and Yo Deli has received renewals multiple times since those citations were issued. The only other alleged wrongdoing is that Yo Deli failed to maintain a sign informing patrons that there was additional seating upstairs. There appears to be no clear requirement to business owners that such a sign is necessary in the first place. Yo Deli had never received such a citation in the past, even though the basic layout of the business had not changed. Regardless, this alleged violation could be fixed in a matter of minutes at virtually no cost. Despite this, based on a supposedly missing sign, Defendants shut the business down for two weeks and are now threatening to take its liquor license.

Best Beer and Sky Beer are similarly instructive. Best Beer received a citation because, supposedly, it did not maintain enough square footage to meet the license requirements. This claim was ultimately dismissed because the PLCB could not prove that the square footage was insufficient. Even though Best Beer defeated that citation, it is still being used as a basis not to renew its liquor license. To make matters worse, Best Beer is under common management with

Sky Beer. Defendants similarly refused to renew Sky Beer's liquor license on the basis of the (now dismissed) citation against Best Beer.

The Philadelphia Police appear to be aware of and assisting in this targeted behavior. When one police officer perceived Plaintiff CDD 75, Inc.'s management as being insufficiently cooperative with an inspection he was conducting, he expressly threatened to come back for further investigation every day and to bring investigators from the PLCB with him. Other non-minority business owners do not appear to be subject to the same hostile treatment.

These issues are compounded by the language barrier that often prevents minority owners from explaining themselves adequately to investigators. Indeed, this issue should have been remedied, as training on implicit bias and dealing with communities with limited English proficiency was supposed to be part of the settlement of the prior discrimination lawsuit. Unfortunately, such conduct has continued and remains targeted at minority-owned businesses.

        ii.   <u>Selective Treatment is Motivated by an Intent to Discriminate</u>

Defendants are selectively targeting minority-owned businesses, including Plaintiffs, resulting in discriminatory treatment. Similarly situated, non-minority group business owners possessing liquor licenses in the City of Philadelphia and the Commonwealth of Pennsylvania are treated differently than Plaintiffs. As noted above, Defendants, namely, the City of Philadelphia, has a well-documented history of discriminating against Asian American and Arab American communities. The selective application and enforcement of state and local laws represent yet another avenue to target these groups. Moreover, the establishment of the Task Force and the implementation of its Report and Recommendations are likely to exacerbate targeted enforcement actions, further infringing on Plaintiffs' equal protection rights under the United States and Pennsylvania Constitutions. The continued selective application and enforcement practices of the

Defendants reveal a persistent pattern of discrimination against Plaintiffs, as outlined in the Verified Amended Complaint.

Accordingly, Plaintiffs are likely to prevail on their claims against Defendants for violations of equal protection rights.

### f.   Plaintiffs are Likely to Prevail on their Civil Conspiracy Claims.

Plaintiffs have a reasonable probability of success on their claim for civil conspiracy. To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law reached an understanding to deprive the plaintiff of constitutional rights. *Harvard*, 973 F.3d at 207 (citing *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 293-94 (3d Cir. 2018)). This requires that the state actors took "concerted action" based on an "agreement" to deprive the plaintiff of his constitutional rights, and that an actual constitutional violation occurred. *Id*.

Here, Defendants participated in a conspiracy to cover up unlawful conduct against Plaintiffs. The actions were carried out by the Defendants under the color of state law in their capacities as policymakers, city and state officials and/or police officers, in accordance with the customs, practices, procedures, and laws of the City of Philadelphia, the Philadelphia Police Department, the Commonwealth of Pennsylvania and the Pennsylvania Liquor Control Board. This conspiracy is evidenced by threats from the Philadelphia Police Department, who have expressly threatened business owners with a joint inspection by the police and the PLCB.

As a direct and proximate result of the Defendants' participation in the conspiracy, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm, including but not limited to financial loss, loss of business opportunities, and emotional distress, as detailed above.

Accordingly, Plaintiffs have shown a likelihood of success on Plaintiffs' conspiracy claim.

