# EXHIBIT A

# COMMONWEALTH OF PENNSYLVANIA



# STOP-AND-GO LEGISLATIVE TASK FORCE

# REPORT AND RECOMMENDATIONS

October 2, 2024

# Stop-and-Go Legislative Task Force Report and Recommendations

October 2, 2024

## Contents

Acknowledgements.................................................................................................................1

Executive Summary..............................................................................................................2

History of Stop-and-Go Establishments in Cities of the First Class and Legal Landscape...............3

Recommendations................................................................................................................10

RECOMMENDATION 1: Streamline the Citation Process.......................................................10

RECOMMENDATION 2: Strengthen the Compliance Program................................................10

RECOMMENDATION 3: Other Citations/Information Received Informs the Process for
Renewal.................................................................................................................12

RECOMMENDATION 4: Increase Penalties and Fines for All Citations.....................................12

RECOMMENDATION 5: Remove *De Novo* Review from Common Pleas Court..............................12

RECOMMENDATION 6: Highlight the Pennsylvania Liquor Control Board Complaint
Process..................................................................................................................12

RECOMMENDATION 7: Increase Recruitment Efforts for Bureau of Liquor Control
Enforcement Agents...............................................................................................12

RECOMMENDATION 8: Require Payment of City Taxes and Fully Adjudicated City Fines
Before a Liquor License May Receive or Renew Their License...........................................12

Task Force Information............................................................................................................13

Act 49 of 2023 and the Purpose of the Task Force.................................................................13

Members of the Stop-and-Go Legislative Task Force..............................................................13

Members of the Stop-and-Go Legislative Task Force Workgroup.............................................14

Meetings, Hearings and Tour of the Task Force....................................................................15

Task Force Meetings and Tour............................................................................................15

Task Force Hearings..........................................................................................................15

Appendix A – Summary of Testimony.....................................................................................17

Appendix B – Summary of Tours............................................................................................30

## Acknowledgements

This report would not have been possible without the knowledge and expertise of the task force's entire workgroup, including the technical assistance from the Pennsylvania Liquor Control Board and the Pennsylvania State Police Bureau of Liquor Control Enforcement, the insights from the City of Philadelphia, additional support from legislators and councilmembers, and efforts made by legislative and administrative staff, as well as all who testified from City Council, neighborhood and business associations. The Task Force members wish to thank all who participated for their public service and contributions in arriving at the recommendations being made in the report.

## Executive Summary

Stop-and-go establishments, also known as "stop-and-gos," are businesses that typically operate as convenience stores or delis and sell alcohol under either a type R (restaurant liquor) or type E (eating place retail dispenser) license.  Despite being licensed to sell alcohol, these entities fail to operate as a bona fide restaurant or eating place, barely complying with minimum requirements associated with their licenses.

Through sales of beer and/or spirits, sometimes including unlawful sales of liquor-by-the-shot for off-premises consumption, their operations wreak havoc in neighborhoods by perpetuating irresponsible drinking, dangerous activity, and other nuisance behavior both in and out of doors.  Stop-and-gos have been problematic in the City of Philadelphia for decades, and they are becoming a problem in other areas of the Commonwealth.  Continued frustration from neighbors, elected officials, regulators and enforcers seeking to nullify the social ills perpetrated by these establishments and re-establish safe and compliant business operations have led to the present day.

Stop-and-gos are rarely able to be shut down despite enforcement efforts centered on licensee non-compliance and the Pennsylvania Liquor Control Board's (PLCB, or Board) licensing and renewal process.  This is due in part to the lengthy hearings and appeals process, the standard of review on board decisions made in renewal and enforcement cases, as well as insufficient fines and fees for violations of the Liquor Code.

Section 218 of Act 49 of 2023 established the Stop-and-Go Legislative Task Force to examine these issues and recommend solutions.  The Task Force reviewed and analyzed the laws pertaining to and issues involving stop-and-go establishments in the City of Philadelphia, held public hearings, received testimony, toured stop-and-go establishments and, accompanied by the extensive work of the task force workgroup, provided for the recommendations for regulating stop-and-gos.

The Stop-and-Go Legislative Task Force makes the following recommendations:
1. Streamline the citation process;
2. Strengthen the Licensing Compliance Program;
3. Inform the process for license renewal with other citations and information;
4. Increase penalties and fines for all citations;
5. Remove *de novo* review from Common Pleas Court;
6. Highlight the Pennsylvania Liquor Control Board Complaint Process;
7. Increase recruitment efforts for Bureau of Liquor Control Enforcement (BLCE) agents; and
8. Require the payment of city taxes and fully adjudicated city fines before a liquor license may be received or renewed.

These recommendations, along with information about the task force and its work, are detailed in this report.

2

# History of Stop-and-Go Establishments in Cities of the First Class and Current Legal Landscape

Stop-and-go establishments, also known as "stop-and-gos," are entities loosely modeled after convenience stores or delis; however, in addition to selling candy, soda and pre-packaged snacks—items typically purchased by children—they are licensed to sell alcohol, including in some instances liquor by-the-shot for on-premises consumption.  Some locations offer video gaming machines, as well.  The broad spectrum of patrons drawn to these establishments creates a precarious atmosphere that, at times, can be viewed as both unsafe and unsavory.

Some individuals enter these premises before noon to begin drinking alcohol, continuing this activity into the early hours of the next day.  Others purchase shot glass-sized portions of liquor in disposable cups and drink them outside the perimeters of stop-and-go stores on a to-go basis, which is typically considered unlawful activity.  Simultaneously, school-aged children frequent these establishments to purchase treats for themselves.  From the conditions inside these facilities to the nuisance behaviors they encourage directly outside their doors, stop-and-go businesses have become blights on their communities across the City of Philadelphia and throughout Pennsylvania.

For more than a decade, these bad actors among holders of alcohol beverage licenses have been difficult to regulate effectively because of the way they operate.  Although they have been granted a license to dispense alcoholic beverages under the Pennsylvania Liquor Code, they fall short of or barely meet the minimum requirements for type R (restaurant liquor) and type E (eating place retail dispenser) licenses.  Such requirements mandate that a facility must be used habitually and principally for the purpose of providing food to the public, have sufficient tables and chairs for at least 30 people at a time, and the premises must meet square footage standards and have available a functioning kitchen or food preparation area, as well as a menu and prepared food.

I.)     **Current Legal Framework**
  A.)  Statutory and Regulatory Requirements
       Stop-and-go establishments are licensed as restaurants (type R) or eating places (type E).  Retail liquor licenses for restaurants allow licensees to sell distilled spirits, wine and malt or brewed beverages for consumption on the premises, and malt or brewed beverages may be sold to-go.  R licensees are also eligible to obtain wine expanded permits to sell limited quantities of wine to-go as well as ready-to-drink cocktail permits to sell ready-to-drink cocktails on a to-go basis.  On the other hand, eating place licenses allow holders to sell only malt or brewed beverages for consumption on the premises or on a to-go basis; holders of these licenses may not sell other types of alcoholic beverages.  It is under either of these licenses that stop-and-go establishments are licensed and able to operate.

       All business premises being operated under an R or E license are required to be habitually and principally used for the purpose of providing food for the public (see the recent Commonwealth Court case, 770 Ameribeer, Inc., v. PLCB, 509 C.D. 2022).  Additionally, R licensees must have a minimum of 400 square feet, while E licensees must have premises that measure at least 300 square feet.  In addition to size requirements, both types of licensees must have the following provisions on-site:
       • No less than 30 seats immediately available and accessible to the public.  (Seats may not be stacked.)

- Sufficient food for at least 30 patrons.
- Dishes and silverware to accommodate at least 30 persons.
- A menu or similar indication of food available for consumption on the premises.
- Prepared food that is regularly and habitually available to customers. (The following are examples of unacceptable food: snack items, expired food, raw or frozen food without any available method for cooking it and quantities of food that would not provide for at least 30 individuals at any one time.)
- A current and valid health license.
- A functioning kitchen or food preparation area.

B.)  <u>Licensing and Renewal Process</u>
Under the Pennsylvania Liquor Code, the PLCB is authorized to issue licenses to retail establishments for the purpose of selling alcoholic beverages in the commonwealth. During the task force hearing on June 15, 2024, Mr. Jason Worley, Chief Counsel of the PLCB, explained his agency is unable to predict which restaurant and eating place licensees will become stop-and-go establishments at the time of initial licensure; however, Ms. Tisha Albert, Director of Regulatory Affairs for the PLCB, testified that the PLCB has succeeded in identifying some establishments who fail to maintain the minimum requirements after becoming licensed through its Licensee Compliance Program (LCP) established under Act 44 of 2017.  The program provides for the following:

- Community members, legislators and others may submit complaints concerning licensees who are believed to be out of compliance with minimum licensing requirements.
- In response to a complaint, PLCB will send an analyst to investigate the complaint in collaboration with BLCE and local authorities.
- For those complaints that are substantiated, PLCB has the authority to suspend the operating privileges of that license immediately.  Such a licensee has the right to request a reinvestigation within 5-10 days to demonstrate their compliance with licensing requirements.
- If deficiencies persist during reinvestigation, a license may fail to be reinstated, at which point, a licensee may request a hearing in Commonwealth Court.  That hearing must occur within 10 days of the hearing request.
- If licenses are reinstated following reinvestigation, some licensees return to their non-compliant activities shortly thereafter.  This is a common characteristic among stop-and-go businesses.

