# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASIAN-AMERICAN LICENSED BEVERAGE ASSOCIATION, et al. | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 2:24-cv-06348 |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al. | : | ***Jury Trial Demanded*** |
| | : | |
| Defendants. | : | |
| | : | |

## PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO CITY DEFENDANTS' AND COMMONWEALTH DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

KANG HAGGERTY LLC

By:     */s/ Kyle Garabedian*
          Edward T. Kang
          Kyle Garabedian
          Kelly Lavelle
          123 South Broad Street, Suite 1950
          Philadelphia, Pennsylvania 19109
          (215) 525-5850 (tel)
          *Counsel for Plaintiffs*

Dated: February 24, 2025

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................. ii

I.      INTRODUCTION ....................................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND...............................................2

III.    LEGAL STANDARD ..............................................................................................12

        A.  Federal Rule of Civil Procedure 12(b)(1)......................................................12

            1.      Commonwealth Defendants Based on the Eleventh Amendment.15

            2.      City Defendants' Motion to Dismiss for Lack of Standing ..........19

        B.  Federal Rule of Civil Procedure 12(b)(6) .....................................................19

IV.     ARGUMENT............................................................................................................23

        A.  Plaintiffs Have Standing to Pursue this Action ..............................................12

            1.      The Individual Member Plaintiffs Have Standing to Bring Causes
                    of Action Against Defendants ...........................................................

            2.      The Association Plaintiffs Have a Standing to Bring this Cause of
                    Action Against Defendants

        B.  The City of Philadelphia is Subject to Municipal Liability ................................

        C.  The Commonwealth Defendants are Not Immune from Suit Pursuant to the
            Eleventh Amendment .........................................................................................

        D.  The Commonwealth Defendants are "Persons" Subject to Liability Under
            Section 1983......................................................................................................

        E.  Plaintiffs Establish Viable Claims for Violation of Due Process of the
            Fourteenth Amendment – Vague and Overbroad (Counts I and II)....................

            1.  The Nuisance and Curfew Ordinances are Unconstitutionally Vague ....

            2.  Section 4-470 of the Liquor Code is Unconstitutionally Vague..........

        F.  Plaintiffs Have Established Viable Claims Under the First Amendment for
            Overbreadth and Violation of the Right to Petition (Counts III, IV, V, and VI) ..

2

G.  The Licensee Compliance Program and the Fiscal Code Violate Plaintiffs' Right to Procedural Due Process (Counts VII and VII) ...................................

H.  Plaintiffs Establish Viable Claims Under the Equal Protection Clause Based on the Selective Enforcement of the State and Local Laws (Counts IX and X) ........

I.  The Coordinated Actions of the City and the Commonwealth Defendants Directly Resulted in Constitutional Violations by Defendants, Supporting Plaintiffs' Claims for Conspiracy (Count XI) .....................................................

J.  Declaratory Judgement (Count XII) ...................................................................

V.  CONCLUSION .................................................................................................

## <u>TABLE OF CONTENTS</u>

**Page(s)**

**Cases**

*Adams Outdoor Advert. Ltd. P'ship by Adams Outdoor GP, LLC v. Pennsylvania Dep't of Transp.*,
930 F.3d 199 (3d Cir. 2019) ................................................................. 21

*Am. Civil Liberties Union v. N.J. Election Law Enforcement Comm'n*,
509 F. Supp. 1123 (D.N.J. 1981) .......................................................... 27

*Animal Science Prods v. China Minmetals Corp.*,
654 F.3d 462 (3d Cir. 2011) ................................................................. 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................. 11

*Bagget v. Bullitt*,
377 U.S. 360 (1964) ............................................................................. 22

*Ballentine v. United States*,
486 F.3d 806 (3d Cir.2007) .................................................................. 10

*Bd. of Trustees of Vill. of Groton v. Pirro*,
152 A.D.3d 149, 58 N.Y.S.3d 614 (N.Y. App. Div. 2017) ................... 27

*BE&K Const. Co. v. NLRB*,
536 U.S. 516 (2002) ............................................................................. 26

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................. 11

*Bell v. Burson*,
402 U.S. 535 (1971) ............................................................................. 30

*Bell v. Hood*,
327 U.S. 678 (1946) ............................................................................... 9

*Board of Regents v. Roth*,
408 U.S. 564 (1972) ............................................................................. 29

*Clark v. City of Lakewood*,
259 F.3d 996 (9th Cir. 2001) ............................................................... 13

*Commonwealth by & through Krasner v. Attorney Gen.*,
309 A.3d 265 (Pa.Cmwlth. 2024) ........................................................ 20

*Dailey v. City of Philadelphia*,
417 F.Supp.3d 597 (E.D. Pa. 2019) ..................................................... 21

*Ex Parte Young*,
209 U.S. ........................................................................................ 18, 19

*Flora v. Cty. of Luzerne*,
776 F.3d 169 (3d Cir. 2015) ................................................................. 11

*Frein v. Pennsyvania State Police*,
47 F.4th 247 (3d Cir. 2022) ............................................................ 18, 19

*Gale v. Storti*,
608 F.Supp.2d 629 (E.D. Pa. 2009) ................................................ 32, 33

*Gentile v. State Bar of Nevada*,
501 U.S. 1030 (1991) ........................................................................... 24

4

*Gold Room, Inc. Pa. Liquor Control Bd.*,
   245 A.3d 1143 (Pa. Cmwlth) ......................................................................... 25

*Gould Elec. Inc. v. United States*,
   220 F.3d 169 (3d Cir.2000) ........................................................................... 11

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ................................................................................. 21, 22

*Hafer v. Melo*,
   502 U.S. 21 (1991) ....................................................................................... 21

*Hendrickson v. AFSCME Council 18*,
   992 F. 3d 950 (10th Cir. 2021) ...................................................................... 19

*Hill v. City of Scranton*,
   411 F.3d 118 (3d Cir.2005) ........................................................................... 30

*Hill v. Colorado*,
   530 U.S. 703 (2000) ..................................................................................... 21

*Holder v. City of Allentown*,
   987 F.2d 188 (3d Cir.1993) ........................................................................... 31

*Holder v. Humanitarian L. Project*,
   561 U.S. 1, (2010) ....................................................................................... 22

*Hunt v. Washington State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ..................................................................................... 16

*Ibarra v. City of Chicago*,
   816 F. Supp. 2d 541 (S.D. Ind. 2011)............................................................. 26

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ........................................................................ 13

*Int'l Longshoremen's Ass'n, S.S. Clerks Local 1624, AFL-CIO v. Virginia Int'l Terminals, Inc.*,
   914 F.Supp. 1335 (E.D. Va. 1996) ................................................................ 11

*Jewish Home of E. Pa. v. Ctrs. for Medicare and Medicaid Servs.*,
   693 F.3d 359 (3d Cir.2012) ........................................................................... 31

*Johnson v. United States*,
   576 U.S. 591, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015)........................... 22, 23

*Long v. Se. Pennsylvania Transportation Auth.*,
   903 F.3d 312 (3d Cir. 2018) ......................................................................... 13

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ..................................................................................... 13

*Machon v. Pennsylvania State Dept. of Public Welfare*,
   847 F. Supp,2d 734 (E.D. Pa. 2012)............................................................... 21

*Manning v. Caldwell for City of Roanoke*,
   930 F.3d 264 (4th Cir. 2019) ........................................................................ 22

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ..................................................................................... 29

*MCI Telecommunication Corp. v. Bell Atlantic Pennsylvania*,
   271 F.3d 491 (3d Cir. 2001) ......................................................................... 18

*McNutt v. General Motors Acceptance Corp.*,
   298 U.S. 178 (1936) ..................................................................................... 10

*Meyer v. Bd. of Cnty. Comm'rs of Harper Cnty.*,
   482 F.3d 1232 (10th Cir. 2007)...................................................................... 26

5

*Mikhail v. Kahn*,
  991 F. Supp. 2d 596 (E.D. Pa. 2014)................................................................. 32
*Monell v. Dep't of Soc. Servs.*,
  436 U.S. 658 (1978) ......................................................................................... 17
*Mortensen v. First Fed. Sav. & Loan Ass'n*,
  549 F.2d 884 (3d Cir.1977) .............................................................................. 10
*Nashville, C. & St. L. Ry. v. Wallace*,
  288 U.S. 249 (1933) ......................................................................................... 13
*National Motor Freight Assn. v. United States*,
  372 U.S. 246 (1963) ......................................................................................... 15
*Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*,
  357 U.S. 449 (1958) ......................................................................................... 27
*Neiderhiser v. Berwick*,
  840 F.2d 214 (3d Cir. 1988) ............................................................................. 14
*Oneida Indian Nation v. County of Oneida*,
  414 U.S. 661  (1974) .......................................................................................... 9
*Paey Associates, Inc. v. Pennsylvania Liquor Control Bd.*,
  78 A.3d 1187 (Pa.Cmwlth. 2013)..................................................................... 25
*Pembaur v. City of Cincinnati*,
  475 U.S. 469 (1986) ......................................................................................... 17
*Pennsylvania Liquor Control Bd. v. Kusic*,
  7 Pa.Cmwlth. 274 (1973).................................................................................. 19
*Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc.*,
  280 F.3d 278 (3d Cir. 2002) ............................................................................. 16
*Phillips v. Cty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ............................................................................. 11
*Reed v. Village of Shorewood*,
  704 F.2d 943 (7th Cir. 1983) ...................................................................... 29, 30
*Richard Roe W.M. v. Devereux Found.*,
  650 F. Supp. 3d 319 (E.D. Pa. 2023)................................................................ 13
*San Filippo v. Bongiovanni*,
  961 F.2d 1125 (3d Cir. 1992) ........................................................................... 21
*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ......................................................................................... 15
*Snowden v. Hughes*,
  321 U.S. 1 (1944) ............................................................................................. 31
*Synthes USA HQ, Inc. v. Commonwealth*,
  289 A.3d 846 (Pa. 2023)................................................................................... 20
*Turner Broadcasting System, Inc. v. F.C.C.*,
  512 U.S. 622 (1994) ......................................................................................... 28
*United States v. O'Brien*,
  391 U.S. 367 (1968) ......................................................................................... 28
*Va. Office for Prot. & Advocacy v. Stewart*,
  563 U.S. 247 (2011) ......................................................................................... 21
*Verizon Md., Inc. v. Pub. Serv. Com'n of Md.*,
  535 U.S. 635 (2002) ......................................................................................... 18

3665691.2

*Virginia v. Am. Booksellers Ass'n, Inc.*,
    484 U.S. 383(1988) .................................................................................................. 14, 26
*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................................................. 15, 16
*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ....................................................................................... 26
*Will v. Michigan Dept. of State Police*,
    491 U.S. 58 ..................................................................................................................... 21
*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ...................................................................................................... 31

Statutes

28 U.S.C. § 2201(a) ......................................................................................................... 35
42 Pa.C.S. § 933(a)(1)(v) ................................................................................................. 30
42 U.S.C. § 1983 ................................................................................................................ 8
Pa. Const. art. IV, § 4.1 ................................................................................................... 20

Rules

Federal Rule of Civil Procedure 12(b)(1) ..................................................................... 9, 10
Federal Rules of Civil Procedure 12(b) ............................................................................. 9
FRCP 8(a)(2) ................................................................................................................... 11
Rule 12(b)(6) .............................................................................................................. 11, 12

7

**STATEMENT OF FACTS**

Plaintiff AALBA is an association of businesspeople licensed by Defendant, PLCB, to sell and dispense alcoholic beverages under the provisions of the Pennsylvania Liquor Code ("Liquor Code"). Am. Compl. ¶ 31. Its members, including the individual Plaintiffs, hold licenses either personally or through business entities they own and control, with the majority being of Asian-American heritage. Am. Compl. ¶¶ 14-19, 32, 33. AALBA represents approximately 110 members holding a similar number of liquor licenses. Am. Compl. ¶ 35. Plaintiff AAB is another association of business people, many of whom hold PLCB licenses to sell alcoholic beverages and operate convenience stores and similar businesses throughout Philadelphia. Am. Compl. ¶ 36-37. These businesses rely on flexible hours to serve the community when traditional grocery stores are closed. Am. Compl. ¶ 36-37. Like AALBA, its members hold licenses either individually or through business entities they own and control. Am. Compl. ¶ 38. Many members of both associations have obtained PLCB licenses to operate as retail dispensers (R- Licenses) or eating place retail dispensers (E licenses). Am. Compl. ¶ 39. Plaintiffs operate from licensed premises approved by the PLCB and the City of Philadelphia through its Department of Licenses and Inspections. 47 P.S. §§ 4-407, 4-442. Am. Compl. ¶ 40.