### g.   Plaintiffs are Likely to Prevail on their claim for Declaratory Judgment

Plaintiffs have a reasonable probability of success on their claim for declaratory judgment. To prevail under the Declaratory Judgment Act, a plaintiff must demonstrate an "actual controversy" indicating imminent and inevitable litigation and direct, substantial, and present interest. 28 U.S.C. § 2201; *Mills v. City of Philadelphia*, 630 F.Supp.3d 638, 646. Defendants have acted intentionally and unlawfully to strip Plaintiffs of their protected interests by enjoining them from operating their businesses without prior notice or warning, often for weeks at a time, and without providing any procedures to challenge or contest these actions. Defendants' actions have resulted in the suspension of operating privileges (effective immediately), which has caused significant financial harm, disruption of regular business, and an immediate threat to the renewal of their licenses.

Plaintiffs have suffered and will continue to suffer immediate and irreparable harm, including but not limited to financial loss, loss of business opportunities, and emotional distress if the state and local law at issue are not declared unconstitutional and void as set forth in detail above.

Accordingly, Plaintiffs have shown a likelihood of success on Plaintiffs' claim for declaratory judgment.

### 2. Plaintiffs have Established Irreparable Harm

To prove irreparable harm, the moving party "must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994) (*quoting Instant Air Freight Co., v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989)). The word "irreparable connotes that which cannot be repaired, retrieved, put down again, atoned for." *Id.* (citations omitted). In addition, the claimed injury cannot merely be possible, speculative or remote. More than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief is a "clear showing of immediate irreparable

injury, or a presently existing actual threat; an injunction may not be used simply to eliminate a possibility of a remote future injury." *Id.* at 655 (internal citations and quotations omitted).

In *Bimbo Bakeries*, the court explained that "[h]arm is irreparable when it cannot be adequately compensated in damages, either because of the nature of the right that is injured, or because there exist no certain pecuniary standards for the measurement of damages. *Bimbo Bakeries USA,* 2010 WL 571774, at *15 (citation omitted). The "impending loss of a business opportunity or market advantage may aptly be characterized as an 'irreparable injury' for … the purpose of a preliminary injunction." *Kessler v. Broder*, 851 A.2d 944, 951 (Pa. Super. 2004). Similarly, "damage to interests in real estate are generally viewed as unique." *J.C. Penney Co. v. Giant Eagle, Inc.*, 813 F. Supp. 360, 369 (W.D. Pa. 1992), *aff'd*, 995 F.2d 217 (3d Cir. 1993) (citing *K–Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 915–16 (3d Cir. 1989))

Here, irreparable harm has already occurred and will continue if not stopped promptly by the Court. Many members of AALBA and ABA have already received some form of adverse action from the PLCB based on the selective and discriminatory enforcement of the law. Those who have not received an adverse action or notice of only a temporary renewal of their license, expect to receive them imminently based on Defendants' conduct to date. If allowed to carry out this discriminatory scheme, Plaintiffs and other licensees in Philadelphia risk permanent closure as they cannot operate without a liquor license.

Similarly, the curfew ordinance risks making it economically untenable for certain businesses to operate in the impacted areas. In particular, many of ABA's members rely upon maintaining flexible hours to cater to underserved members of the community, including shift workers and others who depend on businesses staying open past 11 p.m. Without those flexible hours, many ABA members lose significant revenue which threatens the viability of their business.

Defendants' actions threaten to permanently close established businesses arbitrarily and without adequate due process. Defendants' conduct is part of a concerted pattern targeted at these minority-owned businesses, with the express purpose of shutting them down. On information and belief, even if a single citation or enforcement action is defeated by Plaintiffs or its members, Defendants will simply keep harassing them until they drum up a basis for further enforcement action or the stress, expense, and uncertainty of operating under these conditions push the owners to abandon the business. Several members of AALBA and ABA have already expressed that they are considering closing or selling their businesses to escape the harassment and avoid the uncertainty that they will be shut down. These instances collectively demonstrate a sustained pattern of enforcement actions, unannounced inspections, and citation issuances disproportionately directed at Plaintiffs' businesses.

As set forth above, other businesses, owned by non-minorities or controlled by larger corporate interests, are treated differently and are not subject to the same frequency of inspection or the repeated bad-faith interpretations of the applicable requirements. And, in other parts of the state, where the racial makeup of the owners is not overwhelmingly Asian or Arab as it is in Philadelphia, subject to the same requirements or level of enforcement.