Once a stop-and-go establishment is identified through the citation process or through the PLCB Compliance Program, the PLCB can further evaluate these businesses during license renewal.  For retail licenses, including those that are types R and E, the renewal period is two years.

Under Section 470 of the Liquor Code, the PLCB's Bureau of Licensing has the authority to object to licenses based on the operational history of a licensee, including previous citations, the reputations of owners and officers, whether the establishment meets statutory and regulatory requirements and any conduct occurring on or near the licensed premises that has a nexus to the operation of the licensed business.  After

4

reaching out to police for public records and police incidents, the Bureau of Licensing determines if there is sufficient evidence to move forward with an objection.  Upon objecting to a license, an administrative hearing is held before the matter is considered by the three-member PLCB.  The Board can decide to approve or refuse the renewal, or it may impose a conditional licensing agreement that includes additional restrictions on the licensee.

In the event the Board refuses renewal, the licensee has the right to appeal this decision to the court of common pleas for the county in which the licensee operates.  Further appeals may be taken to the Commonwealth Court of Pennsylvania.
If a citation is pending at the time of renewal, the PLCB has the ability to issue a conditional approval, allowing a licensee to operate until that underlying citation is adjudicated.

C.) <u>Enforcement by Citation</u>
Pursuant to the Liquor Code, the BLCE investigates and issues citations for violations of Pennsylvania's liquor laws.  As outlined by Captain Hennigan, the most common Liquor Code violations at stop-and-go establishments include the following:

- Insufficient food for 30 patrons at one time.
- Insufficient tables and seating for 30 patrons at one time.
- Failure to maintain minimum square footage required for a serving area.
- Expired Department of Health permit.
- Sale of liquor to go.
- Operating another business or selling products without the approval of the PLCB.

The BLCE prioritizes the enforcement of violations typically associated with stop-and-go establishments and devotes considerable resources to address these violations within the City of Philadelphia and throughout the Commonwealth.

Each public complaint received by the BLCE is investigated, and the agency works closely with the Philadelphia Police Department and the Departments of Health and Licensing and Inspections (L&I) to enforce non-compliant behavior of stop-and-go establishments.  Further, BLCE officers attempt to educate licensees who may be first-time offenders.

Within 30 days of an investigation, Section 471(b) of the Liquor Code requires that the BLCE provide notice to a licensee regarding the nature of an alleged violation.  This notice of violation (NOV) is sent to the licensee via certified mail.  Prior to mailing such notice, a BLCE supervisor must review and approve both the investigative report and the NOV, and the District Office Commander must sign the NOV.

Additionally, in accordance with Section 471(a) of the Liquor Code, the BLCE may issue a citation via certified mail to a licensee.  When citations are issued to stop-and-go operators for violations of the Liquor Code, the citation goes before an Administrative Law Judge (ALJ) for adjudication.  A licensee may waive a hearing and accept a recommended penalty or proceed with a hearing.  After a hearing is conducted, an appeal may be sought by the licensee or BLCE, first with the PLCB, then with the appropriate

Court of Common Pleas, then with the Commonwealth Court. Any of these procedural steps result in a delay of the penalty.

The BLCE participates in compliance checks conducted by the PLCB when a licensing analyst inspects whether an establishment is compliant with applicable statutory requirements. If a licensee is deemed non-compliant, the PLCB is authorized to suspend the licensee's authority to sell alcohol immediately. Such suspension remains in place until the licensee is found to have corrected the deficiencies upon re-inspection. Licensees who regain the privilege to sell alcohol may, and often do, become non-compliant again. This requires the BLCE and PLCB to conduct more compliance checks.

D.) Nuisance Businesses

The PLCB has established the Nuisance Bar Program to facilitate license non-renewal for those licensees who have abused their license privileges. Such licensees fit a pattern of violations or conduct that endangers the health and safety of the local community. This program is implemented in partnership with local communities, law enforcement, government and the Pennsylvania Legislature to eliminate "problem bars" in neighborhoods. Each year, the PLCB objects to approximately 150 licenses, due to the agency's statutory duty to protect the safety and welfare of the commonwealth.

In the City of Philadelphia, Inspector Michael O'Donnell of the Philadelphia Police Department, Commanding Officer of the Neighborhood Nuisance Enforcement Unit (NEU), testified that a local city ordinance allows members of his unit to deem stores as chronic nuisance establishments if they receive three violations within a 12-month period. Should a critical incident occur within an establishment, such as a homicide, shooting, serious aggravated assault or rape, the Nuisance Enforcement Unit may require the owner of that facility to work with the police department to develop and implement an abatement plan. If violations occur following the establishment of an abatement plan, the unit has the ability to impose stronger penalties against those businesses. The abatement plan has proven successful in bringing establishments into compliance in the city.

**II.)    Problem Establishments**

A.) Non-Compliant Licensees

Stop-and-gosare those businesses that have been issued type R or E licenses by the PLCB, deeming them restaurants or eating places. Unfortunately, Captain Hennigan said it is common practice for stop-and-go operators to use these licenses solely for the privilege of serving alcoholic beverages to the public. Rather than function as the law requires for restaurants or eating places, they choose to engage in a pattern of non-compliance.

According to the BLCE, stop-and-go establishments are often cited for the following violations:

- Averments for R licensees:
  - Not a bona fide restaurant because the business maintained insufficient food items, eating utensils, dishes, seating and/or failed to provide food upon request.

- o  Not a bona fide restaurant because the business failed and/or refused to allow the consumption of malt or brewed beverages purchased at your licensed establishment to be consumed on the premises.
- o  The licensed premises did not meet the requirements for a restaurant liquor license because they did not have a serving area of at least 400 square feet available for use.

- Type E licensee averments:
  - o  Not a bona fide eating place because the business maintained insufficient food items, eating utensils, dishes, seating and/or failed to provide food upon request.
  - o  The licensed premises did not meet the requirements for an eating place license because it did not have a total area of 300 square feet available to the public and used for the storage of malt or brewed beverages.

- Averment for both R and E licensees:
  - o  The business sold, furnished or gave liquor for consumption off premises.

Hearing testifiers from the PLCB and BLCE commented that stop-and-go owners usually return to their non-compliant practices, regardless of previous citations and the time-consuming hearing and appeals process.  Mr. Ralph DiPietro, Deputy Commission of Strategic Initiatives/Quality Control Quality of Life Department for the Philadelphia Department of Licensing and Inspections, said the lucrative nature of these stop-and-go businesses drives owners to adjust their operations minimally to ensure they are able to continue selling alcohol without having to meet any of the additional requirements imposed upon type R and E licensees.

B.) Loitering, Crime, Violence
Philadelphia City Councilwoman Cindy Bass said she does not believe stop-and-go establishments are addressing the spirit of the law, and she is concerned that they are feeding addiction disorders in the community.  Representatives of Residential Community Organizations expressed their concern and frustration with their neighborhood stop-and-go establishments.

Such shops encourage loitering and littering, invite undesirable activities onto residential sidewalks and encourage criminal behavior, including murder.  If such establishments are not in compliance with minimum licensing requirements, residents testified that stop-and-gosshould not be allowed to continue operating.  Additionally, they explained that stop-and-go owners are not attempting to contribute to the communities surrounding their stores but, instead, are driving back to their own safe neighborhoods at the end of each day.  Mr. Charles Moran, Executive Director of the PA Licensed Beverage and Tavern Association, said stop-and-go businesses are giving all licensees a black eye.  Testifiers urged for greater enforcement, compliance checks and monitoring of stop-and-go stores.  They said police officers are not responding to and following-up on public complaints regarding stop-and-go establishments.

7

C.) <u>Racial Targeting</u>
Mr. David Oh, President and CEO of the Asian American Chamber of Commerce, said he is concerned that Asian American business owners, who own and operate many stop-and-go establishments, should not be targeted due to their race.  Task Force member Mr. Darrell Clarke assured Mr. Oh that no individual or business is, or will be, targeted based on race.

III.)    **Limitations of the Current System**
A.) <u>Enforcement Delays</u>
The two-year license renewal process limits the PLCB in its ability to take swift action against bad actors.  Moreover, their ability to effectively regulate stop-and-gos is further restricted by the lengthy hearing and appeals process that is currently in place through the licensing and citation processes.  For instance, in the *770 Ameribeer, Inc.* case, the appellant applied for renewal on September 19, 2020, and the Commonwealth Court affirmed the PLCB's denial of that business' license in 2024—nearly four years later.

B.) <u>Insufficient Fines and Penalties</u>
Act 14 of 1987 established the current fine structure associated with violations of the Liquor Code, which range from $50 to $1,000 for most violations, including those commonly associated with stop-and-go establishments.  Although licenses may be suspended, they are not mandatory for such offenses, even when they repeatedly occur.  Without significant penalties for these offenders, most licensees are unlikely to be deterred from committing initial or repeat offenses.  Certain offenses that are considered more serious, such as providing alcohol to minors, are fined $1,000 to $5,000 per violation.

C.) <u>Varied Success in Addressing Noncompliance</u>
According to the testimony of Mr. Worley, after the Board makes a decision in a renewal case, that appeal goes to the Court of Common Pleas in the county where the establishment is located.  A de novo standard of review is applied, meaning the court is looking at the case anew and does not have to give deference to the Board's decision.  This can be problematic, as judges tend to show leniency toward local businesses, resulting in judgements that are unpredictable and inconsistent across the commonwealth.  Afterward, the appeal is referred to the Commonwealth Court of Pennsylvania, where an appellate standard review is applied and their ability to overturn findings of fact is limited.