Upon information and belief, all actions taken by Defendants against Plaintiffs were due to a purposeful campaign between and among Defendants with a specific goal of preventing Plaintiffs from operating. Am. Compl. ¶ 42. Defendants have tirelessly made efforts to inhibit Plaintiffs' business operations, selectively enforcing laws and ordinances for the express purpose of driving Plaintiffs out of business. Am. Compl. ¶ 43. The overwhelming majority of the impacted businesses are owned by racial minorities, specifically Asian and Arab Americans. Am. Compl. ¶

44. Actions taken by and on behalf of the Defendants, individually and collectively, against Plaintiffs' lawful business operations, include but are not limited to (a) selective enforcement of laws and ordinances targeted at Plaintiffs; (b) facially unfair and biased administration of those laws and ordinances intended to prevent Plaintiffs from complying in good faith as a pretext to impose penalties (up through and including the loss of a license or the closure of the business); (c) repeated Police Department and BLCE visits to the Plaintiffs' establishments for unannounced inspections; and (d) discriminatory and harassing conduct by the Police Department and BLCE. Am. Compl. ¶ 45.

Due to the concerted and purposeful efforts of the Defendants, Plaintiffs have, at times, been forced to cease operations, have struggled to stay open for business and are at risk of losing the liquor licenses and, consequently, their livelihood. Am. Compl. ¶ 48. Accordingly, Plaintiffs have sustained and will continue to sustain a substantial loss of business due to the adverse effect of the unlawful conduct of Defendants. Am. Compl. ¶ 50. Defendants' arbitrary and capricious conduct unjustly deprives Plaintiffs of their fundamental and constitutionally protected rights, violating due process and equal protection guarantees and infringing on protected expressive activity. Am. Compl. ¶ 51.

### History of Regulations of "Stop-and-Go" Establishments

The City of Philadelphia has a longstanding history of scrutinizing and regulating minority-owned (namely, Asian or Arab Americans) businesses, including so-called "stop-and-go" establishments. Am. Compl. ¶ 52. In 1987, enforcement of alcohol sales at these establishments shifted from the PLCB to the Pennsylvania State Police, creating the Pennsylvania State Police Bureau of Liquor Control Enforcement. Sections 211 and 472 of the Act of April 12, 1951 (P.L. 90, No. 21), known as the Liquor Code, re-enacted and amended June 29, 1987 (P.L. 32, No. 14).

2

Am. Compl. ¶ 53. The pertinent provisions of Act 39 of 2005 are outlined in Sections 407 and 442, 47 P.S. §§ 4-407 and 4-442, which include requirements for licensing. Am. Compl. ¶ 57.

In 1990, the PLCB introduced the Nuisance Bar Program, which allows the PLCB to deny license renewals in an effort to remove "problem bars" from communities. Am. Compl. ¶ 54.  The pertinent provisions of Act 39 of 2005 are outlined in Sections 407 and 442 of the Liquor Code, 47 P.S. §§ 4-407 and 4-442, which include requirements for licensing. Am. Compl. ¶ 57. That same year, Philadelphia's former Mayor John A. Street enacted an ordinance mandating an 11 p.m. curfew for businesses on residential streets. Phila. Code § 9-627. Am. Compl. ¶ 58. Section 9-627, enacted to address "nuisance retail shops, such as take-out and convenience stores, was amended by the Philadelphia City Council in 2007 to specifically target "take-out restaurants" situated on corner lots at street intersections. *Id.* Am. Compl. ¶ 59.

In 2018, twenty-three local Chinese take-out restaurant owners sued the City of Philadelphia, challenging the 11 p.m. curfew ordinance under section 9-627 as unconstitutional due to its discriminatory intent and enforcement against Asian Americans. *See Liu v. City of Philadelphia*, 2:18-cv-04900-MMB (E.D. Pa. November 13, 2018). Am. Compl. ¶ 60. The former curfew ordinance was overwhelmingly and selectively enforced against Chinese-owned businesses. Am. Compl. ¶ 61. Upon information and belief, 80%-90% of citations under the former curfew ordinance in 2015-2016 targeted Asian or minority-owned businesses, while similar businesses operated without issue. Am. Compl. ¶ 62. The case settled, with the City agreeing to suspend curfew enforcement and implement police training on implicit bias and communication with limited English-proficient communities. Am. Compl. ¶ 63.

Unfortunately, the passage of time has done little to quell the anti-Asian and other minority sentiments that motivated the passage and selective enforcement of the earlier ordinance. Am.

Compl. ¶ 64. In the wake of the pandemic and ever-increasing geopolitical tensions in Asia and the Middle East, time has only increased anti-Asian and anti-Arab sentiment. Am. Compl. ¶ 65. The City has renewed its discriminatory practices by enacting new curfew laws and an overbroad nuisance ordinance that discriminates against minority-owned businesses. Am. Compl. ¶ 67.

In response to ongoing concerns over "stop-and-go" establishments, the Pennsylvania General Assembly passed Act 44 of 2017, amending the Fiscal Code at 72 P.S. § 1799.6-E, to expand PLCB oversight through the Licensee Compliance Program and the creation of the PLCB Bureau of Licensing. 72 P.S. § 1799.6-E. Am. Compl. ¶ 68. The Compliance Program introduced the Investigation & Suspension Process, requiring seating and food service compliance and allowing the PLCB and law enforcement to perform unannounced inspections. Noncompliance can result in an immediate, unappealable administrative suspension or license revocaition.[1] 72 P.S. § 1799.6-E. Am. Compl. ¶ 69.

In 2023, the Pennsylvania Stop-and-Go Legislative Task Force ("Task Force") was established to review and recommend solutions regarding these establishments. 47 P.S. § 218. Am. Compl. ¶ 70. On information and belief, no members of the Asian or Arab communities were members of the Task Force or had a substantial voice in the process that followed. Am. Compl. ¶ 71. In October 2024, the Task Force issued its Report and Recommendations, advising the General Assembly of guidelines for legislative remedies to regulate "stop-and-gos," including streamlining the citation processes, strengthening the Compliance Program, increasing penalties and fines, and recruiting more BLCE agents. Am. Compl. ¶ 73, Ex. A. Notably, the Report and Recommendations provide an alternative definition for stop-and-go establishments as "a Commonwealth licensee

---

[1] *See* Pennsylvania Liquor Control Board, Licensee Compliance Program, https://www.lcb.pa.gov/Licensing/Documents/Complete%20Licensee%20Compliance%20Program%20Guide%20for%20Licensees.pdf.

which holds either a restaurant liquor (R) license or an eating place retail dispenser (E) license and receives at least two violations for failing to act as a bona fide restaurant or eating place within a 12-month period." *See* Am. Compl., Ex. A, p. 9. As of 2024, the Pennsylvania General Assembly continues to review these regulations, with some legislators advocating for fairer enforcement practices to avoid discrimination. Am. Compl. ¶ 75.

Many of the targeted establishments are owned and operated by immigrants and minority entrepreneurs. The Task Force has acknowledged that the supposed problems with the "stop-and-go" businesses it seeks to address are limited to Philadelphia, where such establishments are overwhelmingly minority-owned. Am. Compl. ¶ 77. The General Assembly intends to use the Task Force's Report and Recommendations to enact additional legislation regulating stop-and-go establishments. 47 P.S. § 218. Am. Compl. ¶ 78. On information and belief, license holders in other parts of Pennsylvania are not subject to the same repeated scrutiny as minority-owned businesses located in Philadelphia. Am. Compl. ¶ 79.

### Statutory and Regulatory Requirements
#### The Liquor Code

Most businesses selling alcohol are licensed under the Liquor Code as either retail dispensers (R licenses or Restaurant License) or eating place retail dispensers (E license). See 47 P.S. §§ 4-406, 4-407, 4-442, respectively. Am. Compl. ¶ 80. Both R and E licensees are required to offer food to the public and must have seating to accommodate thirty persons. R licensees must measure at least 400 square feet, while E licensees require a minimum of 300 square feet. 47 P.S. § 1-102. Am. Compl. ¶ 84. Additionally, all licensees must provide: (i) no less than thirty seats (seats may not be stacked); (ii) sufficient food for at least thirty patrons; (iii) dishes and utensils for at least thirty persons; (iv) a current and valid health license; (v) a functioning kitchen or food preparation area. *See* PLCB Compliance Program. Am. Compl. ¶ 85.

5

<u>The Philadelphia Code</u>

Plaintiffs' businesses are also subject to local laws and ordinances under The Philadelphia Code, including the Curfew and Nuisance Ordinances discussed in detail herein. Am. Compl. ¶ 87. At least fifteen of Plaintiff AALBA's members are subject to the Curfew Ordinances. Am. Compl. ¶ 88.

<u>The Curfew Ordinances</u>

Recently enacted sections 9-630, 9-641, 9-642, and 9-643 (collectively, the "Curfew Ordinances") of the Philadelphia Code restrict the hours of operation for business in certain designated areas of Philadelphia. Phila. Code §§ 9-630, 9-641, 9-642 and 9-643. Am. Compl. ¶ 89. Sections 9-630, 9-641, and 9-642 define "Commercial Establishment" as "[a]n establishment involved in the buying and selling of goods where consumers primarily purchase goods intended for consumption or use off premises, including a Food Establishment as defined in Code Section 6-102." This definition excludes "Food Establishments" with a Restaurant Liquor License, as well as those serving exclusively as drive-throughs or operating as gas stations. Section 9-643 defines "Commercial Establishment" without these specific exclusions.  Phila. Code §§ 9-630, 9-641, 9-642 and 9-643. Am. Compl. ¶ 90. Under section 6-102 "Food Establishment" is defined broadly as "[a]ny establishment or portion thereof where food is handled or sold" including various types of stands, vehicles, or vending machines but excluding facilities such as railroad dining cars in transit and financial investment and brokerage transactions where no food handling takes place with the City. Phila. Code § 6-102. Am. Compl. ¶ 91.

On or about August 12, 2024, City Council enacted Ordinances (Bill Nos. 240498, 240474, 240476), amending Chapter 9-600 of The Philadelphia Code, adding various locations to the section regulating the hours of operations of certain establishments and including the modification

6

of the definition of "Commercial Establishment" to exclude Food Establishments that serve customers exclusively from a drive-through window or fueling station. Phila. Code §§ 9-630, 9-641, 9643. Am. Compl. ¶¶ 92, 94, 96. These sections prohibit any "Commercial Establishment" from operating between the hours of 11 p.m. and 6 a.m. within certain specified areas in the City. On the same date, City Council enacted Ordinances (Bill Nos. 240414 and 240468), adding Section 9-642 restricting "Commercial Establishments" in certain areas from operating during the hours of 12 midnight and 6 a.m. Phila. Code § 9-642. Am. Compl. ¶ 95.

Pursuant to the Philadelphia Police Department Memorandum (24-06) regarding Enforcement of Business Curfews, officers are required to track violations of the Curfew Ordinances and notify the Neighborhood Nuisance Enforcement Unit of all violations, and for repeated violations "consider Nuisance Business Action, consistent with Directive 4.25, 'Nuisance Abatement Tool for Commanders'" (related to identifying Chronic and Critical Nuisance Businesses and enforcing the Nuisance Ordinance). Am. Compl. ¶ 97.

The Curfew Ordinances primarily affect specific areas within Philadelphia where Plaintiffs operate their establishments. Am. Compl. ¶ 98. These restrictions thus disproportionately impact these minority groups and their businesses operating in these areas within the City. Am. Compl. ¶ 99. More affluent, whiter neighborhoods within Philadelphia are not subject to the same restrictions and oversite as Plaintiffs' businesses. Am. Compl. ¶ 100.

<u>The Nuisance Ordinance</u>

Chapter 9-4400 of the Philadelphia Code, titled "Responsible Business Operations," establishes regulations to identify and address "nuisance businesses." Phila. Code §§ 9-4401-9-4406 (the "Nuisance Ordinances"). Am. Compl. ¶ 101. While the supposed purpose is to deter criminal activity, it takes no action against the actual lawbreakers; instead, it punishes law-abiding

7

business owners by punishing them for even alleged criminal activities *around* their businesses. Am. Compl. ¶ 102. In a shocking overreach of police power, the Nuisance Ordinance purports to give officers the ability to shutter businesses if violent activity happens nearby or if they can string together seemingly trivial offenses. Am. Compl. ¶ 103. Section 1-112 of the Philadelphia Code provides the PPD with the authority to issue code violation notices ("CVNs") to enforce any provision of the Philadelphia Code or any regulation adopted under the Code. Phila. Code § 1-112(a). Am. Compl. ¶ 104. The PPD also has authority under section 9-4403 to deem businesses as "chronic nuisance business" or "critical nuisance business" and to issue a Notice of Intent to Cease Operations against them. Phila. Code § 9-4403. Am. Compl. ¶ 105.