As Plaintiffs and their members stand to lose their livelihoods from this pattern of unlawful conduct, they now seek recourse from this Court to enjoin the discriminatory enforcement and application of the overbroad, vague, and inconsistently enforced laws and ordinance threatening to close businesses throughout the City. The Plaintiffs and the members of AALBA and ABA will face significant, irreparable damages if the discriminatory enforcement practices continue. Thus, the harm Defendants' conduct has caused, and is causing, is imminent and irreparable and can only be remedied through the issuance of an injunction.

### 3. The Balance of Harms Favors Issuing an Injunction

In deciding whether injunctive relief is appropriate, the court must balance the hardships to the respective parties. *MarbleLife, Inc. v. Stone Res., Inc.*, 759 F. Supp. 2d 552, 563 (E.D. Pa. 2010). The balancing test is intended to ensure that the issuance of an injunction would not harm the defendants more than a denial would harm the party seeking an injunction. *Id.* (citation omitted).

Defendants will not be harmed in any way if their discriminatory enforcement practices are enjoined. By contrast, if an injunction is not granted, Plaintiffs will suffer irreparable harm, including the irretrievable loss of their businesses and liquor licenses.

### 4. The Public Interest Favors Injunctive Relief

There is a clear public interest in assuring compliance with federal and state statutes protecting the right to due process, free speech-right to petition and equal protection. No legitimate public interest is served through this discriminatory conduct. Accordingly, this factor also weighs in favor of injunctive relief.

## IV.    <u>CONCLUSION</u>

For all these reasons, Plaintiffs respectfully request this Court to grant its Motion for Preliminary Injunction.

                                        **KANG HAGGERTY LLC**

                                        <u>*/s/ Kyle Garabedian*</u>
                                        Edward T. Kang
                                        Kyle Garabedian
                                        Kelly Lavelle
                                        Kang Haggerty LLC
                                        123 South Broad Street, Suite 1950
                                        Philadelphia, Pennsylvania 19109
                                        (215) 525-5850 (tel)
                                        (215) 525-5860 (fax)
                                        ekang@kanghaggerty.com
                                        kgarabedian@kanghaggerty.com
                                        klavelle@kanghaggerty.com
                                        *Counsel for Plaintiffs*

Dated: January 27, 2025

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION D/B/A ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION OF PHILADELPHIA | : : : : : | CIVIL ACTION |
| | : | Case No. 2:24-cv-06348 |
| YO DELI, INC. | : : | |
| BEST BEER, INC. | : | ***Jury Trial Demanded*** |
| SKY BEER DELI, INC. | : : | |
| MAYA INVESTMENT GROUP, LLC | : : | |
| 7701 OGONTZ, INC. | : : | |
| CDD 725, INC. | : : | |
| and | : : | |
| ARAB AMERICAN BUSINESS ASSOCIATION AND PROFESSIONAL ASSOCIATION OF THE DELAWARE VALLEY | : : : : : | |
| Plaintiff, | : : | |
| v. | : : | |
| CHERELLE PARKER, IN HER OFFICIAL CAPACITY AS MAYOR OF THE CITY OF PHILADELPHIA | : : : : | |
| CITY OF PHILADELPHIA | : : | |
| DAVID W. SUNDAY, JR., IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE COMMONWEALTH OF PENNSYLVANIA | : : : : : | |
| PENNSYLVANIA STATE POLICE BUREAU OF LIQUOR CONTROL ENFORCEMENT | : : | |

and                                          :
                                             :
PENNSYLVANIA LIQUOR CONTROL                  :
BOARD                                        :
                                             :
                    Defendants.              :

## CERTIFICATE OF SERVICE

I, Kyle Garabedian, counsel for the Plaintiffs, hereby certify that a true and correct copy of

the foregoing Motion was served on the Defendants via overnight mail on January 28, 2025. The

foregoing Motion will also be served via process server upon the issuance of a summons.

                                          _/s/ Kyle Garabedian_
                                          Kyle Garabedian

Dated: January 27, 2025

58