D.) <u>Insufficient Staffing</u>
There are insufficient officers in the BLCE to monitor and routinely enforce codes and conduct investigations in the estimated 1,431 licensed restaurant and 116 eating places in Philadelphia County.  Presently, Captain Hennigan said there are approximately 19 BLCE officers to patrol approximately 1,500 licensees within Philadelphia and the surrounding region.  Senator Street commended their hard work but noted the importance of expanding their staffing complement to bolster enforcement efforts.

E.) <u>Limited Enforcement Authority</u>
State law limits who can enforce Liquor Code violations.  Although the BLCE

may issue citations for violations of Pennsylvania's liquor laws, it does not have the authority to cite establishments for violations of any other laws when conducting investigations, such as health and sanitation codes.  Further, L&I cannot cite establishments for violations beyond their purview, and the Philadelphia Police Department has the ability to cite only those stop-and-go establishments deemed a chronic nuisance under local ordinance.

**IV.)**    **Defining a Stop-and-Go Establishment**

In the court case 770 Ameribeer, Inc., v. PLCB, 509 C.D. 2022, the Commonwealth Court decision affirmed a Philadelphia Court of Common Pleas case which affirmed the decision of the PLCB to deny the Licensee's application to renew its restaurant license based on its failure to operate a bona fide restaurant.  In reaching its decision, the Commonwealth Court relied on the definition of a "restaurant" under Section 102 of the Pennsylvania Liquor Code which reads as follows:

> *"[A] reputable place operated by responsible persons of good reputation **and habitually and principally used for the purpose of providing food for the public,** the place to have an area within a building of not less than four hundred square feet, **equipped with tables and chairs, including bar seats, accommodating at least thirty persons at one time**. The [B]oard shall, by regulation, set forth what constitutes tables and chairs sufficient to accommodate thirty persons at one time."*

Based on the above court decision, the Task Force has identified a stop-and-go establishment as a Commonwealth licensee which holds either a restaurant liquor (R) license or an eating place retail dispenser (E) license and receives at least two violations for failing to act as a bona fide restaurant or eating place within a 12-month period.

The PLCB recommended both their analysts and BLCE officers have the ability to conduct inspections, as the PLCB alone may not have the necessary manpower to support the number of visits to violating establishments that may be warranted.

9

# Recommendations

The Stop-and-Go Legislative Task Force makes the following recommendations to members of the General Assembly representing residents of the City of the First Class, the Pennsylvania Liquor Control Board, and the chairman and minority chairman of the Law and Justice Committee of the Senate and the chairman and minority chairman of the Liquor Control Committee of the House of Representatives:

1. **Streamline the citation process;**
2. **Strengthen the Licensing Compliance Program;**
3. **Inform the process for license renewal with other citations and information;**
4. **Increase penalties and fines for all citations;**
5. **Remove *de novo* review from Common Pleas Court;**
6. **Highlight the Pennsylvania Liquor Control Board Complaint Process;**
7. **Increase recruitment efforts for Bureau of Liquor Control Enforcement agents; and**
8. **Require the payment of city taxes and fully adjudicated city fines before a liquor license may be received or renewed.**

## RECOMMENDATION 1: Streamline the Citation Process

- Eliminate the Notice of Violation requirement to allow the BLCE to immediately cite a licensee upon a liquor enforcement officer finding a violation (within 30 days of completion of investigation).
- Impose a time constraint on the issuance of adjudications for all violations of the Liquor Code, such as six (6) months from the date of citation, to ensure that penalties are aligned with the violation and may be considered when the Board reviews license renewals.

## RECOMMENDATION 2: Strengthen the Compliance Program

- Processing of issues involving failure to maintain the minimum requirements for licensure would be brought by the Bureau of Licensing, in conjunction with BLCE, and handled as objections presented to a board hearing examiner, while processing of traditional violations would remain as part of the citation process to be fully presented by BLCE before ALJs. Minimum requirements for licensure that must be continually maintained by restaurant, hotel, and eating place retail dispenser licensees include the following:
- A serving area of at least 400 square footage for an R license or 300 square footage for an E license for the use and accommodation of the public (must not be behind locked door or inaccessible area).
- No less than 30 seats immediately available and accessible to the public (Seats may not be stacked).
- Sufficient food for at least 30 patrons. This shall mean prepared food that is regularly and habitually available to customers. (The following are examples of unacceptable food: snack items, expired food, raw or frozen food without any available method for cooking it and quantities of food that would not provide for at least 30 individuals at any one time.)
- Dishes and silverware to accommodate at least 30 persons.
- A menu or similar indication of food available for consumption on the premises.
- A current and valid health license.
- A functioning kitchen or food preparation area.
- PLCB would designate hearing examiners to specifically hear these violations to expedite the process.

10

- Move the License Compliance Program from the Fiscal Code to the Liquor Code.
- When the Bureau of Licensing determines that a licensee has failed to maintain the minimum requirements for licensure, the license will be immediately suspended and remain suspended for a period of 30 days.  The licensee shall also be subject to paying a possible fine of $3,000.
- If the Bureau of Licensing determines that a licensee has failed to maintain the minimum requirements for licensure for a second time within a two-year licensing period, the license will be immediately suspended and remain suspended for a period of 60 days. The licensee shall also be subject to paying a possible fine of $7,500.
- A licensee may contest any determination by the Bureau of Licensing that results in an immediate suspension of its license by requesting an expedited hearing before a Board hearing examiner.  Requests for a hearing after the initial determination shall be held before a Board hearing examiner within ten (10) days after the receipt of the request. Within five (5) days of the hearing, the hearing examiner shall make a recommendation which shall be presented to the Board for final determination at its next regularly scheduled Board meeting following receipt of the hearing examiner's recommendation.
- After reviewing the evidence at the hearing, the Board may, within its discretion, uphold the suspension and order payment of the designated fine, or direct the immediate reinstatement of the license.
- Licensees may also waive their right to a hearing and agree to the suspension and fine.
- If a licensee is determined, either by the Board or through the waiver process, to have failed to maintain the minimum requirements for licensure on two or more occasions within a two-year renewal period, the licensee shall also be required to immediately enter into a conditional license agreement with the PLCB indicating their plan to correct all violations before being allowed to reopen.
- Any licensee that violates the terms of the conditional license agreement or is determined to have failed to meet the minimum requirements for licensure for a third (3rd ) time or more within a two-year renewal period, shall again have its license immediately suspended and shall be subject to a further hearing before a Board hearing examiner to determine whether the license should be revoked and/or licensee should be subject to a further fine in the amount of $10,000.
- Licensees shall receive notice of PLCB's intention to suspend or permanently revoke a license within 10 days of inspection by the PLCB, along with information on how to request a hearing before a Board hearing examiner or submit a waiver.
- Any decision by the PLCB's three-member Board to uphold a suspension and fine or impose a revocation and fine shall be subject to appeal to the Commonwealth Court within 30 days.
- Upon revocation of the license and exhaustion of the applicable appeals period, the PLCB may place the license in the auction pool and determine its location, except it may not be located in a city of the 1st class.
- The PLCB should also be prohibited from issuing or approving a transfer of a license held by a licensee that has failed to meet the minimum requirements for licensure for a third (3rd) time in a two-year renewal period to any immediate family members of the licensee or its owners or officers per a conditional licensing agreement.

## RECOMMENDATION 3: Inform the Process for License Renewal with Other Citations and Information

- Allow any citations or violations issued by a police department, department of public health or department of licenses and inspections forwarded to the BLCE/PLCB to be considered in the licensing or judicial process.

## RECOMMENDATION 4: Increase Penalties and Fines for All Citations

- Increase the penalties and fines for all citations, which currently range between $1,000 and $5,000 for enhanced citations and between $50 and $1,000 for all other citations.

## RECOMMENDATION 5: Remove De Novo Review from Common Pleas Court

- Remove the de novo review of the court of common pleas from the appeals process to allow an appeal of the Board's decision (in both licensing and enforcement matters) to go directly to the Commonwealth Court under the appellate error of law/abuse of discretion standard.

## RECOMMENDATION 6: Highlight the Pennsylvania Liquor Control Board Complaint Process

- Highlight the PLCB complaint process to increase understanding by community members.
- Require PLCB and PSP websites to have hyperlinks to other agencies' pages for greater access of the public information release reports (PIRRs)
- Support the PLCB to distribute materials with complaint process and hotline number.
- Require licensees to post the complaint process and hotline number.

## RECOMMENDATION 7: Increase Recruitment Efforts for Bureau of Liquor Control Enforcement Agents

- Reclassify the BLCE officers to assist with recruitment of new agents.

## RECOMMENDATION 8: Require the Payment of City Taxes and Fully Adjudicated City Fines Before a Liquor License May Be Received or Renewed

- Expand the Liquor Code's current tax clearance requirements for licensure and renewal to include local tax clearance requirements.
- Require local tax authorities to share tax clearance information with the PLCB for purposes of determining eligibility for licensure and renewal.