According to the Philadelphia Code, a "chronic nuisance business" is one that has received notices for "nuisance behavior" on three (3) or more separate days within a twelve (12) month period." Phila. Code § 9-4401(1). Am. Compl. ¶ 106. "Nuisance behavior" includes activities that disrupt the community's health, safety, or welfare and consists of eighteen possible offenses. Am. Compl. ¶ 107. These range from obviously illegal conduct, such as drug dealing and prostitution, to trivial offenses completely outside the owners' control, such as littering, or a patron parking on the sidewalk.  Am. Compl. ¶ 108. It also includes vague "catchall provisions" that incorporate unspecified other potential offenses, including, but not limited to:

*     *     *     *     *

(o) Conduct that violates the provisions of the Pennsylvania Liquor Code. . .pertaining to unlawful acts relative to liquor and licenses (47 P.S. § 4-493);

*     *     *     *     *

(q)  Repeated or continuing violations of any other City ordinance and/or regulations;
(r)  Any other activity that constitutes a public nuisance under The Philadelphia Code.
Phila. Code § 9-4401(3). Am. Compl. ¶ 109.

The PPD may issue a violation notice to a business owner when nuisance behavior or serious violent behavior has taken place inside the business or ***on the sidewalk or street, abutting***

8

*the business* during business hours. Phila. Code § 9-4402(1)(emphasis added); Philadelphia Police Department Directive 4.25. Am. Compl. ¶ 111. The Nuisance Ordinances offer no guidance on how nearby the alleged nuisance behavior must be to trigger its requirements. Am. Compl. ¶ 112. Indeed, read literally, the business itself could be the *victim* of a crime and then be subject to further punishment. Am. Compl. ¶ 113. Such a system is wildly unfair on its face, enacting punitive measures against law-abiding citizens instead of actual criminals. Am. Compl. ¶ 114. This inconsistency indicates that the true purpose of the Nuisance Ordinance is to target and shut down minority-owned businesses rather than deter criminal conduct. Am. Compl. ¶ 115.

### Enforcement of Ordinances and Statutes

#### PLCB Bureau of Licensing and BLCE

The PLCB Bureau of Licensing and the BLCE play significant roles in enforcing the Liquor Code. Am. Compl. ¶ 116. The BLCE prioritizes the enforcement of violations commonly associated with these establishments, allocating considerable resources to monitor compliance within the City and throughout the Commonwealth. Am. Compl. ¶ 117; Ex. A at p. 5. Public complaints are investigated by the BLCE. 47 P.S. § 4-471(b). Am. Compl. ¶ 118. If violations are found, the BLCE may issue a citation, which is adjudicated by an Administrative Law Judge (ALJ). 47 P.S. § 4-471(a). Am. Compl. ¶ 119.

#### PLCB Licensee Compliance Program

As mandated by Act 44 of 2017, which amended the Fiscal Code, the PLCB's Bureau of Licensing and the Licensee Compliance Program oversee establishments' adherence to requirements regarding seating, food, square footage, and other criteria. Am. Compl. ¶ 120. Upon receiving a complaint, a licensing analyst and law enforcement officer conduct an unannounced compliance inspection . Am. Compl. ¶ 121. If violations are found, they can impose an

9

***unappealable*** administrative suspension of the operating privileges. Am. Compl. ¶ 122. Repeated violations within a 12-month period result in escalating penalties, with a minimum license suspension of twenty days for a second offense and thirty days for a third. *Id.* Am. Compl. ¶ 124.

The PLCB's Bureau of Licensing has the authority to object to or deny license renewal based on a licensee's operational history, including prior citations, the reputations of owners and officers, compliance with statutory requirements, and incidents occurring on or near the premises that may impact public safety or welfare. Am. Compl. ¶ 125. Once an establishment is identified through the citation process or he PLCB Compliance Program, the PLCB may further evaluate the business during the biennial license renewal process and has the authority to deny renewal. Am. Compl. ¶ 126. If a license is revoked, the business is ineligible to obtain a new license for three years from the date of revocation. Am. Compl. ¶ 127.

Philadelphia County currently has more retail liquor licenses than the Liquor Code allows; therefore, if a plaintiff's liquor license is revoked or not renewed, the license ceases to exist. Am. Compl. ¶ 128. The only ways to obtain a liquor license are by transferring a license from an existing owner or by purchasing one from a current licensee or at auction. Am. Compl. ¶ 129. R-licenses can sell for up to $300,000, while E-licenses go for around $150,000. Am. Compl. ¶ 120. Given the high demand, the prices are likely to be even higher by the time they are eligible to obtain a new license (three years from the date it is revoked). Am. Compl. ¶ 131.

The PLCB may refuse to renew a license:

* * * * *

(4) due to the manner in which this or another licensed premises was operated while the licensee, its shareholders, directors, officers, association members, servants, agents or employes were involved with that license. When considering the manner in which this or another licensed premises was being operated, the board may consider activity that occurred on or about the licensed premises or in areas under the licensee's control if the activity occurred when the premises was open for operation and if there was a relationship between the activity outside the premises and the manner in which the

10

licensed premises was operated. The board may take into consideration whether any substantial steps were taken to address the activity occurring on or about the premises.

47 P.S. § 4-470(a.1). Am. Compl. ¶ 132. The ambiguous and overly broad interpretation of the term "activity" considered during the renewal process could unjustly punish businesses through the non-renewal of liquor licenses in circumstances where they were actually the *victims* of a crime. Am. Compl. ¶ 133. This, combined with the fact that the PLCB may also consider police incident reports or citations in its decision-making process, discourages businesses from calling the police for assistance or reporting crimes occurring on or near their premises. Am. Compl. ¶ 134.

**The Ordinances of The Philadelphia Code are Unconstitutionally Vague and Overbroad**

The Curfew Ordinances regulate the operations of "Commercial Establishments." Am. Compl. ¶ 136. The Curfew Ordinances of the Philadelphia Code define "Commercial Establishment" as "[a]n establishment involved in the buying and selling of goods where consumers primarily purchase goods intended for consumption or use off premises, including a Food Establishment as defined in Code Section 6-102 . . . ." Phila Code §§ 9-630(1), 9-641(1), 9-642(1), 9-643(1). Am. Compl. ¶ 137. However, the Curfew Ordinances do not define critical terms such as "primarily" or "goods," which are essential for the application and enforcement of the regulations. Am. Compl. ¶ 138. This lack of clarity leaves the ordinances susceptible to arbitrary and discriminatory enforcement. Am. Compl. ¶ 139. The Curfew Ordinances do not provide any mechanism or clear standard for the Philadelphia Police to determine whether a business qualifies as a "Commercial Establishment" under the ordinances. Am. Compl. ¶ 140. The Curfew Ordinances' definition of "Commercial Establishment" is so vague that persons of ordinary intelligence must guess its meaning and application, leading to inconsistent enforcement. Am. Compl. ¶ 141. This vagueness allows for selective enforcement. Am. Compl. ¶ 142.

11

Upon information and belief, as with efforts to enforce the prior curfew ordinance, enforcement of the new Curfew Ordinance is once again selective and targeted toward minority-owned businesses. Am. Compl. ¶ 143. Section 9-4402(1) of the Nuisance Ordinances, which allows establishments to be issued notices of violation based on nuisance behavior or serious violent behavior that has taken place inside the business or on the sidewalk or street, abutting the business is unconstitutionally overbroad and vague. Phila. Code § 9-4402(1). Am. Compl. ¶ 144. The broad scope of this provision invites arbitrary and discriminatory enforcement as it encompasses a wide range of behaviors, including activities not related to the operation of the business itself. Am. Compl. ¶ 145. The Nuisance Ordinance also includes the extreme punitive measure of shutting down a business, even if the business did not contribute to the offending behavior. Am. Compl. ¶ 146.

The overly broad scope of the Nuisance Ordinance unlawfully infringes upon Plaintiffs' protected right to petition law enforcement for protection or to report criminal activity on or near their property without fear of reprisal or punishment. Am. Compl. ¶ 147. As a result, several Plaintiffs have expressed reluctance to contact law enforcement out of fear that doing so will generate police reports, which could later be used as grounds for denying their liquor licenses. Am. Compl. ¶ 148. This chilling effect on the fundamental right to petition the police underscores the unconstitutional nature of the Nuisance Code's vague and overly broad provisions. Am. Compl. ¶ 149.

Defendants intentionally discriminated against members of a minority group and their businesses based on race and/or national origin by deliberately crafting the Curfew and Nuisance Ordinances to produce discriminatory effects. Am. Compl. ¶ 150. The Curfew and Nuisance Ordinances were designed and have been enforced to disproportionately target specific groups and

their businesses, resulting in discriminatory effects that violate both the United States Constitution and the Pennsylvania Constitution. Am. Compl. ¶ 151. The vagueness and overbreadth of the Curfew and Nuisance Ordinances are further demonstrated by the record of enforcement actions taken by the Philadelphia Police Department, as detailed below. Am. Compl. ¶ 152. The inconsistent and arbitrary enforcement of these ordinances demonstrates their application in a manner that fails to provide adequate notice and leads to unequal treatment. Am. Compl. ¶ 153.

### Section 4-470 of the Liquor Code is Unconstitutionally Vague and Overbroad

As set forth above, Section 4-470 of the Liquor Code governs the renewal of liquor licenses and establishes the criteria that the Director of the Bureau Licensing and the PLCB may consider when granting or denying an application for a liquor license renewal. 47 P.S. § 4-470. Am. Compl. ¶ 155. The grounds for objecting to and refusing the renewal of a liquor license include violations of any laws of the Commonwealth or any regulations promulgated by the PLCB, as well as the existence of one or more adjudicated citations associated with the license sought to be renewed or any other license issued by the PLCB. 47 P.S. § 4-470(a.1). Am. Compl. ¶ 156. Additionally, the renewal process permits consideration of the vague and overly broad term "activity" occurring on or near the licensed premises or in areas under the licensee's control.[2] 47 P.S. § 4-470(a.1)(4). Am. Compl. ¶ 157. Section 4-470 of the Liquor Code fails to provide clear standards or adequate notice to licensees regarding the criteria for renewal decisions. Am. Compl. ¶ 158. Allowing consideration of vague and overly broad terms such as "activity" and basing decisions regarding renewals on the undefined "activity" invites arbitrary and discriminatory decision-making. Am. Compl. ¶ 159. The broad and undefined scope of "activity" also infringes on licensees'

---

[2] The Liquor Code does limit this to "activity" that took place while the premises were open for operation and bore a relationship to the manner in which the licensed premises was operated. *See* 47 P.S. ¶ 4-470(a.1).

fundamental right to petition law enforcement for assistance or to report a crime. Am. Compl. ¶ 160.

Several Plaintiffs have expressed reluctance to contact law enforcement out of fear that doing so will generate police reports of "activity," which may later be cited as grounds for denying their liquor licenses. Am. Compl. ¶ 161. This chilling effect on the fundamental right to petition the police underscores the unconstitutional nature of the Liquor Code's vague and overly broad provisions. Am. Compl. ¶ 162.

Furthermore, Defendants' actions have led to the suspension of operating privileges (effective immediately), causing significant financial harm, disrupting regular business operations, and jeopardizing license renewal. Am. Compl. ¶ 163. Defendants' actions have further threatened to permanently close established businesses arbitrarily and without adequate due process. Am. Compl. ¶ 164.

### The Philadelphia Code and Liquor Code Have Been Selectively Enforced

The Philadelphia Code and Liquor Code have been selectively enforced against certain minority groups, including Plaintiffs and their businesses, resulting in discriminatory treatment. Am. Compl. ¶ 165. As detailed herein, the Curfew and Nuisance Ordinances are impermissibly vague and overbroad in both their language and their application, enabling selective enforcement against Plaintiffs in violation of constitutional protections. Am. Compl. ¶ 166. Specifically, in addition to being unconstitutionally vague and overbroad, the Curfew Ordinances target specific geographic areas within the City of Philadelphia, leading to disparate treatment for Plaintiffs who are licensed to sell certain alcoholic beverages for consumption off-premises compared to other licensees across the City and the Commonwealth who are not subject to the same restrictions. Am. Compl. ¶ 167. The restrictions based on geography are arbitrary and bear no rational relationship to any legitimate state interest. Am. Compl. ¶ 168. Additionally, the establishment of the Task

14

Force and the implementation of its Report and Recommendations will likely lead to further targeted enforcement efforts that violate Plaintiffs' equal protection rights of the United States and Pennsylvania Constitutions. Am. Compl. ¶ 169. There is a clear path set for the laws to be applied in a discriminatory manner, disproportionately impacting Plaintiffs and other minority-owned businesses. Am. Compl. ¶ 170. The harm from this is compounded because the PLCB then uses these alleged violations as a pretext to avoid renewal of the liquor licenses for the impacted businesses. Am. Compl. ¶ 171.