# Task Force Information

## Act 49 and the Purpose of the Task Force

The General Assembly established the Stop-and-Go Legislative Task Force through Act 49 of 2023 and charged it with the following powers and duties per Section 218(b) of the Liquor Code:

1. Review and analyze the law, procedures, practices, processes and rules relating to the issues involving stop-and-go establishments.
2. Hold public hearings for the taking of testimony and the requesting of documents.
3. Through the chair, administer oaths and affirmations to witnesses appearing before the task force.
4. Accept and review written comments from individuals and organizations.
5. Issue the report under subsection (f) no later than four months after the task force's initial meeting.  In addition to any information that the task force deems appropriate, the report shall:
    (i) Define and create a liquor license category for stop-and-go establishments located and operating within a city of the first class.
    (ii) Provide recommendations for regulating stop-and-go establishments that are located and operating within a city of the first class.

Within Act 49, Section 218(f) states:

The task force shall compile a report of recommendations…within four months after the task force's initial meeting and deliver the report to each member of the General Assembly who represents residents of a city of the first class, the board, the chairman and minority chairman of the Law and Justice Committee of the Senate and the chairman and minority chairman of the Liquor Control Committee of the House of Representatives.

As defined in Act 49, Section 218(h)(1)(i) and (ii), "stop-and-go establishment" means "establishments that are legal holders of a restaurant or R-license and a convenience store or deli that sells beer and liquor, sometimes in quantities as low as a single shot, that may be consumed on premises or immediate outside the establishment."

## Members of the Stop-and-Go Legislative Task Force

Act 49 of 2023, Section 218(c) and (d) defined the composition of the Task Force.

The Task Force shall:

1. Consist of the following members who shall be appointed within twenty-five days after the effective date of this subsection:
    a. One member appointed by the Governor
    b. One member appointed by the President Pro Tempore
    c. One member appointed by the Minority Leader of the Senate
    d. One member appointed by the Speaker of the House of Representatives
    e. One member appointed by the Minority Leader of the House of Representatives
    f. An ex officio member from the Pennsylvania Liquor Control board who shall not have voting rights

13

2.    A chair of the task force shall be elected by a majority vote of the members of the task force

The Task Force members are:
- Senator Anthony Hardy Williams (D-8, Philadelphia), Chair, Appointee of Minority Leader of the Senate
- Senator Frank Farry (R-6, Bucks), Appointee of Senate President Pro Tempore
- Representative Anthony Bellmon (D-203, Philadelphia), Appointee of Speaker of the House of Representatives
- Representative Joe Hogan (R-142, Bucks), Appointee of the Minority Leader of the House of Representatives
- Mr. Darrell Clarke, ex-officio, Member from the Pennsylvania Liquor Control Board
- Ms. Cornelia Swinson, Appointee of the Governor


## Members of the Stop-and-Go Legislative Task Force Workgroup

The Stop-and-Go Legislative Task Force Workgroup was established to offer expertise to the task force members.  The Task Force Workgroup included the following members:
- Tisha Albert, Director of Regulatory Affairs, PA Liquor Control Board
- Jason Worley, Chief Counsel, PA Liquor Control Board
- Michael Vigoda, Board Secretary and Director, Office of Legislative and Government Affairs, PA Liquor Control Board
- Tumar Alexander, City of Philadelphia
- Captain James Hennigan, Director of Operations, Bureau of Liquor Control Enforcement, PA State Police
- Christopher Herrington, Office of General Counsel, Bureau of Liquor Control Enforcement, PA State Police
- Vicki Wilken, Legislative Counsel, Senator Pittman
- Ryan Skoczylas, Chief of Staff, Senator Farry
- Tyler Cooper, Legislative Director, Senator Farry
- Shania Bennet, Office of Youth Engagement
- Cortez Patton, Chief of Staff, Senator A. Williams
- Jerome "Al" Taylor, Legislative Director, Senator A. Williams
- Amanda Wolfe, Legislative Director, Senator A. Williams
- Kristin Bray, Chief Legal Counsel to the Mayor's Office, City of Philadelphia
- Lynn Benka-Davies, Executive Director, House Liquor Control Committee (D)
- Michael Biacchi, Executive Director, House Liquor Control Committee (R)
- Francis Healy, Deputy Commissioner, Chief of Staff and Legal Affairs, Philadelphia Police Department
- Brian Farrow, Squad Supervisor, Bureau of Liquor Control Enforcement, PA State Police
- Stephen Bruder, Policy Director, Senator Costa
- Ron Jumper, Chief Counsel, Senator Costa
- Sergeant Reyna Todd, PA State Police, Bureau of Liquor Control Enforcement

## Meetings, Hearings and Tours of the Task Force
### Task Force Meetings and Tour

**April 9, 2024 – Senate Majority Caucus Room, 156 Main Capitol Building – Harrisburg, PA**
During its organizational meeting held on April 9, 2024, the Task Force voted unanimously to appoint Senator Anthony Williams as Chair.  The Stop-and-Go Task Force Workgroup was also unanimously established by the task force members to offer expertise related to the legal, regulatory, enforcement, licensing, local government, and neighborhood issues of stop-and-gos.

**May 29, 2024 – Meeting and Fact-finding Tour – Philadelphia Police 18th District Headquarters; Three (3) Stop-and-Go Establishments – Philadelphia, PA**
The task force meeting began at 11:00 am at the 18th Police District located at 55th and Pine Streets, Philadelphia PA. Legislators attending the meeting included task force members Sen. Frank Farry, Rep. Joe Hogan, Darrell Clarke, and Cornelia Swinson.  The task force was also accompanied by Sen. Sharif Street and Rep. Jordan Harris. Sen. Anthony Williams, who arranged the tour, and task force member Rep. Anthony Bellmon were represented by staff.

Also attending were representatives from the PLCB, PSP/BLCE, Mayors Office of the City of Philadelphia, 18th Police District, L&I from the City of Philadelphia and KYW News Radio.

The meeting began with remarks by Rep. Jordan Harris and Sen. Sharif Street who briefly discussed the issues surrounding stop-and-go establishments. The tour began shortly after and visited three (3) stop-and-gos in Southwest Philadelphia.[1]

### Task Force Hearings
The Stop-and-Go Legislative Task Force held two hearings. The purpose of the hearings was to receive testimony on the licensing and regulation of stop-and-go establishments in Philadelphia and across the commonwealth.[2] The task force consists of Senator Anthony Williams (Chair), Senator Frank Farry, Representative Joe Hogan, Representative Anthony Bellmon, Governor's appointee Cornelia Swinson, and PLCB member Darrell Clarke.

Darrell Clarke presided as chair of the task force hearings on behalf of Senator Anthony Williams. Senator Street attended the hearings on both days to offer his support and input on the issue of stop-and-go establishments.

**July 15, 2024 – Philadelphia City Council Chambers, City Hall – Philadelphia, PA**
- Tisha Albert, Director of Regulatory Affairs, Pennsylvania Liquor Control Board
- Jason Worley, Chief Counsel, Pennsylvania Liquor Control Board
- Captain James Hennigan, Director of Operations, Bureau of Liquor Control Enforcement, Pennsylvania State Police
- Staff Inspector Michael O'Donnell, Philadelphia Police Department

**July 16, 2024 – Philadelphia City Council Chambers, City Hall – Philadelphia, PA**
- Charles Moran, Executive Director, PA Licensed Beverage and Tavern Association

---

[1] Additional information about the tour may be found in Appendix B.
[2] A summary of the verbal testimony may be found in Appendix A.

- David Oh, President, CEO, Asian American Chamber of Commerce
- Christopher Edwards, Representative, Baynton Hill Neighbors Association
- Ted Stones, Representative, Twelfth Ward Residential Community Organization
- Rev. Chester Williams, Representative, Chew Belfield Neighbors Club Residential Community Organization
- Deneene Brockington, Representative, Penn Knox Neighborhood Association
- Darnell Deans, Local Resident, Philadelphia, PA
- Stephanie Ridgeway, Local Resident, Philadelphia, PA
- Darnetta Arce, Executive Director, Lower North Philadelphia Community Development Corporation (CDC)

# Appendix A – Summary of Testimony

FOR STOP-AND-GO OCT '24 REPORT PURPOSES

**Stop-and-Go Legislative Task Force –7/15/24 Hearing Summary (State and Local Regulation and Enforcement)**

Location: Philadelphia – City Council Chambers, City Hall
Date: Monday, July 15, 2024
Time: 1:00 pm

**Hearing Overview**
On the first day of hearings, the members heard from Jason Worley and Tisha Albert, who provided testimony on behalf of the PA Liquor Control Board (PLCB) whose primary responsibility is to issue licenses to those persons or businesses wishing to manufacture, distribute, sell, transport and/or store alcoholic beverages in Pennsylvania. Worley and Albert offered testimony regarding restaurant liquor licenses and eating place retail dispenser licenses which are the two main retail liquor licenses under which stop and go establishments exist. Also, Worley and Albert testified regarding the Licensee Compliance Program (LCP), which grants a PLCB analyst the ability to suspend licenses of those establishments that fail to meet the minimum requirements of licensure, as well as the two-year renewal process which has been utilized with varied success by the PLCB in addressing stop and go establishments. Lastly, the two PLCB representatives offered recommendations for the task force to consider.