In previous years, the PLCB would simply issue a renewal—or in exceedingly rare cases, a denial—of the license in question during each renewal period. Am. Compl. ¶ 172. In a complete change from the past practice, the PCLB has now issued dozens of "temporary renewal" letters refusing to renew many liquor licenses pending the results of a hearing. Am. Compl. ¶ 173. The enforcement practices of the Defendants reveal a consistent and discriminatory pattern of targeting Plaintiffs as detailed below. Am. Compl. ¶ 174.

<u>Yo Deli Inc.</u>

In some instances, the PLCB is taking action against Plaintiffs and their members based on alleged violations in the distant past. Am. Compl. ¶ 175. For instance, AALBA member Yo Deli Inc. recently received a temporary license renewal from PLCB, claiming it may have abused its license based on two provided citation numbers: 15-174 and 13-1726. Am. Compl. ¶ 175, Ex. B. However, as the first two digits in the citation numbers indicate the year the citations were issued, it is evident that the most recent of those citations occurred nearly *ten years* ago, with the other occurring over *eleven years ago.* Am. Compl. ¶ 176.

Yo Deli Inc. has renewed its license multiple times in the interim without issue, investing considerable time, effort, and money into the business year after year. Am. Compl. ¶ 177. PLCB

now arbitrarily threatens the existence of the business nearly a decade later, demostrating clear bias and an efforts to shut down minority-owned businesses like Yo Deli Inc. at any cost. Am. Compl. ¶ 178. In effect, the PLCB is taking the unfair position that any citation, regardless of how remote in time, can be used to justify shuting down a law-abiding business in the future. Am. Compl. ¶ 179.

Yo Deli Inc. has also been the target of unfair efforts to drum up new citations. Am. Compl. ¶ 180. In June 2024, immediately upon opening the store, white inspectors for the PLCB came in to inspect and measure the premises. Am. Compl. ¶ 181. While the staff prepared to open the store, the inspectors began yelling and accusing them of adding additional seating. Am. Compl. ¶ 182. It would have been impossible for additional seating to be added. Am. Compl. ¶ 183. After this hostile exchange, the inspector left. Am. Compl. ¶ 184. The inspector returned later, purporting to shut down Yo Deli Inc, not because there was insufficient seating, but because  there should have been a sign advising patrons that additional seating was available on the second floor. Am. Compl. ¶ 185. There is no express requirement in the law to post such a sign. Am. Compl. ¶ 186. Even if there was, remediating the issue would be trivial and could be accomplished immediately for virtually zero expense. Am. Compl. ¶ 187. Despite this, the inspector required Yo Deli Inc. to shut down for two weeks, causing significant financial harm, disruption of regular business, and a further threat to the renewal of its license. Am. Compl. ¶ 188. Based on the old violation and the trivial claim that it was missing a sign, PLCB now arbitrarily threatens the existence of the business by issuing only a temporary license, illustrating its clear bias and efforts to shut down minority-owned businesses like Yo Deli Inc. at any cost. Am. Compl. ¶ 189.

<u>7701 Ogontz Inc.</u>

16

The City of Philadelphia, using the Nuisance Business Ordinance, also actively seeks to disrupt and shut down members of Plaintiff's organization. Am. Compl. ¶ 190. For instance, 7701 Ogontz Inc. operates Riley Deli in Philadelphia. Am. Compl. ¶ 191. On or about February 28, 2024, they received a warning from the City accusing them of being a nuisance business. Am. Compl. ¶ 193, Ex. C. This allegation was based on the fact that members of the Police Department arrested two individuals in Riley Deli for allegedly selling drugs somewhere nearby the restaurant. Am. Compl. ¶ 193. During the arrest that followed, one of the individuals appeared to break several fingers. That individual was ultimately released at the scene. Am. Compl. ¶ 194. On information and belief, the allegations against both these individuals were later dismissed. Am. Compl. ¶ 195. However, the City has not withdrawn its citations against Riley Deli, warning that with further violations the City could "begin legal action to close your establishment." Am. Compl. ¶ 196. This has the perverse effect that Riley Deli is subject to punishment, even where, apparently, no underlying crime was committed. Am. Compl. ¶ 197. Officers at the scene asserted to the manager of Riley Deli that if there was another incident or if they received another ticket, the business would be shut down. Am. Compl. ¶ 198. As a result, Riley Deli's owners, managers, and employees are afraid to even contact the police or report potential criminal activity in the neighborhood out of concern that they will receive another nuisance violation, which could result in the closing of the establishment. Am. Compl. ¶ 199.

<u>Best Beer, Inc.</u>

On or about February 22, 2022, the BLCE issued a citation (No. 22-0189) to Best Beer, Inc., alleging that it did not meet the 300 square-foot requirement for an eating place license. Am. Compl. ¶ 200. As a result, Best Beer was shut down for two weeks, and a liquor license suspension placard was displayed on the storefront. On June 6, 2022, an administrative hearing was held, and

17

the citation was dismissed, finding that BLCE had failed to establish that Best Beer had inadequate square footage. Am. Compl. ¶ 201. Despite the citation being dismissed, Best Beer received a letter on October 17, 2024 from the PLCB in response to its application for renewal. This letter indicated that the PLCB was considering the previously dismissed citation as part of its determination on the renewal application. Am. Compl. ¶ 202, Ex. D. Best Beer incurred $1,750 in legal fees related to the citation and the administrative hearing. Am. Compl. ¶ 203.

To make matters worse, Best Beer shares common ownership with a similar establishment called Sky Beer Deli, Inc. ("Sky Beer"). Am. Compl. ¶ 204. Sky Beer has *never* been shut down due to an inspection by the BLCE or Police Department. Am. Compl. ¶ 205. Despite this, Sky Beer received only a temporary license renewal. On information and belief, Defendants are attempting to use the same *dismissed* allegations against Best Beer to shut down the business of a separate business.  Am. Compl. ¶ 206, Ex. D.

<u>Bu-Bu Deli</u>

Maya 2008 Investment Group LLC operates Bu-Bu Deli at 3153 N. 22nd Street in Philadelphia. Am. Compl. ¶ 207. On or about September 12, 2024, Bu-Bu Deli received two CVNs from the PPD for patrons drinking on the sidewalk in front of the establishment and creating a nuisance. Am. Compl. ¶ 208, Ex. F. These individuals were not encouraged to loiter anywhere near the business, nor could Bu-Bu Deli force them to leave a public sidewalk where they otherwise had a right to be. Am. Compl. ¶ 209. The business is also located near a bus stop, where residents *need* to gather in order to ride public transportation. Am. Compl. ¶ 210. The owners and managers of Bu-Bu Deli have no means to determine who is unlawfully loitering nearby, as opposed to waiting for a bus. Am. Compl. ¶ 211.

18

On or about September 14, 2024, Bu-Bu Deli received CVN 6456364-5 also for creating a nuisance and a separate Complaint or Incident Report was issued describing the incident as follows "Upon arrival at the business at the above location Police observed multiple individuals creating a nuisance by blocking the active pedestrian sidewalk and, when politely asked, failed to disperse from outside the store." Am. Compl. ¶ 212, Ex. F. To the extent these individuals did anything unlawful in the first instance, they received no punishment. Instead, only Bu-Bu Deli received a citation. Am. Compl. ¶ 213. These citations were accompanied by threats that further citations could result in the closure of this business. Am. Compl. ¶ 214.

<u>700 SE Inc.</u>

700 SE Inc. operates a takeout business at 700 Snyder. Am. Compl. ¶ 215. Like many members of the AALBA and AAB, the owners of 700 SE Inc. have limited English proficiency, but have nevertheless been able to establish a successful business that serves the community in South Philadelphia. Am. Compl. ¶ 216. 700 SE Inc. has nevertheless received two citations from the Police Department, based on conduct over which it has no control. Am. Compl. ¶ 217. For the first citation, the officer cited Section 10-604(2)(a), which prohibits the consumption of alcohol in public parks and similar spaces. Am. Compl. ¶ 218. To the extent anyone has loitered in front of the business, the owners or managers of 700 SE Inc. generally asked them to leave. Am. Compl. ¶ 219. However, much like the owners of 700 SE Inc., the patrons often have limited English skills as well, making any communication (much less a directive to leave) difficult. Am. Compl. ¶ 220. Regardless, the cited ordinance was inapplicable and, further, it was the individuals and not the business who committed the alleged violation. Am. Compl. ¶ 221. On information and belief, those accused of loitering received no punishment. Am. Compl. ¶ 222.

19

In a second instance, the officer allegedly observed empty beer containers in bushes nearby, citing the Nuisance Ordinance restriction on illegal consumption of alcohol. Am. Compl. ¶ 223. In fact, the Nuisance Ordinance also expressly identifies littering as a form of nuisance behavior. Am. Compl. ¶ 224. In effect, other people's attempts to litter are now a potential basis to shut down 700 SE Inc. business. Am. Compl. ¶ 225. Given the general condition of streets, and the common sight of empty alcohol containers, virtually any business in Philadelphia could be subject to citation for violating the Nuisance Ordinance. Am. Compl. ¶ 226. However, the selective enforcement has targeted minority-owned businesses instead. Am. Compl. ¶ 227. 700 SE Inc. is left in a precarious position, as even a trivial offense by one of its customers, or even a random person passing by the store, could serve as a basis for a third citation that could shut down the business. Am. Compl. ¶ 228.

<u>CDD 725, Inc.</u>

Upon information and belief, CDD 725, Inc. has been subjected to numerous unfounded and unnecessary inspections, which were allegedly conducted with the intent and effect of intimidating, harassing, and threatening Plaintiffs. Am. Compl. ¶ 229, Ex. G. Despite each unannounced inspection's Complaint or Incident Report stating that "no issues were noted," the assigned police officer continued to conduct repeated inspections without any new basis or violations observed. *Id.* Am. Compl. ¶ 230. On or about October 21, 2024, an officer from the Philadelphia Police Department arrived at CDD 725 for an unannounced inspection. During the issuance of the incident report, the officer requested that the manager on duty sign the notice, which once again confirmed that there were no violations. Am. Compl. ¶ 231. There is no printed space on the incident report form that requires, or even requests, that an owner or manager sign. Am. Compl. ¶ Am. Compl. ¶ 232. That line was added by hand by the officer. Am. Compl. ¶ 233.

20

When the manager on duty asked why he needed to sign, the officer immediately became hostile, raised his voice, and issued threats. The officer accused the manager of "giving him a hard time" and "breaking his stones." Am. Compl. ¶ 235. The officer then threatened to return every day for further inspections. Am. Compl. ¶ 236. The officer made good on this threat, having returned for further inspections on at least two separate occasions since then. Am. Compl. ¶ 237. Illustrating the concerted action between the City and the PLCB, the officer further threatened that he would "come back with the LCB and we'll see how that works out." Am. Compl. ¶ 238.

On a separate occasion, the officer advised the owner that stores like his are liable for crimes in the area. Am. Compl. ¶ 239. The owner of CDD 725 Inc. went to the local precinct to try and find more information about this conduct and why he was the subject of repeated inspections or requests that he sign these incident reports. Am. Compl. ¶ 240. Instead of answers, the owner received conflicting explanations about the number of inspections and the reasons he was presented with the citation. Am. Compl. ¶ 241.

<u>Other Impacted Businesses</u>

Even businesses that do not serve alcohol, but serve the community by offering flexible hours, are suffering as a result of these practices. Am. Compl. ¶ 242. For instance, several member organizations of AAB do not sell alcohol, but still suffer considerable harm from the curfew ordinances. Am. Compl. ¶ 243. Once such member operates a grocery store, known as the Quick Stop, on Kensington Avenue. Am. Compl. ¶ 244. Their business relies on having flexible hours to serve the community, which suffers from a lack of quality options for fresh food. Am. Compl. ¶ 245. In particular, shift workers and other working-class people depend on businesses that are open after 11 p.m. Am. Compl. ¶ 246. The Quick Stop is one of the only businesses that can cater to these needs, providing fresh meat, produce, and dairy products to this underserved community,

21

even at odd hours. Am. Compl. ¶ 247. Reducing the time members of AAB can operate has a significant impact on their revenue, which relies on their flexible hours. Am. Compl. ¶ 248.