The task force also heard from law enforcement officials, Captain James Hennigan from the PSP Bureau of Liquor Code Enforcement (BLCE) and Staff Inspector Michael O'Donnell from the Philadelphia Police Department. During his testimony Captain Hennigan outlined the most common liquor code violations, the investigation process and the enforcement process including the penalties and problems associated with utilizing citations. Staff Inspector O'Donnell provided testimony regarding the Nuisance Business Abatement Program which requires chronic nuisance businesses to work with the Philadelphia Police and Department of Licenses & Inspections to adopt an "abatement plan" for curtailing the nuisance behaviors. Also, a comparison was made regarding the qualifications for BLCE officers and Philadelphia police officers. Lastly after it was established that there were only 19 BLCE officers assigned to cover the Philadelphia region, both officers agreed that granting Philadelphia police officers additional authority to enforce liquor code violations generally would be a good idea.

**PANEL ONE:**
**Jason Worley, Chief Counsel, Pennsylvania Liquor Control Board (PLCB)**
**Tisha Albert, Director of Regulatory Affairs, PLCB**
**Captain James Hennigan, Pennsylvania State Police**

First to testify was Jason Worley, Chief Counsel, PLCB.  Mr. Worley emphasized the PLCB wants to do whatever it can to help develop a plan to address stop-and-go establishments.  These establishments have contributed to a multitude of quality of life and public health and safety issues in the City of Philadelphia for a number of years.  Unfortunately, the PLCB cannot predict which establishments will become a stop-and-go during the licensing approval process.

There is a section of the PA Liquor Code, Sect. 611, 47 P.S. Section 6-611, which allows actions to enjoin common nuisances to be brought by certain state and local authorities other than the PLCB. These cases may be brought as actions in equity in any court having jurisdiction to hear equity cases in the county where the nuisance is occurring. Mr. Worley says that this provision is often overlooked as an option for addressing problematic establishments.

It is important to note that the PLCB does not recommend adding more licenses or categories of licenses, as this will devalue current licenses. Further, the PLCB does not recommend simply amending the Liquor Code without doing more, as this will not effectively address the issue at-hand. Making changes to other laws may also be appropriate to address the issue.

Next, Tisha Albert, Director of Regulatory Affairs for the PLCB, testified that the Board can sometimes identify stop-and-go establishments through its Licensee Compliance Program (LCP). This program is based on additional authority granted to the PLCB by Act 44 of 2017. It provides for the following:

- Through LCP, community members, legislators and others can lodge complaints concerning licensees believed to be out of compliance with minimum licensing requirements.
- In response to a complaint, LCP will send an analyst to a licensed premises to investigate the complaint. These investigations are in collaboration with PA State Police, Bureau of Liquor Control Enforcement (BLCE) and local authorities.
- When complaints are substantiated, PLCB has authority to immediately suspend the license of that licensee. That licensee then has the right to request a reinvestigation within 5-10 days to demonstrate compliance.
- If licensing refuses to reinstate a license following reinvestigation because of continuing deficiencies, the licensee may request a hearing before Commonwealth Court which must occur within 10 days of the request.
- Sometimes licensees will meet requirements during reinvestigations, so that their licenses are reinstated, but, afterward, they quickly return to non-compliant activities.

Ms. Albert also testified that once a stop-and-go is identified through the citation process or through the LCP, the PLCB can further evaluate these businesses at the time of license renewal, as all licenses have set renewal periods. For retain licenses, which includes restaurant and eating place licenses, the renewal period is two years.

Captain James Hennigan with the PA State Police was next to testify. He talked extensively about the types of violations commonly found at stop-and-go establishments and the enforcement process. He stated that stop-and-go establishments are businesses that hold restaurant-type liquor licenses, the same licenses used by restaurants and eating places; however, unlike typical restaurants and eating establishments, stop-and-gosoperate under a business model similar to a convenience store where sundry items, candy and snack foods are sold. Simultaneously, limited to no prepared food is made available for purchase. Liquor is often served in disposable cups and served "to go." Many stop-and-go establishments only meet the bare minimum requirements of restaurant and eatery licensees, such as square footage and seating standards, by providing 30 chairs which are folded up or chained in back rooms that cannot be accessed by the public and are open only during inspections. Stop-and-go facilities use their restaurant and eatery licenses for the purpose of selling alcohol—often shots, not food.

18

According to Captain Hennigan, some of the most common violations encountered at stop-and-go establishments include the following:

- Insufficient food for 30 patrons at one time.
- Insufficient tables and seating for 30 patrons at one time.
- Failure to maintain minimum square footage required for a serving area.
- Expired Department of Health permits.
- Sale of liquor "to go."
- Operating another business or selling products without the approval of the PLCB.

The BLCE has made enforcement of stop-and-go violations a priority and has devoted considerable resources to address these violations.  Each public complaint received by the BLCE is investigated, and the BLCE works closely with the Philadelphia Police Department, Philadelphia Health Department, Philadelphia Licensing and Inspection and the PLCB Board to address stop-and-gos.  Additionally, BLCE officers attempt to educate licensees who may be first-time offenders.

Still, Captain Hennigan says there are limitations with the enforcement process.  For one, violations by stop-and-go establishments result in citations that follow the same procedural process as any other Liquor Code violation.  The citation goes before an Office of Administrative Law Judge (ALJ) for adjudication.  A licensee may waive a hearing and accept a recommended penalty or proceed with a hearing.  After a hearing is conducted, an appeal may be sought by the licensee or BLCE, first with the Board, then with the Court of Common Pleas, then with Commonwealth Court.  Any of these procedural steps may delay the penalty.  Additionally, penalties range from $50 to $1,000.  While suspension or revocation is possible, it is <u>rarely imposed</u> for these types of violations.

Captain Hennigan confirmed that BLCE participates in Board-conducted compliance checks.  Under this process, a licensing analyst will inspect whether an establishment is compliant with applicable statutory requirements.  If a licensee is determined to be non-compliant with statutory requirements for the type of license held, the Board is authorized to suspend the licensee's authority to sell alcohol immediately until the licensee is found to have corrected the deficiencies upon reinspection.  Unfortunately, a licensee who regains the privilege to sell alcohol may, and often does, become non-compliant again shortly thereafter, requiring yet another compliance check by the board and BLCE.  Even if a citation for non-compliance is adjudicated or a licensee's operating privileges are suspended under the Board's Licensee Compliance Program, the Liquor Code only permits the Board's Bureau of Licensing to object to the renewal of such a liquor license every two years.  The Board may only consider adjudicated, not pending, citations when making its final decision regarding license renewal.

**Question & Answer Period**

Sen. Frank Farry asked the panel about the timeline of the license renewal process, and what happens if there are pending citations that have not been adjudicated?  Ms. Albert responded that the expiration date in Philadelphia is October 31st.  However, the renewal process begins 4-5 months prior to expiration.  That provides an opportunity for PLCB to reach out to law enforcement, the public, and legislators to canvass and identify establishments.  PLCB will determine if there is sufficient evidence to move forward with an objection [to a license renewal].  Once PLCB objects to a license, it schedules a hearing.  After the hearing examiner submits their recommended opinion and goes before the Board, that can take 4-5 months.  If there is a citation pending at the time of renewal, PLCB has the ability to issue a conditional approval, allowing a licensee to operate until the underlying citation is adjudicated.  Mr. Worley added that the appeal process can delay renewals significantly, sometimes years.

Sen. Farry also asked if there is grading to offenses, or if it is limited to a range of fines ($50 to $1,000)? Captain Hennigan says he doesn't believe there's anything that provides a schedule that raises fines based on the number of violations.  Mr. Worley added that the Liquor Code gives the Administrative Law Judge (ALJ) broad discretion in setting penalties, and it probably varies from judge to judge based on their discretion.  Mr. Worley agrees that as subsequent offenses are coming up for the same establishment, in theory the penalties would become increasingly harsh, but he can't say for certain that's how ALJ's apply the penalties.

Sen. Sharif Street asked how many liquor control enforcement agents are available to address violations in the County of Philadelphia?  Captain Hennigan says there are 128 agents throughout the Commonwealth and nine district enforcement offices.  There are 44 vacancies.  The Philadelphia office covers three counties- Philadelphia, Chester and Delaware.  For those three counties there are currently 16 officers and 11 vacancies.  There are also seven enforcement officers in the Eastern section that are part of a special investigations unit, with three of those based in Philadelphia.  All total, there are about 19 officers and four additional that come from Allentown and Wilkes Barre to help with investigations in the city.  Pittsburgh is authorized to have 30 officers because they have more counties to cover.  Pittsburgh currently has 10 vacancies.  Captain Hennigan said there are 1,547 licensed establishments in the city (1,431 restaurant licenses, 116 eating places).

Sen. Street also asked if allowing the Philadelphia Police Dept. to have concurrent jurisdiction to address Liquor Code violations could be helpful?  Mr. Hennigan said he wouldn't be able to answer that question.  He continued to state that officers focus a lot on stop-and-gosand the work they've done has been exemplary and the number of citations they've issued has increased.  Senator Street noted that PSP works really hard, but 19 people is not a lot, especially considering there are thousands of establishments.  Going from 19 officers to thousands of officers would help enforce violations.  "When we look at enforcement, we have to look at capacity."

Rep. Joe Hogan asked the panel to confirm that a stop-and-go license owner could transfer his or her license to a family member, and that establishment could continue to operate as a stop-and-go?  Mr. Worley replied that can happen sometimes.  Through the renewal process, PLCB enters into a conditional licensing agreement with a licensee that allows them to transfer the license to a bonafide 3rd party.  But sometimes that license can transfer to family members and that operation can continue for years. Mr. Worley noted that PLCB does have the opportunity to refuse a transfer when reviewing a license renewal.  The applicant needs to meet all of the criteria set forth in the liquor code.  That includes the reputation of the applicant and any involvement the applicant has had in the business.