On information and belief, other businesses not owned by minorities are not subject to the same level of enforcement. Am. Compl. ¶ 249. These are but a few examples of the discriminatory conduct faced by members of the Asian and Arab business owners in Philadelphia. Am. Compl. ¶ 250. Of AALBA's approximately 110 members, nearly 60 have already received an adverse action from the PLCB in the form of temporary renewals to their liquor licenses based on the selective and discriminatory enforcement of the law. Am. Compl. ¶ 251. For context, in prior renewal periods, on average *one* member of AALBA would receive an adverse action, in the form of an outright rejection of their renewal application. Am. Compl. ¶ 252.

Defendants' actions threaten to permanently close established businesses arbitrarily and without adequate due process and/or result in non-renewal of their liquor licenses. Am. Compl. ¶ 253. Defendants' conduct is part of a concerted pattern targeted at these minority-owned businesses, with the express purpose of shutting them down. Am. Compl. ¶ 254. On information and belief, even if a single citation or enforcement action is defeated by Plaintiffs or its members, Defendants will simply keep harassing them until they drum up a basis for further enforcement action, or the stress, expense, and uncertainty of operating under these conditions push the owners to abandon the business. Am. Compl. ¶ 255. Several members of AALBA and ABA have already expressed that they are considering closing or selling their businesses to escape the harassment and avoid the uncertainty that they will be shut down arbitrarily.  Am. Compl. ¶ 256.

These instances collectively demonstrate a sustained pattern of enforcement actions, unannounced inspections, and citation issuances disproportionately directed at Plaintiffs' businesses. Am. Compl. ¶ 257. On information and belief, other similarly situated businesses

22

possessing liquor licenses in Philadelphia, owned by non-minorities or controlled by larger corporate interests, are treated differently and are not subject to the same frequency of inspection or the repeated bad-faith interpretations of the applicable requirements. Am. Compl. ¶ 258. On information and belief, similarly situated businesses possessing liquor licenses and operating in neighborhoods in Philadelphia where the racial makeup of the owners is not overwhelmingly Asian or Arab, are not subject to the same stringent requirements or level of enforcement. Am. Compl. ¶ 259. On information and belief, similarly situated businesses possessing liquor licenses operating in neighborhoods in Philadelphia where the clientele is predominantly white are not subject to the same stringent requirements or level of enforcement. Am. Compl. ¶ 260. On information and belief, similarly situated white-owned businesses, takeouts, grocery stores, or restaurants possessing liquor licenses are not similarly designated as potential nuisances. Am. Compl. ¶ 261.

To make matters worse, this conduct makes the impacted businesses *less safe* by creating a barrier to contacting the police to report any crimes in the area. Am. Compl. ¶ 262. By reporting a crime, business owners risk receiving a citation, even if they are the victim of criminal activity. Am. Compl. ¶ 263. This same catch-22 can similarly impact their liquor licenses, given the coordination between the City of Philadelphia and the PLCB on this issue. Am. Compl. ¶ 264. As Plaintiffs and their members stand to lose their businesses and livelihoods from this pattern of unlawful conduct, they now seek recourse from this Court to enjoin the discriminatory enforcement and application of the overbroad, vague, and inconsistently enforced laws and ordinance, threatening to close businesses throughout the City. Am. Compl. ¶ 265. The Plaintiffs, as well as the members of AALBA and ABA, will face significant, irreparable damages if the discriminatory enforcement practices continue. Am. Compl. ¶ 266.

23

## I.    **INTRODUCTION**

The matter before the Court are the motions to dismiss (the "Motions") filed by Defendants, Cherelle Parker, In Her Official Capacity as Mayor of the City of Philadelphia, City of Philadelphia (collectively, "City Defendants") and David W. Sunday, Jr., In His Official Capacity as Attorney General of the Commonwealth of Pennsylvania, Pennsylvania State Police Bureau of Liquor Control Enforcement and Pennsylvania Liquor Control Board (collectively, "Commonwealth Defendants") under 12(b)(1) and 12(b)(6). Defendants seek to dismiss Plaintiffs' Amended Complaint through misstatements of legal standards, disregard for controlling precedent, and a failure to acknowledge the well-pleaded allegations set forth in the Amended Complaint. However, their arguments are without merit. Plaintiffs' Amended Complaint asserts viable claims that fully satisfy the applicable standards, and Defendants fail to provide any legitimate basis for dismissal. Their arguments neither demonstrate a deficiency in the pleadings nor justify dismissal under Rule 12(b)(1) or 12(b)(6).

Plaintiffs have sufficiently alleged standing for both individual and association Plaintiffs and have asserted viable constitutional claims that meet the legal standard to withstand dismissal. Plaintiffs have also demonstrated that both the City and Commonwealth Defendants are "persons" under 42 U.S.C. § 1983 and are neither immune nor exempt from liability. Plaintiffs have established viable claims for all twelve counts of the Amended Complaint, demonstrating serious and ongoing constitutional violations. These include violations of their First Amendment right to petition the police for assistance and procedural due process violations, which have resulted in the loss of their livelihood for two weeks at a time without notice or an opportunity to be heard. As set forth in detail herein, Plaintiffs have

pled sufficient facts to survive dismissal on all twelve counts. Given the well-pleaded allegations and the significant constitutional issues at stake, Defendants' Motions should be denied in their entirety.

## II.    **FACTUAL AND PROCEDURAL BACKGROUND**

On November 26, 2024, Plaintiffs filed the above-captioned action enjoining Defendants from continuing their unlawful and discriminatory treatment of Plaintiffs, including the selective enforcement of state and local laws, and prohibiting any further harassment, intimidation, or retaliation related to Plaintiffs' business operations and from denying or obstructing the renewal of Plaintiffs' liquor licenses or business permits based on discriminatory, unconstitutional, or unlawful criteria, including the improper application of Philadelphia's Curfew and Nuisance Ordinances. ECF No. 1. Plaintiffs filed an Amended Complaint on January 27, 2025, adding David W. Sunday, Jr., In His Official Capacity as Attorney General of the Commonwealth of Pennsylvania as a party and adding claims of violation of procedural due process,  claims based on discriminatory, unconstitutional, or unlawful criteria, including the improper application of under Section 4-470 of the Liquor Code, the PLCB Compliance Program and 72 P.S. § 1799.6-E(a)(1) and (b) of the Fiscal Code and declaratory judgment. ("Amended Complaint"). ECF No. 28. The City Defendants and Commonwealth Defendants have each filed a Motion to Dismiss Plaintiffs' Amended Complaint. ECF No. 34 and No. 36, respectively. Plaintiffs submit this omnibus response in opposition and memorandum of law in support of thereof, addressing both motions in full.

## III.    **LEGAL STANDARD**

3665691.2

The City Defendants and Commonwealth Defendants move to dismiss Plaintiffs' Amended Complaint under Federal Rules of Civil Procedure 12(b)1) and 12(b)(6). Under either standard the Motions should be denied.

## A. Federal Rule of Civil Procedure 12(b)(1)

### 1. Commonwealth Defendants Based on Eleventh Amendment

A court may dismiss a claim under Rule 12(b)(1) for lack of subject matter jurisdiction **only** when the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or ... is wholly insubstantial and frivolous." *Bell v. Hood,* 327 U.S. 678, 682 (1946)(emphasis added); s*ee also Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666 (1974) (claim must be "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy"). Ordinarily, a court must assume jurisdiction over a case before deciding legal issues on the merits. *Bell,* 327 U.S. at 682.

Here, the Commonwealth Defendants move to dismiss under Rule 12(b)(1), invoking Eleventh Amendment immunity. However, Plaintiffs need only demonstrate a plausible basis for jurisdiction, not prove their claims, to survive dismissal. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189 (1936). The Amended Complaint satisfies this standard because it seeks prospective relief, which falls within the well-established *Ex Parte Young* exception to Eleventh Amendment immunity (see below). As such, dismissal under 12(b)(1) is unwarranted.

### 2. City Defendants' Motion to Dismiss for Lack of Standing

The City Defendants characterize their Motion to Dismiss as brought under both 12(b)(1) and 12(b)(6). However, their brief only sets forth the legal standard for a motion to dismiss under 12(b)(1) while simultaneously asserting that their 12(b)(1) motion should be evaluated under the

standard for 12(b)(6). While Plaintiffs do not disagree that this is the appropriate approach, they note that the motion in substance relies solely on Rule 12(b)(1) while invoking the standard for 12(b)(6).

Under Federal Rule Civil Procedure 12(b)(1), a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim. "A motion to dismiss for want of standing is ... properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States,* 486 F.3d 806, 810 (3d Cir.2007). In evaluating a Rule 12(b)(1) motion, a court must first determine whether the movant presents a facial or factual attack. *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). City Defendants assert that their Rule 12(b)(1) motion is as a facial attack because they contend that the Amended Complaint lacks sufficient factual allegations to establish standing. In reviewing a facial challenge, which contests the sufficiency of the pleadings, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elec. Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000). In such a challenge, a court assumes the truth of the facts alleged by plaintiff, thereby functionally affording the plaintiff the same procedural protection he or she would receive under Rule 12(b)(6) consideration. *Int'l Longshoremen's Ass'n, S.S. Clerks Local 1624, AFL-CIO v. Virginia Int'l Terminals, Inc.*, 914 F.Supp. 1335, 1338 (E.D. Va. 1996)

### B.  Federal Rule of Civil Procedure 12(b)(6)

Commonwealth Defendants also bring the Motion to Dismiss for failure to state a claim under 12(b)(6), while the City Defendants' Motion to Dismiss under 12(b)(1) is effectively treated as a 12(b)(6) motion. Under Rule 12(b)(6), a district court must accept as true all well-pleaded

allegations of fact in the plaintiff's complaint and draw all reasonable inferences in the light most favorable to the plaintiff. *Phillips v. Cty. of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008).

Rule 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." FRCP 8(a)(2). To survive a motion to dismiss, a complaint need only include "enough facts to state a claim to relief that is plausible on its face," i.e., only enough "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 570 (2007). A motion to dismiss will be denied if the plaintiff presents "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]" of a cause of action. *Phillips, supra,* 515 F.3d at 234. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

When deciding a motion to dismiss under Rule 12(b)(6), "[t]he district court may not make findings of fact and, insofar as there is a factual dispute, the court may not resolve it." *Flora v. Cty. of Luzerne,* 776 F.3d 169, 175 (3d Cir. 2015) (citing *Animal Science Prods v. China Minmetals Corp.,* 654 F.3d 462, 469 n.9 (3d Cir. 2011) (district court is not permitted to make independent findings of fact when deciding a Rule 12(b)(6) motion)). The Amended Complaint easily meets the low threshold needed to put Defendants on notice of a plausible claim for relief.

IV.    **ARGUMENT**

   **A. Plaintiffs Have Standing to Pursue this Action**

First, both the City Defendants and the Commonwealth Defendants assert that Plaintiffs lack standing through similar, but equally flawed, theories. The City Defendants contend that the Individual Plaintiffs lack standing to bring claims because they have not

suffered sufficient harm from the City's conduct, largely because the City has not successfully closed any of the Plaintiffs' businesses pursuant to the nuisance ordinance. Both the City and Commonwealth Defendants also argue that AALBA and ABA lack organization standing to bring these claims. These claims fail as the Amended Complaint clearly articulates harm from the challenged ordinances and adverse actions by the City. Additionally, AALBA and ABA have standing to challenge the constitutionality and selective enforcement of the relevant ordinances.

    1.  <u>The Individual Member Plaintiffs Have Standing to Bring Causes of Action Against Defendants</u>

City Defendants' argument that the individual member Plaintiffs lack standing because they have not suffered a cognizable "injury in fact" does not have any basis in law or fact. The individual Plaintiffs have standing to challenge the Nuisance and Curfew Ordinances because they have suffered, or are at imminent risk of suffering, direct harm as a result of these laws.[3] To establish standing, a plaintiff must demonstrate (1) an injury-in-fact which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)(internal citations omitted). Alleging such an injury is "not Mount Everest. The contours of the ... requirement, while not precisely defined, are very generous, requiring only that claimant allege some specific, identifiable trifle of injury.'" *Long v. Se. Pennsylvania Transportation Auth.*, 903 F.3d 312, 321 (3d Cir. 2018). Only "one plaintiff needs

---

[3] In making this argument, the City cites to testimony from public hearings, including members of the Philadelphia Police Department. This information falls outside the operative complaint and is not appropriate for consideration on a Motion to Dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)

to meet the standing requirements for the lawsuit to proceed." *Richard Roe W.M. v. Devereux Found.*, 650 F. Supp. 3d 319, 327 n.6 (E.D. Pa. 2023).

Courts have consistently recognized standing in cases where business owners challenge government actions that restrict their ability to lawfully operate. *Clark v. City of Lakewood*, 259 F.3d 996, 1008 (9th Cir. 2001), *as amended* (Aug. 15, 2001)(recognizing business owner's standing to request an injunction stopping enforcement of an ordinance impacting the operation of his business). Moreover, because Plaintiffs have standing to seek injunctive relief, they also have standing to seek declaratory relief. *See Nashville, C. & St. L. Ry. v. Wallace,* 288 U.S. 249, 261, 264 (1933) (holding that where a request for injunctive relief is properly before the court, a suit for declaratory judgment is also appropriate for federal adjudication).