Sen. Street asked if there is an analysis performed that looks at whether there is an arm's length relationship between the parties from whom a license is being transferred?  Mr. Worley said that is not a standard set forth in the Liquor Code, but it is something the PLCB evaluates as part of the renewal process (to see whether it's a transfer to a family member or is an arm's length transaction).
Rep. Anthony Bellmon asked about increasing penalties beyond the $50 - $1,000 in fines?  Captain Hennigan didn't get into specific numbers but has discussed graduated penalties.  Mr. Worley confirmed the range of penalties or fines for most violations is $50 - $1,000.  There are certain categories of offenses that are called enhanced violations under the Liquor Code that can receive a penalty of $1,000 - $5,000.  Those would be for things like selling drugs, sales to minors, etc.

Rep. Bellmon asked about following up on establishments that are found not in compliance, or are only in compliance during a checkup but go out of compliance following the checkup? Can state police do another follow up? Captain Hennigan says they do go back and re-check establishments, especially after they are temporarily suspended. The first thing officers do is make sure they are not selling alcohol with their operating privilege suspended. Often, an establishment may have a room with a locked door containing 30 tables and chairs and all they have to do is unlock the door and now they are in compliance. It's not difficult for them to come back into compliance. Officers have to make sure they're not sacrificing the quality of an investigation for a citation. Using another example, officers might have to follow up because one day the licensee may say their kitchen isn't open simply because their cook didn't show up. Some judges may say it's not fair or viable for officers to cite them after one visit, so they have to go back a second day or more.

Rep. Bellmon also asked about any follow-up with community members who make a complaint about an establishment? Ms. Albert said they get a lot of anonymous complaints, so it's hard to follow up with them. When a letter goes out and it results in a citation, that's public knowledge. Ultimately, she does not believe they do a follow-up. If an establishment is suspended, a green placard is posted and that is taken down after they come back into compliance. That's something they can look into doing as well. Rep. Bellmon asked if any information is shared with the State Representative or Senator about establishments that are noncompliant? Ms. Albert replied that the license renewal is for a 2-year period and, over that time, they do have contact with the different legislators who have an interest. They do keep them informed when they reach out, or on any kind of Board or court decision on a case.

Pennsylvania Liquor Control Board member Darrell Clarke inquired about the ratio of food vs. sale of alcohol requirement for establishments. He believes the language was recently changed. Mr. Worley confirmed there was a change, explaining that there used to be a requirement that a certain percentage of a licensee's business be comprised of food sales vs. alcohol sales. That language was removed from the Liquor Code. There's really no definition of what constitutes sufficient food set forth in the Liquor Code. There simply must be enough food for 30 people at any one time. There has been case law determining what's sufficient or not sufficient in particular situations. In some cases, BLCE has investigated an establishment and there were only enough hamburgers to feed 13 people, or pizzas to feed 20 people, so that was deemed insufficient based on quantity, not the food type itself. Simply having chips or pretzels is not sufficient, it must be more substantive than that. It is an area that could warrant further clarification in the Liquor Code, not just relative to stop-and-gosbut for all restaurant licensees and eating place retail dispensers. Captain Hennigan added that the ambiguity of how much food is enough is challenging and some clarity on that would be helpful. He said there are bars that may fall under that same category. The food they offer may or may not fall under that range and it is very ambiguous. Board member Clarke stated that on a tour of establishments, one of the inspectors wiped their hand across a grill. When they lifted their hand, it was covered in dust. Clearly, it had not been used in some time.

Board member Clarke said that they haven't been very successful in terminating licenses on appeal. There's a significant percentage that has been overturned. Is there a sense of what the reason is for that? What can communities do to enhance the process? Mr. Worley said it varies across the state. Part of the reason for that, in his opinion, is that after the Board makes a decision on a renewal case, that appeal goes to the Court of Common Pleas in the county where the establishment is located. The court is then applying a de novo standard of review, so they are looking at the case anew and they don't have to give deference whatsoever to the Board's decision. There is a new fact finder looking at the case, and their perspective may be different, particularly because you're dealing with an establishment

21

that's located within their home county. Then, once the appeal is taken from Common Pleas, it goes to Commonwealth Court, which is a court of statewide jurisdiction. At that point, Commonwealth Court is applying an appellate standard review and their ability to overturn credibility determinations, findings of fact, is very limited. There's a lot of variables that go into these cases, and he believes it varies county by county. He said they have been successful more recently in addressing some of these stop-and-go establishments in Philadelphia (including the Ameribeer case). Part of the reason they were successful in that case was because there were three or four similar cases out of Commonwealth Court that had very similar facts, so it made it difficult for the court to rule against the Board or reverse the trial court.

**PANEL TWO:**
**Ralph DiPietro City of Philadelphia, Department of Licenses and Inspections (L&I)**
**Michael O'Donnell, Staff Inspector, Philadelphia Police Department's Neighborhood Nuisance Enforcement Division**

Ralph DiPietro from the city's Department of License and Inspection spoke first. He said his department is responsible for enforcing the codes in the City of Philadelphia with respect to property, maintenance, fire, and business licensing. Specifically, with regard to stop-and-gos, his department enforces zoning, fire and property maintenance codes, as well as enforcement of food licensing. They do not necessarily conduct sanitary inspections of food. Instead, that's done by the health department. His department does issue the license, and that license is critical in terms of getting a liquor license. So, it's important to have a food license to qualify for a liquor license.

Michael O'Donnell, an inspector from the Philadelphia Police Department, testified about nuisance establishments. He oversees the Neighborhood Nuisance Enforcement Division. His division deals with abandoned vehicles, vice operations, and nuisance bars. Under city code, they deal with chronic and critical issues with establishments, whether that's stores, stop-and-gos or other liquor establishments, such as bars.

When it comes to stop-and-gos, Inspector O'Donnell testified that his unit works together with L&I as well as the health department to visit establishments when they get complaints. His office is the conduit for the police department, so he receives complaints from the district captains in the local precincts. They will bring those complaints to his office, and then they go out with L&I and the health department or the state partners as well. They will perform compliance checks within those establishments.

**Question & Answer Period**
Sen. Street stated that state law limits who can do enforcement with regard to liquor code violations. There is a compliment of 19 people available to Philadelphia, Delaware, and Chester Counties, so those people are serving an area that includes 2.8, 2.6, 2.7 million people and thousands of establishments. He suggested giving concurrent jurisdiction to L&I city license inspectors or the police department, or both. Senator Street asked the panel members if they think concurrent jurisdiction would be helpful? Mr. DiPietro responded that it's certainly an intriguing idea, but he's not qualified to speak on the legality of that, but it's certainly something he'd like to discuss. Inspector O'Donnell said he didn't want to speak for the police department, but it's certainly very interesting. They have a lot of locations around the city that cause problems in and around those establishments. He believes having the ability to work with state partners and other entities in the city would be helpful.

22

Sen. Farry inquired further about local coordination among the various enforcement entities. Mr. DiPietro stated that he does have a very good relationship with the folks from local control enforcement, specifically around nuisance establishments. He stated that one of the problems they have is there's no real definition of a "restaurant." He suggested tightening up language as far as what is a restaurant, what is food and what is sufficient food. Whatever requirements are placed on an establishment, as far as menus, square footage, food, etc., they'll meet those requirements because these are lucrative operations to some extent. The real challenge is when they behave badly. He says that what you really want to focus on is when the stop-and-gos behave badly and cause problems in the communities. Inspector O'Donnell added that his department focuses on fights or quality of life issues, places where people buy alcohol and then hang out drinking outside. When an establishment has three violations within a 12-month period, they are deemed a chronic nuisance. He said that last year, City Council amended the code with regard to "critical incidents." So, under one violation where something critical happens in an establishment, such as a homicide, shooting, serious aggravated assault or rape, they can go to the establishment owners, bring them to the table and make them develop an abatement plan. This may include things like closing at a certain hour, adding security, removing gambling machines, etc. Inspector O'Donnell said that if violations occur after the plan is in place, they can impose stronger penalties. The abatement plan has been successful in bringing business to the table and under compliance. They're correcting issues in their establishments.

Board member Clarke asked Captain Hennigan to rejoin the panel and explain the requirements to become a BLCE officer. Captain Hennigan said it requires a high school diploma and an extensive process that includes a written test, background investigation, polygraph examination, physical fitness test, psychological evaluation, etc. Once they get through that, they must get through a 16-week training program at the academy. Recruits must be 21 when they graduate from the academy. Captain Hennigan says they have the same recruitment challenges facing other law enforcement agencies. Recently, they formed a new unit whose primary task is to go into communities and recruit. Inspector O'Donnell said that, to get into the Philadelphia Police Academy, recruits must take a written test and a physical fitness exam, psychological tests, and polygraphs. After that, the academy is nine months of the same type of testing and physical fitness training.

Rep. Bellmon asked if a person in the community complained about a stop-and-go, is that info relayed to the state? Inspector O'Donnell said it depends on the nature of the complaint. More than likely it would go from the citizen to that district where the stop-and-go is located. That captain will more than likely send his officers there to investigate. If people are hanging out and fighting, they will probably make that a roll call complaint and officers would be assigned to check on that location each day. If it's something more significant, Inspector O'Donnell said he would forward it to the state.