Further, because First Amendment rights are at stake, Plaintiffs not only have standing on their own behalf, but also on behalf of other members as the broadened concepts of standing in First Amendment cases would permit them to do so. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93(1988)(holding that "in the First Amendment context, litigants are permitted to challenge a statute. . .because . . . the statute's very existence may cause [them or] others not before the court to refrain from constitutionally protected speech or expression.") (internal quotation marks omitted). Moreover, as discussed herein, the individual member Plaintiffs clearly suffered and continue to suffer a current, concrete injury to their First Amendment right to petition. *See, id.* (finding "injury in fact" requirement met where "the law is aimed directly at plaintiffs, who . . . [would] have to take significant and costly compliance measures or risk criminal prosecution") (internal citations omitted); *Neiderhiser v. Berwick*, 840 F.2d 214, 216-17 (3d Cir. 1988) (holding defendant municipality's imminent threat of enforcement of ordinance sufficient to establish standing).

30

The Individual Plaintiffs meet all the required elements. First, the individual business owners face and have suffered and face the imminent threat of tangible harm, including the threatened closure of their businesses due to enforcement of the ordinances. There is no dispute that the Individual Plaintiffs are subject to the Nuisance Ordinance, which is in itself an injury. In fact, two Plaintiffs, 7701 Ogontz and 2008 Maya Investment Group, already received letters from the City accusing them of nuisance activity and warning that "the Philadelphia License and Inspection Department could begin legal action to close your establishment." Am. Compl. Ex. C and Ex. F. Similarly, in the context of the Curfew Ordinances, the Complaint specifically alleges at least one member of AAB that is subject to the Curfew Ordinance and notes that at least fifteen of Plaintiff AALBA's members are subject to the Curfew Ordinances. ECF No. 28, ¶ 88. Additionally, the reduced hours impact the revenue of impacted businesses. ECF No. 28, ¶ 248. The ordinances directly impact Plaintiffs' ability to operate and sustain their livelihood, creating a concrete and particularized injury. Second, the harm is directly caused by the enforcement of the challenged ordinances, which impose the penalties described in detail in the Plaintiffs' Amended Complaint. Third, a favorable ruling would redress these harms by preventing the enforcement of unconstitutional ordinances and restoring the individual member Plaintiffs' ability to operate their business without fear of arbitrary punishment.

### 2.   The Association Plaintiffs Have Standing to Bring Causes of Action Against Defendants

Despite the City and Commonwealth Defendants' challenge to the standing of Plaintiffs AALBA's and AAB's (the "Association Plaintiffs") to bring this action on behalf of their members, the well-established doctrine of associational standing firmly supports their right to do so. In *Warth v. Seldin*, 422 U.S. 490 (1975), the United States Supreme Court affirmed that an association may

assert the rights of its members when the challenged conduct adversely affects its members' collective interests. Moreover, the Court recognized that even in the absence of the individual members asserting an injury, an association may have standing solely as the representative of its members. *Warth, 422 U.S. at 511* (citing *National Motor Freight Assn. v. United States*, 372 U.S. 246 (1963)).

To establish standing, an association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action. *Id.* (citing *Sierra Club v. Morton*, 405 U.S. 727, 734-741 (1972)). As long as this can be established, and as long as the nature of the claim and the nature of the relief sought does not make the individual participation of each injured party indispensable to a proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction. *Id*. The Court elaborated on the type of relief that an association could properly pursue on behalf of its members:

> "(W)hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind."

*Id*. at 515. Consistent with these principles, the Supreme Court recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Importantly, the need for some level of participation of the individual members does not bar associational standing under this third criterion. Associational

standing remains intact even if some members must provide discovery or trial testimony, as long the lawsuit does not require participation from every injured member. *Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 283 (3d Cir. 2002).

The Association Plaintiffs clearly satisfy the prerequisites for associational standing. The Amended Complaint details how Defendants' conduct has directly deprived members of AALBA and AAB of their due process rights, equal protection, First Amendment freedoms, and other constitutional guarantees under both federal and state law. Protecting these rights is central to the Association Plaintiffs' purpose.[4] That involvement from AALBA or ABA members may be needed in the prosecution of this matter does not defeat those organizations standing to challenge the offending laws or the enforcement of them against their members. Accordingly, this argument is without merit.

### B. The City of Philadelphia is Subject to Municipal Liability

Next, the City Defendants argue that the complaint should be dismissed because "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." City Def. Br. at p. 22. The City of Philadelphia is subject to municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), for the enactment and enforcement of unconstitutional ordinances. Under *Monell*, a municipality may be held liable under Section 1983 when execution of a government's policy, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. 436 U.S. at 694. Here, the Nuisance and Curfew Ordinances, enacted by City Council and signed into law by the Mayor, constitute an official municipal policy that directly results in the deprivation

---

[4] To the extent Defendants' arguments are based on the request for monetary damages, this would not defeat AALBA or ABA's ability to seek injunctive relief or declaratory judgment fr the benefit of their members.

of Plaintiffs' constitutional rights. The Supreme Court has held that municipal liability under

Section 1983 can be imposed for a single decision by a municipal policymaker. *See Pembaur*

*v. City of Cincinnati*, 475 U.S. 469 (1986)(finding that "even a single decision by such a body

unquestionably constitutes an act of official government policy.")   Given that the City's

enactment and enforcement of these ordinances represent official legislative action, municipal

liability exists. As such, contrary to the City Defendants' assertions,   Plaintiffs have

sufficiently asserted that the City of Philadelphia, through its elected officials and

enforcement procedures, has implemented unconstitutional policies making it liable under

Section 1983.

### C.  The Commonwealth Defendants are Not Immune from Suit Pursuant to the Eleventh Amendment

Commonwealth Defendants challenge Plaintiffs' request for relief, asserting the

Commonwealth Defendants are immune from suit under the Eleventh Amendment of the

Constitution. However, this argument is misplaced for several reasons. The *Ex Parte Young*

doctrine is a well-established exception to Eleventh Amendment immunity that ensures state

officials cannot use immunity as a shield to evade accountability for unconstitutional conduct. *Ex*

*Parte Young*, 2019 U.S. 123 (1908); *MCI Telecommunication Corp. v. Bell Atlantic Pennsylvania*,

271 F.3d 491, 506 (3d Cir. 2001). Under this doctrine, plaintiffs may bring claims against state

officials, such as the Attorney General, in their official capacities to seek prospective relief and

prevent ongoing unconstitutional conduct. *Id.* The principle applies even when the state itself

would otherwise be immune from suit.

In determining whether the doctrine of *Ex Parte Young* avoids an Eleventh Amendment

bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges

an ongoing violation of federal law and seeks relief properly characterized as prospective. *Verizon*

34

*Md., Inc. v. Pub. Serv. Com'n of Md.*, 535 U.S. 635, 645 (2002). Here, there is no dispute that Plaintiff, who requests a permanent injunction and declaratory judgment, seeks prospective relief. *See id.* (finding declaratory relief could be sought under *Ex Parte Young* exception where it "adds nothing to the prayer for injunction").

Despite this well-settled legal principle, Defendants cite *Frein v. Pennsyvania State Police*, 47 F.4th 247 (3d Cir. 2022) to support their immunity argument, but their reliance on this case is misplaced. While *Frein* recognized that the Pennsylvania State Police is an "arm" of the Commonwealth and therefore immune from suits for monetary damages, the Third Circuit expressly acknowledged that injunctive relief remains available under *Ex Parte Young. Id*. at 257 (citing *Ex Parte Young*, 209 U.S. at 159)(holding Plaintiffs could "not sue the police for money damages" but " they may seek [ ] an injunction."). The same would hold true for each Defendant that is an alleged "arm" of the state. As such, Defendants' immunity argument mischaracterizes the case law and ignores the clear exception allowing injunctive and declaratory relief. Their reliance on *Frein* does not support their claim of immunity but rather underscores the very exception that permits Plaintiffs' claims to proceed.

Defendants also argue that the Attorney General cannot be sued because he is an "arm" of the state and he lacks a direct connection to the enforcement of the Liquor Code. However, this argument ignores his central role in the statutory framework governing the attorneys' duties and central role in overseeing and advising on the enforcement of the Liquor Code. The *Ex Parte Young* doctrine, "does not require the state official have a special connection to the unconstitutional act or conduct." *Hendrickson v. AFSCME Council 18*, 992 F. 3d 950, 965 (10th Cir. 2021).

Here, the Attorney General is actively engaged in the ongoing violation of federal law by enforcing and overseeing the unconstitutional provisions of the Pennsylvania Liquor Code. The

Attorney General is required by the Administrative Code to be the sole legal advisor to the Liquor Control Board, and the Board is not permitted to take actions on legal matters that would be contrary to the advice of the Attorney General. *Pennsylvania Liquor Control Bd. v. Kusic,* 7 Pa.Cmwlth. 274, 278 (1973). By continuing to enforce and uphold these unconstitutional provisions, the Attorney General is not merely advising but is actively complicit in ongoing violations of federal law. The Liquor Code, as applied, deprives Plaintiffs and other license holders of constitutional rights. The Attorney General's role in advising the PLCB on enforcement matters directly ties him to the ongoing unconstitutional violations. Further, the Commonwealth Attorneys Act mandates that the Pennsylvania State Police, including the Bureau of Liquor Control Enforcement, cooperate with the Attorney General and furnish any services as the Attorney General requests. 71 P.S. § 732-206.

As the Pennsylvania Supreme Court recently recognized: "[T]he Pennsylvania Constitution designates the Attorney General as the 'chief law officer' for the Commonwealth as a whole, accountable directly to the Pennsylvania voters, and independent of the Governor and the Commonwealth agencies. Pa. Const. art. IV, § 4.1." *Synthes USA HQ, Inc. v. Commonwealth*, 289 A.3d 846, 859 (Pa. 2023); *Commonwealth by & through Krasner v. Attorney Gen.*, 309 A.3d 265, 273–74 (Pa.Cmwlth. 2024).

Additionally, the Commonwealth Attorneys Act provides: "It shall be the duty of the Attorney General to uphold and defend the constitutionality of all statutes so as to prevent their suspension or abrogation in the absence of a controlling decision by a court of competent jurisdiction." 71 P.S. § 732-204. The Act further grants the Attorney General the authority to represent the Commonwealth and all Commonwealth agencies ... in ***any action brought by*** or against the Commonwealth or its agencies, and may intervene in any other action ...." 71 P.S. §

36

732-204(c) (emphasis added). This section unambiguously establishes the Attorney General's authority to act on behalf of the Commonwealth in *any* civil litigation, including matters concerning constitutional challenges to state statutes. As such, Defendants' claim that the Attorney General lacks a connection to the enforcement of the Liquor Code is legally and factually incorrect. His statutory authority over the PLCB and his obligation to uphold and defend Pennsylvania laws directly link him to the enforcement of the constitutional provisions at issue.[5]

### D.  The Commonwealth Defendants are "Persons" Subject to Liability under Section 1983

Just as Eleventh Amendment immunity does not bar Plaintiffs' claims for injunctive relief, Defendants also qualify as "persons" subject to liability under Section 1983 when sued for prospective relief. *Hafer v. Melo*, 502 U.S. 21, 24 (1991)(citing *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n. 10 (1989). Courts have consistently recognized that state parties may be held liable under Section 1983 for ongoing constitutional violations, affirming Plaintiffs' right to seek injunctive relief in this case. *See Machon v. Pennsylvania State Dept. of Public Welfare*, 847 F. Supp,2d 734, 744-745 (E.D. Pa. 2012)(citing *Va. Office for Prot. & Advocacy v. Stewart,* 563 U.S. 247, 255-56 (2011). Because Plaintiffs seek prospective relief to prevent ongoing constitutional harm, the Defendants' arguments to the contrary lack merit.

### E.  Plaintiffs Establish Viable Claims for Violation of Due Process Clause of the Fourteenth Amendment – Vague and Overbroad (Counts I and II)

The basic principle of due process holds that a statute is void for vagueness if its prohibitions are not clearly defined. *Dailey v. City of Philadelphia*, 417 F.Supp.3d 597, 616 (E.D. Pa. 2019), *aff'd*, 819 Fed.Appx. 71 (3d Cir. 2020)(citing *Grayned v. City of Rockford,* 408 U.S.

---

[5] Notably, despite claiming that Attorney General is not the proper officer of the Commonweal to name. If the Court finds this argument persuasive, Plaintiffs should be given leave to amend and identify a more appropriate officer.