**Stop-and-Go Legislative Task Force –7/16/24 Hearing Summary (Neighborhood and Business Impacts)**
Location: Philadelphia – City Council Chambers, City Hall
Date: Monday, July 16, 2024
Time: 10:00 am

**Hearing Overview**
On the second day of hearings, the task force heard from Councilwoman Cindy Bass, two residents, several representatives from neighborhood associations and two representatives from business associations. Testimony from the residents and neighborhood organization representatives focused on the negative impacts that stop-and-go establishments are having in the community. They stated that stop-and-gos, which are out of compliance, bring trash, debris, loitering, the wrong kind of foot traffic,

and even killings to the neighborhood. These establishments are not managed properly and should not exist if they are not in compliance. All called for stronger enforcement and follow up to address the problem.

**PANEL ONE:**
**Deneene Brockington, Representative, Penn Knox Neighborhood Association**
**Darnell Deans, Local Resident, Philadelphia, PA**

Ms. Brockington did research and found many of these licensees are out of compliance. She wants to know why they are operating. Her first recommendation is noncompliant entities should be shut down. She is a business owner who subcontracts to deliver packages for Amazon, and if she is out of compliance, she gets 30-60 days to become compliant or can lose her contract. These entities are community nuisances that can cause violence, shootings and fear, and the business owners don't seem to invest in community responsibility. She is grateful for the Task Force because the issue is enforcement, as this predatory culture must be stopped. She says if an entity cannot follow the laws in place and are perpetuating bad behavior, then they should be out of business. She wants the Task Force to ensure regulations are enforced.

Mr. Deans concurs with the need to enforce compliance. His ward has several stop-and-gos, which cause traffic and are eyesores. Loiterers sit all day drinking and scare off customers who want to buy water or other non-alcoholic items. The entities claim compliance on some parts of their licensure, but he argues that if they are not fully compliant, they should be shut down. He sees places that may shut down, even temporarily but ultimately will reopen. Even when they close, there is still traffic, shooting violence and people who are disrespectful loitering. As soon as something is enforced, once the enforcer leaves, noncompliant behavior begins again. Proper enforcement requires follow-up. He does not want to close anyone down, but he sees some stop-and-gos disinterested in operating safely. They get away with a lot. Everyone needs to follow rules and regulations, and if stop-and-go owners cannot, then they do not have to be open.

**Question & Answer Period**
Rep. Bellmon asked who the community members report a violation to. Ms. Brockington said they report to the district council office. As a former constituent services staff person to Councilwoman Bass, it was very difficult to get enforcement to act.  Deans said ward leaders, council members offices, state Senators, as well as police, often get called. He said police get tired of coming out to enforce on stop-and-gos but suggest they should do something about it so they don't keep getting called out. Rep. Bellmon asked if anyone follows up with them once they make a call to report a violation.  Ms. Brockington suggested that it often takes the community member being the one to follow up.  Mr. Deans said he's experienced follow up from those people he's reported incidents to.

Ms. Swinson asked who they saw going into these businesses, as she sees children going into them on the way to school. Ms. Brockington responded when kids use public transit and this is on the transit line, if they carry candy, soda and other snack food, then school children will go there. The businesses operate like war zones and the people operating them do not treat the community well.  These places should not be allowed to sell food that is popular with children. Even places with signs saying kids aren't allowed still let them in.

Sen. Street asked if they were aware that Philadelphia Police Department and Philadelphia Licensing and Inspections don't have the ability to enforce liquor violations and whether it would it be helpful if they

24

did. Ms. Brockington answered it would be helpful.  Sen. Street said state law provides for the Bureau of Liquor Enforcement to do enforcement.  That is 19 officers for 2.9 million people in three counties. Mr. Deans and Ms. Brockington spoke to inefficiencies in who to call. Ms. Brockington indicated there clearly are not enough enforcement officers. The state needs to hire more or partner with local authorities to create more job opportunities for enforcement. Legislation means nothing without enforcement.

Mr. Deans wanted to know why there are only 19 BLCE officers and why there have not been more added. Sen. Street said that was an excellent question and something to establish on the record.

**PANEL TWO:**
**Stephanie Ridgeway, Local Resident, Philadelphia, PA**
**Darnetta Arce, Executive Director, Lower North Philadelphia Community Development Corporation**
**Christopher Edwards, Representative, Baynton Hill Neighbors Association**
**Cindy Bass, Deputy Majority Whip, Philadelphia City Council, District 8**

Ms. Ridgeway stated there was a meeting in 2013 at the Cecil B. Moore Library to shed light on the problem. It is ten years later and at least five people have lost their lives. She is a resident and businessowner and sees "enforcement without consequence." She must be compliant with her business, but stop-and-gos do not. There are restaurants without food that have been out of compliance for a decade. She cannot collect any rent if her licenses are expired.  A person cannot keep a driver's license if they are not compliant. There are young people impacted by these businesses, as some are within 500 feet of the library, which then must decide what to do with the day-drinkers and drug dealers who start hanging out as early as 4:00 am. She invites the panel to see these things first-hand; they last all day. These activities harm a community trying to rejuvenate itself. She does not want to see lip service to this issue. She wants these businesses to understand the harms they pose to the neighborhood, such as leaving trash and urinating and defecating in public. This is not about shutting anyone down but about giving communities opportunities to grow. She is in an impoverished area and would like businesses other than stop-and-gos to come into the community.  She wants young people to be safe going to school. This type of behavior is not profitable for other local businesses.

Ms. Arce appreciated the hearing. These stop-and-gos are throughout our community and the state. They are managed differently in places like Harrisburg and Pittsburgh, you don't see the same issues as in Philadelphia. If these are businesses making money, she questions why the businesses can't have what they need, such as staff and cleaning services, to care for things necessary for compliance.  In her neighborhood, there are five stop-and-gos within a three-block radius. There are family centers, recreation centers and residences with so much access to stop-and-gos. They are not trying to put anyone out of business. Her mother used to say, "it's not what you do, it's how you do it." Stop-and-go owners should manage their businesses properly. She is asking for help to have these businesses be managed properly.

Mr. Edwards indicated this is a long-established problem. He is a corporate chartered accountant with an advertising firm and understands business models and analyzing risk for acquiring businesses. He has lived in Germantown for eight years and avoids stop-and-gos because of the problems they cause on the street. The business model for stop-and-gos is to make money in vulnerable neighborhoods with a high demand for alcohol.  Because of the demand and vulnerable populations, stop-and-go businesses can get away with a lot in Philadelphia versus the suburbs because there are not as many vulnerable populations outside the city. Stop-and-gos will always find ways to protect their revenue. Many members of the community use their services as corner stores, including children, particularly in food

deserts. But selling small quantities of alcohol create what are essentially bars. Sometimes when owners "manage" their business, they just kick people outside, causing dysfunction in the community. They reinforce the cycle of poverty. He is grateful for the Task Force but doesn't see the problem going away due to improper regulation and enforcement. These places as they operate now do not need to exist, but because of the other services they provide, they are not going anywhere.  These are very localized problems and there can be disagreement on how to deal with them in different places. Regulations have to apply statewide. He suggested there should be a limitation on how small a quantity of alcohol can be sold so as to discourage these entities from operating as bars selling shots and single bottles of beer to consume on site. Operating wholesale would be better for the community, similar to how is done in other jurisdictions. If the primary customers are children, the primary commodity should not be alcohol. For example, if a stop-and-go earns more than 10-15% of its revenue from alcohol, they should not allow children inside without a guardian. They are not against entrepreneurship or the Asian-American community, they just want their recommendations to be heard.

Mr. Clarke wanted to clarify that the issue of stop-and-gos has nothing to do with Asian-Americans, but behaviors of establishments. Edwards agreed.

Councilwoman Cindy Bass offered comments regarding how long people in Philadelphia have been struggling with stop-and-go establishments and the frustration the task force is hearing from citizens is because they have been an issue since at least the 1990s. She harkened to discussions that occurred in 2015 and a bill that passed in 2017 providing for these liquor-licensed entities to be paired with a restaurant license issued by the city.  These are not places where you can buy a freshly made sandwich, they are places to purchase alcohol and over-the-counter drugs to make people's highs go higher.  They increase addiction in the community. She spoke to the number of conversations she and others have had with city entities about compliance of these businesses. Stop-and-gos are not operating according to the spirit of the law with regards to food service.  There is an oversaturation of these types of business rather than quality businesses that discourage addiction in the neighborhoods. She spoke to addiction as being a continuing and long-standing issue that she hopes will be addressed with new policy in this space.

### Question & Answer Period
Sen. Street asked Councilwoman Bass whether more authority to entities in the city to do enforcement would be desirable. She said it would. She indicated the Mayor wants a cleaner, greener, safer city, but you cannot have that without addressing stop-and-gos.

Rep. Bellmon asked Ms. Arce whether there is a limit to how many shots are sold at stop-and-gos. She responded that every time someone stands in line, a shot is available to be consumed. Rep. Bellmon asked whether there is a rule that the shot must be consumed on-premises. Ms. Arce responded no. She asked if the representative has seen people loitering at a stop-and-gos, because they are really operating as a bar. Non-alcoholic products are often expired and just there for show. They do not abide by any law restricting alcohol sales to certain times, meaning drinking occurs all day long.