104, 108 (1972)). Although the vagueness doctrine is rooted in criminal law, it has also been held to apply in civil contexts. *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1135 (3d Cir. 1992).

A law is unconstitutionally vague if it (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" **_or_** (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Adams Outdoor Advert. Ltd. P'ship by Adams Outdoor GP, LLC v. Pennsylvania Dep't of Transp.*, 930 F.3d 199, 205 (3d Cir. 2019)(citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000))(emphasis added). A vagueness challenge requires a case-by-case inquiry to determine whether the statute at issue is vague as applied to the affected party. *San Filippo*, 961 F.2d at 1136.

The fundamental rationale behind the vagueness doctrine is that due process requires a statute to provide sufficient notice of its scope. *Grayned,* 408 U.S. at 108. Laws must provide people of ordinary intelligence a reasonable opportunity to understand what conduct is prohibited. *Id.* Terms dependent on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" are particularly problematic. *Holder v. Humanitarian L. Project,* 561 U.S. 1, 20, (2010). Without transparent meanings, citizens may "steer far wider of the unlawful zone . . .than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (quoting *Bagget v. Bullitt*, 377 U.S. 360, 372 (1964)). When a statute includes an undefined term and "the statutes and case law fail to provide any standards of what is meant by the term," such circumstances "compel[ ] the conclusion that use of the term in the challenged scheme is unconstitutionally vague." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 274 (4th Cir. 2019).

A vague provision does not pass constitutional muster because some applications of it may be clear. As the Supreme Court explains "merely because there is some conduct that clearly falls

38

3665691.2

within the provision's grasp. For instance, we have deemed a law prohibiting grocers from charging an 'unjust or unreasonable rate' void for vagueness—even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable. We have similarly deemed void for vagueness a law prohibiting people on sidewalks from 'conduct[ing] themselves in a manner annoying to persons passing by'—even though spitting in someone's face would surely be annoying." *Johnson v. United States*, 576 U.S. 591, 602–03, 135 S. Ct. 2551, 2561, 192 L. Ed. 2d 569 (2015). Where a statute provides a confusing list of examples for what is prohibited, this make the provision more, not less, vague. *See id. (*explaining that the "phrase 'shades of red,' standing alone, does not generate confusion or unpredictability; but the phrase 'fire-engine red, light pink, maroon, *navy blue*, or colors that otherwise involve shades of red' assuredly does so.") (italics in original).

### 1.   The Nuisance and Curfew Ordinances are Unconstitutionally Vague

City Defendants contend that Counts I and II of Plaintiffs' Amended Complaint should be dismissed because the Curfew Ordinances are not vague, relying on case law where vague challenges were rejected when the conduct prohibited is clearly defined. This argument mischaracterizes both the ordinances/statutes at issue and the Supreme Court's precedent cited above.

The Nuisance Ordinance allows police to cite establishments for for an essentially unlimited and undefined range of conduct. The Nuisance Ordinance defines "Nuisance Behavior" as  "Behavior that *interferes with the health, safety or welfare of the community*, including, but not limited to, the following:"  *See* Phila. Code § 9-4401. Definitions. None of the terms within this definition are defined by the statute. While this general prohibition would be difficult to parse, the ensuing list of prohibited conduct renders it

39

incomprehensible, encompassing a list of examples that ranges from trivialities like loitering and litter on the sidewalk to prostitution and drug sales. *Id.*

These issues are compounded by the lack of guidance regarding proximity to the business. The Nuisance Ordinance applies to nuisance behavior occurring "on the sidewalk or street, abutting the business" but provides no clear standard for determining how close the alleged nuisance behavior must be to trigger enforcement. ECF No. 28, ¶¶ 101-115, 144-146. In other words, the Nuisance Ordinance punishes unspecified behavior, an unspecified distance away from an impacted business, by unspecified individuals (who are not the business owner). On its face, the Nuisance Ordinance is impermissibly vague, because a person of ordinary intelligence could not predict what behavior (and by whom) is actually regulated. At a minimum, the Nuisance Ordinance invites arbitrary enforcement . City officials have virtually unlimited discretion in determining when enforcement is warranted, further increasing the risk of arbitrary and inconsistent application.

The Curfew Ordinances are unconstitutionally vague because they fail to define critical terms, depriving individuals of clear notice of prohibited conduct. For example, the term "Commercial Establishment" is defined as "[a]n establishment involved in the buying and selling of goods where consumers primarily purchase goods intended for consumption or use off premises, including a Food Establishment as defined in Code Section 6-102 . . . ." Phila Code §§ 9-630(1), 9-641(1), 9-642(1), 9-643(1). However, the ordinances do not define key terms such as "primarily" or "goods" which are essential for the proper application and enforcement of the ordinances.

The term "primarily," as a "term of degree," is especially problematic. The Supreme Court has recognized that such terms are inherently challenging to enforce because they fail to provide adequate notice. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1047 (1991). Without clear standards, individuals cannot determine whether their businesses qualify as "Commercial

Establishments" under the ordinances. This lack of clarity denies individuals and businesses fair notice and invites arbitrary enforcement. Further, the ordinances lack a clear standard to guide the Police Department's determination of whether a business qualifies as a "Commercial Establishment" under the provisions. Consequently, City officials have broad discretion to interpret which establishments must comply, resulting in inconsistent application.

### 2. Section 4-470 of the Liquor Code is Unconstitutionally Vague

Section 4-470 of the Liquor Code is also unconstitutionally vague because it fails to define critical terms, depriving licensees of clear notice of prohibited conduct. Specifically, the provision states that the PLCB may consider "activity" that occurs on or off a licensee's premises when determining whether to renew a license. However, the term "activity" is not defined, granting the board unrestrained discretion to arbitrarily decide which conduct could lead to the non-renewal of a liquor license.

Commonwealth Defendants contend the law is not vague, arguing that Pennsylvania courts have "repeatedly" determined that the term activity in Section 4-470 refers to criminal activity. Cmwlth. Defs.' Br. at 29-30. This assertion misrepresents the case law. Defendants mischaracterize what the cited cases actually establish. For instance, Commonwealth Defendants cite *Gold Room, Inc. Pa. Liquor Control Bd.*, 245 A.3d 1143, 1153-54 (Pa. Cmwlth), for the proposition that the court equated "activity" with "criminal activity." However, the court in *Gold Room* did not make such a holding; rather, it merely referenced criminal activity while discussing the statute, without explicitly defining "activity" as synonymous with "criminal activity."

41

Similarly, the other cases cited by the Commonwealth Defendants do not hold that "activity" is limited to "illegal" or "criminal" conduct. Instead, they merely discuss criminal and illegal activity in the context of Section 4-470 violations. In fact, one case cited by Commonwealth Defendants directly contradicts their argument. In *Paey Associates, Inc. v. Pennsylvania Liquor Control Bd.*, 78 A.3d 1187 (Pa.Cmwlth. 2013), the court explicitly stated: "Although the . . . Court referenced 'illegal activity,' Section 470(a.1) of the Liquor Code makes clear that the PLCB merely consider 'activity' that occurred on or about the licensed premises in determining whether a licensee abused its privilege of holding a license. Even assuming, *arguendo,* that "illegal" activity is required to meet the standard . . . . " 78 A.3d at 1198. In other words, there has been no clear holding that "activity" is limited to criminal activity.

The Commonwealth Defendants seemingly argue that by raising concern about calling the police will generate reports of "activity" that will be used to deny a liquor license renewal undermines a claim of vagueness. This argument misses the point. It is precisely the lack of clarity on what "activity" will be used against them that creates the chilling effect that restricts a willingness to call the police. There is no exception for reporting a crime, no guidance distinguishing between types of unlawful activity, and no limitations on the Commonwealth Defendants' discretion (even assuming that the provision only encompasses illegal conduct). As with the Nuisance Ordinance, no distinction is drawn between littering and genuine crimes. The absence of a clear definition leaves Plaintiffs and other licensees without adequate notice and enables arbitrary enforcement, making Section 4-470 unconstitutionally vague.

F.  **Plaintiffs Have Established Viable Claims Under the First Amendment for Overbreadth and Violation of the Right to Petition (Counts, III, IV, V and VI)**

42

The First Amendment right to petition is "one of the most precious of the liberties safeguarded by the Bill of Rights." *BE&K Const. Co. v. NLRB*, 536 U.S. 516, 524 (2002)(internal citations omitted). It is also well established that reporting a crime is a form of protected First Amendment activity. *See e.g. Meyer v. Bd. of Cnty. Comm'rs of Harper Cnty.*, 482 F.3d 1232, 1243 (10th Cir. 2007) (reporting a crime to police officers "constitutes an exercise of the First Amendment right to petition the government for the redress of grievances."); *Ibarra v. City of Chicago*, 816 F. Supp. 2d 541, 550 (S.D. Ind. 2011) ("When a crime victim reports that crime to a police officer ... he is engaging in constitutionally protected activity"); see also *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (holding that the "plaintiffs [had] alleged an actual and well-founded fear that [a] law [would] be enforced against them" and that harm could "be realized even without an actual prosecution"); *White v. Lee*, 227 F.3d 1214, 1229 (9th Cir. 2000)(holding that the plaintiff was chilled from engaging in First Amendment activities when the state actors' actions "would have chilled or silenced a person of ordinary firmness from engaging in future First Amendment activities").

Courts have recognized that ordinances penalizing individuals or property owners for calls to the police have a chilling effect on the constitutional right to seek redress from the government. As a result, such laws have been found to be overbroad and facially invalid under the First Amendment. *See Bd. of Trustees of Vill. of Groton v. Pirro*, 152 A.D.3d 149, 150, 58 N.Y.S.3d 614 (N.Y. App. Div. 2017). For instance, in the *Pirro* matter, a nuisance ordinance was found unconstitutional because of the chilling effect it had on the right to call the police. Of particular concern, much like the Nuisance Ordinance and the Liquor Code provision at issue here, the ordinance in *Pirro* failed to distinguish between crimes committed *by* tenants of certain properties from crimes committed *against* them. *Id.*

43

The strict scrutiny standard applies to Plaintiffs' First Amendment claims, requiring the government to demonstrate that any restrictions are narrowly tailored to serve a compelling state interest. *See Am. Civil Liberties Union v. N.J. Election Law Enforcement Comm'n*, 509 F. Supp. 1123, 1128-29 (D.N.J. 1981)(providing that laws that infringe on the right to petition "must be based on a compelling governmental interest" and take the "least restrictive means to further such an interest"). This level of scrutiny is necessary even when the deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable consequence of the government's conduct. *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449 at 461 (1958). Neither the Nuisance Ordinance nor Section 4-470 of the Liquor Code can withstand this level of judicial scrutiny.[6]

The City and Commonwealth Defendants challenge Plaintiffs' claims under the First Amendment, arguing that the  Nuisance Ordinance and the Liquor Code do not infringe upon Plaintiffs' right to petition. However, these provisions, both individually and collectively, impose unconstitutional restrictions that deter Plaintiffs from exercising their right to seek redress from the government. The City's Nuisance Ordinance and the Liquor Code, particularly when viewed in tandem, create a restrictive regulatory framework that threatens to punish businesses for reporting conduct beyond their control, is not narrowly tailored to the government's interest, and

---

[6] The Commonwealth Defendants suggest that intermediate scrutiny would apply, claiming that the provisions of Liquor Code "(a) the law furthers an important or substantial government interest, (b) if the governmental interest is unrelated to the suppression of free expression, and (c) if the incidental restriction on alleged First Amendment freedoms is no great than is essential to the furtherance of that interest." Commonwealth Br. at p. 30 *citing Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994) (citing *United States v. O'Brien*, 391 U.S. 367 (1968)). However, the Nuisance Ordinance and Section 4-470 fail even under this standard, as the provisions are far more broad than necessary to further any legitimate government interest (for instance, by providing an exception when the business itself is the victim).

chills their ability to report unlawful conduct (even as the victim) without fear of punishment. The enforcement of the Nuisance Ordinance and Section 4-470 have the same chilling effect by discouraging business owners from calling the police for fear of adverse consequences.[7]

### G. The Licensee Compliance Program and the Fiscal Code Violate Plaintiffs' Right to Procedural Due Process (Counts VII and Counts VIII)

Defendants challenge Plaintiffs' due process claims but fail to address the specific laws and conduct at issue. Instead, they rely on generalized arguments regarding "temporary renewal letters," disregarding the actual basis for Plaintiffs' claims. Counts VII and VII of Plaintiffs' Amended Complaint challenge Defendants' actions under the Licensee Compliance Program and Section 1799.6-E(a)(1) of the Fiscal Code, which empower Defendants to suspend or effectively revoke liquor licenses without prior notice or warning *and without providing any procedures to challenge or contest these actions*. ECF No. 28 ¶¶ 68, 69, 120-124, 308-320. Defendants' enforcement of these provisions has resulted in businesses being shut down for weeks at a time, depriving Plaintiffs of their ability to operate and sustain their livelihood—a clear violation of due process. The failure to provide notice or an opportunity to be heard before imposing such drastic penalties is fundamentally unconstitutional. *See Mathews v. Eldridge*, 424 U.S. 319, 332-33 (1976)(holding that, at a minimum, due process requires notice and an opportunity for a hearing before a state actor deprives a person of property interest.)