Sen. Street asked if the testifiers believed there should be a rule regarding what percentage of revenue comes from food for it to be considered a restaurant.  Ms. Ridgeway responded that she believes there should be such a rule, and that those restaurants with a license who are not following regulations and are out of compliance should have their licenses rescinded. Sen. Street asked if rescinded licenses should be allowed to be sold to a spouse or child. Testifiers responded no.

**PANEL THREE:**
**Ted Stones, Representative, Twelfth Ward Residential Community Organization**
**Rev. Chester Williams, Representative, Chew Belfield Neighbors Club Residential Community Organization**

Mr. Stones drew a picture of a neighborhood where the community gets along and teaches their children, and then he turns the corner and finds a mass of people who are wounded who go to stop-and-gos to self-medicate. It's traumatizing to see so many people in a broken state of despair. These businessowners should recognize they are helping the problem to grow. It's predatory to do this to disenfranchised people who are in desperate need of help. Stop-and-gos offer drinks that Mr. Stones likened to chemical bombs due to the amount of alcohol in them. His community is suffering and being preyed upon by these establishments. Legislation is needed to deal with things starting at home, including mass incarceration and poverty. His community is being legislated to suffer. Stop-and-gos need to be gone and something needs to be done to help people who are suffering.

Rev. Williams testified that the businesses need to know what they are not doing to help the community and fix it. Very few he's interacted with will help him clean up the neighborhood, including the alleys behind their businesses. They donate nothing to charity. He wants stop-and-gos to be thriving businesses that are painted, cleaned and not boarded, and to be more socially responsible neighbors in the community. More local enforcement is needed. If businesses do not comply, then they should be shut down. Stop-and-gos should offer fresh food to serve the community well. They are dividing the city and the neighborhoods they are in. They are open all night and cause noise. People come from all over knowing these places are open all night, tearing up the neighborhood. He wants these businesses to work with the community.

**Question & Answer Period**
Mr. Clarke noted the previous day's testimony included state and local governing entities and that they need to read the record from today's testimony. He noted a working group was formed to assist the work of the task force. The testimony recommendations are up for discussion, so if they do not have questions, it is because they are trying to focus on getting testimony on the record.

Sen. Street asked the testifiers about concurrent enforcement and a definition of a restaurant, particularly where there is a food sales requirement. They responded that the community needs to be protected from predators.

Ms. Swinson noted that she was once an executive director of a neighborhood advisory committee. At that time, they had a community police officer who could be called for advice and to document what was going on in the neighborhood. They also walked the beat. Going back to that model may help the community feel like they had someone available to address concerns. We want businesses that are managed and enforced properly. Enforcement cooperation between the city and state is important.

**PANEL FOUR:**
**Charles Moran, Executive Director, PA Licensed Beverage and Tavern Association**
**David Oh, President & CEO, Asian American Chamber of Commerce of Greater Philadelphia**

Mr. Moran testified that the Pennsylvania Licensed Beverage and Tavern Association (PLBTA) is concerned that stop-and-go establishments are problematic businesses. He believes they need to be gotten under control or closed where appropriate. Mr. Moran said they do not see this problem outside

27

Philadelphia.  Stop-and-gos are unlike other eating place licensees, such as Sheetz and Rutters, which sell alcohol and food under one roof and operate as respectable businesses.  Stop-and-gos suffer management issues and do not meet the requirements for the licenses they have, including for health and safety.  They act like magnets for bad crowds of people.  PLBTA is concerned that stop-and-gos are giving all the businesses represented by his association a black eye and he wants them to be stopped by the PLCB and BLCE, who sometimes have their hands tied by state laws. Moran reaffirmed the organization's promise to work with the task force to clean up Philadelphia.  Community health, crime, and drug use need to be included in solutions to the issue, not just state Liquor Code changes.  He invited the task force to share lists of stop-and-go licensees with PLBTA so they can ensure they are not members of their association.

Mr. Oh testified that his chamber represents a limited amount of food and beverage members, as there is an Asian American Licensed Beverage Association that represents beer delis. Businesses that are certified chamber members must operate responsibly.  The concerns expressed during testimony regarding the health and safety of the city are of the chamber's concern as well.

Mr. Oh spoke about the diversity of Asian American, which includes 64 different descriptions of people.  11% of Philadelphia and 7% of the country are Asian or fall under the Asian American moniker.

The history of Asians in this country is one of discrimination.  They could not vote or be naturalized until recent history and therefore were not involved in the legislative process.  Mr. Oh believes there are issues of guilt by association with beer deli owners of Asian descent.  Many owners of these businesses are scared.

His primary concern is that Asian business owners, who own or operate a significant amount of stop-and-go establishments, should not be targeted based on race. He also thinks "beer delis" should clean themselves up and said there are compliance issues.  He said he likes uniformity in municipalities for state law enforcement and thinks the state should beef up enforcement itself. There is a state entity that oversees these licenses and state troopers who are stationed in Philadelphia.  Mr. Oh does not want money siphoned from state enforcement to the city where politics may come into play.  He is concerned about targeting people based on the color of their skin, as it always leads to problems.  He appreciates the separation between the city and state.  The state has more money available and qualified state enforcers aren't subject to the politics of the city.

Mr. Clarke responded by assuring Mr. Oh that no individual or business is or will be targeted based on race. The task force's work is about businesses that are not in compliance.  Mr. Oh responded appreciatively, but cautioned that even properly managed businesses are seen as being guilty by association when they are owned by people who look like bad actor owners.

Mr. Clarke also described an anecdote of city law enforcement not having proper training in the field of licensing enforcement to stress the importance of having the right people doing the enforcement in these matters.

**Question & Answer Period**
Sen. Street clarified that racial discrimination is inappropriate, but frustration at business practices at stop-and-gos is appropriate. He also challenged Mr. Oh's assertion that Philadelphia does not enforce state laws.  Sen. Street said the Philadelphia Police Department should not suffer from being a home

rule county that cannot enforce state liquor law because it's been carved out of their enforcement jurisdiction.

Ms. Swinson said this is not about race, but rather management and enforcement. The point is stop-and-gos should be safe, healthy and family-friendly.  The tenor of the conversation is about having better neighbors.

Rep. Bellmon asked in what capacity Mr. Oh was testifying. Mr. Oh said he has members of his chamber who operate similarly to stop-and-gos, which he calls "beer delis." Mr. Bellmon asked if any of the chamber's beer delis also experience nuisance activity outside their establishments.  Mr. Oh said he believes there are some problems, but the issue is that the owner is selling a lawful product, but the person who buys it may do unlawful things nearby. Mr. Oh then asked if the nuisance problem is the business owner's responsibility to confront themselves or if they should rely on the police.  He also is concerned that even when business owners kick people out, they tend to congregate on the street anyway, and owners do not know what to do about that. If they call police, police may not respond, and owners are scared they may be blamed for what is on the street. But ordinarily, police are who they would want to call. Rep. Bellmon asked about his members' community work.  Mr. Oh thinks one problem is his members may not get credit for the community work they do conduct. He has offered to work with the city and the community to address nuisance issues, but the businesses owned by those sitting in the council chambers are not likely the ones where nuisance issues are occurring.

# Appendix B – Summary of Tours

**Stop-and-Go Legislative Task Force – 5/29/24 Tour Summary**

Location: Philadelphia – 18th Police District and Various Stop-and-Go Locations
Date: May 29, 2024
Time: 11:00 am

The task force meeting began at 11:00 am at the 18th Police District located at 55th and Pine Streets, Philadelphia PA. Legislators attending the meeting included task force members Sen. Frank Farry, Rep. Joe Hogan, Darrell Clarke, and Cornelia Swinson.  The task force was also accompanied by Sen. Sharif Street and Rep. Jordan Harris. Sen. Anthony Williams, who arranged the tour, and task force member Rep. Anthony Bellmon were represented by staff.

Also attending were representatives from the PLCB, PSP/BLCE, the Mayor's Office of the City of Philadelphia, 18th Police District, L&I from the City of Philadelphia and KYW News Radio.

The meeting began with remarks by Rep. Jordan Harris and Sen. Sharif Street who briefly discussed the issues surrounding stop-and-go establishments. Members of the task force were also provided with an opportunity to speak. After the opening remarks were made, group pictures were taken, and the tour began.

During the tour, task force members, accompanied by the police, L&I, and PSP/BLCE, were taken via van to view three (3) stop-and-go establishments. The members were taken to the following locations.
- Deli 54 Inc. (Lid: 70538) 5426 Chester Ave.
- 2. Fortune Deli Inc (Lid: 65222) 6165 Woodland Ave.
- 3. Hbp21 Inc. (Lid: 82303) 648 S 60th St.

At the first location, Deli 54 Inc., the store was packed with people. In plain view of the members were filled bottles of alcohol with prices on top that were being sold to the patrons of the store. There was no prepared food being sold and the tables and chairs for seating were locked up in a room located in the rear of the store. The members would see more of the same at the other tour locations. There is no doubt that after touring the stop-and-go establishments, the members gained a better understanding about what they are and the problems that they present in the neighborhoods in which they exist.

Below please find the link to KYW News Radio Coverage of the Stop-and-Go Legislative Task Force tour.

https://www.audacy.com/podcast/kyw-newsradio-audio-on-demand-12880/episodes/legislative-task-force-mounts-fact-finding-tour-of-southwest-philly-stop-and-go-stores-a0b23