Plaintiffs clearly have a constitutionally protected interest in maintaining their liquor licenses, which are essential to the operation of their businesses and their ability to sustain their

---

[7] City Defendants' argument that "Plaintiffs do not allege that they have contacted the PPD for assistance with nuisance behavior and then received a citation" entirely misses the point. *See* City Defs.' Br. at 32. The very basis of Plaintiffs' claim is that they are *afraid* to call the police because of the risk of enforcement of the Nuisance Ordinance and the Liquor Code. The fact that Plaintiffs are reluctant to contact police is proof of the harm suffered.

livelihood. Defendants attempt to sidestep the issue by arguing that Pennsylvania law classifies a liquor license as a "privilege" rather than a "right." However, this argument is legally irrelevant. A state's characterization of an interest as a "privilege" does not determine whether the interest is protected under the Fourteenth Amendment; rather, federal constitutional law controls. *Board of Regents v. Roth*, 408 U.S. 564, 571-72 (1972). Therefore, the fact that Pennsylvania characterizes a liquor license as a "privilege" that designation is not dispositive of whether it constitutes property for due process purposes. In *Reed v. Village of Shorewood*, 704 F.2d 943 (7th Cir. 1983), the court rejected the argument that the state liquor code declaring that a liquor license "shall be purely a personal privilege . . . and shall not constitute property" precluded the license from being property under the due process clause. 704 F.2d at 948. Further, the Supreme Court has made it clear that once a license is issued and becomes integral to a person's livelihood, it cannot be revoked or suspended without due process of law. *Bell v. Burson*, 402 U.S. 535, 539 (1971).

Despite these well-established constitutional principles, the laws at issue provide no procedural protections. Defendants' The Licensee Compliance Program and Section 1799.6-E of the Fiscal Code do not provide any mechanism for a liquor license holder to challenge a unilateral decision to suspend a liquor license. In fact, the section goes even further by explicitly barring a hearing or appeals: "Section 464 of the Liquor Code [relating to right to a hearing and appeals] and 42 Pa.C.S. § 933(a)(1)(v) (relating to appeals from government agencies) ***shall not apply to an administrative suspension under subsection (a)(1)***." 72 P.S. § 1799.6E(b)(emphasis added). All the facts stated herein form the basis for Plaintiffs' claim that the Commonwealth Defendants violated the procedural due process rights of Plaintiffs afforded by the Fourteenth amendment. Plaintiffs have properly alleged that the statutory provisions at issue permit the suspension of liquor licenses without notice, an opportunity to be heard or any right to appeal. Defendants fail to

46

address these provisions, effectively conceding that they have no valid defense. Given these uncontested violations of due process, Plaintiffs are likely to succeed on their claims.

### H. Plaintiffs Establish Viable Claims under the Equal Protection Clause Based on Selective Enforcement of the State and Local Laws (Counts IX and X)

To establish selective enforcement, Plaintiffs must show that (1) they were treated differently from other similarly situated entities, and (2) that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor or to prevent the exercise of a fundamental right. *Hill v. City of Scranton,* 411 F.3d 118, 125 (3d Cir.2005) (citing *Holder v. City of Allentown,* 987 F.2d 188, 197 (3d Cir.1993)). Plaintiffs must not only show "unequal application to those who are entitled to be treated alike," but also that there is "an element of intentional or purposeful discrimination" present. *Snowden v. Hughes,* 321 U.S. 1, 8 (1944); *see also Jewish Home of E. Pa. v. Ctrs. for Medicare and Medicaid Servs.,* 693 F.3d 359, 363 (3d Cir.2012) ("[T]o maintain an equal protection claim of this sort, [plaintiff] must provide evidence of discriminatory purpose, not mere unequal treatment or adverse effect.")

Here, the City's own admissions establish both prongs of selective enforcement. The City has acknowledged that it enacted the Nuisance Ordinance to target "certain business models" and the Curfew Ordinances to target "geographical areas and business models." *See* Def.s Opp. Br. p. 27-28. In effect, Defendants admit that they are targeting Plaintiffs.

First, the City's enactment of and enforcement of the Nuisance and Curfew Ordinances disproportionately impact "certain businesses models," particularly Asian and Arab owned R and E licensed establishments. The Supreme Court has long recognized that law applied in a discriminatory manner, even if facially neutral, can violate the Equal Protection Clause. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). The City here has enacted and enforced these ordinances in a

47

way that disproportionately impacts certain businesses and neighborhoods, effectively creating two separate legal standards—one for Plaintiffs and another for other liquor license holders. Upon information and belief, other similarly situated businesses, *i.e.* other R and E license holders, are not experiencing the same level of enforcement. Discovery is ongoing and necessary to further explore the scope and pattern of the City's selective enforcement.

Second, drawing all inferences in favor of Plaintiffs, the City's admission that the ordinances were enacted to target "certain business models" (i.e., the Asian and Arab-owned licensees) provides direct evidence of discriminatory intent. Unlike enforcement measures aimed at all businesses equally, the City has explicitly singled out "certain business models" in certain geographical locations. This targeted approach disproportionately burdens Asian and Arab-owned establishments, creating a pattern of selective enforcement based on impermissible considerations.

Additionally, both the City and Commonwealth Defendants' enforcement of the Nuisance Ordinance and the Liquor Code demonstrates selective enforcement that targets Plaintiffs while allowing other similarly situated businesses to operate without the same scrutiny. 165-266. As set forth in great detail in the Amended Complaint, the City and Commonwealth Defendants have disproportionately enforced the laws against Plaintiffs' establishments while similarly situated businesses have not been subjected to the same level of scrutiny. ECF No. 28 ¶¶ 165-266. Discovery is ongoing and necessary to fully explore the scope and pattern of the City and Commonwealth Defendants' selective enforcement practices. However, at this stage, Plaintiffs have sufficiently alleged facts supporting their claim that the Nuisance Ordinance and the Liquor Code are being unequally and discriminatorily enforced against them, and as such, dismissal is not warranted.

**I.  The Coordinated Actions of the City and Commonwealth Defendants Directly Resulted in Constitutional Violations by Defendants, Supporting Plaintiffs' Claims for Conspiracy (Count XI)**

Plaintiffs have sufficiently pled facts supporting their conspiracy claims under Section 1983 in their Amended Complaint. To state a Section 1983 conspiracy claim, a plaintiff must establish: (1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Gale v. Storti*, 608 F.Supp.2d 629, 635 (E.D. Pa. 2009)(citations omitted). At the motion to dismiss stage, a plaintiff "must assert facts from which a conspiratorial agreement can be inferred." *Mikhail v. Kahn*, 991 F. Supp. 2d 596, 645 (E.D. Pa. 2014), *aff'd*, 572 F. App'x 68 (3d Cir. 2014).  Plaintiffs have exceeded this threshold by alleging specific facts demonstrating a coordinated effort between the City and Commonwealth Defendants to target their business through legislative and regulatory measures. .

A conspiracy claim under Section 1983 requires a plaintiff to show "an agreement, understanding, or 'meeting of the minds' to violate their rights." *Gale*, 608 F.Supp.2d at 635. Plaintiffs have sufficiently alleged an agreement or meeting of the minds between Defendants. The City and Commonwealth Defendants' collaboration and enforcement of the recommendations of the Stop-And-Go Legislative Task Force ("Task Force') provide clear evidence of concerted action aimed at targeting Plaintiffs' businesses. As detailed in the Amended Complaint, the Task Force was established in 2023 to review and recommend regulatory measures to target establishments like those owned by the Plaintiffs. ECF No. 28, ¶¶ 73-79. In October 2024, the Task Force issued its Report and Recommendations advising the General Assembly on legislative remedies to regulate "stop-and-gos." The Acknowledgments section of the Report and Recommendations credits the Pennsylvania Liquor Control Board and the Pennsylvania State Police Bureau of Liquor

Control Enforcement and the City of Philadelphia for their collaboration and contributions. ECF No. 28, Ex. A, p. 1.

The Task Force includes representatives from both City and Commonwealth Defendants, and its recommendations further prove the existence of a coordinated effort, included streamlining the citation processes, strengthening the Licensee Compliance Program, increasing penalties and fines, and recruiting more BLCE agents. ECF No. 28, Ex. A, p. 10-12. The Report and Recommendations explicitly state the objective of the Task Force:

> Stop-and-gos are rarely able to be shut down despite enforcement efforts centered on licensee noncompliance . . .Section 218 of Act 49 of 2023 established the Stop-and-Go Legislative Task Force to examine these issues and recommend solutions. The Task Force reviewed and analyzed the laws pertaining to and issues involving stop-and-go establishments in the City of Philadelphia . . . and, accompanied by the extensive work of the task force workgroup, provided for the recommendations for regulating stop-and-gos.

ECF No. 28, Ex. A, p. 2.

The very creation and stated objective of the Task Force—to "shut down" these establishments—demonstrates a deliberate and coordinated effort between the City and Commonwealth Defendants' to target, regulate, and ultimately eliminate Plaintiffs' businesses by revoking liquor licenses and imposing onerous compliance measures. Further confirming the coordinated scheme, during a Task Force hearing a representative of the Pennsylvania State Police testified that the BLCE works closely with the Philadelphia Police Department, other Philadelphia agencies and the PLCB to address these issues with these establishments. ECF No. 28, Ex. A, at 19. This joint enforcement strategy constitutes an agreement sufficient to satisfy the first element of a Section 1983 conspiracy claim.

Plaintiffs have also sufficiently alleged that this conspiracy as resulted in, and continues to result in, the deprivation of their constitutional rights, as required by the second element of a

Section 1983 conspiracy claim. Plaintiffs have already set forth multiple constitutional violations in their Amended Complaint, as detailed herein. The enforcement actions resulting from the Task Force's recommendations were intentionally designed to, and in fact do, deprive Plaintiffs of their constitutional rights. Given these well-pleaded facts, Plaintiffs have adequately satisfied the second element of a section 1983 conspiracy claim.

As Plaintiffs have pled sufficient facts to establish both the existence of a conspiracy claim and a deprivation if their constitutional rights, Plaintiffs' cause of action of conspiracy under Section 1983 should not be dismissed.

### J.  Declaratory Judgment (Count XII)

Plaintiffs' declaratory judgment claim under Section 1983 survives dismissal because it seeks relief to remedy serious ongoing constitutional violations by the City and Commonwealth Defendants' enforcement of unconstitutional laws. The Declaratory Judgement Act allows courts to issue a declaratory judgment in "a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201(a). Here, Plaintiffs seek a declaration that the City's and Commonwealth's laws, as detailed in the Amended Complaint, are unconstitutional and void. These laws, both individually and collectively, violate Plaintiffs' constitutional rights, including due process, equal protection, and First Amendment right to petition. Additionally, Section 1799.6-E(a) and (b) of the Fiscal Code and the Licensee Compliance Program violate Plaintiffs' rights to procedural due process.

Defendants' arguments for dismissal are without merit. The City Defendants' standing challenge is baseless, as Plaintiffs have already established standing above. Likewise, City and Commonwealth Defendants' assertions that Plaintiffs fail to state a claim for declaratory

51

relief ignore the well-pleased allegations and legal arguments already set forth in this brief.

Plaintiffs have met the necessary standard to proceed with their declaratory judgment claim.

V.    <u>**CONCLUSION**</u>

For all the reasons set forth herein, Plaintiffs respectfully request this Court deny the City and Commonwealth Defendants' Motions to Dismiss in their entirety.  Should the court be inclined to grant any of the relief requested herein, Plaintiffs respectfully request the right to amend to address any remaining deficiencies

Respectfully submitted,

**KANG HAGGERTY LLC**

By: <u>*/s/ Kyle Garabedian*</u>
        Edward T. Kang
        Kyle Garabedian
        Kelly Lavelle
        123 S. Broad Street, Suite 1950
        Philadelphia, PA 19109
        P: (215) 525-5850
        F: (215) 525-5860
        ekang@kanghaggerty.com
        kgarabedian@kanghaggerty.com
        klavelle@kanghaggerty.com
        *Attorneys for Plaintiffs*

Dated:  February 24, 2025

52